

# IN THE UNITED STATES DISTRICT COURT FOR THE FILED
## NORTHERN DISTRICT OF OKLAHOMA

SEP 3 2013

Phil Lombardi, Clerk
U.S. DISTRICT COURT

*l* THE WILLIAMS COMPANIES, INC., a
Delaware corporation; and

*2* TRANSCONTINENTAL GAS PIPE LINE
COMPANY, LLC, a Delaware limited
liability company

                          Plaintiff,

v.

*3* IRONSHORE INSURANCE LTD., a foreign
corporation

                        Defendant.

Case No. **13-CV-571 CVE - TLW**

Removed from the District Court of
Tulsa County, State of Oklahoma,
Case No. CJ-2013-03629

## NOTICE OF REMOVAL PURSUANT TO 28 U.S.C. §§ 1332, 1441, 1446

Pursuant to 28 U.S.C. §§ 1332, 1441, 1446, Defendant Ironshore Insurance Ltd., (Ironshore) hereby removes this action from the District Court of Tulsa County, Oklahoma, to the United States District Court for the Northern District of Oklahoma, and alleges and shows this Court as follows:

### I. JURISDICTION

1.    Plaintiffs, The Williams Companies, Inc. ("Williams") and Transcontinental Gas Pipe Line Company LLC ("Transco"), filed this lawsuit on August 5, 2013 in the District Court of Tulsa County, State of Oklahoma, Case No. CJ-2013-03629. *See* Petition (Ex. 1). Plaintiffs allege breach of contract and seek a declaratory judgment that Ironshore is obligated to pay insurance policy benefits for alleged damages arising out of an incident at Williams' Eminence Facility in Covington County, Mississippi on December 26, 2010. *See* Petition (Ex. 1).

2.      Plaintiff Williams is an energy company organized under the laws of the State of Delaware with its principal place of business located in Tulsa, Oklahoma. *See* Petition at ¶ 1 (Ex. 1).

3.      Plaintiff Transco is a limited liability company organized under the laws of the State of Delaware. *See* Petition at ¶ 2 (Ex. 1).

4.      Ironshore is a foreign corporation organized and existing under the laws of Bermuda, with its corporate headquarters and principal place of business in Hamilton, Bermuda.

5.      Diversity of citizenship, therefore, exists between the parties. That diversity existed at the time this lawsuit was commenced as required pursuant to 28 U.S.C. 1332(a)(2).

6.      Plaintiffs seek damages in excess of $3,250,000. *See* Petition at ¶14 (Ex. 1). Accordingly, the amount in controversy exceeds $75,000 in this matter, exclusive of interest and costs, as required pursuant to 28 U.S.C. § 1332(a). As such, this court has original jurisdiction of this matter based on diversity of citizenship and amount in controversy pursuant to 28 U.S.C. 1332.

## II. PROCEDURAL REQUIREMENTS FOR REMOVAL

7.      This lawsuit was filed on August 5, 2013. Defendant, denying the efficacy of Plaintiffs' method, was allegedly served with process through purported statutory agents for service of process on August 13, 2013. Removal of this action is timely under 28 U.S.C. § 1446(b), as this Notice of Removal is filed within thirty (30) days after August 13, 2013, the earliest date of receipt by Defendant through service or otherwise, of a copy of the initial pleadings setting forth the claim for relief upon which such action or proceeding is based so as to be ascertainable that the case is one which is or has become removable.

8.    Pursuant to 28 U.S.C. § 1446(a) and LCvR81.2, copies of all process, pleadings and orders filed in the District Court of Tulsa County, State of Oklahoma, in Case No. CJ-2013-03629, are attached.  *See* Ex. 2.  Also, pursuant to LCvR81.2, Ironshore advises this Court that there are no motions or matters pending before the state court that will require resolution by this Court.  A copy of the docket sheet from Tulsa County District Court is also attached pursuant to LCvR81.2.  *See* Docket Sheet (Ex. 3).  Further, Ironshore files herewith a Status Report on Removed Action on the form provided by the Clerk, as required pursuant to LCvR81.2.

9.    Ironshore is filing a copy of this Notice of Removal with the Clerk of Tulsa County, Oklahoma, the State Court in which the action was pending as required by 28 U.S.C. § 1446(d).  A copy of the Notice of Removal is also being served upon Plaintiff's counsel as required by 28 U.S.C. § 1446(d).

## NOTICE OF REMOVAL PURSUANT TO CHAPTER 2 OF THE FEDERAL ARBITRATION ACT AND 28 U.S.C. § 1331

10.    This Court also has original jurisdiction over this action pursuant to Chapter 2 of the Federal Arbitration Act ("FAA") and 28 U.S.C. § 1331.  Section 202 of the FAA states, in part:

> An arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention [the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention")].

11.    Section 203 provides that "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The District Courts of the United States . . . shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy."

3

12.     Section 205 governs the removal of cases from state courts and provides, in part, that:

> Where the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention, the defendant or the defendants may, at any time before the trial thereof, remove such action or proceeding to the district court of the United States for the district and division embracing the place where the action or proceeding is pending. The procedure for removal of causes otherwise provided by law shall apply, except that the ground for removal provided in this section need not appear on the face of the complaint but may be shown in the petition for removal.

13.     The Convention applies where four requirements are met: (1) there must be a written agreement; (2) it must provide for arbitration in the territory of a signatory of the convention; (3) the subject matter must be commercial; and (4) a party to the agreement is not an American citizen. *Riley v. Kingsley Underwriting Agencies, Ltd.*, 969 F.2d 953 (10th Cir. 1992).

14.     Defendants may remove this action to this Court pursuant to the provisions of U.S.C. § 205 because the subject matter of the action pending in State court relates to an arbitration agreement falling under the Convention.

15.     First, the Ironshore Insurance Policy at issue herein contains a written arbitration agreement. *See* Insurance Policy (Ex. 4.) That arbitration provision states as follows:

ARBITRATION AND CHOICE OF LAW CLAUSE

1. Any dispute, controversy or claim arising out of or relating to this Policy or the breach, termination or invalidity thereof shall be finally and fully determined in London, England under the provisions of the Arbitration Act 1996 ("Act") and/or any statutory modifications or amendments thereto, for the time being in force, by a Board composed of three arbitrators. Each arbitrator shall be an active Queens Counsel or retired English judge familiar with Insurance and with the Act. All matters relating to the existence of the agreement to arbitrate and the selection of arbitrators shall be determined

under the laws of England and Wales.  The arbitrator shall be selected for each controversy as follows:

Any party may, in the event of such a dispute, controversy or claim, notify the other party or parties to such dispute, controversy or claim of its desire to arbitrate the matter, and at the time of such notification the party desiring arbitration shall notify any other party or parties of the name of the arbitrator selected by it. The other party who has been so notified shall within thirty (30) calendar days thereafter select an arbitrator and notify the party desiring arbitration of the name of such second arbitrator. If the party notified of a desire for arbitration shall fail or refuse to nominate the second arbitrator within thirty (30) calendar days following the receipt of such notification, the party who first served notice of a desire to arbitrate will, within an additional period of thirty (30) calendar days, apply to a judge of the High Court of Justice of England and Wales for the appointment of a second arbitrator and in such a case the arbitrator appointed by such a judge shall be deemed to have been nominated by the party or parties who failed to select the second arbitrator. The two arbitrators, chosen as above provided, shall within thirty (30) calendar days after the appointment of the second arbitrator choose a third arbitrator, who shall be the chairman. In the event of the failure of the first two arbitrators to agree on a third arbitrator within said thirty (30) calendar day period, either of the parties may within a period of thirty (30) calendar days, thereafter, after notice to the other party or parties, apply to a judge of the High Court of Justice of England and Wales for the appointment of a third arbitrator, and in such case the person so appointed shall be deemed and shall act as the third arbitrator and chairman. Upon acceptance of the appointment by said third arbitrator, the Board of Arbitration for the controversy in question shall be deemed fixed.

2.  The board of Arbitration shall fix, by a notice in writing to the parties involved, a reasonable time and place for the hearing and may prescribe reasonable rules and regulations governing the course and conduct of the arbitration proceeding, including without limitation discovery by the parties.

3.  The board shall, within ninety (90) calendar days following the conclusion of the hearing, render its award as respects the matter or matters in controversy in writing and shall cause a copy thereof to be served on all the parties thereto, but the Board shall not set forth any reasons for its award. In case the Board fails to reach a unanimous decision, the decision of the majority of the members of the Board shall be deemed to be the decision of the Board, and the same shall be final and binding on the parties thereto. Such decision shall be a complete defense to any attempted appeal or litigation of such decision in the absence of serious irregularity under Section 68 of the Act. Without limiting the foregoing, the parties waive any right to appeal to, and/or seek

collateral review of the decision of the Board of Arbitration by, any court or other body to the fullest extent permitted by applicable law, including, without limitation, any right to make application to the court under Section 45 or to appeal under Section 69 of the Act.

Any order as to the costs of the arbitration shall be in the sole discretion of the Board, who may direct to whom and by whom and in what manner they shall be paid.

16.     Second, the United Kingdom of Great Britain where the arbitration is to take place is a signatory to the Convention.

17.     Third, the subject matter is commercial because it involves an insurance policy and is a dispute between an insurer and an insured.

18.     Fourth, one of the parties to the agreement is not an American citizen. Ironshore Insurance Ltd., a party to the insurance policy containing the arbitration agreement at issue, is not a citizen of the United States. It is a citizen of Bermuda, with its principal place of business in Bermuda. *See* Petition at ¶ 3 (Ex 1).

19.     Defendant Ironshore has complied with all local court rules concerning removal of the state court action as set forth in paragraphs 8 and 9 above.

Based on the foregoing, Ironshore hereby removes this action from the Oklahoma District Court in and for Tulsa County to the United States District Court for the Northern District of Oklahoma, pursuant to 28 U.S.C. § 1332, 1441 and 1446 and alternatively 9 U.S.C. § 205.

Respectfully submitted,

McAfee & Taft

By: _____

WILLIAM S. LEACH, OBA #14892
MICHAEL F. SMITH, OBA# 14815
1717 S. Boulder
Suite 900
Tulsa, Oklahoma 7119
(918) 587-0000 FAX (918) 599-9317

Attorneys for IRONSHORE INSURANCE LTD.

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of September, 2013, a true and correct copy of the foregoing document was mailed with proper postage thereon prepaid to:

James E. Green, Jr. & Melodie Freeman-Burney
CONNER & WINTERS, LLP
4000 One Williams Center
Tulsa, OK 74172-0148

Michael J. Gibbens & Susan E. Huntsman
Crowe & Dunlevy
500 Kennedy Bldg.
321 S Boston Ave.
Tulsa, OK  74103-3313

_____

7





**1022331510**

### IN THE DISTRICT COURT IN AND FOR TULSA COUNTY,
### STATE OF OKLAHOMA

**DISTRICT COURT**
# FILED

THE WILLIAMS COMPANIES, INC., a )
Delaware corporation; and )          AUG – 5 2013
TRANSCONTINENTAL GAS PIPE LINE )
COMPANY, LLC, a Delaware limited liability )   **SALLY HOWE SMITH, COURT CLERK**
Company, )                            **STATE OF OKLA. TULSA COUNTY**
 )
        Plaintiffs, )
 )
  vs. )        # CJ-2013-03629
 )        CASE NO: E. MARK BARCUS
IRONSHORE INSURANCE LTD., a foreign )   JUDGE: _____
corporation, )
 )
        Defendant. )

### PETITION

**COME NOW** the Plaintiffs, The Williams Companies, Inc. ("Williams") and

Transcontinental Gas Pipe Line Company, LLC ("Transco"), and bring this Petition against

Ironshore Insurance Ltd. ("Ironshore") for insurance policy benefits owed to Williams and

Transco under a policy insuring certain property located at, as well as the natural gas stored

within, Transco's Eminence Underground Gas Storage Facility and a declaratory judgment

regarding rights and duties under a policy of insurance. In support of its Petition, the Plaintiffs

allege and state as follows.

### PARTIES, JURISDICTION, AND VENUE

    1.    Plaintiff Williams is an energy company organized under the laws of the State of

Delaware with its principal place of business located in Tulsa, Oklahoma.

    2.    Plaintiff Transco is a limited liability company organized under the state laws of

Delaware. Transco is primarily engaged in the business of storing, transporting, and distributing

natural gas.



**EXHIBIT**

tabbies

1




3.      Upon information and belief, Defendant Ironshore is an insurance company organized under the laws of Bermuda, with its principal place of business in Hamilton, Bermuda.

4.      Ironshore has sold or subscribed to multiple insurance policies issued to Williams and its subsidiaries and affiliated companies, including but not limited to Transco.  More specifically, Ironshore issued first party property insurance policies to Williams and Transco for the following policy years:  (1) May 1, 2008 to May 1, 2009; (2) May 1, 2010 to May 1, 2011; (3) May 1, 2011 to May 1, 2012; and (4) May 1, 2012 to May 1, 2013.

5.      The property insurance policies issued by Ironshore to Williams and Transco provide insurance coverage for property located in:  Alabama, Colorado, the District of Columbia, Florida, Georgia, Idaho, Kansas, Louisiana, Maryland, Mississippi, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania, South Carolina, Texas, Utah, Virginia, Washington, Wyoming, and Oklahoma.

6.      The United States property covered by Ironshore's policies issued to Williams and Transco has a total value approximating $18 billion USD.

7.      For those policies, Ironshore has received some $3,427,782.00 USD in premiums paid by Williams.

8.      Upon information and belief, Ironshore also issued to corporations other than Williams and Transco numerous other policies which provide property insurance coverage for property located in the United States.

9.      Ironshore is generally engaged in the business of issuing property insurance policies covering risks to property located in the United States, and specifically covering risks to property located in Oklahoma, and is subject to the jurisdiction of this Court on that basis.

10.     Ironshore has also agreed by contract to the jurisdiction of this Court.

 

11.     This Court also has jurisdiction over Ironshore and this action pursuant to 12 O.S. § 2004(F) and also pursuant to 12 O.S. §§ 1651, 1652, and 1655, because a case of actual controversy exists which requires a declaration of the rights of the parties and other relief.

12.     Venue is also proper in this District pursuant to 12 O.S. §§ 137, 139, and 187.

## THE EMINENCE FACILITY AND THE OCCURRENCE

13.     Transco owns the Eminence natural gas storage facility, which consists of seven very large natural gas storage caverns dissolved in the subsurface salt dome in Covington County, Mississippi. The top of the caverns are approximately 2,400 feet below the surface of the ground. At the time of the occurrence, Cavern 3 held approximately 2.7 *billion* cubic feet of gas.

14.     On December 26, 2010, Cavern 3 suffered a significant, unexpected drop in pressure, from 3,188 to 2,831 psig in one minute. Later inspection and testing, in June of 2013, has confirmed that the Cavern 3 Well suffered a significant casing breach at a depth of 927.5 feet. This resulted in an emergency situation due to the imminent danger that all or a portion of the remaining gas in Cavern 3 would escape and result in the loss of the gas and an explosion and/or fire on the surface.

15.     By December 28, 2010, gas had reached the surface and was escaping around the wellhead of Cavern 3 and creating geysers out of water wells in the area. Enormous amounts of gas escaped from Cavern 3 to the surface and to all subsurface formations above the caprock.

16.     Plaintiffs immediately began attempting to depressurize the cavern by flowing gas from Cavern 3 into the pipeline. Then, because the flow rates from the wellhead were too high for continuous flowing into the pipeline, Plaintiffs began venting and flaring gas, all in an attempt to remove the remaining gas from the uncontrolled Cavern 3 as quickly as possible.

-3-



17.     In early January 2011, the nearby Cavern 1 well also lost integrity as gas escaping from Cavern 3 through subsurface formations burst up around the wellbore and wellhead of Cavern 1, venting violently into the atmosphere and causing a cave-in around the Cavern 1 wellbore.

18.     There was an imminent danger that the violent shaking of the Cavern 1 wellhead would cause it to shear off, allowing the approximately 1.784 billion cubic feet of gas stored in Cavern 1 to escape directly to the surface. Plaintiffs therefore moved expeditiously to remove all of the gas from Cavern 1, which process was not fully accomplished until March 25, 2011.

19.     As part of its emergency response, Plaintiffs ultimately drilled 272 monitoring wells and found gas-charged sands in all subsurface zones above the caprock which covers the salt dome, with the shallowest gas-charged sand zone occurring at 30 feet below the ground. These wells were drilled to serve as relief valves to try to remove the gas from the subsurface formations where it posed a threat of escape to the surface, and as monitoring wells to determine the location, size, and boundaries of the gas plumes in the various underground formations.

20.     The Cavern 3 gas would have been evacuated from the cavern within a few days to a few months and the imminent danger emergency would potentially have subsided relatively quickly except that, on January 3, 2011, the Cavern 3 well became plugged with mud, clay, and debris, which was apparently sucked into the wellbore from surrounding formations through the casing breach. Although the plug did not create a complete seal, it effectively prevented Plaintiffs from continuing to remove the massive amounts of gas stranded in the cavern through the Cavern 3 wellbore.

21.     As a result of the mud blockage, instead of being an event lasting only a few weeks to a few months, this imminent danger emergency event continued for two and one-half

-4-



years. The plug itself increased the danger of the situation; it was not an engineered plug, but an earthen one that was temporary and unstable, and which was in imminent danger of failing at any time and releasing a huge amount of uncontrolled gas to the surface and to the subsurface formations.

22. Plaintiffs estimated that just under 2 billion cubic feet of gas was in the uncontrolled environment—either stranded in underground formations or in Cavern 3 below the casing hole—with many potential leak paths to the surface.

23. It was determined that the only reasonable way to alleviate the extreme danger created by the immense amount of gas stranded in the uncontrolled cavern was by drilling a new relief well into the cavern, through which Plaintiffs could remove the remaining stranded gas and could stabilize the cavern by filling it with water.

24. However, due to the December 26, 2010 incident, gas had escaped into all subsurface formations above the caprock, and Plaintiffs' prior information about those zones was obsolete. Therefore, to properly design the drilling program for the Cavern 3 Relief Well, various pilot wells first had to be drilled to determine the new gas pressures in the formations through which the relief well would be drilled, including gas pressures in gas found just below the caprock.

25. Ultimately, it was necessary to drill fourteen pilot wells in the course of which many difficulties were encountered, including lost circulation, gas kicks, loss of well control, and stuck pipe. Plaintiffs ultimately gathered the information it needed to begin the Cavern 3 Relief Well, which was spudded on March 18, 2012.

26. Plaintiffs completed the Cavern 3 Relief Well on November 5, 2012, went through the washing process and then began alternating between removing gas and injecting

water into the cavern. This was a delicate process and extreme care had to be taken so as not to create pressure differentials that would disturb the non-engineered mud plug in the Cavern 3 wellbore. During this entire time, Plaintiffs were still flaring and/or venting gas out of some of the subsurface zones through the monitoring wells.

27.     All of the remaining gas was removed from Cavern 3 through the Cavern 3 Relief Well and the cavern was full of water by June 10, 2013.

28.     Due to the Cavern 3 event and other factors, Caverns 1 and 2 were also destabilized and were taken out of service and filled with water. Cavern 4 was already out of service and filled with water at the time of this event. Plaintiffs intend to continue to operate Caverns 5, 6, and 7.

29.     As a direct result of this incident, Transco suffered three types of insured losses. The first two are covered by the Policy's property insuring agreements. First, Transco suffered the loss of insured gas that flowed out of the cavern into the atmosphere or into subsurface formations and was then vented and/or flared into the atmosphere. The total amount of this portion of the claim is $10,251,237.77 USD.

30.     Second, Transco suffered physical damage to dehydration equipment on the surface at the Eminence facility in the amount of $620,561.80 USD.

31.     Third, Transco incurred expenses as a result of its successful attempts to prevent the imminent risk of further stranded gas escaping to the surface and being lost into the atmosphere and/or causing a fire or explosion that would have destroyed the insured surface property. These costs are covered under the Policy's' "Sue and Labor" provision. The total amount of these costs is not fully known at this time and will be determined at trial, but Plaintiffs estimate it will be approximately $80,000,000.00 USD.



32.     Ironshore made a provisional, conditional, advance payment for the lost gas and property damage elements of this claim by way of an electronic wire transfer of funds into a Williams bank account, which Ironshore reserves the right to seek back from Plaintiffs.

### THE IRONSHORE PROPERTY POLICY

33.     For the policy year of May 1, 2010 to May 1, 2011, Williams and Transco purchased a property insurance program covering the gas stored in the Eminence caverns, whether owned by Transco or others, and covering the buildings and equipment and appurtenances at the Eminence facility.

34.     Williams is declared as the "Loss Payee" under the Declarations of the property insurance program. The relevant policies provide that, "Loss, if any, under this Policy shall be adjusted with and payable to The Williams Companies, Inc. or order, whose acceptance shall constitute a release in full of all liability of Underwriters under this Policy as regards such loss."

35.     The relevant policies provide that both Williams and Transco are "Named Assureds" under the property insurance program.

36.     The property insurance program includes a primary layer of insurance with $50,000,000.00 USD in limits, excess of a $2,000,000.00 USD self-insured retention. Ten underwriters subscribed to various proportionate shares of this primary $50 million USD layer of property insurance, including Ironshore, which subscribed to six and one-half percent (6.5%) of the primary layer. For a covered claim under the program, Ironshore is responsible to pay its proportionate share of the total limits to which it subscribed, which equals 6.5% of the $50,000,000.00 USD primary limits, or a total of $3,250,000.00 USD.

37.     Ironshore's Policy is Policy Number B0180E101443 (the "Ironshore Policy") and a true and correct copy is attached hereto as Exhibit 1.

-7-




38.     The Ironshore Policy is a blanket, all risks, property policy, which covers under Section A (with emphasis added):

> [T]he Assured's interest against ***all risks*** of physical loss or physical damage, and extra expense / contingent extra expense, ***in respect of all real and personal property of every kind and description***, owned, operated, controlled, leased, rented, used or intended for use by the Assured . . . . This subsection includes but is not limited to pipelines, compression and pump stations, terminals, and gas or other product in lines and / or storage . . . .

39.     Under the heading "CONDITIONS," the Ironshore Policy states, without exception, that it provides insurance coverage for the same risks and ***on the same terms and conditions*** as the policies of two other insurers subscribing to the Williams property program primary layer for May 1, 2010 to May 1 2011, which includes the AEGIS Policy No. L0559A1A10 ("AEGIS Policy"), attached hereto as Exhibit 2, and the Lexington Insurance Company Policy No. 61466527 ("Lexington Policy"), attached hereto as Exhibit 3. *See* Exhibit 1 at Page 3 of 11. The Ironshore Policy provides (with emphasis added):

> **CONDITIONS:**     ***To co-insure the same risk at the same terms and conditions as the Co-insurer's Policy Numbers are (sic) L0559A1A10 (Aegis NJ) and 6146657 (Lexington).*** Co-insurer's Policy Wording as submitted to Ironshore 29 April 2010.
>
> The Co-insurer are (sic) Aegis NJ with 40% and Lexington Insurance with 25%.
>
> Notice of Loss to: McGriff Seibels and Williams Inc., Birmingham, Alabama.
>
> LMA 5092 – US Terrorism Risk Insurance Act of 2002 as amended Not Purchased Clause.

These are the only provisions under the "CONDITIONS" section of the Ironshore Policy, and the Ironshore Policy does not state any conditions that are exceptions to its duty to "***co-insure the same risk at the same terms and conditions***" as the AEGIS and

-8-

 

Lexington Policies.

40.     The AEGIS Policy and the Lexington Policy, which the Ironshore Policy

purports to follow "on the same terms and conditions," each contain an Oklahoma

choice of law and exclusive Oklahoma jurisdiction provision.  Those provisions state:

### B.9.     GOVERNING LAW AND JURISDICTION

> Any dispute relating to this Policy or to a claim (including but not limited
> thereto, the interpretation of any provision of the Policy) shall be
> governed by and construed in accordance with the laws of the state of
> Oklahoma.
>
> Each party agrees to submit to the exclusive jurisdiction of the Courts of
> Oklahoma.

*See* Exhibit 2 at Page 20 of 57; Exhibit 3 at Page 20 of 57.

41.     However, the Ironshore Policy then inconsistently and ambiguously provides

under "CHOICE OF LAW AND JURISDICTION": "Ironshore Arbitration and Choice of Law

Clause IRNS-002 11/2007 as attached." *See* Exhibit 1 at Page 3 of 11.

42.     The "Arbitration and Choice of Law Clause" attached to the Ironshore Policy

purportedly requires disputes under the policy to be determined in London, England under the

Arbitration Act 1996. *See* Exhibit 1 at Pages 9 and 10 of 11.

43.     The choice of law provision attached to the Arbitration provision states in relevant

part (with emphasis added):

> ***This policy shall be construed in accordance with the laws of the State of New
> York, United States except insofar as such laws:***
>
> A.     pertain to regulation under the New York Insurance Law, or regulations
>        issued by the Insurance Department of the State of New York pursuant
>        thereto, applying to insurers doing insurance business, or issuance, deliver
>        or procurement of policies of insurance, within the State of New York or
>        as respects risks or insurerds (sic) situated in the State of New York;



B.      pertain to choice of law and result in the selection of any substantive law other than New York; or

C.      ***are inconsistent with any of the Ironshore Insurance Ltd Terms and Conditions.***

Exhibit 1 at Page 10 of 11.

     44.    Ironshore's purported choice of law and jurisdiction clause is ambiguous, internally inconsistent, illusory, and therefore unenforceable. The choice of law and exclusive jurisdiction clauses in the AEGIS Policy and the Lexington Policy, which are adopted by reference into the Ironshore Policy, are, by contrast, clear, unambiguous, and enforceable. Therefore, the controlling provisions in the Ironshore Policy designate Oklahoma law as the choice of law for all disputes and provide that each party agrees to submit to the exclusive jurisdiction of the Courts of Oklahoma.

     45.    Because it follows the same terms and conditions as the AEGIS Policy and the Lexington Policy, the Ironshore Policy also contains a provision covering Sue and Labor expenses. In "SECTION A.2. EXTENSIONS OF COVERAGE," the AEGIS Policy and the Lexington Policy both include section "A.2.M. SUE AND LABOR EXPENSES," which provides (emphasis in originals):

> It is agreed that should the Property Insured under this Policy suffer loss or damage covered under the terms of this Insurance, or should loss or damage covered under the terms of this Insurance be imminent, it shall be lawful and necessary for the **Assured,** their factors, servants and assigns, to sue, labor and travel for, in and about the defense, safeguard and recovery of the said Property, or any part thereof, without prejudice to this Insurance, and subject always to the terms, conditions, limitations and exclusions applicable to this Policy, the charges thereof shall be borne by the Underwriters. It is especially declared and agreed that no acts of the Underwriters or the **Assured** in recovering, saving or preserving the Property shall be considered as a waiver or acceptance of abandonment.
>
> Notwithstanding the foregoing, the Underwriters' liability for Sue and Labor

-10-



Expenses shall always be contained within the overall Limit of Underwriters' Liability as set forth in Item 5. of the Declarations.

This Sue and Labor provision is incorporated by reference into, and is a valid and enforceable extension of coverage under the Ironshore Policy.

46.     Williams and Transco have satisfied all the terms and conditions of Ironshore's Policy, including without limitation payment of substantial premiums, and are entitled to the full benefit of the insurance.

## COUNT ONE – BREACH OF INSURANCE CONTRACT

47.     Plaintiffs repeat and incorporate by reference paragraphs 1 through 46 above as if fully set forth herein.

48.     Under the terms and conditions of the Policy, the amount of Transco's claim, consisting of lost gas, damage to surface property and sue and labor expenses, far exceeds Ironshore's total limits under the Policy.

49.     Williams and Transco have complied in full with all conditions precedent and other requirements for coverage and reimbursement under the Policy.  In particular, Williams and/or Transco have paid all of the substantial premiums for the Policy, have provided timely and effective notice of this claim, and have fully cooperated with Ironshore's investigation of the claim.  Williams and Transco have otherwise complied with all other requirements under the Ironshore Policy.

50.     Ironshore has failed and refused to fully, finally, and without contingency pay Transco's claim and has failed or refused to acknowledge its insuring obligations to Williams and/or Transco.

51.     By failing to fully, finally, and without contingency pay the amounts for lost gas,

-11-



property damages, and Sue and Labor expenses, Ironshore has breached its duties under the Ironshore Policy and has wrongfully deprived Williams and/or Transco of the benefit of the insurance coverage provided under the Ironshore Policy.

52.     As a result of Ironshore's breach of contract, Williams and/or Transco have suffered damages in an amount to be determined at trial, but not less than Three Million Two Hundred Fifty Thousand US Dollars ($3,250,000.00 USD).

53.     Further, Plaintiffs will be forced to incur substantial, additional costs and fees to enforce their contractual rights in this action.

**WHEREFORE,** The Williams Companies, Inc. and Transcontinental Gas Pipe Line Company, LLC respectfully request that this Court enter judgment in favor of Plaintiffs and against Ironshore Insurance Ltd. in the amount of Three Million Two Hundred Fifty Thousand US Dollars ($3,250,000.00 USD), and for attorneys' fees, costs, and pre- and post-judgment interest pursuant to law, and for such other and further relief as the Court deems equitable and just.

## COUNT TWO – FOR DECLARATORY JUDGMENT

54.     Plaintiffs repeat and incorporate by reference paragraphs 1 through 53 above as if fully set forth herein.

55.     Pursuant to 12 O.S. §§ 1651 *et seq.*, Plaintiffs seek a declaratory judgment that Ironshore is obligated under its insurance Policy and applicable law to pay in full the claim identified above arising out of the incident at the Eminence Facility on December 26, 2010.

56.     Plaintiffs also seek declarations ancillary to the primary coverage declaration sought here, including but not limited to: (1) that Ironshore's New York choice of law provision is ambiguous, internally inconsistent, illusory, and therefore unenforceable; (2) that pursuant to



the terms and conditions expressly incorporated into the Ironshore Policy, any dispute relating to the Ironshore Policy or to a claim, including but not limited to the interpretation of any provision of the Policy, shall be governed by and construed in accordance with the laws of the State of Oklahoma; (3) that pursuant to the terms and conditions expressly incorporated into the Ironshore Policy, Ironshore has submitted to the exclusive jurisdiction of the courts in Oklahoma; (4) that pursuant to Oklahoma law, Ironshore's London Arbitration provision is void as against public policy; and (5) such further relief related to the declaration as may be necessary and proper, including but not limited to temporary or permanent injunctive relief prohibiting Defendant from pursuing these matters in arbitration.

57.     Ironshore has failed and refused to fully, finally, and without contingency pay Plaintiffs' claim and has failed or refused to acknowledge its insuring obligations to Williams and/or Transco.

58.     A judicial declaration is necessary and appropriate at this time because an actual and justiciable controversy exists between Plaintiffs and Ironshore concerning Ironshore's obligations and duties under the Ironshore Policy as respects the claim, and Plaintiffs are entitled to ascertain their rights under the Ironshore Policy.

**WHEREFORE,** The Williams Companies, Inc. and Transcontinental Gas Pipe Line Company, LLC respectfully request that this Court determine and declare, and enter a declaratory judgment and order that Ironshore is obligated to pay in full Transco's property loss, property damage, and Sue and Labor reimbursement claim arising out of the incident at the Eminence Facility on December 26, 2010, and for further necessary and proper relief related to the declaration.



## PRAYER FOR RELIEF

**WHEREFORE,** The Williams Companies, Inc. and Transcontinental Gas Pipe Line Company, LLC pray that this Court provide the following relief:

1.    That the Court enter final judgment in favor of The Williams Companies, Inc. and Transcontinental Gas Pipe Line Company, LLC and against Ironshore Insurance Ltd. in the amount of Three Million Two Hundred Fifty Thousand US Dollars ($3,250,000.00 USD); and

2.    That the Court award The Williams Companies, Inc. and Transcontinental Gas Pipe Line Company, LLC its attorneys' fees, costs, and pre- and post-judgment interest pursuant to law; and

3.    That the Court enter a final declaratory judgment that Ironshore is obligated to pay in full the property loss, property damage, and Sue and Labor reimbursement claim arising out of the incident at the Eminence Facility on December 26, 2010; and

4.    That the Court enter a final declaratory judgment that:

   a.    Ironshore's New York choice of law provision is ambiguous, internally inconsistent, illusory, and therefore unenforceable; and

   b.    Pursuant to the terms and conditions expressly incorporated into the Ironshore Policy, any dispute relating to the Ironshore Policy or to a claim, including but not limited to the interpretation of any provision of the Policy, shall be governed by and construed in accordance with the laws of the state of Oklahoma; and

   c.    Pursuant to the terms and conditions expressly incorporated into the Ironshore Policy, Ironshore has submitted to the exclusive jurisdiction of the courts in Oklahoma; and

-14-




d.      Pursuant to Oklahoma law, Ironshore's London Arbitration clause is void

as against public policy; and

e.      Such further relief related to the declarations as may be necessary and

proper, including but not limited to temporary or permanent injunctive relief

prohibiting Defendant from pursuing these matters in arbitration; and

5.      That the Court award such other and further relief as the Court deems equitable

and just.

## JURY TRIAL DEMANDED

The Williams Companies, Inc. and Transcontinental Gas Pipe Line Company, LLC

hereby request a trial by jury in this matter.

Respectfully Submitted,

**CONNER & WINTERS, LLP**

James E. Green, Jr. OBA # 3582
M. Freeman-Burney, OBA #12337
4000 One Williams Center
Tulsa, OK  74172-0148
918/586-8516; 918/586-8616 Fax

and

**CROWE & DUNLEVY**
Michael J. Gibbens, OBA #3339
 Susan E. Huntsman, OBA #18401
 500 Kennedy Building
 321 S. Boston Avenue
 Tulsa, OK  74103-3313
 918 / 592-9800

*Attorneys for Plaintiffs,*
*The Williams Companies, Inc. and*
*Transcontinental Gas Pipe Line Company, LLC*

-15-

### COMPANY POLICY NUMBER 180/E101443

IN CONSIDERATION of the Insured named in the Schedule hereto having paid or having agreed to pay the premium as set forth in the said Schedule to the Insurer who has hereunto subscribed its Name.

THE INSURER HEREBY AGREES for the proportion set against its Name to indemnify the Insured or the Insured's Executors, Administrators and Assigns against Loss as more fully set forth herein during the period of Insurance stated in the said Schedule or during any subsequent period as may be mutually agreed upon between the Insured and the Insurer.

PROVIDED that:-

1. the liability of the Insurer shall not exceed the limits of liability expressed in the said Schedule or such other limits of liability as may be substituted therefor by memorandum hereon or attached hereto signed by or on behalf of the Insurer;

2. the liability of the Insurer in respect of such loss, damage or liability shall be limited to the proportion set against its name or such other proportion as may be substituted therefor by memorandum hereon or attached hereto signed by or on behalf of the Insurer;

3. if the Insured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this Policy shall become void and all claim hereunder shall be forfeited.

IN WITNESS WHEREOF I, being a representative of the Insurer and authorised by the said Insurer to sign this Policy on their behalf, have hereunto subscribed my name this *second* day of *September* Two Thousand and Ten.

Signed...........................................................

| Section | Participation | The Insurer | Reference Number |
|---------|---------------|-------------|------------------|
| Section 2 | 6.50% (Risk) 7.50% (Named Windstorm) | Ironshore Insurance Ltd. (Bermuda) | 443122610A |

**EXHIBIT**

1



## The Williams Companies
## Policy # B0180E101443
## Tax Wording

THIS CONTRACT IS REGISTERED AND DELIV-
ERED AS A SURPLUS LINE COVERAGE UNDER
THE ALABAMA SURPLUS LINE INSURANCE LAW.
BROKER: RONALD B. GIADROSICH
LIC. #A064443

This insurance is issued pursuant to the Florida
Surplus Lines Law. Persons insured by surplus
lines carriers do not have the protection of the
Florida Insurance Guaranty Act to the extent
of any right of recovery for the obligation of
an insolvent unlicensed insurer.

**Surplus lines insurers' policy
rates and forms are not
approved by any Florida
Regulatory Agency**

This contract is registered and
delivered as a surplus line
coverage under the Surplus Line
Insurance Law, O.C.G.A.
Chapter 33.5.
Ronald B. Giadrosich

This policy is issued by an insurer not
authorized to do business in Kansas and, as
such, the form, financial condition, and rates
are not subject to review by the
Commissioner of Insurance and the insured
is not protected by any guaranty fund.

**This insurance is issued by a
nonadmitted insurer not under
the jurisdiction of the Maryland
Insurance Commissioner.**

**The insurance company with which this coverage
has been placed is not licensed by the State of
North Carolina and is not subject to its supervision.
In the event of the insolvency of the insurance
company, losses under this policy will not be paid
by any State insurance guaranty or solvency fund.**
Licensee: Camille Smith

This contract is delivered as surplus line coverage under
the Nonadmitted Insurance Act. The insurer issuing this
contract is not licensed in Colorado but is an approved
nonadmitted insurer. There is no protection under the
provisions of the Colorado Guaranty Association Act.
Ronald B Giadrosich

FL Premium: 4319.55    FHCF: 43.20
Tax: 215.98    Surcharge: 4.00
Stamping Fee: 4.32    Citizens: 60.47
Total: 4647.52

This surplus line contract is issued pursuant to the Idaho insurance
laws by an insurer not licensed by the Idaho Department of
Insurance. There is no coverage provided for surplus line insurance
by either the Idaho Insurance Guaranty Association or by the Idaho
Life and Health Insurance Guaranty Association.

Premium: 14976.37
Policy Fee:
Surplus Lines Tax: 224.65
Stamping Fee: 37.44
Filing Fee:

This insurance policy is delivered as a surplus line coverage under
the insurance code of the State of Louisiana.

In the event of insolvency of the company issuing this contract, the
policyholder or claimant is not covered by the Louisiana Insurance
Guaranty Association which guarantees only specific policies
issued by an insurance company authorized to do business in
Louisiana. This surplus line policy has been procured by the
following licensed Louisiana surplus lines broker:

By: _Ronald Giadrosich_
McGriff Seibels & Williams, Inc

Louisiana Premium: 54575.90

Policy Fee:

Surplus Lines Tax: 2728.79

**The Williams Companies**
**Policy # B0180E101443**
**Tax Wording**

This insurance policy is issued pursuant to Mississippi law covering surplus lines insurance. The company issuing the policy is not licensed by the State of Mississippi, but is authorized to do business in Mississippi as a nonadmitted company. The policy is not protected by the Mississippi Insurance Guaranty Association in the event of the insurer's insolvency.
Ronald B Giadrosich

MS Premium: 2077108
Tax: 830.84
Stamping Fee: 51.93
MWUA: 1038.55

This contract is registered and delivered as surplus line coverage under the surplus line insurance law in Oklahoma. It is not subject to the protection of the State guaranty association.

This policy provides surplus lines insurance by an insurer not otherwise authorized to transact business in New Mexico. This policy is not subject to supervision, review, or approval by the superintendent of insurance. The insurance so provided is not within the protection of any guaranty fund law of New Mexico designed to protect the public in the event of the insurer's insolvency.

This policy is written by a surplus lines insurer and is not subject to the filing or approval requirements of the New Jersey Department of Banking and Insurance. Such a policy may contain conditions, limitations, exclusions and different terms than a policy issued by an insurer granted a Certificate of Authority by the New Jersey Department of Banking and Insurance. The insurer has been approved by the Department as an eligible surplus lines insurer, but the policy is not covered by the New Jersey Insurance Guaranty Fund, and only a policy of medical malpractice liability insurance as defined in N.J.S.A. 17:30D-3d or a policy of property insurance covering owner-occupied dwellings of less than four dwelling units are covered by the New Jersey Surplus Lines Guaranty Fund.

THE INSURER(S) NAMED HEREIN IS (ARE) NOT LICENSED BY THE STATE OF NEW YORK, NOT SUBJECT TO ITS SUPERVISION, AND IN THE EVENT OF THE INSOLVENCY OF THE INSURER(S), NOT PROTECTED BY THE NEW YORK STATE SECURITY FUNDS. THE POLICY MAY NOT BE SUBJECT TO ALL OF THE REGULATIONS OF THE INSURANCE DEPARTMENT PERTAINING TO POLICY FORMS.

This Insurance is Issued Pursuant to the New Jersey Surplus Lines Law.

McGriff Seibels & Williams
2211 7th Avenue South
Birmingham, AL 35233

License # 0202947

The insurer which has issued this insurance is not licensed by the Pennsylvania Insurance Department and is subject to limited regulation. This insurance in NOT covered by the Pennsylvania Property and Casualty Insurance Guaranty Association. Surplus Lines Licensee: Ronald B. Giadrosich McGriff, Seibels and Williams, Inc. 2211 7th Ave South Birmingham, AL 35233

This is evidence of insurance procured and developed under this Oregon Surplus lines laws. It is NOT covered by the provisions of ORS 734.510 to 734.710 relating to the Oregon Insurance Guaranty Association. If the insurer issuing this insurance becomes insolvent, the Oregon Insurance Guaranty Association has no obligation to pay claims under this evidence of insurance.
Ronald B Giadrosich

Oregon Premium: 8817.35
Tax: 176.35
Fire Marshal Tax: 88.17
SLSC: 15.00




### The Williams Companies
### Policy # B0180E101443
### Tax Wording

This insurance contract is issued pursuant to the Wyoming Insurance Laws by an insurer neither licensed by nor under the jurisdiction of the Wyoming Insurance Department.

This contract is registered and delivered as a surplus line coverage under the insurance code of the state of Washington, enacted in 1947. It is not issued by a company regulated by the Washington state insurance commissioner and is not protected by any Washington state guaranty fund law.

McGriff, Seibels & Williams

The insurer issuing this policy does not hold a certificate of authority to do business in this state and this is not fully subject to regulation by the Utah Insurance Commissioner. This policy receives no protection from any of the guaranty associations created under Chapter 28, Title 31A (UC 31A-15-103[8]).

Washington Premium: 39681.95
Policy Fee: _____
Surplus Lines Tax: 793.64
Stamping Fee: 158.73

This company has been approved by the director or his designee of the South Carolina Department of Insurance to write business in this State as an eligible surplus lines insurer, but it is not afforded guaranty fund protection.

This insurance contract is with an insurer not licensed to transact insurance in this state and is issued and delivered as surplus line coverage under the Texas insurance statutes. The Texas Department of Insurance does not audit the finances or review the solvency of the surplus lines insurer providing this coverage, and this insurer is not a member of the property and casualty insurance guaranty association created under Chapter 462, Insurance Code. Chapter 225, Insurance Code, requires payment of 4.85 percent tax on gross premium.

24937.08 Texas Premium

1209.45 Texas State Tax

14.96 Texas Stamping Fee




# COMPLAINT NOTICE

### IMPORTANT NOTICE

To obtain information or make a complaint:

You may contact the **Texas Department of Insurance** to obtain information on companies, coverages, rights or complaints at:

**1-800-252-3439**

You may write the **Texas Department of Insurance:**

**P.O. Box 149104**
**Austin, TX 78714-9104**
**FAX#(512)475-1771**
**Web: http//www.tdi.state.tx.us**
E-mail: ConsumerProtection@tdi.state.tx.us

#### PREMIUM OR CLAIM DISPUTES:
Should you have a dispute concerning your premium or about a claim you should contact the agent or the company first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

#### ATTACH THIS NOTICE TO YOUR POLICY:
This notice is for information only and does not become a part or condition of the attached document.

### AVISO IMPORTANTE

Para obtener informacion o para someter una queja:

Puede comunicarse con el **Departamento de Seguros de Texas** para obtener informacion acerca de companias, coberturas, derechos o quejas al:

**1-800-252-3439**

Puede escribir al Departamento de Seguros de Texas:

**P.O. Box 149104**
**Austin, TX 78714-9104**
**FAX#(512)475-1771**
**Web: http//www.tdi.state.tx.us**
E-mail: ConsumerProtection@tdi.state.tx.us

#### DISPUTAS SOBRE PRIMAS O RECLAMOS:
Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con el agente o la compania primero. Si no se resuelve la disputa, prede entonces comunicarse con el departamento (TDI).

#### UNA ESTE AVISO A SU POLIZA:
Esta aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.




# SCHEDULE

**UNIQUE MARKET REFERENCE:**  B0180E101443

**TYPE:**  Primary Onshore Energy Package

**INSURED:**  THE WILLIAMS COMPANIES INC including all Subsidiary, Associated, Affiliated, Inter-related or Controlled Companies, Corporations, or Firms (including any Limited Liability Company as defined herein, general and limited partnerships and joint ventures) as now exist or may hereafter be constituted for which The Williams Companies, Inc has or acquires financial control or has responsibility to provide insurance. Also including Williams Partners LP and its subsidiaries and Gulfstream Natural Gas System, LLC and Gulfstream Management & Operating Services, LLC , Williams Pipeline Partners LP and its subsidiaries and Wamsutter LLC

**ADDRESS OF INSURED:**  One Williams Center
P.O. Box 3483
Tulsa
Oklahoma 74101
U.S.A.

**PERIOD:**  From:  1st May 2010
To:  1st May 2011
Both days at 12:01am Central Standard Time at Tulsa Oklahoma, USA.

**INTEREST:**  Section A:

Section A covers the Assured's interest against all risks of physical loss or physical damage, and extra expense / contingent extra expense, in respect of all real and personal property of every kind and description, owned, operated, controlled, leased, rented, used or intended for use by the Assured, and includes, but is not limited to, improvements and betterments, property of others in the Care, Custody or Control of the Assured or in the Care, Custody or Control of others on behalf of the Assured, property for which the Assured is responsible, personal property of the Assured's employees or officials while on premises owned or controlled by the Assured, at the option of the Assured, electronic data equipment and media, valuable papers and records, property in the Course of Construction, Installation, Erection or Assembly in progress at inception or any time during the policy period or acquired subsequent thereto, and Property in Transit. This subsection includes but is not limited to pipelines, compression and pump stations, terminals, and gas or other product in lines and / or storage, including, but not limited to, petroleum products, natural gas and its by-products, liquids derived from natural gas, liquefied natural gas, ethanol and ethanol production by-products all as further described in Section A of the Policy Wording provided that such Property is scheduled and declared at inception.

Section B:

Section B covers Time Element loss from direct physical loss or damage to property arising from an Occurrence covered or a peril insured against, under Section A of this section, all as further described in Section B of the Policy wording provided that such property is scheduled and declared at inception.

For the purpose of this Subsection the term Time Element shall be understood to mean Business Interruption on an Actual Loss Sustained

2/9/10

 

basis, Contingent Business Interruption, Accounts Receivable or Rental Value, and as further described in Section B of the Policy Wording.

It is understood and agreed that wherever reference is made herein to Property scheduled and declared at inception, same shall be deemed to be such Property values and Business Interruption values as scheduled and declared by the Assured, which held on file with McGriff Seibel and Williams Inc, and RK Harrison Insurance Brokers Limited and have been submitted under the TWC-Insurance website as at date to be agreed slip leader only, which is accessible and available to underwriters hereon for underwriting information purposes.

**SUM INSURED/LIMIT OF LIABILITY (For Assured's Interest unless otherwise stated)**

A limit of USD 50,000,000 Combined Single Limit, Sections A and B combined, applies in respect of each and every accident or occurrence, subject to the following separate annual aggregate limits:

USD 50,000,000 for losses caused by the peril of Flood;

USD 50,000,000 for losses caused by the peril of Earthquake shock;

USD 50,000,000 for losses caused by the peril of Named Windstorm (including ensuing Flood);

Subject to further sublimits as attached.

Maximum Period of Indemnity for Section B, twenty four (24) months.

EXCESS OF:

Underlying Retentions / Excess as per schedule attached.

**SITUATION/TERRITORIAL SCOPE:**

The (50) States of the United States of America, the District of Columbia, Canada and Puerto Rico except Worldwide for transit.

**CONDITIONS:**

To co-insure the same risk at the same terms and conditions as the Co-insurer's Policy Numbers are L0559A1A10 (Aegis NJ) and 6146657 (Lexington). Co-insurer's Policy Wording as submitted to Ironshore 29 April 2010.

The Co-insurer are Aegis NJ with 40% and Lexington Insurance with 25%.

Notice of Loss to: McGriff, Seibels and Williams Inc, Birmingham, Alabama.

LMA 5092 – US Terrorism Risk Insurance Act of 2002 as amended Not Purchased Clause.

**LOSS PAYEE:**            Insured or Order.

**NOTICES:**               None.

**EXPRESS WARRANTIES:**    None.

**SUBJECTIVITIES:**        None.

**CHOICE OF LAW AND JURISDICTION:**

Ironshore Arbitration and Choice of Law Clause IRNS-002 11/2007 as attached






| | |
|---|---|
| **PREMIUM:** | USD 9,500,000 (100%) annual, split: |
| | USD 7,000,000 (100%) annual in respect of Risk |
| | USD 2,500,000 (100%) annual in respect of Named Windstorm |
| **PREMIUM PAYMENT TERMS:** | 45 days Premium Payment Condition PPC5 (TOR) 4/86 as attached. |
| **TAXES PAYABLE BY INSURED AND ADMINISTERED BY INSURERS:** | None applicable. |
| **RECORDING, TRANSMITTING & STORING INFORMATION:** | Where R K Harrison Insurance Brokers Limited maintains risk and claim data/information/documents R K Harrison Insurance Brokers Limited may hold data/information/documents electronically. |






### THE WILLIAMS COMPANIES, INC.

### SCHEDULE OF PROGRAM SUB-LIMITS (FOR INTEREST)

(To apply any one occurrence / accident unless otherwise stated and excess of Program Retentions)

The following sublimits are for the Assured's interest and apply in respect of each and every Occurrence. They are included within, and not in addition to, the limits of liability:

| | | | |
|---|---|---|---|
| a) | USD | 2,000,000 | per month, in respect of Business Interruption arising from locations for which Business Interruption values have not been declared at inception. |
| b) | USD | 25,000,000 | in respect of Extra Expense. |
| c) | USD | 15,000,000 | in respect of Expediting Expense. |
| d) | USD | 25,000,000 | in respect of Property in Course of Construction (excluding delay in Start Up). Maximum estimated insurable contract value at inception of work USD 25,000,000 |
| e) | USD | 25,000,000 | in respect of Contingent Business Interruption. |
| f) | USD | 10,000,000 | in respect of Contingent Extra Expense and Rental Value. |
| g) | | 30 DAYS | in respect of Ingress / Egress. |
| h) | USD | 25,000,000 | in respect of Removal of Debris. |
| i) | USD | 25,000,000 | in respect of Demolition and Increased Cost of Construction. |
| j) | USD | 25,000,000 | in respect of off Premises Power / Service Interruption, combined single sublimit with Contingent Business Interruption if applicable. |
| k) | USD | 25,000,000 | in respect of Property in Course of Transit. |
| l) | USD | 1,000,000 | in respect of Valuable Papers and Records. |
| m) | USD | 2,500,000 | in respect of Accounts Receivable. |
| n) | USD | 2,500,000 | in respect of Reconstitution of Electronic Data and/or Media. |
| o) | USD | 2,500,000 | in respect of Professional Fees. |
| p) | | 30 DAYS | in respect of Interruption by Civil or Military Authority (including OSHA). |
| q) | USD | 25,000,000 | Miscellaneous Unscheduled Locations in respect of property damage |
| r) | USD | 10,000,000 | Fire Brigade Charges and Extinguishing Expenses. |
| s) | USD | 1,000,000 | Claims Preparation Costs. |
| t) | | 45 DAYS | in respect of Impounded Water. |
| u) | USD | 1,000,000 | in respect of Hazardous Substances and/or Contamination |
| v) | USD | 50,000,000 | in respect of Automatic Acquisitions. |
| w) | USD | 50,000,000 | in respect of gas in pipelines |
| x) | USD | 150,000,000 | in respect of gas in storage |





**THE WILLIAMS COMPANIES, INC.**

**SCHEDULE OF RETENTIONS**
**(For the Assured's Interest Unless Otherwise Stated)**

The Excess Amounts under Section A and Section B are:

1.  Section A-Property Damage:

    USD 2,000,000 any one accident or occurrence except

    i)   Geismar Olefins Plant (10/12th's owned) USD 1,000,000 any one accident or occurrence.

    ii)  In respect of Conway Storage and Fractionator USD 1,000,000 any one accident or occurrence

    iii) In respect of Gulfstream Natural Gas System LLC USD 500,000 (100%) any one accident or occurrence.

    iv)  In respect of Laurel Mountain Midstream LLC assets and RW Gathering LLC assets USD 250,000 any one accident or occurrence.

    v)   In respect of losses resulting from Transportation as covered by Section 2 of this policy USD 250,000 any one accident or occurrence Physical Damage / Time Element combined

    However, USD 10,000,000 any one accident or occurrence in respect of Named Windstorm (except for Gulfstream Natural Gas System LLC which is USD 5,000,000 for 100%), which is in lieu of any other Excess amounts under Section A.

2.  Section B-Time Element:

    60 days waiting period any one accident or occurrence except as respects Gulfstream Natural Gas System, LLC, RW Gathering LLC and Laurel Mountain Midstream LLC assets to which 45 days waiting period any one accident or occurrence applies.

    However in respect of losses arising from Named Windstorm 75 days waiting period any one accident or occurrence.

Notwithstanding anything contained within the above Retentions / Excess Amounts to the contrary, it is understood and agreed that if loss arising out of an Occurrence involves loss at one or more locations and/or is subject to any combination of the aforementioned Property Damage Retentions / Excess Amounts, then the amount to be applied as the Property Damage Retention / Excess Amounts shall be the largest single Property Damage Retention / Excess amount applicable.

If following a loss covered by a peril insured the property being repaired or replaced is subject to an additional loss caused by a peril insured, then no additional Retention / Excess Amounts will be incurred by the Assured.



**THE WILLIAMS COMPANIES, INC.**

**U.S. TERRORISM RISK INSURANCE ACT OF 2002 AS AMENDED**
**NOT PURCHASED CLAUSE**

*This Clause is issued in accordance with the terms and conditions of the "U.S. Terrorism Risk Insurance Act of 2002" as amended as summarized in the disclosure notice.*

It is hereby noted that the Underwriters have made available coverage for "insured losses" directly resulting from an "act of terrorism" as defined in the "U.S. Terrorism Risk Insurance Act of 2002", as amended ("TRIA") and the Insured has declined or not confirmed to purchase this coverage.

This Insurance therefore affords no coverage for losses directly resulting from any "act of terrorism" as defined in TRIA except to the extent, if any, otherwise provided by this policy.

All other terms, conditions, insured coverage and exclusions of this Insurance including applicable limits and retentions remain unchanged and apply in full force and effect to the coverage provided by this Insurance.

LMA5092
21/12/2007
Form approved by Lloyd's Market Association






**THE WILLIAMS COMPANIES, INC.**

**PREMIUM PAYMENT CONDITION (TOR) 4/86 DIRECT**

It is a condition of this contract of insurance that the premium due at inception must be paid to and received by Insurers on or before midnight on 15 June 2010.

If this condition is not complied with, then this contract of insurance will terminate on the above date with the insured hereby agreeing to pay premium calculated at not less than pro rata temporis.

PPC5 (TOR) 4/86





**THE WILLIAMS COMPANIES, INC.**

**ARBITRATION AND CHOICE OF LAW CLAUSE**

1.  Any dispute, controversy or claim arising out of or relating to this Policy or the breach, termination or invalidity thereof shall be finally and fully determined in London, England under the provisions of the Arbitration Act 1996 ("Act") and/or any statutory modifications or amendments thereto, for the time being in force, by a Board composed of three arbitrators.  Each arbitrator shall be an active Queens Counsel or retired English judge familiar with insurance and with the Act.  All matters relating to the existence of the agreement to arbitrate and the selection of arbitrators shall be determined under the laws of England and Wales.   The arbitrator shall be selected for each controversy as follows:

    Any party may, in the event of such a dispute, controversy or claim, notify the other party or parties to such dispute, controversy or claim of its desire to arbitrate the matter, and at the time of such notification the party desiring arbitration shall notify any other party or parties of the name of the arbitrator selected by it.  The other party who has been so notified shall within thirty (30) calendar days thereafter select an arbitrator and notify the party desiring arbitration of the name of such second arbitrator.  If the party notified of a desire for arbitration shall fail or refuse to nominate the second arbitrator within thirty (30) calendar days following the receipt of such notification, the party who first served notice of a desire to arbitrate will, within an additional period of thirty (30) calendar days, apply to a judge of the High Court of Justice of England and Wales for the appointment of a second arbitrator and in such a case the arbitrator appointed by such a judge shall be deemed to have been nominated by the party or parties who failed to select the second arbitrator.  The two arbitrators, chosen as above provided, shall within thirty (30) calendar days after the appointment of the second arbitrator choose a third arbitrator, who shall be the chairman.  In the event of the failure of the first two arbitrators to agree on a third arbitrator within said thirty (30) calendar day period, either of the parties may within a period of thirty (30) calendar days, thereafter, after notice to the other party or parties, apply to a judge of the High Court of Justice of England and Wales for the appointment of a third arbitrator, and in such case the person so appointed shall be deemed and shall act as the third arbitrator and chairman.  Upon acceptance of the appointment by said third arbitrator, the Board of Arbitration for the controversy in question shall be deemed fixed.

2.  The board of Arbitration shall fix, by a notice in writing to the parties involved, a reasonable time and place for the hearing and may prescribe reasonable rules and regulations governing the course and conduct of the arbitration proceeding, including without limitation discovery by the parties.

3.  The board shall, within ninety (90) calendar days following the conclusion of the hearing, render its award as respects the matter or matters in controversy in writing and shall cause a copy thereof to be served on all the parties thereto, but the Board shall not set forth any reasons for its award.  In case the Board fails to reach a unanimous decision, the decision of the majority of the members of the Board shall be deemed to be the decision of the Board, and the same shall be final and binding on the parties thereto.  Such decision shall be a complete defense to any attempted appeal or litigation of such decision in the absence of serious irregularity under Section 68 of the Act. Without limiting the foregoing, the parties waive any right to appeal to, and/or seek collateral review of the decision of the Board of Arbitration by, any court or other body to the fullest extent permitted by applicable law, including, without limitation, any right to make application to the court under Section 45 or to appeal under Section 69 of the Act.

    Any order as to the costs of the arbitration shall be in the sole discretion of the Board, who may direct to whom and by whom and in what manner they shall be paid.

4.  Ironshore Insurance Ltd and the Insured agree that in the event that claims for indemnity or contribution are asserted in any action or proceeding against Ironshore Insurance Ltd by any of the insured's other insurers in any jurisdiction or forum other than that set forth in this paragraph 4, the insured will in good faith take all reasonable steps requested by Ironshore Insurance Ltd to assist Ironshore Insurance Ltd in obtaining a dismissal of these claims (other than on the merits) and will,





without limitation, undertake to the court or other tribunal to reduce any judgment or award against such other insurers to the extent that the court or tribunal determines that Ironshore Insurance Ltd would have been liable to such insurers for indemnity or contribution pursuant to this Policy. The Insured shall be entitled to assert claims against Ironshore Insurance Ltd for coverage under this Policy, including, without limitation, for amounts by which the Insured reduced its judgment against such other insurers in respect of such claims for indemnity or contribution, in an arbitration between Ironshore Insurance Ltd and the Insured pursuant to this paragraph 4, which arbitration may take place before, concurrently with and/or after the action or proceeding involving such other insurers; provided, however, that Ironshore Insurance Ltd in such arbitration in respect of such reduction of any judgment shall be entitled to raise any defenses under this Policy and any other defenses (other than jurisdictional defenses) as it would have been entitled to raise in the action or proceeding with such insurers (and no determination in any such action or proceeding involving such other insurers shall have collateral estoppel, res judicata or other issue preclusion or estoppel effect against Ironshore Insurance Ltd in such arbitration, irrespective of whether or not Ironshore Insurance Ltd remained a party to such action or proceeding).

## GOVERNING LAW AND INTERPRETATION

This policy shall be construed in accordance with the laws of the State of New York, United States except insofar as such laws:

A.   pertain to regulation under the New York Insurance Law, or regulations issued by the Insurance Department of the State of New York pursuant thereto, applying to insurers doing insurance business, or issuance, delivery or procurement of policies of insurance, within the State of New York or as respects risks or insureds situated in the State of New York;

B.   pertain to choice of law and result in the selection of any substantive law other than New York; or

C.   are inconsistent with any of the Ironshore Insurance Ltd Terms and Conditions.

provided, however, that the provisions, stipulations, exclusions and conditions of this Policy are to be construed in an evenhanded fashion as between the Insured and Ironshore Insurance Ltd.  Without limitation, where the language of this Policy is deemed to be ambiguous or otherwise unclear, the issues shall be resolved in the manner most consistent with the relevant provisions, stipulations, exclusions and conditions (without regard to authorship of the language, without reference to the reasonable expectations of one party only and without any presumption or arbitrary interpretation or construction in favour of either the Insured or Ironshore Insurance Ltd and without reference to parol or other extrinsic evidence).

IRNS-002 11/2007





THE WILLIAMS COMPANIES, INC.

## LMA3333

**Insurer's liability several not joint**

The liability of an insurer under this contract is several and not joint with other insurers party to this contract. An insurer is liable only for the proportion of liability it has underwritten. An insurer is not jointly liable for the proportion of liability underwritten by any other insurer. Nor is an insurer otherwise responsible for any liability of any other insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by an insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp. This is subject always to the provision concerning "signing" below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is an insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. A member is not jointly liable for any other member's proportion. Nor is any member otherwise responsible for any liability of any other insurer that may underwrite this contract. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

**Proportion of liability**

Unless there is "signing" (see below), the proportion of liability under this contract underwritten by each insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp and is referred to as its "written line".

Where this contract permits, written lines, or certain written lines, may be adjusted ("signed"). In that case a schedule is to be appended to this contract to show the definitive proportion of liability under this contract underwritten by each insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together). A definitive proportion (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of a Lloyd's syndicate taken together) is referred to as a "signed line". The signed lines shown in the schedule will prevail over the written lines unless a proven error in calculation has occurred.

Although reference is made at various points in this clause to "this contract" in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.



ATTACHING TO AND FORMING PART OF POLICY NO. E101443

## ENDORSEMENT NO. 001

**INSURED:**     The Williams Companies, Inc.

**EFFECTIVE:**     01st May 2010 at 12:01am Central Standard Time

It is understood and agreed that, with effect from inception, for the purposes of any premium adjustments associated with the addition or deletion of any assets to/from coverage provided by this policy the rating schedule attached (1 page) is to apply.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.



## COF May 1, 2010 - 2011 Premium Worksheet

### "Risk" Only Rates (i.e. not including Named Windstorm premium)

| | Value | Rate | Premium |
|---|---|---|---|
| **SECTION 2** | | | |
| All Onshore PD Values $ | 13,065,789,608 | 0.040631814% $ | 5,308,867 |
| All Onshore BI Values (2010 BI only) $ | 2,378,337,196 | 0.071105674% $ | 1,691,133 |
| | | **Subtotal** $ | **7,000,000** |

### NWS Only Rates (in addition to "Risk" premium)

| | Value | Rate | Premium |
|---|---|---|---|
| **SECTION 2** | | | |
| "Gulf" PD Values $ | 527,010,681 | 0.24500439% $ | 1,291,199 |
| "Gulf" BI Values (2010 BI only) $ | 179,892,000 | 0.42875768% $ | 771,301 |
| "Non-Gulf" PD Values $ | 12,538,778,947 | 0.00266995% $ | 334,779 |
| "Non-Gulf" BI Values (2010 BI only) $ | 2,198,445,196 | 0.00467242% $ | 102,721 |
| | | **Subtotal** $ | **2,500,000** |

The above values and rates are to be used for calculation of applicable Additional Premiums / Return Premiums during the May 1, 2010 to May 1, 2011 policy period.

Onshore rates do not include TRIPRA premium, as this option was declined by the Assured.

Underwriters hereon note that the 2010 value declared at inception for Gulfstream BI ($125.566mm) has been included above for premium rating purposes under the Section 2 (Onshore) values only. However, as noted in the renewal submission provided to underwriters at inception, an Onshore or and Offshore loss could result in a total BI loss for Gulfstream. However Ironshore's exposure is limited to the Onshore element only.



ATTACHING TO AND FORMING PART OF POLICY NO. E101443

### ENDORSEMENT NO. 002

**INSURED:**  The Williams Companies, Inc.

**EFFECTIVE:**  27th August 2010 at 12:01am Central Standard Time

It is understood and agreed by all underwriters hereon that with effect from August 27, 2010 the Echo Springs TXP4 natural gas processing facility is covered hereunder. As a consequence of the foregoing an Additional Premium is due of: USD 67,677(100% annual) subject to Other Deductions From Premium and to be calculated pro-rata for the remainder of the Policy Term based on 247/365 days.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.



ATTACHING TO AND FORMING PART OF POLICY NO. E101443

## ENDORSEMENT NO. 003

INSURED:   The Williams Companies, Inc.

EFFECTIVE:   1ˢᵗ May 2010 at 12:01am Central Standard Time

Underwriters hereby note and agree that the following changes apply to the Co-insurers policy:

1)   Effective at Policy Inception, it is understood and agreed that the **GENERAL EXCLUSIONS** of this Policy, Clause C. 6. **AUTHORITIES EXCLUSION** is amended to read as follows:

### C.6. AUTHORITIES EXCLUSION

Except as specifically stated in this policy or endorsement attached thereto, the Underwriters shall not be liable for loss, damage, costs, expenses, fines, or penalties incurred, sustained by or imposed on the Assured at the order of any Government Agency, Court, or other Authority arising from any cause whatsoever.

However, if any time element coverage is afforded by this policy or endorsement thereto, the coverage is extended to include any increase in the actual loss sustained by the Assured, resulting directly from an interruption of business covered hereunder, during the length of time not exceeding ~~four (4) consecutive weeks~~ thirty (30) consecutive days, when as a direct result of damage to or destruction of covered property by the peril(s) insured against access to the premises or commencement of repairs is delayed at the order of any Government Agency, Court or other Authority.

2)   It is hereby understood and agreed that the Assured shall have the option to declare Business Interruption value(s) and purchase Time Element coverage for E&P revenue at the Parachute Creek and/or Willow Creek facility(ies) at a later date in the policy term, with additional premium to be calculated pro-rata of the Policy rate for "Business Interruption" (with a minimum of 50% of the applicable annual premium).

Underwriting information supporting this provision was provided to Insurers as part of the renewal underwriting submission (a copy is attached to this Endorsement as Information).

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.





## WILLOW CREEK / PARACHUTE CREEK Business Interruption Exposure Summary

Please note that the declared Business Interruption value for the Willow Creek plant is only representative of gas processing revenue (not E&P production revenue). No BI value has been declared for the Parachute Creek facility. The reason for not declaring a BI value for E&P production at either plants is because lost throughput at one plant can be "picked up" by the other in the event of a loss. That said, future the plants experiences a situation that results in an extended outage, Williams would need to declare a BI value for E&P production for the other operating plant. Williams would like to have underwriters consider this exposure now, and provide confirmation that Williams could elect to declare and purchase BI cover for E&P production revenue losses as a result of loss / damage to the Parachute Creek and/or Willow Creek plant at a later date in the policy term, at the Policy BI rate agreed at inception.

### WILLOW CREEK

- Grassroots plant was constructed in 2008/2009 was achieved of operation beginning in late August 2009

- Designed to declare this plant to extract up to 10,000 barrels of natural gas liquids (NGL) per day from pipeline gas (gas is internally at pipeline quality so the plant can be fully bypassed if necessary)

- Processing Capacity of 170 million cubic feet per day. All gas enters the plant via a 30" pipeline from the Wamsutter E&P treating plant located near Parachute, CO, about 60 miles to the south.

- Three Solar Titan combustion turbine driven compressors deliver the residue gas into the plant to other pipelines. The plant requires all three of these compressor units for full operation but can process 350 to 375 MMscf/d with any two of the units.

- Residue gas can go to Williams Northwest Pipeline, Colorado Interstate Gas (CIG), Colorado Interstate Pipeline (CIG) and Rocky Mountain Express

- NGLs currently supplied to other boundaries. A portion of ONEOK via pipeline.



### PARACHUTE CREEK

- Train I was completed in 2002 and is rated at 125 MMcf/day processing capacity

- Train II was completed in 2006 and combined to increase capacity to 500 MM cf/day

- Train III was completed in 2007 and is rated at 500 MMcf/day. A further Train III Expansion was completed in 2008/09 and is also rated at 500 MMcf/day

- Plant operates 24/7 52 and is manned at all times.

- Field gas comes in at mixed 700 psi through one 30" and one 16" gathering pipeline system and is fully treated and liquid.

- Gas is processed and sold via pipeline, while condensate is stored and transported by truck (liquids are sent to a tank area 30 psi where present).

- There is a project underway to add a 6inch NGL line from Parachute to Grand Valley which will replace the existing 5-inch line, allowing all NGLs to be sent by pipeline instead of truck.



# CONTRACT ENDORSEMENT

Unique Market Reference:        B0180/E101443

Endorsement Reference:          007

Insured:                        The Williams Companies Inc

## CONTRACT CHANGES

It is noted and agreed, with effect from the date of agreement to this endorsement, Survey Fees are payable by underwriters of USD 127,000 (100%).

The contribution of each underwriter towards the total fees of USD 127,000 (100%) is calculated in equal proportion to the percentage signed line of each underwriter per Section 2 Onshore Pure Risk only

All other terms and conditions remain unchanged

## AGREEMENT

| GENERAL UNDERWRITERS AGREEMENT (GUA) | | |
|---|---|---|
| Each Underwriter's proportion is several not joint | | |
| Slip Leader Only | Slip Leader And Agreement Parties | All Underwriters |
| | Box 1 | Box 2 | Box 3 |
| Notification to followers | | |
| | Yes / No | |
| | Within _____ working days | |



## Starr Technical Risk Agency - Survey Schedule 2010/2011 Term

| Company | Asset | Location | Last Inspection | Cost | Target Complete | Date Completed | Comments |
|---|---|---|---|---|---|---|---|
| WGP-West | Ironson Station 41 | Johnson Bayou, LA | Feb-08 | $2,400.00 | Mar-10 | Jul-10 | Replaces W. Vernon Station on original agreement |
| WGP-West | Pageant Station | Pagosa, CO | Mar-08 | $2,600.00 | Jun-10 | Aug-10 | |
| WGP-West | Soda Springs Station | Soda Springs, ID | Mar-08 | $2,800.00 | Jun-10 | Aug-10 | |
| WGP-West | Lava Hot Springs Station | Lava Hot Springs, ID | Mar-08 | $2,500.00 | Oct-10 | Aug-10 | |
| WGP-West | Pocatello Station | Pocatello, ID | Mar-08 | $2,500.00 | Oct-10 | Aug-10 | |
| WGP-West | Burley Station | Twin Falls, ID | Mar-08 | $2,500.00 | Oct-10 | Aug-10 | |
| WGP-West | Buhl Station | Buhl, ID | Mar-08 | $2,500.00 | Oct-10 | Aug-10 | |
| Midstream | Opal Gas Plant | Opal, WY | Aug-08 | $10,000.00 | Nov-10 | Jan-10 | |
| Midstream | Big Piney Compressor Station | Big Piney, WY | Aug-08 | $2,500.00 | Nov-10 | Jul-10 | |
| Midstream | Echo Springs Gas Plant | Wamsutter, WY | Aug-08 | $10,000.00 | Nov-10 | Jun-10 | |
| Midstream | 8-Mile Lake Compressor Station | Wamsutter, WY | Aug-08 | $2,500.00 | Nov-10 | Jul-10 | |
| Midstream | Geismar Olefins Plant | Geismar, LA | Dec-08 | $12,000.00 | Nov-10 | Oct-10 | |
| WGP-Transco | Compressor Station 130 | Carter, GA | Jan-09 | $2,500.00 | Feb-11 | Jan-11 | |
| WGP-Transco | Compressor Station 140 | Mause, SC | Jan-09 | $2,500.00 | Feb-11 | Jan-11 | |
| WGP-Transco | Compressor Station 145 | Crover, NC | Jan-09 | $2,500.00 | Feb-11 | Jan-11 | |
| WGP-Transco | Compressor Station 150 | Mount Airie, NC | Jan-09 | $2,500.00 | Feb-11 | Jan-11 | |
| WGP-Transco | Compressor Station 155 | Lexington, NC | Jan-09 | $2,500.00 | Feb-11 | Jan-11 | |
| E & P | Parachute Creek Gas Plant | Parachute Creek, CO | Aug-09 | $10,000.00 | Mar-11 | Mar-11 | |
| Midstream | Ignacio Gas Plant | Durango, CO | Jun-09 | $10,000.00 | Apr-11 | Mar-11 | |
| Midstream | Conway NGL Fractionation Plant | McPherson, KS | Jun-09 | $10,000.00 | Apr-11 | Aug-10 | |
| WGP-Transco | Meadows LNG Plant | Carlstadt, NJ | May-09 | $10,000.00 | Apr-11 | Jul-10 | |
| WGP-Transco | Compressor Station 85 | Greensburg, LA | Feb-09 | $2,500.00 | Apr-11 | Feb-11 | |
| WGP-Transco | Compressor Station 70 | Tylertown, MS | Feb-09 | $2,500.00 | Apr-11 | Feb-11 | |
| WGP-Transco | Compressor Station 77 | Seminary, MS | Mar-09 | $2,500.00 | Apr-11 | Feb-11 | |
| WGP-Transco | Compressor Station 80 | Kosciusko, MS | Mar-09 | $2,500.00 | Apr-11 | Feb-11 | |
| WGP-West | Plymouth VA | Plymouth, VA | Aug-09 | $2,500.00 | Mar-11 | Mar-11 | |
| Midstream | Rimrock Cochran | Rimrock, Alberta | Jul-07 | $0.00 | Mar-11 | | Scheduled for August 2011 |
| | | | | $115,300.00 | | | |



 

Policy No. MSW-0388

### WILLIAMS May 1, 2010 PRIMARY $50MM ONSHORE PROPERTY POLICY

The subscribers hereto, severally but not jointly, do insure:

**Assured:**          The Williams Companies, Inc. et al.

**Assured's Address:**  One Williams Center
P.O. Box 3483
Tulsa, OK 74101

Acting upon your instructions, we have effected with **Security as within** insurance as noted below.

**Limits:**          As within

**Locations:**       As within

**Term:**            May 1, 2010 to May 1, 2011 both days at 12:01 a.m., Central Standard Time at Tulsa, OK, U.S.A.

**Coverage:**        Onshore Property / Business Interruption

**Premium:**         As within

THIS POLICY IS MADE AND ACCEPTED SUBJECT TO THE FOREGOING STIPULATIONS AND CONDITIONS, AND TO THE CONDITIONS PRINTED ON THE BACK HEREOF, which are specifically referred to and made a part of this policy, together with such other provisions, agreements or conditions as may be endorsed hereon or added hereto; and no officer, agent or other representative of the undersigned shall have power to waive or be deemed to have waived any provision or condition of this cover note unless such waiver, if any, shall be written upon or attached hereto, nor shall any privilege or permission affecting the insurance under this policy exist or be claimed by the Assured unless so written or attached.

This document is intended for use as evidence that insurance described herein has been effected against which a policy(ies) will be issued and that in the event of any inconsistency therewith the terms and conditions and provision of the policy(ies) prevail.  Immediate advice must be given of any discrepancies or necessary changes.

> **EXHIBIT**
>
> 2

C:\Documents and Settings\besta\Local Settings\Temporary Internet Files\OLK40\Primary $50mm Onshore Policy (2).doc

 

Policy No. MSW-0388

# SUBSCRIPTION PAGE

| Interest / Participation (%) | INSURER / SECURITY | AUTHORIZED SIGNATURE | POLICY / REFERENCE NO. |
|---|---|---|---|
| Solely As Respects the perils of Named Windstorm / ensuing Flood: **40.0%**  As Respects all other risks as covered herein: **31.5%** | Associated Electric & Gas Insurance Services Ltd. | | L0559A1A10 |
| Solely As Respects the perils of Named Windstorm / ensuing Flood: **7.5%**  As Respects all other risks as covered herein: **6.5%** | Ironshore Insurance Ltd. (Bermuda) | As per separate Binder held by RK Harrison Insurance Brokers, Ltd. as placing broker, subject wording attached to this Binder including mandatory endorsements. | |
| **25.0%** | Lexington Insurance Company | | 61466527 |

**TOTAL PARTICIPATION:**

| | |
|---|---|
| Solely As Respects the perils of Named Windstorm / ensuing Flood: | **72.5%** |
| As Respects all other risks as covered herein: | **63.0%** |

## Policy Provisions

It is expressly understood and agreed by the assured by accepting this instrument that McGriff, Seibels & Williams, Inc. is not one of the Underwriters of insurers hereunder and is not nor shall be in any way or to any extent liable for any loss or claim whatsoever as an insurer, but that the assurers hereunder are those underwriters whose names are on file as hereinbefore set forth.

In consideration of the premium as hereinafter stated, the various companies named herein, severally but not jointly, do hereby insure that Assured named herein, for the amounts and proportions, set opposite their respective names. All subject to the terms and conditions of the forms and endorsements attached herein.

This insurance is made and accepted subject to all the provisions, conditions and warranties as set forth herein and in any forms or endorsements attached hereto, all of which are to be considered as incorporated herein, and any provisions or conditions appearing in any forms or endorsements attached hereto which alter the policy provisions shall supersede such policy provisions insofar as they are inconsistent therewith.

Any provisions required by law, to be stated in policies issued by any company subscribing hereto, shall be deemed to have been stated herein. It is further agreed that each of the companies will issue their individual policies in accord with the terms described herein, upon demand by the Assured.



I:\home\und dpt\COMMON\PROPERTY ACCOUNTS\williams companies\L0559A1A10\Primary $50mm Onshore Policy (2).doc



**The Williams Companies**
**Policy # L0559A1A10**
**Tax Wording**

THIS SURPLUS LINE CONTRACT IS ISSUED PURSUANT TO THE IDAHO INSURANCE LAWS BY AN INSURER NOT LICENSED BY THE IDAHO DEPARTMENT OF INSURANCE. THERE IS NO COVERAGE PROVIDED FOR SURPLUS LINE INSURANCE BY EITHER THE IDAHO INSURANCE GUARANTY ASSOCIATION OR BY THE IDAHO LIFE AND HEALTH INSURANCE GUARANTY ASSOCIATION.

*Ronald B Giadrosich*

This policy is issued by an insurer not authorized to do business in Kansas and, as such, the form, financial condition, and rates are not subject to review by the Commissioner of Insurance and the insured is not protected by any guaranty fund.

---

THIS CONTRACT IS REGISTERED AND DELIVERED AS A SURPLUS LINE COVERAGE UNDER THE ALABAMA SURPLUS LINE INSURANCE LAW.
BROKER: RONALD B. GIADROSICH
LIC. #A064443

---

This contract is delivered as surplus line coverage under the Nonadmitted Insurance Act. The insurer issuing this contract is not licensed in Colorado but is an approved nonadmitted insurer. There is no protection under the provisions of the Colorado Guaranty Association Act.
Ronald B Giadrosich

This insurance policy is delivered as a surplus line coverage under the insurance code of the State of Louisiana.

In the event of insolvency of the company issuing this contract, the policyholder or claimant is not covered by the Louisiana Insurance Guaranty Association which guarantees only specific policies issued by an insurance company authorized to do business in Louisiana. This surplus line policy has been procured by the following licensed Louisiana surplus lines Broker:

By: *Ronald B Giadrosich*

McGriff Seibels & Williams, Inc

Louisiana Premium: 272 242.43

Policy Fee: _____

Surplus Lines Tax: 13,612.12

FL Premium: 2154235  FHCF: 215.47

Tax: 1077.37  Surcharge: 400

Stamping Fee: 43.10  Citizens: 301.66

Total: 2318895

### Surplus lines insurers' policy rates and forms are not approved by any Florida Regulatory Agency

This insurance is issued pursuant to the Florida Surplus Lines Law. Persons insured by surplus lines carriers do not have the protection of the Florida Insurance Guaranty Act to the extent of any right of recovery for the obligation of an insolvent unlicensed insurer.

This contract is registered and delivered as a surplus line coverage under the Surplus Line Insurance Law, O.C.G.A. Chapter 33.5.
Ronald B. Giadrosich

**This insurance is issued by a nonadmitted insurer not under the jurisdiction of the Maryland Insurance Commissioner.**

The insurance company with which this coverage has been placed is not licensed by the State of North Carolina and is not subject to its supervision. In the event of the insolvency of the insurance company, losses under this policy will not be paid by any State insurance guaranty or solvency fund.
Licensee: Camille Smith

This insurance policy is issued pursuant to Mississippi law covering surplus lines insurance. The company issuing the policy is not licensed by the State of Mississippi, but is authorized to do business in Mississippi as a nonadmitted company. The policy is not protected by the Mississippi Insurance Guaranty Association in the event of the insurer's insolvency.
Ronald B Giadrosich

MS Premium: 103,612.94

Tax: 4144.52

Stamping Fee: 259.03

MWUA: 5180.65



# The Williams Companies
## Policy # L0559A1A10
### Tax Wording

This policy is written by a surplus lines insurer and is not subject to the filing or approval requirements of the New Jersey Department of Banking and Insurance. Such a policy may contain conditions, limitations, exclusions and different terms than a policy issued by an insurer granted a Certificate of Authority by the New Jersey Department of Banking and Insurance. The insurer has been approved by the Department as an eligible surplus lines insurer, but the policy is not covered by the New Jersey Insurance Guaranty Fund, and only a policy of medical malpractice liability insurance as defined in N.J.S.A. 17:30D-3d or a policy of property insurance covering owner-occupied dwellings of less than four dwelling units are covered by the New Jersey Surplus Lines Guaranty Fund.

THE INSURER(S) NAMED HEREIN IS (ARE) NOT LICENSED BY THE STATE OF NEW YORK, NOT SUBJECT TO ITS SUPERVISION, AND IN THE EVENT OF THE INSOLVENCY OF THE INSURER(S), NOT PROTECTED BY THE NEW YORK STATE SECURITY FUNDS. THE POLICY MAY NOT BE SUBJECT TO ALL OF THE REGULATIONS OF THE INSURANCE DEPARTMENT PERTAINING TO POLICY FORMS.

This contract is registered and delivered as surplus line coverage under the surplus line insurance law in Oklahoma. It is not subject to the protection of the State guaranty association.

This Insurance is Issued Pursuant to the New Jersey Surplus Lines Law.

McGriff Seibels & Williams
2211 7th Avenue South
Birmingham, AL 35233

License # 0202947

This policy provides surplus lines insurance by an insurer not otherwise authorized to transact business in New Mexico. This policy is not subject to supervision, review, or approval by the superintendent of insurance. The insurance so provided is not within the protection of any guaranty fund law of New Mexico designed to protect the public in the event of the insurer's insolvency.

This is evidence of insurance procured and developed under this Oregon Surplus lines laws. It is NOT covered by the provisions of ORS 734.510 to 734.710 relating to the Oregon Insurance Guaranty Association. If the insurer issuing this insurance becomes insolvent, the Oregon Insurance Guaranty Association has no obligation to pay claims under this evidence of insurance.

Ronald B Gladrosich

Oregon Premium: 4398380
Tax: 879.68
Fire Marshall Tax: 439.84
SLSC: 15.00

This company has been approved by the director or his designee of the South Carolina Department of Insurance to write business in this State as an eligible surplus lines insurer, but it is not afforded guaranty fund protection.

The insurer which has issued this insurance is not licensed by the Pennsylvania Insurance Department and is subject to limited regulation. This insurance in NOT covered by the Pennsylvania Property and Casualty Guaranty Association.
Surplus Lines Licensee: Ronald B. Gladrosich McGriff, Seibels and Williams, Inc. 2211 7th Ave South Birmingham, AL 35233

The insurer issuing this policy does not hold a certificate of authority to do business in this state and this is not fully subject to regulation by the Utah Insurance Commissioner. This policy receives no protection from any of the guaranty associations created under Chapter 28, Title 31A (UC 31A-15-103[8]).

### The Williams Companies
### Policy # L0559A1A10
### Tax Wording

This insurance contract is with an insurer not licensed to transact insurance in this state and is issued and delivered as surplus line coverage under the Texas insurance statutes. The Texas Department of Insurance does not audit the finances or review the solvency of the surplus lines insurer providing this coverage, and this insurer is not a member of the property and casualty insurance guaranty association created under Chapter 462, Insurance Code. Chapter 225, Insurance Code, requires payment of 4.85 percent tax on gross premium.

This contract is registered and delivered as a surplus line coverage under the insurance code of the state of Washington, enacted in 1947. It is not issued by a company regulated by the Washington state insurance commissioner and is not protected by any Washington state guaranty fund law.

McGriff, Seibels & Williams

Washington Premium: 197,946.54
Policy Fee: _____
Surplus Lines Tax: 3958.93
Stamping Fee: 44.87

```
| 4 3943| Texas Premium
 60.3.31   Texas State Tax
 74.64    Texas Stamping Fee
```

This insurance contract is issued pursuant to the Wyoming Insurance Laws by an insurer neither licensed by nor under the jurisdiction of the Wyoming Insurance Department.



# VIRGINIA FORM SLB-9

DATE 8/31/10

Applicant/Insured The Williams Companies

Name of Non-Admitted Insurer

(If available) Associated Electric & Gas Insurance Services

Policy No.  L0559A1A10

## NOTICE TO INSURED

THE INSURANCE POLICY THAT YOU HAVE APPLIED FOR HAS BEEN PLACED WITH OR IS BEING OBTAINED FROM AN INSURER APPROVED BY THE STATE CORPORATION COMMISSION FOR ISSUANCE OF SURPLUS LINES INSURANCE IN THE COMMONWEALTH, BUT NOT LICENSED OR REGULATED BY THE STATE CORPORATION COMMISSION OF THE COMMONWEALTH OF VIRGINIA. THEREFORE, YOU, THE POLICYHOLDER, AND PERSONS FILING A CLAIM AGAINST YOU ARE NOT PROTECTED UNDER THE VIRGINIA PROPERTY AND CASUALTY INSURANCE GUARANTY ASSOCIATION ACT (§§ 38.2-1600 ET SEQ.) OF THE CODE OF VIRGINIA AGAINST DEFAULT OF THE COMPANY DUE TO INSOLVENCY. IN THE EVENT OF INSURANCE COMPANY INSOLVENCY, YOU MAY BE UNABLE TO COLLECT ANY AMOUNT OWED TO YOU BY THE COMPANY REGARDLESS OF THE TERMS OF THIS INSURANCE POLICY, AND YOU MAY HAVE TO PAY FOR ANY CLAIMS MADE AGAINST YOU.

McGriff, Seibels, and Williams
(Name of Surplus Lines Broker)

101870
(License Number)

2211 7th Ave South
Birmingham, AL 35233
(Broker's Mailing Address)

VIRGINIA FORM SLB-9 (Eff. 9/96)

# COMPLAINT NOTICE

## IMPORTANT NOTICE

1.   To obtain information or make a complaint:

2.   You may call McGriff, Seibels & Williams, Inc.'s toll-free telephone number for information or to make a complaint at:

### 1-800-476-2211

3.   You may also write to McGriff, Seibels & Williams, Inc.

### P.O. Box 10265
### Birmingham, AL 35202-0265

4.   You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at:

### 1-800-252-3439

5.   You may write the Texas Department of Insurance:

### P.O. Box 149104
### Austin, TX 78714-9104
### FAX#(512)475-1771
### Web: http//www.tdi.state.tx.us
E-mail: ConsumerProtection@tdi.state.tx.us

6.   **PREMIUM OR CLAIM DISPUTES:**
Should you have a dispute concerning your premium or about a claim you should contact the agent or the company first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

7.   **ATTACH THIS NOTICE TO YOUR POLICY:**
This notice is for information only and does not become a part or condition of the attached document.

## AVISO IMPORTANTE

Para obtener informacion o para someter una queja:

Usted puede llamar al numero de telefono gratis de McGriff, Seibels & Williams, Inc.'s para informacion o para someter una queja al:

### 1-800-476-2211

Usted tambien puede escribir a McGriff, Seibels & Williams, Inc.:

### P.O. Box 10265
### Birmingham, AL 35202-0265

Puede comunicarse con el Departamento de Seguros de Texas para obtener informacion acerca de companias, coberturas, derechos o quejas al:

### 1-800-252-3439

Puede escribir al Departamento de Seguros de Texas:

### P.O. Box 149104
### Austin, TX 78714-9104
### FAX#(512)475-1771
### Web: http//www.tdi.state.tx.us
E-mail: ConsumerProtection@tdi.state.tx.us

**DISPUTAS SOBRE PRIMAS O RECLAMOS:**
Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con el agente o la compania primero. Si no se resuelve la disputa, prede entonces comunicarse con el departamento (TDI).

**UNA ESTE AVISO A SU POLIZA:**
Esta aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.



Policy No. MSW-0388

# THE WILLIAMS COMPANIES, INC.

## ONSHORE PROPERTY / BUSINESS INTERRUPTION POLICY

## TABLE OF CONTENTS

### DECLARATIONS

1. NAMED ASSURED
2. LOSS PAYEE
3. POLICY PERIOD
4. INTEREST
5. SUMS INSURED AND/OR LIMITS OF LIABILITY
6. RETENTIONS AND/OR EXCESS AMOUNTS
7. NAMED WINDSTORM EXCESS
8. TERRITORIAL LIMITS
9. NOTICE TO UNDERWRITERS
10. NOTICE TO THE ASSURED
11. PREMIUM
12. SCHEDULE OF SUBLIMITS

### GENERAL DEFINITIONS, CONDITIONS AND EXCLUSIONS

A. DEFINITIONS
 A.1. NAMED ASSURED
 A.2. OCCURRENCE, EARTHQUAKE SHOCK, FLOOD AND NAMED WINDSTORM
 A.3. ONSHORE
 A.4. RIVER CROSSING(S)
 A.5. ACTUAL CASH VALUE
 A.6. REPLACEMENT COST
 A.7. OBJECT
 A.8. VALUABLE PAPERS AND RECORDS

B. CONDITIONS
 B.1. EXCESS AND UNDERLYING INSURANCE
 B.2. BANKRUPTCY AND INSOLVENCY
 B.3. ABANDONMENT OF PROPERTY
 B.4. INSPECTION AND AUDIT
 B.5. CANCELLATION
 B.6. CURRENCY
 B.7. CLAIMS NOTIFICATION AND LOSS ADJUSTMENT CLAUSE
 B.8. UNDERWRITERS' SERVICING AGENTS OR BROKERS
 B.9. GOVERNING LAW AND JURISDICTION
 B.10. ALTERNATE DISPUTE RESOLUTION
 B.11. SERVICE OF SUIT
 B.12. TITLES OF PARAGRAPHS
 B.13. DELAYS, ERRORS OR OMISSIONS
 B.14 OIL POLLUTION ACT DISCLAIMER
 B.15. ACTION AGAINST UNDERWRITERS



C:\Documents and Settings\besta\Local Settings\Temporary Internet Files\OLK40\Primary $50mm Onshore Policy (2).doc

 

Policy No. MSW-0388

      B.16.  ASSIGNMENT
      B.17.  ASSISTANCE AND COOPERATION OF THE ASSURED
      B.18.  RECOVERABLE CHARGES
      B.19   CERTIFICATES OF INSURANCE
      B.20.  SUBROGATION
      B.21.  AUTOMATIC ACQUISITIONS
      B.22.  OTHER INSURANCE
      B.23.  CLAIMS PREPARATION COST
      B.24.  OFAC CLAUSE

**C.**    **EXCLUSIONS**
      C.1.   WAR AND TERRORISM EXCLUSION (NMA 2918 Amended)
      C.2.   INSTITUTE RADIOACTIVE CONTAMINATION, CHEMICAL, BIOLOGICAL,
               BIO-CHEMICAL, ELECTROMAGNETIC WEAPONS EXCLUSION CLAUSE
               (CL370)
      C.3.   ASBESTOS CLAUSE
      C.4.   MICROORGANISM EXCLUSION
      C.5.   INSTITUTE CYBER ATTACK EXCLUSION CLAUSE (CL380)
      C.6.   AUTHORITIES EXCLUSION
      C.7.   DATA DISTORTION/CORRUPTION EXCLUSION
      C.8.   MILLENNIUM CLAUSE

## SECTION A - REAL AND PERSONAL PROPERTY

**A.1.**   **INSURING AGREEMENTS**
      A.1.A. PERILS INSURED
      A.1.B. PROPERTY INSURED
      A.1.C. ADDITIONAL PROPERTY INSURED

**A.2.**   **EXTENSIONS OF COVERAGE**
      A.2.A. EXPEDITING EXPENSE
      A.2.B. TRANSIT
      A.2.C. POLLUTION HAZARD
      A.2.D. VALUABLE PAPERS AND ELECTRONIC DATA PROCESSING MEDIA
      A.2.E. DEMOLITION AND INCREASED COST OF CONSTRUCTION
      A.2.F. FIRE BRIGADE CHARGES AND EXTINGUISHING EXPENSES
      A.2.G. REMOVAL OF DEBRIS
      A.2.H. PROFESSIONAL FEES
      A.2.I. HAZARDOUS SUBSTANCES OR CONTAMINANTS
      A.2.J. MISCELLANEOUS UNSCHEDULED LOCATIONS
      A.2.K. PROPERTY IN COURSE OF CONSTRUCTION
      A.2.L. PIPELINE CONSTRUCTION COVERAGE
      A.2.M. SUE AND LABOR EXPENSES



C:\Documents and Settings\basta\Local Settings\Temporary Internet Files\OLK40\Primary $50mm Onshore Policy (2).doc



Policy No. MSW-0388

**A.3.  CONDITIONS**
    A.3.A.  BRANDS OR TRADEMARKS
    A.3.B.  DUE DILIGENCE
    A.3.C.  MISREPRESENTATION
    A.3.D.  SALVAGE AND RECOVERIES
    A.3.E.  SPECIAL STATE REQUIREMENTS
    A.3.F.  SUSPENSION
    A.3.G.  PAIRS AND SETS
    A.3.H.  VALUATION

**A.4.  EXCLUSIONS**
    A.4.A.  PROPERTY EXCLUDED
    A.4.B.  PERILS EXCLUDED
    A.4.C.  SEEPAGE AND/OR POLLUTION EXCLUSION (NMA 1999B AMENDED)

## SECTION B – TIME ELEMENT

**B.1.  INSURING AGREEMENTS**

**B.2.  BASIS OF INDEMNITY**

**B.3.  DEFINITIONS**

**B.4.  CONDITIONS**
    B.4.A.  EXPERIENCE OF THE BUSINESS
    B.4.B..  EXTENDING THE PERIOD OF INTERRUPTION
    B.4.C.  RESUMPTION OF OPERATIONS
    B.4.D.  CALCULATION OF INDEMNITY AND INDEMNITY LIMIT

**B.5.  EXTENSIONS OF COVERAGE**
    B.5.A.  EXTRA EXPENSE
    B.5.B.  IMPOUNDED WATER
    B.5.C.  SERVICE INTERRUPTION
    B.5.D.  DEFERRED PAYMENTS FROM CUSTOMERS
    B.5.E.  INGRESS/ EGRESS
    B.5.F.  RENTAL VALUE
        1.   INSURING AGREEMENT
        2.   BASIS OF INDEMNITY
        3.   EXCLUSIONS
        4.   PERIOD OF INTERRUPTION
    B.5.G.  LEASEHOLD INTEREST
    B.5.H.  ACCOUNTS RECEIVABLE

**B.6. EXCLUSIONS**





# DECLARATIONS

### 1.  NAMED ASSURED

**THE WILLIAMS COMPANIES, INC.** including all Subsidiary, Associated, Affiliated, Inter-related or Controlled Companies, Corporations or Firms (including any Limited Liability Company as defined herein, general and limited partnerships and joint ventures) as now exist or may hereafter be constituted for which The Williams Companies, Inc. has or acquires financial control or has the responsibility to provide insurance. Also including Williams Partners LP and its subsidiaries and Gulfstream Natural Gas System, LLC and Gulfstream Management & Operating Services, LLC, Williams Pipeline Partners LP and its subsidiaries and Wamsutter LLC.

### 2.  LOSS PAYEE

Loss, if any, under this Policy shall be adjusted with and payable to The Williams Companies, Inc. or order, whose acceptance shall constitute a release in full of all liability of Underwriters under this Policy as regards such loss.

### 3.  POLICY PERIOD

The period of this Policy shall be from **May 1, 2010 to May, 1, 2011**, both dates at 12:01 a.m., Central Standard Time at Tulsa, Oklahoma, U.S.A.

### 4.  INTEREST

### Section A

Section A covers the Assured's **Onshore** interest against all risks of direct physical loss or damage in respect of real and personal property of every kind and description, owned, operated, controlled, leased, rented, used or intended for use by the **Assured**, and includes but is not limited to, improvements and betterments, property of others in the Care, Custody or Control of the **Assured** or in the care, custody or control of others on behalf of the **Assured**, property for which the **Assured** is responsible, personal property of the **Assured's** employees or officials while on premises owned or controlled by the Assured at the option of the **Assured,** electronic data equipment and media, valuable papers and records, property in the Course of Construction, Installation, Erection or Assembly in progress at inception or any time during the policy period or acquired subsequent thereto, and property in Transit. This Section includes but is not limited to pipelines, compression and pump stations, terminals, and gas or other product in lines and/or storage, including, but not limited to petroleum products, natural gas and its by-products, liquids derived from natural gas, liquefied natural gas, ethanol and ethanol production by-products, all as further described in Section A of this Policy provided that such property is scheduled and declared at inception.





Policy No. MSW-0388 DECLARATIONS

## Section B

Section B covers Time Element loss from direct physical loss or damage to property arising from an **Occurrence** covered or a peril insured against under Section A, all as further described in Section B of this Policy, provided that such property is scheduled and declared at inception.

For the purpose of this Section the term Time Element shall be understood to mean Business Interruption on an Actual Loss Sustained basis, Contingent Business Interruption, Extra Expense, Contingent Extra Expense, Accounts Receivable and Rental Value as further described in Section B of this Policy.

## Section A and B

It is understood and agreed that wherever reference is made herein to property scheduled and declared at inception, same shall be deemed to be such values as scheduled and declared by the Assured, which is held on file with McGriff Seibels & Williams, Inc. and as submitted under the TWC-Insurance web site at inception, which is accessible and available to underwriters hereon for underwriting information purposes.

5. ## SUMS INSURED AND/OR LIMITS OF LIABILITY
   ## (For the Assured's Interest Unless Otherwise Stated)

A limit of USD **50,000,000** combined single limit Sections A and B combined applies in respect of any one accident or **Occurence**, subject to the following separate annual aggregate limits:

a)      USD **50,000,000** for losses caused by the peril of **Flood;**

b)      USD **50,000,000** for losses caused by the peril of **Earthquake Shock;**

c)      USD **50,000,000** for losses caused by the peril of **Named Windstorm.**

Subject further to sublimits as attached to these Declarations.

These limits apply in excess of the Retention / Excess amounts stated in Item 6. or Item 7. of these Declarations.

Maximum **Period of Interruption** for Section B twenty-four (24) months.





Policy No. MSW-0388 DECLARATIONS

**6.** **RETENTIONS AND/OR EXCESS AMOUNTS**
   **(For the Assured's Interest Unless Otherwise Stated)**

Retention/Excess Amounts shall apply separately in respect of Sections A and B. However all Retention/Excess Amounts noted in respect of Section A are also inclusive of any applicable Extra Expense and/or Contingent Extra Expense amount.

Single Largest Excess (Section A)
In the event of a loss involving more than one location, the Retention/Excess shall not exceed the single largest applicable Excess amount any one accident or **Occurrence**.

### Section A

USD 2,000,000 any one accident or **Occurrence** except:

   i)    In respect of Geismar Olefins Plant (10/12ths owned) USD 1,000,000 any one accident or **Occurrence**

   ii)   In respect of Conway Storage and Fractionator USD 1,000,000 any one accident or **Occurrence**

   iii)  In respect of Gulfstream Natural Gas System LLC USD 500,000 any one accident or **Occurrence** (for 100%)

   iv)   In respect of Laurel Mountain Midstream LLC assets and RW Gathering LLC assets USD 250,000 any one accident or **Occurrence**

   v)    In respect of losses resulting from Transportation as covered herein USD 250,000 any one accident or **Occurrence**.

### Section B

60 days waiting period any one accident or **Occurrence** except as respects Gulfstream Natural Gas System LLC, RW Gathering LLC, and Laurel Mountain Midstream LLC assets to which 45 days waiting period any one accident or **Occurrence** applies.

**7.** **NAMED WINDSTORM EXCESS**

### Section A

USD 10,000,000 any one accident or **Occurrence** in respect of losses arising from **Named Windstorm** for interest, (except for Gulfstream Natural Gas System LLC which is for 100% interest), which is in lieu of any other excess amounts under Section A.

### Section B

75 days waiting period any one accident or **Occurrence** in respect of losses arising from **Named Windstorm** which is in lieu of any other excess amounts under Section B.





Policy No. MSW-0388 DECLARATIONS

## 8.   TERRITORIAL LIMITS

The fifty (50) states of the United States of America, the District of Columbia, Canada and Puerto Rico except Worldwide for Transit as further defined in Policy.

## 9.   NOTICE TO UNDERWRITERS

All notices and correspondence to Underwriters, including premiums, required under this Policy are to be sent to the following entity for onward transmission to Underwriters:

McGriff, Seibels & Williams, Inc.
P.O. Box 10265
Birmingham, Alabama 35202, U.S.A.

## 10.   NOTICE TO THE ASSURED

All notices and correspondence to the **Assured** relating to this Policy are to be addressed and sent to the Assured at the following address:

The Williams Companies, Inc.
Risk Management and Insurance Department

| At: | One Williams Center, | Or: | P.O. Box 3483 |
|-----|----------------------|-----|----------------|
|     | Tulsa, Oklahoma 74172, U.S.A. |     | Tulsa, Oklahoma 74101, U.S.A. |

## 11.   NET PREMIUM FOR THE POLICY PERIOD (100%)

| **Named Windstorm / ensuing Flood:** | USD 2,500,000 |
|---------------------------------------|----------------|
| **All other risks covered herein:** | USD 7,000,000 |
| TOTAL: | USD 9,500,000 |

Premium includes an allowance of up to 2.5% for Engineering / Loss Control Inspection services to be performed by Starr Technical Risk Agency and/or AIG Global Energy Inspection and Insurance Company and/or Hydrocarbon Risk Consultants Limited. Allowance shall be for services performed during the Policy Period, payable at expiry, subject to receipt of invoices/receipts and inspection reports.



Policy No. MSW-0388 DECLARATIONS

## 12.   SCHEDULE OF SUBLIMITS

The following sublimits are for the **Assured's** interest and apply in respect of each and
every **Occurence**. They are included within, and not in addition to, the limits of liability:

| | | |
|---|---|---|
| a) | USD 2,000,000 | per month, in respect of Business Interruption arising from locations for which Business Interruption values have not been declared at inception. |
| b) | USD 25,000,000 | in respect of Extra Expense. |
| c) | USD 15,000,000 | in respect of Expediting Expense. |
| d) | USD 25,000,000 | in respect of Property in Course of Construction (excluding delay in Start Up). Maximum Estimated Insurable Contract Value at inception of work USD 25,000,000. |
| e) | USD 25,000,000 | in respect of Contingent Business Interruption. |
| f) | USD 10,000,000 | in respect of Contingent Extra Expense and Rental Value. |
| g) | 30 DAYS | in respect of Ingress / Egress. |
| h) | USD 25,000,000 | in respect of Removal of Debris. |
| i) | USD 25,000,000 | in respect of Demolition and Increased Cost of Construction. |
| j) | USD 25,000,000 | in respect of off Premises Power / Service Interruption, combined single sublimit with Contingent Business Interruption if applicable. |
| k) | USD 25,000,000 | in respect of Property in Course of Transit. |
| l) | USD 1,000,000 | in respect of Valuable Papers and Records. |
| m) | USD 2,500,000 | in respect of Accounts Receivable. |
| n) | USD 2,500,000 | in respect of Reconstitution of Electronic Data and/or Media. |
| o) | USD 2,500,000 | in respect of Professional Fees. |
| p) | 30 DAYS | in respect of Interruption by Civil or Military Authority (including OSHA). |
| q) | USD 25,000,000 | (100%) Miscelleaneous Unscheduled Locations in respect of property damage. |
| r) | USD 10,000,000 | Fire Brigade Charges and Extinguishing Expenses. |
| s) | USD 1,000,000 | Claims Preparation Costs. |



Policy No. MSW-0388 DECLARATIONS

| | | |
|---|---|---|
| t) | **45 DAYS** | in respect of Impounded Water. |
| u) | **USD  1,000,000** | in respect of Hazardous Substances and/or Contaminants and/or Pollutants. |
| v) | **USD 50,000,000** | in respect of Automatic Acquisitions. |
| w) | **USD 50,000,000** | in respect of gas in pipelines. |
| x) | **USD 150,000,000** | in respect of gas in storage. |



C:\Documents and Settings\besta\Local Settings\Temporary Internet Files\OLK40\Primary $50mm Onshore Policy (2).doc



# GENERAL DEFINITIONS, CONDITIONS, AND EXCLUSIONS
## Applicable to Section A and Section B of this Policy

**IN THE EVENT OF ANY CONFLICT BETWEEN THESE GENERAL DEFINITIONS, EXCLUSIONS AND CONDITIONS AND THE TERMS AND CONDITIONS OF AN INDIVIDUAL SECTION OF THIS POLICY, IT IS AGREED THAT THE TERMS AND CONDITIONS OF THE INDIVIDUAL SECTION SHALL ALWAYS PREVAIL.**

Words and phrases which appear in **bold** type in this Wording have the meanings set forth in these General Definitions, Exclusions and Conditions or the individual Sections of this Policy.

## A. DEFINITIONS

### A.1.   NAMED ASSURED

The term "**Named Assured**", wherever used in this Policy, shall mean the entities stated in Item 1. of the Declarations.

As used therein, the term "Limited Liability Company (LLC)" shall mean any Limited Liability Company (as now or hereafter formed and defined under the laws of any state of the United States of America), or a similar entity formed under the laws of any country outside of the United States of America, elsewhere in this Policy referred to as a "LLC", of which a **Named Assured** is a member.

It is agreed by the Underwriters that the coverage provided under this Policy for any LLC shall extend to any subsidiary company of such LLC and to the liability of any manager or employee of such LLC or subsidiary company while acting in his or her capacity as such.

Notwithstanding anything to the contrary contained in the foregoing, it is agreed by both the Underwriters and the **Named Assured** that:

1.    any LLC formed or acquired after the inception date or any anniversary date of this Policy shall be automatically covered under this Policy;

2.    the Underwriters' liability under this Policy shall not be increased by the bankruptcy, insolvency or inability or refusal to pay of other members of any LLC (or the insurers of such other members) of which a **Named Assured** is a member.

It is further agreed that any reference to "LLC" under this definition shall be deemed to read "LLC or LLP", and that LLP shall mean a Limited Liability Partnership.



Case 4:13-cv-00571-CVE-FHM   Document 2 Filed in USDC ND/OK on 09/03/13   Page 62 of 281



**A.2.**   <u>OCCURRENCE, EARTHQUAKE SHOCK, FLOOD AND NAMED WINDSTORM</u>

i.      The term "accident" and/or "Occurrence" (where applied), wherever used in this Policy, shall mean one loss or series of losses arising out of one event, except:

        i)      as respects the peril of **Earthquake Shock**, the term "**Occurrence**" shall mean the sum total of all losses sustained by the **Assured** during any period of seventy two (72) hours commencing during the term of this Policy;

        ii)      as respects the peril of **Flood**, the term "**Occurrence**" shall mean the sum total of all losses sustained by the **Assured** during any period of seventy two (72) hours commencing during the term of this Policy;

        iii)      as respects the peril of **Named Windstorm**, the term "**Occurrence**" shall mean the sum total of all losses sustained by the **Assured** arising out of the same atmospheric disturbance during any period of seventy two (72) hours commencing during the term of this Policy;

     Should any **Occurrence** referred to above extend beyond the expiration date of this Policy and commence prior to the expiration, the Underwriters shall pay all losses occurring during such period as if such period fell entirely within the term of the Policy.

     The Underwriters shall not be liable, however, for any loss caused by any **Occurrence** commencing before the effective date and time or after the expiration date and time of this Policy.

ii.      The term "**Earthquake Shock**", wherever it is used in this Policy, shall mean earthquake, volcanic eruption, shock, tremor, landslide, subsidence, sinkhole collapse, tsunami, mud flow or rock fall or any other earth movement, and shall not include any ensuing loss, damage or destruction resulting from other perils insured.

iii.      The term "**Flood**", wherever it is used in this Policy, shall mean waves, tide or tidal water or the rising (including the overflowing or breaking of boundaries) of lakes, ponds, reservoirs, rivers, harbors, streams, water channels or other bodies of water, whether or not driven by wind.

iv.      The term "**Named Windstorm**", wherever it is used in this Policy, shall mean a storm, cyclone, atmospheric disturbance, depression or other weather phenomena for the period of time the National Oceanic and Atmospheric Administration (NOAA) identifies the storm, cyclone, atmospheric disturbance, depression or other weather phenomena with an Atlantic designated name allocated by the World Meteorological Organisation and only while located in the geographic jurisdiction of the United States and/or its offshore waters including but not limited to the Gulf of Mexico. The term **Named Windstorm** shall include ensuing **Flood**.



Policy No. MSW-0388 GENERAL DEFINITIONS

**A.3.   ONSHORE**

The term **"Onshore"** shall mean the **Assured's** operations, property and interests up to and including the line of ordinary low water along that portion of the coast of land within the territorial limits defined herein but shall not include that which is in direct contact with the open seas and beyond the line marking the seaward limit of inland waters.

**A.4.   RIVER CROSSING(S)**

A "River Crossing" is defined as the length of pipeline extending above or beneath the main active river channel or body of water and extending an additional 50 feet on either side of the main river channel or body of water and also includes the length of pipeline in the floodplain adjoining the main river channel or body of water.

**A.5.   ACTUAL CASH VALUE**

The term **"Actual Cash Value"** means the **Replacement Cost** less deduction for physical depreciation. In determining **Actual Cash Value**, deduction for depreciation shall be no more than 2% per annum and which not to exceed fifty percent (50%) if the item was in use at the time of loss. In no event shall the **Actual Cash Value** exceed what it would cost to repair or replace the property lost or damaged.

**A.6.   REPLACEMENT COST**

The term "Replacement Cost" means the lesser of either:

i.      the cost to replace new with like kind and quality, without deduction for depreciation, at the time of replacement; or

ii.     the cost to repair, re-work, re-route, rebuild, or modify, at the time of such reinstatement or repair, without deduction for depreciation, in order to return, as much as is reasonably possible, to the state of existence and/or operation prior to loss; or

iii.    the **Limit of Insurance**.

"Replacement Cost" shall also include any costs covered under General Conditions item B.18 and/or Section A.2 Extensions of Coverage.

If, as a result of direct physical loss or damage to Insured Property, and/or direct physical loss or damage to the property of others directly related and necessary to the operation of Insured Property, caused by a Peril Insured against by Section A, it becomes necessary to repair, replace, re-work, re-route, rebuild, modify, or demolish any Insured Property, whether damaged or not, then **"Replacement Cost"** shall include:

i.      the cost sustained in demolishing and removing any damaged or undamaged portion of the Insured Property necessitated by such loss or damage, including the cost of clearing the site thereof and removal of debris;

ii.     the cost incurred in repairing, rebuilding, replacing, re-routing, re-working or modifying the damaged, demolished, and undamaged portions of such Insured Property in order to return, as much as is reasonably possible, such Insured Property to the state of existence and/or operation prior to such loss.





Policy No. MSW-0388 GENERAL DEFINITIONS

**A.7.** **OBJECT**

The term "**Object**" means any boiler, fired or unfired pressure vessel, refrigeration or air conditioning system, piping and accessory equipment and any mechanical or electrical machine or apparatus used for the generation, transmission or utilization of mechanical or electrical power.

**A.8.** **VALUABLE PAPERS AND RECORDS**

The term "**Valuable Papers and Records**" shall mean written, printed or otherwise inscribed documents and records including but not limited to books, mortgages, abstracts, drawings, exposed film, manuscripts, maps and records.



C:\Documents and Settings\testa\Local Settings\Temporary Internet Files\OLK40\Primary $50mm Onshore Policy (2).doc



Policy No. MSW-0388 GENERAL CONDITIONS

## B. CONDITIONS

**B.1. EXCESS AND UNDERLYING INSURANCE**

Permission is granted to the **Assured** to have:

i.   excess insurance over the Limits of Liability as set forth in the Declarations;

ii.  insurance in the name of and for the benefit of the **Assured** applying to the **Assured's** Retentions/ Excess amounts as set forth in the Declarations, or any part thereof, and the existence of such insurance, if any, shall not reduce any liability under this Policy.

**B.2. BANKRUPTCY AND INSOLVENCY**

In the event of the bankruptcy or insolvency of the **Assured** or of the **Assured's** estate or of any entity comprising the **Assured**, the Underwriters hereon shall not be relieved of the payment of any losses or claims that would have been payable hereunder but for such bankruptcy or insolvency.

**B.3. ABANDONMENT OF PROPERTY**

There can be no abandonment to the Underwriters of any property without the prior consent of Underwriters.

**B.4. INSPECTION AND AUDIT**

Underwriters or their specified representatives shall be permitted but not obligated to inspect the **Assured's** property and operations at any reasonable time during normal working hours, as far as they relate to the subject matter of this Insurance, subject to prior notice being given to the Risk Management and Insurance Department of The Williams Companies, Inc.  Neither the Underwriters' right to make inspections nor the making thereof nor any advice or report resulting therefrom shall constitute an undertaking on behalf of or for the benefit of the **Assured** or others, to determine or warrant that such property or operations are safe or healthful, or are in compliance with any law, rule or regulation.

Underwriters or their specified representatives may examine and audit the **Assured's** books and records at any reasonable time during normal working hours subject to prior notice being given to the Risk Management and Insurance Department of The Williams Companies, Inc., as far as they relate to the subject matter of this Insurance.



 

Policy No. MSW-0388 GENERAL CONDITIONS

**B.5.** **CANCELLATION**

This Policy cannot be cancelled by the **Assured**, nor can Underwriters reduce or cancel their participation on the Policy, for any reason except as follows:

a.   At any time an Underwriter can cancel his participation under the Policy if such cancellation is permitted by, and is in accordance with, any cancellation clause or automatic termination clause applicable to any war, strikes or similar coverage;

b.   At any time the **Assured** can cancel this Policy if the **Assured** is purchased by another company or entity, or is not the sole surviving entity following a merger with any other company or entity, or there is a significant change in the **Assured's** ownership. Notice of Cancellation in respect of such circumstance is to be given to Underwriters thirty (30) days prior to such cancellation date.

Any returns of premium payable following cancellation in accordance with this Clause will be calculated on a *pro rata* basis.

In addition, the Special Cancellation Provisions below apply:

Special Cancellation Provisions

1.   It is understood and agreed that if:

    A.   any Underwriter subscribing to this insurance:

        i.   ceases underwriting or accepting new business, whether entirely or in any class of business which partially or totally includes the coverage under this Policy, or

        ii.   enters into a runoff arrangement, or

        iii.   is subject to a scheme of arrangement, or

    B.   any action is taken in any jurisdiction for the suspension of payments by, or the dissolution, winding up, termination of existence, liquidation, insolvency administration or bankruptcy of any Underwriter, or

    C.   a provisional liquidator, liquidator, trustee, administrator, receiver, administrative receiver or similar officer is appointed in respect of any Underwriter or in respect of any part of its assets, or

    D.   any authorisation, approval or consent, licence, exemption, filing, registration or notarisation or other requirement necessary or desirable to enable any Underwriter to carry on business is modified, revoked or withheld or does not remain or proves not to have been in full force and effect, or

    E.   it becomes unlawful for any Underwriter to perform any of its obligations under the Policy or an intention is announced to take any of the actions stated in paragraphs A. to D. above, or

    F.   in the published opinion of the Underwriter's auditor or a credit rating agency, the financial ability of an Underwriter to pay claims is or may be impaired,

    then the **Assured** or the **Assured's** Broker (as agent of the **Assured**) is entitled at its option to cancel that Underwriter's participation in this Policy at any time after the applicable act stated above.





Policy No. MSW-0388 GENERAL CONDITIONS

In that event, the premium earned by such Underwriter for this Insurance shall be the pro rata proportion of the premium allocated to the risks covered under the Policy which corresponds to the period for which the Underwriter has been on risk, but after the deduction of that Underwriter's proportion of outstanding claims under the Policy.

2.   Notwithstanding anything to the contrary contained in this Insurance or subsequently endorsed to it, it is understood and agreed between the Underwriters and the **Assured** that underwriters may cancel this insurance by giving the Assured written notice stating when, not less than ten [10] days thereafter for non- payment of premium, such cancellation shall be effective.

Earned premium shall be calculated on a pro-rata basis.

**B.6.** <u>CURRENCY</u>

The premiums, losses and claims, if any, under this Policy are payable in United States of America Dollars (USD).

**B.7.** <u>CLAIMS NOTIFICATION AND LOSS ADJUSTMENT CLAUSE</u>

a.   <u>Notice of Loss</u>

As soon as practicable after a) any **Occurrence** likely to give rise to a claim hereunder, and/or b) any loss or damage which is insured against under this Policy, is known to the Risk Management and Insurance Department of The Williams Companies, Inc., the **Assured** shall report such loss or damage with full particulars to the entity stated in Item 11. of the Declarations.

The failure to give notice in accordance with the foregoing of any **Occurrence** which at the time did not appear to involve this Policy but which at a later date appears to give rise to claim hereunder, shall not prejudice such claim.

b.   <u>Proof of Loss</u>

In the event of loss under this Policy it shall be necessary for the **Assured** to render a signed and sworn proof of loss as soon as practicable to Underwriters or their appointed representatives stating the place, time, cause of loss, damage or expense; the interest of the **Assured** and of all others in the property involved; the value of the property involved in the loss; and the amount of loss, damage or expense, including any outside claim expense, other than legal expenses incurred by the **Assured**, for any service to prove a loss resulting from an **Occurrence** insured against under this Policy.

c.   <u>Payment of Loss</u>

All adjusted claims under this Policy shall be due and payable no later than thirty (30) days after the presentation and acceptance of proof of loss by Underwriters or their appointed representative. In the event any payment, including partial loss payment, is not made within thirty days underwriters agree to reimburse the Assured for loss of interest calculated at the prevailing LIBOR rate per annum and/or pro rata for each day the payment is overdue from each respective market.





Policy No. MSW-0388 GENERAL CONDITIONS

d.   **Partial Loss**

Permission is hereby granted to the **Assured** to commence   repairs in respect of any partial damage to property insured hereunder by a covered loss, provided always that Underwriters' appointed loss adjuster has reviewed and agreed to this with the **Assured**.

In the event of such covered loss whether a partial or total loss, Underwriters will make periodic loss payments to the **Assured** for both property damage and business interruption/time element subject to the Sum Insured/Limit of Liability of this Policy.  Such advance partial payments will be made within (30) thirty days from submission and acceptance by Underwriters of a partial proof of loss with reasonable supporting documentation.

Underwriters agree to make an initial advance payment for property damage being the **Actual Cash Value** of the property lost or damaged.  In the event of a loss involving a number of properties/assets an initial advance payment can apply to each property/asset lost or damaged.  Subsequent payments on account for property damage shall be made when repair/replacement costs incurred exceed the initial payment for each property/asset.   Incurred Business Interruption losses will also be eligible for inclusion within the computation for any partial payment.

Subsequent payments on account for business interruption/time element losses shall be payable in full thirty (30) days after such period of interruption.

Nothing contained in this clause shall override the basis of recovery and/or valuation clauses contained herein for any subsequent or final claims payments.

e.   **Loss Adjustment**

In the event of an **Occurrence**, the panel of agreed Loss Adjusters are as follows:

Cta (Charles Taylor adjusting).

Rex Andrews and Associates.

McLain Crow.

In the event of a loss, it is agreed the Assured can elect any one of the above loss adjusters to commence the adjustment process with prompt advice provided to Underwriters.

AEGIS and Lexington shall have the responsibility for communicating and directing the adjustment activity on all losses to include coordinating the efforts of all insurers in the claims adjustment process as respects communicating instructions, coverage positions and/or settlement offers to the adjuster and insured.

All Other Insurers shall have the absolute right, if they so choose, to attend all meetings relating to the investigation, negotiation, adjustment or settlement of the loss, and to be furnished with all the information obtained in respect of the loss, but all other Insurers are expected to work through AEGIS and Lexington in



Page 19 of 57

 

Policy No. MSW-0388 GENERAL CONDITIONS

communicating and/or coordinating the adjustment process. All questions from all other Insurers relating to coverage, liability and/or the adjustment will be directed to AEGIS and Lexington who will, in turn, work to address the queries and any and all issues through the assigned adjuster, the Assured and the brokers.

**B.8. UNDERWRITERS' SERVICING AGENTS OR BROKERS**

McGriff, Seibels & Williams, Inc., P.O. Box 10265, Birmingham, Alabama, 35202, U.S.A. is the **Assured's** servicing agent and responsible for all service requirements required by the **Assured** relating to all aspects of this insurance.

**B.9. GOVERNING LAW AND JURISDICTION**

Any dispute relating to this Policy or to a claim (including but not limited thereto, the interpretation of any provision of the Policy) shall be governed by and construed in accordance with the laws of the state of Oklahoma.

Each party agrees to submit to the exclusive jurisdiction of the Courts of Oklahoma.

**B.10. ALTERNATE DISPUTE RESOLUTION**

a. In the event of any dispute between the parties relating to or arising out of any provision of this Policy, the representatives of the parties shall meet promptly in a good faith effort to resolve this dispute extra-judicially. The party initially raising a dispute shall arrange for this meeting at a time and place mutually acceptable to both parties. Prior to the meeting, each party shall deliver to the other party a written summary of the evidence and arguments substantiating its position.

b. If the dispute is not resolved as a result of such meeting, the parties shall attempt to resolve the dispute by the use of a non-binding mini-trial. It is understood that the parties may mutually agree to use another method of alternate dispute resolution such as mediation or arbitration.

c. The mini-trial shall be conducted before a panel composed of senior executive officers of each party, who have settling authority to resolve the dispute, and a neutral advisor.

d. The parties shall exchange names of potential advisors and select from this pool a mutually acceptable candidate. If the parties cannot agree on the selection of a neutral advisor, the President of the Center for Public Resources or his or her designee shall select a neutral advisor from the Judicial Panel of the Center for Public Resources.

e. The parties shall promptly agree on the ground rules which will govern the parties' conduct before, during and after the mini-trial. These ground rules shall include:

    i. a schedule for the exchange of documents, including briefs summarising each party's respective position on the dispute;

    ii. the duties and responsibilities of the neutral advisor;

    iii. the format and location of the mini-trial; and



 

Policy No. MSW-0388 GENERAL CONDITIONS

    iv.    mandatory settlement discussions between the senior executives of each party immediately after the mini-trial.

f.    The parties shall also discuss whether any discovery will be necessary to prepare the mini-trial. If the parties mutually agree that such discovery is necessary, the parties shall establish an expedited discovery schedule.

g.    Either party may resort to judicial proceeding if:

    i.    such party's good faith attempt to resolve the dispute by a mini-trial has been unsuccessful, or

    ii.    interim resort to court is necessary to prevent irreparable injury to a party or to third parties.

h.    The costs of this Alternate Dispute Resolution shall be borne equally between both parties.

## B.11.  SERVICE OF SUIT

The **Assured** may serve process upon any senior partner in the firm of:

**Mendes & Mount (Attorneys), 750 Seventh Avenue, New York, N.Y. 10019-6829** and it is agreed that in any suit instituted against any one of them upon this contract the Underwriters will abide by the final decision of the Court or of any Appellate Court in the event of an appeal.

## B.12.  TITLES OF PARAGRAPHS

The several titles of the various paragraphs of this Policy (and of any endorsements attached hereto) are inserted only for purposes of reference and shall not be deemed in any way to limit or affect the provisions to which they relate.

## B.13.  DELAYS, ERRORS OR OMISSIONS

It is agreed that this Insurance shall not be prejudiced by any unintentional delay, error or omission in reporting hereunder, provided prompt notice is given to the Underwriters as soon as said delay, error or omission becomes known to the Risk Management and Insurance Department of The Williams Companies, Inc.



Case 4:13-cv-00571-CVE-FHM   Document 2 Filed in USDC ND/OK on 09/03/13   Page 71 of 281



**B.14.** <u>OIL POLLUTION ACT DISCLAIMER</u>

This insurance does not constitute evidence of financial responsibility under the Oil Pollution Act of 1990 or any similar federal or state law and it is a condition of this insurance that it shall not be submitted to the United States Coast Guard or any federal or state agency as evidence of financial responsibility. The Underwriters do not consent to be guarantors.

**B.15.** <u>ACTION AGAINST UNDERWRITERS</u>

No action shall be brought against Underwriters unless commenced within twenty-four (24) months from the date the claim is disputed in writing.

**B.16.** <u>ASSIGNMENT</u>

Assignment or transfer of this Policy shall not be valid except with the prior written consent of the Underwriters.

**B.17.** <u>ASSISTANCE AND COOPERATION OF THE ASSURED</u>

The **Assured** shall cooperate with Underwriters and, upon Underwriters' request and expense, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and conducting suits.

**B.18.** <u>RECOVERABLE CHARGES</u>

It is agreed that the provisions contained in the **Replacement Cost** definition shall also include the Assured's direct labor cost, general and administrative overhead expenses, engineering and supervision overhead expenses, and indirect labor overhead expenses associated with the repairing or replacing of the damaged or destroyed insured property, such overhead expenses being added at the time of repair or replacement. Overhead expenses will be calculated as 10% of the total direct labor, supervision and engineering charges incurred to repair or replace damaged or destroyed insured property.  Total direct labor, only for purposes of this calculation of overhead expenses, will include:

i.      the Assured's direct employee payroll charges (plus an adder to cover costs of pension, welfare, taxes, insurance, vacation and other paid absences and employment-related costs) and:

ii.     contractor labor charges, but not to include labor charges incurred by a contractor at the contractor's facility.

The Insurers' maximum total liability for overhead expenses in a single Occurrence shall not exceed USD 5,000,000.



C:\Documents and Settings\besta\Local Settings\Temporary Internet Files\OLK40\Primary $50mm Onshore Policy (2).doc



Policy No. MSW-0388 GENERAL CONDITIONS

### B.19.  CERTIFICATES OF INSURANCE

All parties to whom a certificate of insurance has been issued are automatically added to this Policy upon issuance of said certificates, either as additional **Assureds** or as loss payees, or both, in accordance with the terms and conditions of said certificates. Underwriters hereby authorize and approve McGriff, Seibels & Williams, Inc. as the **Assured's** broker of record, to issue appropriate certificates of insurance as may be required to parties who have an insurable interest in property covered by this Policy or to whom the **Named Assured** has otherwise agreed to provide such certificates.

### B.20.  SUBROGATION

The Underwriters shall, upon payment of any loss, damage or expense under this Policy, be subrogated to all the **Assured's** rights of recovery against any other firm, person or corporation who may be legally or contractually liable for such loss, damage or expense paid by the Underwriters and the **Assured** shall at Underwriters' expense execute and deliver instruments and papers and do whatever else is necessary to secure such rights.

It is agreed that the Underwriters may make, after making prior written notice to the **Named Assured**, claim upon and institute legal proceedings against any parties believed responsible for loss, damage or expense paid under this policy in the name of the **Assured** and the **Assured** will give the Underwriters their full co-operation in pursuing such claim or legal proceeding.

Underwriters agree to waive their rights to subrogation on a blanket basis when the Assured has waived their rights in writing prior to loss.

### B.21.  AUTOMATIC ACQUISITIONS

Subject to the Sublimit of Liability stated in the Declarations, this policy is automatically extended to cover, at nil additional premium, additional property and/or interests which may be acquired, constructed, or otherwise become at risk of the **Named Assured** during the period of this Policy, provided that the reportable value of any single newly acquired or constructed property does not exceed USD 50,000,000.

If the reportable values exceed **USD 50,000,000** for any single acquired or constructed property, then such acquired or constructed property is to be agreed by Underwriters prior to attachment. Underwriters reserve the right to charge an additional premium for any single newly acquired or constructed property with values exceeding **USD 50,000,000.**

However and irrespective of reportable values, any such acquired or constructed property located within FEMA Flood Zone A, anywhere in Florida or California, or within twenty-five miles of the coastal boundaries of the following states are to be agreed by Underwriters prior to attachment:

Alabama
Georgia
Louisiana
Mississippi
North Carolina
South Carolina
Texas





Policy No. MSW-0388 GENERAL CONDITIONS

**B.22. OTHER INSURANCE**

If, at the time of loss covered hereunder, there is other insurance in force which would attach to the benefit of the Assured if this Insurance had not been effected, then this Insurance shall apply only as excess of the amount paid by such insurance but in no event as contributing insurance, unless such insurance has been purchased by the Assured specifically to provide additional limits of insurance in excess of the insurance afforded by this Policy, in which case this Policy shall be primary to such excess insurance

**B.23. CLAIMS PREPARATION COST**

Subject to the Sublimit of Liability stated in the Declarations, this Policy is extended to include the reasonable expenses incurred by the Assured for professional services such as auditors, accountants, architects and engineers, except the Assured's own employees or public adjusters, which are required in order to present a loss which is covered by this Policy.

**B.24. OFAC CLAUSE**

Payment of loss under this policy shall only be made in full compliance with all United States of America economic or trade sanction laws or regulations, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").



C:\Documents and Settings\besta\Local Settings\Temporary Internet Files\OLK40\Primary 550mm Onshore Policy (2).doc




Policy No. MSW-0388 GENERAL EXCLUSIONS

## C. EXCLUSIONS

**C.1.** **WAR AND TERRORISM EXCLUSION (NMA 2918 Amended)**

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss:

a. war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

b. any act of terrorism.

For the purpose of this exclusion, an "act of terrorism" means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organization(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or put the public, or any section of the public, in fear.

This Policy also excludes loss, damage, cost, or expense of whatsoever nature directly or indirectly caused by, resulting from, or in connection with any action taken in controlling, preventing, suppressing, or in any way relating to any act of terrorism.

If an act of terrorism results in a fire and the direct physical loss or damage to property insured hereunder located in any State of the United States, or the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, American Samoa, Guam, each of the United States Virgin Islands and any territory or possession of the United States, that, either pursuant to the Standard Fire Policy or otherwise, prohibits exclusions for acts of terrorism that result in fire, the Insurers will pay for the loss or damage caused by that fire. Such coverage for fire applies only to direct loss or damage to property insured hereunder and may be limited, in accordance with the Standard Fire Policy to the lesser of the actual cash value of the property at the time of the loss, or the amount which it would cost to repair or replace the property, without allowance for any increased cost of repair or replacement by reason of any ordinance or law, and without any compensation for business interruption, extra expense to continue business activities, or any other coverage for loss or damage other than direct physical loss or damage to the property insured hereunder.

With respect to fire resulting from any one or more "certified acts of terrorism" as defined under the Federal Terrorism Risk Insurance Act of 2002 ("TRIA"), Insurers will not pay any amounts for which Insurers are not responsible under the terms of that Act (including subsequent Congressional action pursuant to the Act) due to the application of TRIA Section 103 or any clause that results in a cap on our liability for payments for terrorism losses.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the **Assured.**





Policy No. MSW-0388 GENERAL EXCLUSIONS

In the event any portion of this clause is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

**C.2. INSTITUTE RADIOACTIVE CONTAMINATION, CHEMICAL, BIOLOGICAL, BIO-CHEMICAL, ELECTROMAGNETIC WEAPONS EXCLUSION CLAUSE (CL370)**

**This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith.**

In no case shall this insurance cover loss damage liability or expense directly or indirectly caused by or contributed to by or arising from:

1.1    ionising radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel

1.2    the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof

1.3    any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter

1.4    the radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter. The exclusion in this sub-clause does not extend to radioactive isotopes, other than nuclear fuel, when such isotopes are being prepared, carried, stored or used for commercial, agricultural, medical, scientific or other similar peaceful purposes

1.5    any chemical, biological, bio-chemical or electromagnetic weapon.

**C.3. ASBESTOS CLAUSE**

A.    This Policy only insures asbestos physically incorporated in an insured building or structure, and then only that part of the asbestos which has been physically damaged during the Policy period by one of these Listed Perils:

Fire; Smoke; Explosion; Lightning; Windstorm; Hail; Direct Impact of vehicle, aircraft or vessel; Riot or civil commotion; Vandalism or Malicious Mischief; or Accidental Discharge of fire protective equipment.

This coverage is subject to all limitations in the Policy to which this clause is attached and, in addition, to each of the following specific limitations:

1.    The said building or structure must be insured under this Policy for damage by that Listed Peril.

2.    The Listed Peril must be the immediate, sole cause of the damage to the asbestos.

3.    The Assured must report to Underwriters the existence and cost of the damage as soon as practicable after the Listed Peril first damaged the asbestos. However this Policy does not insure any such damage first





Policy No. MSW-0388 GENERAL EXCLUSIONS

reported to Underwriters more than 12 (twelve) months after the expiration, or termination, of the Policy period.

4.   Insurance under this Policy in respect of asbestos shall not include any sum relating to:

(i)   any faults in the design, manufacture or installation of the asbestos;

(ii)   asbestos not physically damaged by the Listed Peril including any governmental or regulatory authority direction or request of whatsoever nature relating to undamaged asbestos.

B.   Except as set forth in the foregoing Clause A of this Condition, this Policy does not insure asbestos or any sum relating thereto.

### C.4.   MICROORGANISM EXCLUSION

This Policy does not insure any loss, damage, claim, cost, expense or other sum directly or indirectly arising out of or relating to:

mold, mildew, fungus, spores or other microorganism of any type, nature, or description, including but not limited to any substance whose presence poses an actual or potential threat to human health.

This exclusion applies regardless whether there is (i) any physical loss or damage to insured property; (ii) any insured peril or cause, whether or not contributing concurrently or in any sequence; (iii) any loss of use, occupancy, or functionality; or (iv) any action required, including but not limited to repair, replacement, removal, cleanup, abatement, disposal, relocation, or steps taken to address medical or legal concerns.

This exclusion replaces and supersedes any provision in the Policy that provides insurance, in whole or in part, for these matters.

### C.5.   INSTITUTE CYBER ATTACK EXCLUSION CLAUSE (CL380)

1.1   Subject only to clause 1.2 below, in no case shall this insurance cover loss damage liability or expense directly or indirectly caused by or contributed to by or arising from the use or operation, as a means of inflicting harm, of any computer, computer system, computer software program, malicious code, computer virus or process or any other electronic system.

1.2   Where this clause is endorsed on policies covering risks of war, civil war, revolution, rebellion, insurrection, or civil strife arising therefrom, or any hostile act by or against a belligerent power, or terrorism or any person acting from a political motive, Clause 1.1 shall not operate to exclude losses (which would otherwise be covered) arising from the use of any computer, computer system or computer software program or any other electronic system in the launch and/or guidance system and/or firing mechanism of any weapon or missile.





Policy No. MSW-0388 GENERAL EXCLUSIONS

**C.6.** **AUTHORITIES EXCLUSION**

Except as specifically stated in this policy or endorsement attached thereto, the Underwriters shall not be liable for loss, damage, costs, expenses, fines, or penalties incurred, sustained by or imposed on the Assured at the order of any Government Agency, Court, or other Authority arising from any cause whatsoever.

However, if any time element coverage is afforded by this policy or endorsements thereto, the coverage is extended to include any increase in the actual loss sustained by the Assured, resulting directly from an interruption of business covered hereunder, during the length of time not exceeding four (4) consecutive weeks, when as a direct result of damage to or destruction of covered property by the peril(s) insured against, access to the premises or commencement of repairs is delayed at the order of any Government Agency, Court, or other Authority.

**C.7.** **DATA DISTORTION/CORRUPTION EXCLUSION**

Underwriters will not pay for Damage or Consequential loss directly or indirectly caused by, consisting of, or arising from:

(A) Any functioning or malfunctioning of the Internet or similar facility, or of any intranet or private network or similar facility;

(B) Any corruption, destruction, distortion, erasure or other loss or damage to data, software or any kind of programming or instruction set;

(C) Loss of use or functionality whether partial or entire of data, coding, program, software, any computer or computer system or other device dependent upon any microchip or embedded logic, and any ensuing inability or failure of the Assured to conduct business.

This exclusion shall not exclude subsequent Damage or Consequential loss, not otherwise excluded, which itself results from a **Defined Peril**. **"Defined Peril"** shall mean Fire, Lightning, **Earthquake Shock**, Explosion, Falling Aircraft, **Flood**, Smoke, Vehicle Impact, **Windstorm** or Tempest, Accidental Breakdown of an **Object** including Mechanical and Electrical Breakdown.

This exclusion shall not act to increase or broaden coverage afforded by this policy.

Such Damage or Consequential Loss described in A, B, or C above, is excluded regardless of any other cause that contributed concurrently or in any other sequence.





Policy No. MSW-0388 GENERAL EXCLUSIONS

### C.8.   MILLENNIUM CLAUSE

A.   Underwriters will not pay for Damage or Consequential Loss directly or indirectly caused by, consisting of, or arising from, the failure of any computer, data processing equipment or media microchip, operating systems, microprocessors (computer chip), integrated circuit or similar device, or any computer software, whether the property of the insured or not, and whether occurring before, during or after the year 2000 that results from the inability to:

1.   correctly recognize any date as its true calendar date,

2.   capture, save, or retain and/or correctly manipulate, interpret or process any data or information or command or instruction as a result of treating any date other than as its true calendar date, and/or

3.   capture, save, retain or correctly process any data as a result of the operation of any command which has been programmed into any computer software, being a command which causes the loss of data or the inability to capture, save, retain or correctly process such data on or after any date.

B.   It is further understood that the Insurer will not pay for the repair or modification of any part of an electronic data processing system or its related equipment, to correct deficiencies or features of logic or operation.

C.   It is further understood that the Insurer will not pay for Damage or Consequential Loss arising from the failure, inadequacy, or malfunction of any advice, consultation, design, evaluation, inspection, installation, maintenance, repair or supervision done by the Assured or for the Assured or by or for others to determine, rectify or test, any potential or actual failure, malfunction or inadequacy described in A. above.

Such damage or Consequential Loss described in A, B, or C above, is excluded regardless of any other cause that contributed concurrently or in any other sequence.

This clause shall not exclude subsequent Damage or Consequential Loss which itself results from a peril not otherwise excluded under this policy.





Policy No. MSW-0388 SECTION A

# SECTION A – REAL AND PERSONAL PROPERTY

## A.1. INSURING AGREEMENTS

### A.1.A. PERILS INSURED

This Section insures against all risks of direct physical loss or damage in respect of property insured from perils not otherwise excluded, subject to the terms and conditions of this Section.  In the event of direct physical loss or damage to any property insured and such direct physical loss or damage, without the intervention of any other independent cause, results in a sequence of events which causes direct physical loss or damage to other property insured, then this Section will cover such resulting loss or damage.  Nothing in this clause shall be deemed to extend this insurance to property which is otherwise specifically excluded from coverages by the terms of this Section.

### A.1.B. PROPERTY INSURED

This Section covers all **Onshore** real and personal property of every kind and description owned, operated, controlled, leased, rented, used or intended for use by the **Assured**, provided that such property is scheduled and declared at inception and includes but is not limited to  improvements and betterments, property of others in the care, custody and control of the **Assured** or in the care, custody and control of others on behalf of the **Assured**, property for which the **Assured** is responsible, personal property of the **Assured's** employees or officials while on premises owned or controlled by the **Assured** at the option of the **Assured**, electronic data equipment and media, valuable papers and records, property in the course of construction and/or alteration and/or extension and/or addition and/or repair and/or installation and/or erection and/or assembly in progress at inception or any time during the policy period or acquired subsequent thereto, and property in transit. This Section includes but is not limited to pipelines, compression and pump stations, terminals, and gas or other product in lines and/or storage, including but not limited to petroleum products, natural gas and its by-products, liquids derived from natural gas, liquefied natural gas, ethanol and ethanol production by-products.

### A.1.C. ADDITIONAL PROPERTY INSURED

This Section covers automatic additions and deletions to property insured in accordance with the Automatic Acquisition Clause of the General Conditions, and includes the testing of any newly acquired property or **Object**, rented, purchased or in the course of construction, acquired after inception date of this Policy.



 

Policy No. MSW-0388 SECTION A

## A.2. EXTENSIONS OF COVERAGE

### A.2.A. EXPEDITING EXPENSE

Subject to the Sublimit of Liability stated in the Declarations, this Section shall also pay for the reasonable extra cost to make temporary repairs and to expedite the permanent repair or replacement of property insured damaged by a peril insured, including overtime and the extra cost of express or other rapid means of transportation, including air freight. Expediting Expense shall not include the costs incurred by the Assured for the temporary rental of property or the temporary replacement of damaged property nor shall it include the cost of permanent repair or replacement of the lost or damaged property.

### A.2.B. TRANSIT

Subject to the Sublimit of Liability stated in the Declarations, this Section shall pay for direct physical loss or damage not otherwise excluded, to property insured in transit, within the Territorial Limits as stated in the Declarations, during the policy period, by any means of conveyance, from the commencement of loading and continuously thereafter, including while property insured is at the location of any repair, temporary storage, consignment or exhibition; and including deviation and delay; until unloaded at the place of final destination.

i.    This Section is extended to cover physical loss or physical damage:

       a.    to all incoming and/or outgoing shipments made during the period of insurance;

       b.    to property sold and/or shipped by the **Assured**, in which the **Assured** retains an interest, under terms terminating the shipper's responsibility short of points of delivery;

       c.    to property sold and shipped by the **Assured** under terms of F.O.B. ("Free On Board") point of origin or other terms usually regarded as terminating the shipper's responsibility short of points of delivery; however, shipments on terms whereby the **Assured** is not obligated to provide transit insurance are hereby excluded; however, it is agreed that the Underwriters will grant to the **Assured** the prompt collection of losses which otherwise would have come within the terms of this Policy. Such allowance shall be repayable upon remittance of the purchase price by the consignee or to the extent of any recovery received by the **Assured** from the insurance effected by the consignee or otherwise. The **Assured** agrees not to divulge the existence of this Insurance unless required by statute or compelled by a court of law and to use all reasonable means to collect the full amount due from the party who arranged transit coverage and in the event of being unable to collect, the **Assured** agrees to subrogate to Underwriters any rights the **Assured** may have against any such party who arranged transit insurance. In the event the consignee and/or buyer, through an oversight or other reasons, does not provide primary cover, the **Assured** will be held covered for the shipment on a primary basis;






Policy No. MSW-0388 SECTION A

    d.    caused by any unauthorized person(s) representing themselves to be the proper party(ies) to receive goods for shipment or to accept goods for delivery; and

    e.    resulting from the acceptance by the **Assured**, by its agents or by its customers of fraudulent bills of lading, shipping and delivery orders, or similar fraudulent documents.

ii.    The **Assured** may waive rights of recovery against private and/or contract carriers and accept bills of lading or receipts from carriers, bailees, warehousemen, or processors limiting their liability, but this transit insurance shall not inure to the benefit of any carrier, bailee, warehousemen, or processor.

iii.    the **Assured's** rights shall not be prejudiced by any agreement exempting lightermen from liability.

iv.    This Section excludes property of others and the **Assured's** legal liability therefore, being hauled on vehicles owned, leased or operated by the Assured when acting as a common or contract carrier as defined by the Interstate Commerce Commission Regulations or state regulatory agencies.

## A.2.C. POLLUTION HAZARD

Included within, and not in addition to the Sublimit of Liability stated in the Declarations for Demolition and Increased Cost of Construction, this Section covers direct physical loss or damage to pipeline River Crossings directly caused by governmental authorities acting for the public welfare to prevent or mitigate a pollution hazard, or the threat thereof, resulting from direct physical loss or damage to pipeline **River Crossings** for which the Underwriters are liable under this Section, provided such act of governmental authorities has not resulted from want of due diligence by the **Assured** to prevent or mitigate such hazard or threat.

## A.2.D. VALUABLE PAPERS AND ELECTRONIC DATA PROCESSING MEDIA

Subject to the Sublimits of Liability stated in the Declarations, this Section is extended to cover direct physical loss or damage to Valuable **Papers and Records** and to electronic data processing media.

i.    This coverage does not insure against loss or damage to **Valuable Papers and Records** or to electronic data processing media if such property:

    a.    cannot be replaced with other(s) of like kind and quality or restored to useable condition; or

    b.    is held as samples, or for sale, or for delivery after sale.

ii.    This coverage does not insure against loss or damage resulting from:

    a.    errors or omissions in processing or copying, errors or omissions in machine programming or instructions to machines, or computer error or malfunction;

    b.    unauthorised instruction to transfer property to any person or to any place; or





c.     voluntary parting with any property by the **Assured** or any associate, proprietor, partner, director, trustee, officer, employee or agent of any **Assured** if induced to do so by any fraudulent scheme, trick, device or false pretence.

### A.2.E. <u>DEMOLITION AND INCREASED COST OF CONSTRUCTION</u>

Subject always to the Sublimit of Liability stated in the Declarations, if at the time of repair of any direct physical loss or damage insured against by this Section, there is in force any law or ordinance regulating the construction, demolition, repair, replacement, use or removal of buildings or structures, then this Section is extended to cover:

I.     the additional cost sustained in demolishing and removing any undamaged portion of the buildings or structures necessitated by such law or ordinance including the cost of clearing the site thereof and removal of debris;

II.    the cost incurred in actually repairing, rebuilding or replacing both the damaged and demolished portions of such buildings or structures in a manner to satisfy such law or ordinance.

The total liability under this coverage shall not exceed the actual expenditure incurred in demolishing and removing the undamaged portion of the building(s) or structure(s) involved plus the lesser of the following:

A.     The actual additional  expenditure incurred, not including the cost of land, in rebuilding in compliance with such law or ordinance on another site; or

B.     The additional cost of rebuilding in compliance with such law or ordinance on the same site,

In no event shall this coverage include:

i)     Demolition or increased cost of repair or reconstruction, debris removal or loss of use caused by the enforcement of any law, ordinance or administrative regulation regulating asbestos material;

ii)    Any governmental direction or request declaring that that asbestos material present in or part of or utilized on any undamaged portion of insured property can no longer be used for the purpose for which it was intended or installed and must be removed or modified; or

iii)   Cost of compliance with the enforcement of any law, ordinance or administrative regulation which the Assured would have otherwise incurred by nature of such law, ordinance or administrative regulation in the absence of any loss or damage insured against under this Policy





Policy No. MSW-0388 SECTION A

### A.2.F. FIRE BRIGADE CHARGES AND EXTINGUISHING EXPENSES

Subject to the Sublimit of Liability stated in the Declarations, this Section is extended to cover fire brigade charges and other extinguishing expenses including loss of fire extinguishing materials.

### A.2.G. REMOVAL OF DEBRIS

Subject to the Sublimit of Liability stated in the Declarations, this Section shall provide reimbursement of all expenses incurred for debris removal, demolition, removal of ice and dewatering of property, and of cleaning up the site, lease or pipeline right of way, at an insured location, occasioned by direct physical loss or damage to insured property covered by this Policy, and for the temporary removal from its location any insured property endangered by a peril for which indemnity is provided. This extension shall not apply to any cost to remove or neutralize Contaminants and/or Pollutants.

### A.2.H. PROFESSIONAL FEES

Subject to the Sublimit of Liability stated in the Declarations, this Section is extended to include Architects', Surveyors', Accountants', Consulting Engineers' or other professional fees of similar nature necessarily incurred in the reinstatement of property consequent upon its loss or damage (but not for preparing any claim), but not including attorneys' fees.

### A.2.I. HAZARDOUS SUBSTANCES OR CONTAMINANTS

Subject to the Sublimit of Liability stated in the Declarations, if, as a result of an Occurrence insured hereunder, covered property is damaged, contaminated or polluted by Hazardous Substances or Contaminants, Underwriters shall be liable under this policy and any of its endorsements, for the additional expenses incurred for cleanup, repair or replacement, or disposal of that damaged, contaminated or polluted property. As used hereon additional expenses shall mean expenses incurred beyond those for which Underwriters would have been liable if no Hazardous Substances or Contaminants had been involved in the Occurrence.





Policy No. MSW-0388 SECTION A

### A.2.J. MISCELLANEOUS UNSCHEDULED LOCATIONS

Subject to the Sublimit of Liability stated in the Declarations, this Section, subject to all terms, conditions and limitations herein, is extended to cover insured property while at fixed locations not included in the property scheduled and declared at inception.

Coverage under this extension shall not apply to signs, tracks, trestles, bridges, tunnels, electrical transmission and distribution lines, line transformers, towers and poles, cables, equipment or apparatus connected to any of the preceding.

Coverage under this extension shall also not apply to property located anywhere in Florida or California, or within twenty-five miles of the coastal boundaries of the following states:

Alabama
Georgia
Louisiana
Mississippi
North Carolina
South Carolina
Texas

### A.2.K. PROPERTY IN COURSE OF CONSTRUCTION

Subject to the Sublimit of Liability stated in the Declarations, and subject to all terms, conditions and limitations herein, this policy is extended to cover property in the course of construction, fabrication, installation, erection, assembly or testing, including while in transit and storage, (hereinafter referred to as construction work) which commences within the Policy period or is in progress as of inception, provided that the estimated insurable contract value at the inception of such construction work does not exceed the Sublimit. Such coverage shall apply automatically without advice to Underwriters and cover shall continue hereunder through to individual project completion, meaning the earlier of either the completion of testing or the placing of the project into commercial operation, if taking place in the Policy period. Any projects extending beyond the Policy period and intended for coverage hereunder are to be declared and endorsed for coverage under this Policy at terms to be agreed by the Insurer.

With respect to any construction work where the contract value exceeds the sublimit amount stated in the Declarations of this Policy, provision of coverage may be considered by Underwriters subject to the provision of acceptable Underwriting information, and terms and conditions to be specifically agreed by Underwriters prior to attachment of coverage for such construction work hereon.

Notwithstanding anything contained within the foregoing to the contrary, it is understood and agreed that irrespective of the contract value, coverage hereon shall also apply automatically, without advice to underwriters, to any property destined to be used in the course of construction or fabrication or installation or erection or assembly or testing, including while in transit and storage, provided that coverage for any such property to be used is not afforded to the Assured by any other insurance policy and coverage for all such property shall be automatically transferred to a Construction All Risks policy, if applicable, at the inception date of the Construction All Risks policy. Coverage for such property to be used shall always be limited to the Sublimit as stated in the Declarations of this Policy applying to this Property in Course of Construction Clause.

In no event shall this extension include coverage for any Delay in Start-Up.



 

Policy No. MSW-0388 SECTION A

**A.2.L. PIPELINE CONSTRUCTION COVERAGE**

Notwithstanding anything contained within this Policy to the contrary, it is understood and agreed that when the scope of any construction project covered hereunder in accordance with the preceding clause **A.2.K.** of this Section involves the laying or installation of pipelines, then Exclusion **A.4.A.xi.** of this Section is deleted in its entirety, and the following wording is added to this Section:

i.     The following is added to clause **A.2.K.** of this Section, **PROPERTY IN COURSE OF CONSTRUCTION:**

In the event of insured physical loss of or damage to pipelines being a part of the insured project, Insurers will pay the following necessary and reasonable costs:

    a.     Costs of searching for leaks following a hydrostatic test using special apparatus such as robotic cameras, including the cost of lease, operation and transport of such apparatus.  Insurers' liability for this extension of coverage shall not exceed **USD 250,000** in any one **Occurrence.**

    b.     Costs to excavate and backfill a trench, not damaged in itself, when necessary to search for damage to or to effect the repair or replacement of the pipeline, or any portions thereof.  However, Insurers shall not be liable for costs beyond that required to search for damage in, or to effect the repair or replacement of, the pipeline, or any portions thereof.

ii.    The following is added to Item **A.4.B.** of this Section, **PERILS EXCLUDED:**

Insurers shall not be liable for:

Loss, damage or expense caused by, resulting from, contributed to or made worse by accumulation of water, silt, mud, sand or other debris within or upon pipelines when the length of an open trench exceeds **1 mile** per section per **Occurrence,** within open trenches and within or upon pipelines installed therein.

iii.   The following is added to Item **A.3.** of this Section, **CONDITIONS:**

The **Named Assured** warrants that:

    a.     100% of all welded seams six inches in diameter and greater have been x-rayed and all others inspected and tested according to Department of Transportation regulations.  Any deficiencies discovered thereby have been properly repaired;

    b.     Prior to completion of pressure tests, open trenches have been sufficiently backfilled to prevent displacement of pipelines and cables in the event of water accumulation and further that installed pipelines have been plugged so as to prevent the accumulation of water, silt, mud or other debris within the pipeline.





**A.2.M.** <u>SUE AND LABOR EXPENSES</u>

It is agreed that should the Property Insured under this Policy suffer loss or damage covered under the terms of this Insurance, or should loss or damage covered under the terms of this Insurance be imminent, it shall be lawful and necessary for the **Assured**, their factors, servants and assigns, to sue, labor and travel for, in and about the defense, safeguard and recovery of the said Property, or any part thereof, without prejudice to this Insurance, and subject always to the terms, conditions, limitations and exclusions applicable to this Policy, the charges thereof shall be borne by the Underwriters. It is especially declared and agreed that no acts of the Underwriters or the **Assured** in recovering, saving or preserving the Property shall be considered as a waiver or acceptance of abandonment.

Notwithstanding the foregoing, the Underwriters' liability for Sue and Labor Expenses shall always be contained within the overall Limit of Underwriters' Liability as set forth in Item 5. of the Declarations.

## A.3. CONDITIONS

**A.3.A.** <u>BRANDS OR TRADEMARKS</u>

In the event of damage to property, caused by the perils insured against under this Section, bearing a brand or trademark, or sale of which in any way carries or implies the guarantee or the responsibility of the manufacturer or the **Assured**, the salvage value of such damaged property shall be determined after removal in the customary manner of all such brands or trademarks or other identifying characteristics. This Clause shall in no way obligate the **Assured** to remove brands or trademarks. The **Assured** will be given the option to control the salvage disposition of the damaged property. Any expense in connection with this disposition will be included as part of the loss.

**A.3.B.** <u>DUE DILIGENCE</u>

The **Assured** shall take all reasonable precautions and consider all reasonable recommendations of the Underwriters to prevent loss or damage to the property insured.

**A.3.C.** <u>MISREPRESENTATION</u>

This Section shall be void if the **Assured** has willfully concealed or misrepresented any material fact or circumstance concerning this Section or the subject thereof or in case of any fraud, attempted fraud or false swearing by the **Assured** touching any matter relating to this Section or the subject thereof, whether before or after a loss, except that the acts of one **Assured** shall not void, alter, abrogate or otherwise affect this Section as to all other **Assureds** hereunder.

**A.3.D.** <u>SALVAGE AND RECOVERIES</u>

When, in connection with any loss hereunder, any salvage or recovery is received subsequent to the payment of such loss, the loss shall be refigured on the basis on which it would have been settled had the amount of salvage or recovery been known at the time the loss was originally determined. Any amounts thus found to be due either party from the other shall be paid promptly.



Case 4:13-cv-00571-CVE-FHM   Document 2 Filed in USDC ND/OK on 09/03/13   Page 87 of 281



**A.3.E. SPECIAL STATE REQUIREMENTS**

Any and all provisions of this Section which are in conflict with the statutes of the state wherein this Policy is applicable are understood, declared, and acknowledged by Underwriters to be amended to conform to such statutes.

**A.3.F. SUSPENSION**

Upon the discovery of a dangerous condition with respect to any **Object**, any representative of Underwriters may, notify the Director, Risk Management and Insurance, of such condition and allow a 30 day period for the condition to be addressed. In the event that the condition is not addressed, Underwriters may suspend the insurance with respect to an Accident to said Object by written notice mailed or delivered to The Williams Companies, Inc. The insurance so suspended may be reinstated by Underwriters, but only by an endorsement issued to form part of this Policy. The **Assured** shall be allowed the unearned portion of the premium paid for such suspended insurance, pro rata for the period of suspension.

**A.3.G. PAIRS AND SETS**

In the event of loss or damage by the perils insured against under this Section to any article or articles which are part of a pair or set, Underwriters agree to pay the full amount of the value of such pair or a set. The **Assured** agrees to surrender the remaining article or articles of the pair or set to Underwriters. The **Assured** shall have the option of retaining the damaged article or articles and salvage credit to Underwriters shall be negotiated.

**A.3.H. VALUATION**

Notwithstanding anything to the contrary contained herein, in the event of loss, the basis of adjustment and valuation shall be as follows:

a.  **Improvements and betterments, and personal property of the Assured:**
    Replacement Cost if actually replaced or, if not so replaced, at **Actual Cash Value** at time of loss.

b.  **Buildings, structures, machinery and equipment:**
    Replacement Cost if actually replaced; otherwise, **Actual Cash Value** at time of loss.

c.  **Finished Stock:**
    the Assured's selling price less all discounts and non-incurred expense.

d.  **Raw Stock and Stock in Process:**
    Replacement Cost.

e.  **Valuable Papers and Records, and Media:**
    cost to reproduce , if reproduced; if not reproduced, seventy five percent (75%) of reproduction cost or **Actual Cash Value**, whichever is greater.





f.   **River Crossings:**
Replacement Cost if actually replaced; otherwise, **Actual Cash Value** at time of loss.

g.   **Special Provision for Gas Stored Underground:**
Gas loss insured against under this Section from any storage facility will be adjusted for the account of the **Assured** in the same proportion as the **Assured's** own product and the product the **Assured** is responsible for insuring or replacing bears to the total gas volumes in the facility just prior to any loss. Loss will first be adjusted against working gas reserves. Should total working gas be depleted by loss (including working gas not insured under this Section), then loss will be adjusted against cushion gas, provided the **Assured** has insurable interest in cushion gas.

h.   **All Other Property:**
Replacement Cost if actually replaced; otherwise, **Actual Cash Value** at time of loss.

If the the repair, rebuid or replacement of any lost or damaged property is not commenced within two years of the date of loss, the basis of valuation will be the **Actual Cash Value.**

The Insurer shall not pay the **Named Assured** more than the **Named Assured's** or owner's financial interest in the property insured. Financial interests shall include but not be limited to the **Named Assured's** contractual obligation to cover the financial interests of its partners in joint ventures but only to the extent such interests were reported to the Insurer in the application or submission made to the Insurer prior to the Insurer's agreement to provide coverage hereunder or thereafter if accepted in writing by the Insurer.



 

Policy No. MSW-0388 SECTION A

## A.4. EXCLUSIONS

### A.4.A. PROPERTY EXCLUDED

i.      Bills, currency, deeds, evidence of debt, money, notes, securities;

ii.     Land, growing crops, standing timber, animals, watercraft, aircraft (including any airplane, helicopter or other craft designed to fly in the air or space), automotive vehicles licensed for use on public highways except while on premises of the **Assured**;

iii.    Mines, except for equipment and property contained therein, caverns, salt domes and any property contained therein (except insured products), or wells, but this exclusion shall not apply to any ensuing business interruption or extra expense loss that may result because of loss of or damage to the insured product(s);

iv.     Dams, water shafts, power tunnels, dikes, gates and flumes, but this exclusion shall not apply to any resultant damage to covered property caused by a covered peril;

v.      Retaining walls not constituting part of a building, and property located thereon, all when such loss is caused by ice, water pressure, or collision;

vi.     Docks, piers or wharves when such loss is caused by ice or collision;

vii.    Nuclear reactor power plants including all auxiliary property on the site or any other nuclear reactor installation;

viii.   Any nuclear fuel or raw materials used in the nuclear fuel process at any point in the fuel cycle;

ix.     All electrical transmission and distribution lines, line transformers, cables, and equipment or apparatus connected therewith except those on covered property or in the open on land within 1,000 feet of declared property;

x.      Property sold by the Assured under conditional sale, trust agreement, installment plan or other deferred payment plan after delivery to customers, except when the **Assured** is required by contract to provide insurance such as is available under this Section or has the risk of loss;

xi.     Underground transmission and/or lateral pipelines, underground gathering system pipelines, fittings, drains and/or flues, except where located within the fenced area of any plant, compressor station or pumping, metering station or other property, or at **River Crossings**. This exclusion shall not apply to gas or other product within a pipeline or gathering system, or to any ensuing business interruption or extra expense loss that may result because of loss of or damage to such pipeline and/or pipeline equipment, gas or other product, nor shall this exclusion apply to fiberoptic cables, fiberoptic equipment or other related materials, or to leased pipelines;

xii.    Property not located **Onshore**;

xiii.   Property in the course of Ocean Marine Transit;





xiv.   Animals, livestock, standing timber or growing crops;

xv.    Land (including land on which the property is located) except for improvements or betterments,

xvi.   Aircraft, speedcraft, satellites, watercraft, any vehicle or equipment licensed for highway use or rolling stock, except for rolling stock at insured locations or on railroad sidings, and vehicles or equipment licensed for highway use while at insured locations;

xvii.  Bridges, unless specifically identified in property scheduled and declared at inception;

xviii. Railroad beds, ties and tracks, unless they are located on the Assured's premises and are owned by, leased to, or the responsibility of the Assured;

xix.   Reservoirs, containment basins, ponds, or lakes; however, this exclusion shall not apply to equipment or machinery appurtenant to any of the forgoing;

xx.    Dikes or levees, unless specifically identified in property scheduled and declared at inception;

xxi.   Fine art, furs, jewelry, jewels, pearls, precious or semi-precious stones, gold, silver, bullion, platinum or other precious metals and precious alloys;

xxii.  Property of others hauled on vehicles owned, leased or operated by the Assured when acting as a common or contract carrier as defined by the Interstate Commerce Commission or state regulatory agencies.


**A.4.B.  PERILS EXCLUDED**

i.     This Section does not insure loss or damage caused by or resulting from:

    a.   Nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, or due to any act or condition incidental to any of the foregoing, whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by any physical damage insured against by this Section. However, subject to the foregoing and all provisions of this Policy, direct loss by fire resulting from nuclear reaction or nuclear radiation or radioactive contamination is insured against by this Section;

    b.   Infidelity or dishonesty of the **Assured;**

    c.   Any shortage of property discovered upon the taking of inventory or any mysterious disappearance of property or gas in storage;

    d.   **California Earthquake Shock** unless declared and agreed by underwriters;



 

Policy No. MSW-0388 SECTION A

e.  Release, discharge, or dispersal of toxic or hazardous substances, contaminants or pollutants, all whether direct or indirect, proximate or remote, except as specifically provided for in the Seepage, Pollution and Contamination Exclusion attaching to this Section;

f.  Any defect or fault in material, workmanship, or design or latent defect. However, if loss or damage directly results as a consequence of the defective or faulty material, workmanship, design or latent defect excluded above, Underwriters shall be liable for said consequences, but always excluding loss or damage to faulty parts;

g.  Ordinary wear and tear, deterioration, rust, normal corrosion or erosion; gradual cracking, normal settling, shrinkage, bulging, expansion or other gradually developing defects; all unless loss by a peril otherwise insured against hereunder ensues and then Underwriters shall be liable only for such ensuing loss;

h.  Contamination (other than computer viruses, which are already excluded by the provisions of General Condition 26.); shrinkage, evaporation, loss of weight or loss of contents of containers by leakage, unless such damage results directly from other physical damage not otherwise excluded by this Section or results directly from service interruption;

i.  Extremes or changes of temperature or changes in relative humidity, all whether atmospheric or not; exposure to light; change in color or flavor or texture or finish; insects or vermin, seepage, condensation, dampness, depletion, disease, deterioration, dry rot, rot, infestation, inherent vice, mildew, mold, spoilage and decay to raw materials, stock in process or finished goods, unless such damage results directly from other physical damage not otherwise excluded by this Section or results directly from service interruption;

j.  Errors in design, poor workmanship, or use of faulty materials in the development, processing, testing or manufacture of the **Assured's** products or materials; loss attributable to manufacturing or processing operations which result in damage to stock or materials while such stock or materials are being processed, manufactured, tested, or otherwise being worked upon; all unless physical damage not otherwise excluded by this Section results, in which event, this Section shall cover only such resulting damage;

k.  Electrical breakdown of any electrical machine or electrical apparatus while said equipment is undergoing an insulation breakdown test or is being dried out; all unless physical damage not otherwise excluded by this Section results, in which event, this Section shall cover only such resulting damage;

l.  An accident or **Occurrence** to any **Object** operating with sulphur dioxide or hydrogen sulphur gas for:

    (i)  loss or damage resulting from corrosion anywhere following the said accident, and



Case 4:13-cv-00571-CVE-FHM Document 2 Filed in USDC ND/OK on 09/03/13 Page 92 of 281



> (ii) loss or damage to any catalyst caused solely by steam or water contracting or permeating the said catalyst following the said accident or Occurrence.

m.    Confiscation, expropriation, nationalization, commandeering, requisition or destruction of or damage to property by order of the Government de jure or de facto or any public, municipal or local authority of the country or area in which the property is situated, seizure or destruction under quarantine or customs regulation.

n.    Functional and economic obsolescence;

o.    Damage from insects, birds, rodents or other animals;

p.    Settling, cracking, heaving, bulging, expansion or contraction of any foundation, wall, floor, ceiling, roof, structure, patio, walkway, driveway or pavement;

q.    Loss or damage covered by any warranty or guaranty provided by any contractor, vendor, supplier or manufacturer. If the interest of any such contractor, vendor, supplier or manufacturer in the property to which the warranty or guaranty applies is covered under this Policy, this exclusion shall also apply to such interest in such property;

r.    Water below the surface of the ground which presses on or flows or seeps through foundations, walls, floors, paved surfaces, basements, doors, windows or other openings.;

s.    Asbestos;

t.    Fraudulent or dishonest acts;

u.    Voluntary parting;

v.    Loss of market;

w.    Fungi, Wet or Dry Rot, or Bacteria





Policy No. MSW-0388 SECTION A

**A.4.C. SEEPAGE AND/OR POLLUTION AND/OR CONTAMINATION EXCLUSION (NMA 1999B AMENDED)**

Except as may be provided under item(s) A.2.C., A.2.E., and/or A.2.I. of this Section, Extensions of Coverage, this Section does not insure against loss, damage, costs or expenses in connection with any kind or description of seepage and/or pollution and/or contamination, direct or indirect, arising from any cause whatsoever.

NEVERTHELESS if fire is not excluded from this Section and a fire arises directly or indirectly from seepage and/or pollution and/or contamination then direct physical loss or damage insured under this Section arising directly from that fire shall (subject otherwise to the terms, conditions and limitations of the Policy) be covered.

However, if the insured property is the subject of direct physical loss or damage for which Underwriters have paid or agreed to pay then this Section (subject otherwise to its terms, conditions and limitations) insures against direct physical loss or damage to the property insured hereunder caused by resulting seepage and/or pollution and/or contamination.

The **Assured** shall give notice to the Underwriters of intent to claim under the immediately preceding paragraph NO LATER THAN 12 MONTHS AFTER THE DATE OF THE ORIGINAL DIRECT PHYSICAL LOSS OR DAMAGE.

COST OF CLEAN UP EXTENSION
Notwithstanding the provisions of the preceding exclusion in this clause, or any other provision in this Policy respecting seepage and/or pollution and/or contamination, and/or cost of clean, in the event of direct physical loss or damage to the property insured hereunder, this Policy (subject otherwise to its terms, conditions and limitations, including but not limited to any applicable deductible) also insures, within the sum insured, cost of clean up, at the premises of the Assured, made necessary as a result of such direct physical loss or damage.

PROVIDED that this Section does not insure against the costs of decontamination or removal of water, soil or any other substance on or under such premises other than insured property.

It is a condition precedent to recovery under this extension that Underwriters shall have paid or agreed to pay for direct physical loss or damage to the property insured hereunder unless such payment is precluded solely by the operation of any deductible or excess amount and that the Assured shall give notice to the Underwriters of intent to claim for cost of clean up NO LATER THAN 12 MONTHS AFTER THE DATE OF SUCH DIRECT PHYSICAL LOSS OR DAMAGE.



 

Policy No. MSW-0388 SECTION B

# SECTION B – TIME ELEMENT

## B.1. INSURING AGREEMENTS

### B.1.A. Losses to <u>Assured's Property</u>

This Section insures against loss directly resulting from the necessary interruption of the **Assured's** business caused by direct physical loss or damage insured under Section A during the term of this Policy, to real and personal property of the **Assured**, subject to the terms and conditions of this Section.   This Policy is extended to cover Business Interruption incurred, as insured by this Policy, resulting from interruption of the **Assured's** operations at scheduled insured locations following direct physical loss or damage at any other scheduled or unscheduled location(s) of the Assured as covered under the property damage section of this Policy, or which would be covered except for the application of any retention/excess.

### B.1.B. Losses to <u>Contingent Property</u>

Subject to the Sublimit of Liability stated in the Declarations, this Section extends to also insure against loss directly resulting from the necessary interruption of the **Assured's** business caused by direct physical loss or damage to or destruction of real or personal property of third parties by the peril(s) insured against under Section A of this Policy, but only in respect of the **Assured's** direct customers and suppliers and/or as per the Contingent Business Interruption information on file with underwriters.

## B.2. <u>BASIS OF INDEMNITY</u>

The basis of indemnity under this coverage shall be:

<u>Actual Loss Sustained</u>:

the amount of Actual Loss Sustained which occurs during the **Period of Interruption**, calculated in accordance with Clause B.7. of this Section, but not exceeding the reduction in **Gross Earnings** less cash charges and expenses which do not necessarily continue during such interruption of business.



C:\Documents and Settings\besta\Local Settings\Temporary Internet Files\OLK40\Primary $50mm Onshore Policy (2).doc



## B.3. DEFINITIONS

**B.3.A. "Gross Earnings"** shall mean the sum of:

    i.    total net sales value of production (manufacturing operations);

    ii.    total net sales of **Merchandise**; and

    iii.    other earnings derived from operation of the business;

Less the cost of:

    a.    **Raw Stock** from which such production is derived;

    b.    supplies consisting of materials consumed directly in the conversion of such **Raw Stock** into **Finished Stock** or in supplying the service(s) sold by the **Assured**;

    c.    **Merchandise** sold, including packaging materials therefore; and

    d.    services purchased from outsiders (not employees of the **Assured**) for resale which do not continue under contract.

No other costs shall be deducted in determining Gross Earnings.

### B.3.B. Period of Interruption

The **Period of Interruption** shall mean:

    i.    such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such described property as has been lost or damaged or destroyed and to make such property ready for operations under the same or equivalent physical and operating conditions that existed prior to the **Occurrence**. This length of time shall include delays caused by Federal and/or State law, decree, order, regulation or injunction or any similar acts. The length of time does not include any additional time required for making changes to the buildings, equipment or contents regardless of the reason(s) for the changes, except as provided for in the Increased Cost of Construction, Demolition and Debris Removal Clauses contained in this Section; nor any additional time required for restaffing or retraining employees nor for delay of any kind caused by labor disputes, including strikes;

    ii.    such additional time as may be required with the exercise of due diligence and dispatch to repair or replace damaged or destroyed **Valuable Papers and Records**, but not to exceed the time that would be required for transcription from originals or duplicates whether or not the originals or duplicates are available; and/or

    iii.    such additional time as may be required with the exercise of due diligence and dispatch to repair or replace damaged or destroyed media, data and programming for electronic and electromechanical data processing and production equipment, but not to exceed the time that would be required for reproduction from duplicates or from the previous generation of the data, whether or not the duplicates or previous generation are available.





The **Period of Interruption** shall commence on the date immediately following the date of exhaustion of the Retention/Excess Amount (waiting period) stated in Item 7. of the Declarations and shall not be limited by the expiration of this Policy, but the liability of Underwriters shall in no event exceed the maximum **Period of Interruption** stated in Item 5 of the Declarations.

**B.3.C. Finished Stock** is defined as stock manufactured by the **Assured** which in the ordinary course of the **Assured's** business is ready for packing, shipment or sale.

**B.3.D. Raw Stock** is defined as material and supplies in the state in which the **Assured** receives them for conversion into **Finished Stock.**

**B.3.E. Merchandise** is defined as goods kept for sale by the **Assured** which are not the product of manufacturing operations conducted by the **Assured.**

**B.3.F. Normal** shall mean the condition that would have existed had no loss occurred.

## B.4. CONDITIONS

### B.4.A. EXPERIENCE OF THE BUSINESS

In determining the amount payable under this coverage, due consideration shall be given to the experience of the business before the **Period of Interruption** and the probable experience thereafter had no interruption of the business occurred.

In the event the **Assured** would have experienced an operating deficit had no **Period of Interruption** occurred, the Actual Loss Sustained shall be determined by subtracting the operating deficit from the fixed charges and expenses including but not limited to payroll that necessarily continue.

### B.4.B. EXTENDING THE PERIOD OF INTERRUPTION

This Section also insures against the Actual Loss Sustained by the **Assured** resulting directly from the interruption of business, as covered by this Section, for such additional length of time as would be required with the exercise of due diligence and dispatch to restore the business to the condition which would have existed had no loss occurred, commencing with the later of the following dates:

i. The date on which the liability of Underwriters for loss resulting from interruption of business would terminate if this extension of coverage was not provided; or

ii. The date on which repair, replacement or rebuilding of such part of the building(s), structure(s), machinery, equipment or furniture and fixtures of the property insured under Section A as had been damaged or destroyed is actually completed,

but in no event for more than one hundred and eighty (180) consecutive calendar days from said later commencement date.





Policy No. MSW-0388 SECTION B

**B.4.C. RESUMPTION OF OPERATIONS**

As soon as possible after an **Occurrence**, the **Assured** with due diligence and dispatch shall resume business, in whole or in part, and make up lost business within a reasonable period of time (not to be limited to the period during which business is interrupted) through use of every available means, including surplus machinery, duplicate parts, equipment, supplies, surplus or reserve stock, owned or controlled or obtainable from other sources and through working extra time or overtime, all to the extent that the amount for which Underwriters would otherwise be liable under this Section is reduced. Underwriters may take such means as will in the opinion of Underwriters reduce or avert interruption of business or supply the functions in some other way.  All extra expense so incurred by the **Assured** as permitted in this Clause or by the **Assured** at the written direction of Underwriters or by Underwriters, shall be covered hereunder and shall be part of and not in addition to the Sum Insured/ Limit of Liability stated in the Declarations.

**B.4.D. CALCULATION OF INDEMNITY AND INDEMNITY LIMIT**

Business interruption indemnity under this Section is to be calculated on the basis of the monthly business interruption values, which are to be calculated either by applying one twelfth per month of the annual business interruption values declared by the **Assured** at inception, or by taking the actual monthly values declared by the **Assured** at inception.

Indemnification will be calculated on an Actual Loss Sustained basis, to be capped at one hundred and fifteen percent (115%) of the monthly values.  In respect of locations for which Business interruption values have not been declared, Business Interruption indemnity shall be subject to a sublimit of USD 2,000,000 per month per accident or **Occurrence**.

Business Interruption values scheduled and declared after inception by the Assured are to be agreed hereon prior to date of loss, and will be subject to an Additional Premium to be agreed at the time of such declaration by the Assured.



 

## B.5. EXTENSIONS OF COVERAGE

### B.5.A. EXTRA EXPENSE

Subject to the Sublimit of Liability stated in the Declarations;

I.   This Section insures against **Extra Expense** incurred by the **Assured** directly resulting from necessary interruption of the **Assured's** business caused by direct physical loss or damage insured against, during the term of this Policy, to property insured, subject to the terms and conditions of Section A of this Policy.

II.  This Section further insures against **Extra Expense** incurred by the **Assured** directly resulting from necessary interruption of the Assured's business caused by direct physical loss or damage by a peril(s) insured against, to property of third parties and/or unscheduled property of the Assured.  Coverage under this paragraph ii. shall not be subject to any retention/excess amount.

"**Extra Expense**" shall mean:

A.   The reasonable and necessary **Extra Expenses** incurred to temporarily continue the Assured's business to as nearly **Normal** levels as practicable; and the amount of expense which is reasonably incurred by the **Assured** or Underwriters to reduce or avert the interruption of business, but only to the extent that the total amount which otherwise would have been paid is thereby reduced.

B.   The reasonable and necessary extra costs of temporarily using property or facilities of the **Assured** or others.

In no event shall this **Extra Expense** include:

i)    loss of Throughput Income;

ii)   costs which normally would have been incurred in maintaining Throughput Income levels during the same period had no physical loss or physical damage insured against occurred; or

iii)  cost of permanent repair or replacement of property that has been lost or damaged.

This coverage does not cover:

a)   **Extra Expense** incurred as a result of damage to finished products manufactured by the **Assured** nor the time required for their reproduction;

b)   any **Extra Expense** incurred due to the suspension, cancellation or lapse of any lease, contract, license or order nor any loss due to fines or damage for breach of contract or for late or non-completion of orders or penalties of whatsoever nature, nor shall Underwriters be liable for **Extra Expense** incurred due to any other consequential or remote loss.

The **Assured** agrees to use any suitable property or service owned or controlled by the **Assured** or obtainable from other sources in reducing the **Extra Expense** incurred under this coverage.



 

#### B.5.B. IMPOUNDED WATER

In the event that water used as a raw material or for power or for other manufacturing purposes, stored behind dams or in reservoirs, is released from storage as the result of damage as insured against hereunder, to such dam or reservoir, or equipment connected therewith, this Section covers loss, if any, caused by lack of adequate water supply from such sources, such loss not to exceed forty five (45) consecutive days after exhaustion of the Retention/Excess Amount (waiting period) stated in Item 7. of the Declarations.

#### B.5.C. SERVICE INTERRUPTION

Subject to the Sublimit of Liability stated in the Declarations, this Section is extended to cover against loss resulting directly from necessary interruption of the **Assured's** business caused by lack of incoming electricity, fuel, water, gas, steam, refrigeration or telephone service, caused by a type of **Occurrence** that would otherwise be insured, to property of a type not otherwise excluded herein, owned, operated or controlled by the public utility company or any other company contracted by the **Assured** to supply said services directly to the **Assured.**

This Section also insures against a consequential business interruption loss caused by change in temperature or humidity, or interruption of power, gas, water, steam, electricity, heat, air conditioning or refrigeration resulting from physical loss or physical damage by the perils insured, to any generating plant, power house, sub-station, transformer, air conditioning or refrigeration supplier, including electrical transmission and distribution lines, connections or supply pipes away from the **Assured's** locations, which furnishes electricity, steam, gas, water or refrigeration to the **Assured's** locations.

This coverage shall not apply to the following:

a. Any loss if the interruption of the incoming services is caused directly or indirectly by the failure of the Assured to comply with the terms and conditions of any contracts or agreements the Assured has for the receipt of such services;

b. Any loss if the interruption of incoming services is caused directly or indirectly by or results from any deliberate act or acts by the supplying utility to shed load to maintain system integrity; or

c. any purchase of Utility Services by the Assured with the intent of reselling or trading such Utility Services, including hedging and speculation sales of Utility Services.

#### B.5.D. DEFERRED PAYMENTS FROM CUSTOMERS

This Section is extended to cover business interruption loss resulting from the perils insured against, to the property excluded under property exclusion x. of Section A.





Policy No. MSW-0388 SECTION B

**B.5.E.** <u>INGRESS/ EGRESS</u>

Subject to the Sublimit of Liability stated in the Declarations, this Section is extended to cover loss and/or Extra Expense directly resulting from the necessary interruption of the Assured's business due to prevention of ingress to or egress from an insured location (whether or not the premises or property of the Assured is damaged), provided that such prevention is a direct result of physical damage of the type insured by this Policy to the kind of property covered and not excluded by this Policy and occurring within five statute miles of the location so affected.

Such coverage shall start from the day of physical damage or loss and will apply for thirty consecutive days from the start date. Payments under this Coverage Extension shall not be subject to the waiting period for Section B and any time period for which the Assured receives payments under this Coverage Extension shall not count towards the waiting period for Section B.

**B.5.F.** <u>RENTAL VALUE</u>

**1.** <u>INSURING AGREEMENT</u>

Subject to the Sublimit of Liability stated in the Declarations, this Section is extended to cover the Actual Loss Sustained by the **Assured** during the **Period of Interruption** caused by loss or damage insured, during the term of this Policy to property not otherwise excluded which is utilized by the **Assured,** subject to the terms and conditions of this Section.

**2.** <u>BASIS OF INDEMNITY</u>

The basis of indemnity under this coverage shall be:

A. <u>Actual Loss Sustained</u>

In the event the property is necessarily rendered wholly or partially untenantable, Underwriters shall be liable, subject to all other conditions of this coverage, for the Actual Loss Sustained on the following basis during the **Period of Interruption:**

i. the fair rental value of any portion of the property occupied by the **Assured;**

ii. income reasonably expected from rentals of unoccupied or unrented portions of such property; and

iii. the rental income from the rented portions of such property according to bona fide leases, contracts or agreements in force at the time of loss,

but not including non-continuing charges and expenses.

The **Assured** agrees to use any suitable property or service owned or controlled by the **Assured** or obtainable from other sources in reducing loss under this coverage.



 

In determining the indemnity payable under this coverage, due considerations shall be given to rental conditions before the loss and what reasonably could have been expected had no loss occurred.

B.    **Expenses**

Expenses necessarily incurred in reducing loss under this coverage are covered for an amount not exceeding that by which the loss is reduced.

3.    **EXCLUSIONS**

This coverage does not cover:

A.    loss of rental income with respect to any period during which the insured property would not have been tenantable for any reason other than physical damage of the type insured against by Section A;

B.    any increase of loss due to strike(s) or due to the suspension, cancellation or lapse of any lease, contract, license or order nor any loss due to fines or damage for breach of contract or penalties of whatever nature.

4.    **PERIOD OF INTERRUPTION**

The **Period of Interruption** shall mean such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such described property as has been lost or damaged or destroyed and to make such property ready for operations under the same or equivalent physical and operating conditions that existed prior to the **Occurrence**. This length of time shall include delays caused by Federal and/or State law, decree, order, regulation or injunction or any similar acts. The length of time does not include any additional time required for making changes to the buildings, equipment or contents regardless of the reason(s) for the changes, except as provided for in the Increased Cost of Construction, Demolition and Debris Removal Clauses contained in this Section; nor any additional time required for restaffing or retraining employees nor for delay of any kind caused by labor disputes, including strikes;

The **Period of Interruption** shall commence on the date immediately following the date of exhaustion of the Excess amount (waiting period) detailed at Item 7. of the Declarations and shall not be limited by the expiration of this Policy but the liability of Underwriters shall in no event exceed the maximum **Period of Interruption** stated at Item 5 of the Declarations.



Case 4:13-cv-00571-CVE-FHM   Document 2 Filed in USDC ND/OK on 09/03/13   Page 102 of 281



**B.5.G. LEASEHOLD INTEREST**

This Section is extended to cover **Leasehold Interest** of the **Assured** as lessee of premises.

i.    The term **"Leasehold Interest"** is hereby defined as the excess rental amount between the existing lease at time of loss and/or damage and the actual rental payable, including any maintenance or operating charges to be paid by the **Assured** at newly leased premises during the unexpired term of the **Assured's** lease, whether the premises be occupied in whole or in part, or whether they be sublet to others.

ii.    Underwriters shall not be liable for any loss to the interest of the **Assured** as lessee by reason of the **Assured** exercising an option to cancel the lease (except as may be reasonably necessary as a result of destruction of and/or damage to the leased premises), or by suspension, lapse or cancellation of any license.

**B.5.H. ACCOUNTS RECEIVABLE**

Subject to the Sublimit of Liability stated in the Declarations, this Section is extended to cover any shortage in collection of accounts receivable, resulting from direct physical loss or damage insured to accounts receivable records, subject to the following conditions:

i.    In the event of loss hereunder the **Assured** shall use all reasonable diligence and dispatch, including legal action if necessary, to effect collection of outstanding accounts receivable, the records for which have been destroyed, and the extra cost, if any, incurred thereby shall constitute a claim to the extent that it reduces the loss hereunder. Underwriters shall also be liable for interest charges on any loan to offset impaired collections pending repayment of such sum uncollectible as the result of such loss or damage.

ii.    Unearned interest and service charges on deferred payment accounts and normal credit losses on bad debts shall be deducted in determining the recovery hereunder.

iii.    The settlement of any loss hereunder shall be made within ninety (90) days from the date of such loss or damage, and all amounts recovered by the **Assured** on accounts receivable outstanding at the time of such loss or damage shall belong and be paid to Underwriters by the **Assured** up to a total not exceeding the amount of loss paid hereunder, but all recoveries in excess of that amount shall belong to the **Assured.**

iv.    In the event it is possible to reconstruct the **Assured's** accounts receivable records after they have been lost or damaged, so that no shortage in collection of accounts receivable is sustained, Underwriters shall be liable only for the cost of material and time required, with the exercise of due diligence and dispatch, to re-establish and/or reconstruct such accounts receivable records, but only so far as these are not covered by any other form of Insurance.

v.    This coverage does not apply to loss due to book keeping, accounting or billing errors or omissions, or errors or omissions in machine programming or instruction to machines, or computer error or malfunction.





Policy No. MSW-0388 SECTION B

vi.　This coverage does not apply to loss due to alteration, falsification, manipulation, concealment, destruction or disposal of accounts receivable records committed to conceal the wrongful giving, taking, obtaining or withholding of money, securities or other property, but only to the extent of such wrongful giving, taking, obtaining or withholding.

vii.　The **Assured** agrees to use any suitable property or service owned or controlled by the **Assured** or obtainable from other sources in reducing the loss under this coverage.

## B.6. EXCLUSIONS

Underwriters shall not be liable for any Actual Loss Sustained:-

A.　for any time during which business would not or could not have been conducted had direct physical loss or damage to the property as insured against under Section A not occurred;

B.　resulting from damage to finished products manufactured by the **Assured** nor for the time required for their reproduction;

C.　resulting from loss or damage for breach of contract or for late or non-completion of orders;

D.　resulting from breach of contract, penalties, late or non-completion of orders, or suspension, lapse, or cancellation of any contract, permit, lease, or license

E.　for Professional Fees resulting from direct physical loss or damage to property in the course of construction;

F.　resulting from direct physical loss or damage to property not located **Onshore.**

G.　resulting from the loss of incoming Utility Services; or

H.　resulting from loss of Business Interruption or Extra Expense of a trader, reseller or wholesaler of electricity, gas, telephone services or any other commodity or service.

I.　resulting from non-availability of funds for the repair or replacement of lost or damaged property;

J.　resulting from import, export or customs restrictions or regulations

K.　resulting from failure of any Assured to obtain, maintain or extend any contract, permit, lease, license

L.　resulting from failure of any Assured to use reasonable diligence in restoring the damaged property to the condition existing immediately prior to loss or damage;





Policy No. MSW-0388 SECTION B

M.  resulting from interference at an insured location caused by boycott, strikers or other persons involved with building, repairing, replacing, manufacturing or supplying the property insured or services thereof;

N.  resulting from loss occasioned by the failure or inability to collect amounts due from customers for work performed or services provided

C:\Documents and Settings\besta\Local Settings\Temporary Internet Files\OLK40\Primary $50mm Onshore Policy (2).doc



Policy No. MSW-0388 ENDORSEMENT #1

## SERVICE OF SUIT ENDORSEMENT

As respects Associated Electric & Gas Insurance Services Ltd. participation only, it is understood and agreed that General Conditions item B.11. of this Policy is hereby amended as follows:

### B.11.  SERVICE OF SUIT

Service of process in any suit instituted against the Insurer(s) under this Policy may be made upon Dewey & LeBoeuf L.L.P., 1301 Avenue of the Americas, New York, New York 10019.  The Insurer(s) will abide by the final decision of the court in such suit or of any appellate court in the event of any appeal.  Dewey & LeBouef L.L.P. are authorized and directed to accept service of process on behalf of the Insurer(s) in any such suit and, upon the **Assured's** request, to give a written undertaking to the **Assured** that they will enter a general appearance upon the Insurer's behalf in the event such suit is instituted.  Nothing in this clause constitutes or should be understood to constitute a waiver of the Insurer's right to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek to transfer a case to another court as permitted by the laws of the United States or of any state in the United States.

Further, pursuant to any statute of any state, territory or district of the United States of America or province of Canada, which makes provision therefore, we hereby designate the Superintendent, Commissioner or Director of Insurance or other office specified for that purpose in the statute, or his successor or successors in office, as our true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by you or on your behalf or any beneficiary hereunder arising out of this contract of insurance, and we hereby designate the above named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

All other terms and conditions of this Policy remain unchanged.

1 of 1



Policy No. MSW-0388 ENDORSEMENT **#2**

## MEMBERSHIP AND VOTING RIGHTS ENDORSEMENT

As respects Associated Electric & Gas Insurance Services Ltd. participation only, it is understood and agreed this Policy is amended as follows:

> This Policy does not entitle the Assured to be a member in the Insurer.

> This Policy does not entitle the Assured to a vote on any matter submitted to the members of the Insurer.

1 of 1



Policy No. MSW-0388 ENDORSEMENT **#3**

## AMENDATORY ENDORSEMENT

Effective at Policy Inception, it is understood and agreed that the GENERAL EXCLUSIONS of this Policy, Clause C. 6. AUTHORITIES EXCLUSION is amended to read as follows:

**C.6.   AUTHORITIES EXCLUSION**

Except as specifically stated in this policy or endorsement attached thereto, the Underwriters shall not be liable for loss, damage, costs, expenses, fines, or penalties incurred, sustained by or imposed on the Assured at the order of any Government Agency, Court, or other Authority arising from any cause whatsoever.

However, if any time element coverage is afforded by this policy or endorsements thereto, the coverage is extended to include any increase in the actual loss sustained by the Assured, resulting directly from an interruption of business covered hereunder, during the length of time not exceeding ~~four (4) consecutive weeks~~ thirty (30) consecutive days, when as a direct result of damage to or destruction of covered property by the peril(s) insured against, access to the premises or commencement of repairs is delayed at the order of any Government Agency, Court, or other Authority.

All other Terms & Conditions remain unchanged.

| INSURER / SECURITY | AUTHORIZED SIGNATURE | POLICY / REFERENCE NO. |
|---|---|---|
| Associated Electric & Gas Insurance Services Ltd. | *[signature]* Date: 4/4/11 | LO559A1A10 |
| Lexington Insurance Company | Date: _____ | 61466527 |



Policy No. MSW-0388 ENDORSEMENT #4

## AMENDATORY ENDORSEMENT

It is hereby understood and agreed that the Assured shall have the option to declare Business Interruption value(s) and purchase Time Element coverage for E&P revenue at the Parachute Creek and/or Willow Creek facility(ies) at a later date in the policy term, with additional premium to be calculated pro-rata of the Policy rate for "Business Interruption" (with a minimum of 50% of the applicable annual premium).

Underwriting information supporting this provision was provided to Insurers as part of the renewal underwriting submission (a copy is attached to this Endorsement as Information).

All other Terms & Conditions remain unchanged.

| INSURER / SECURITY | AUTHORIZED SIGNATURE | POLICY / REFERENCE NO. |
|---|---|---|
| Associated Electric & Gas Insurance Services Ltd. | Date: 7/4/11 | LO559A1A10 |
| Lexington Insurance Company | Date: _____ | 61466527 |

Policy No. MSW-0388 ENDORSEMENT **#4**

INFORMATION ONLY (excerpt from renewal underwriting submission):





## WILLOW CREEK / PARACHUTE CREEK Business Interruption Exposure Summary

Please note that the declared Business Interruption value for the Willow Creek plant is only representative of gas processing revenue (not E&P production revenue). No BI value has been declared for the Parachute Creek facility. The reason for not declaring a BI value for E&P production at either plant is because lost throughput at one plant can be "picked-up" by the other in the event of a loss. That said, if one of the plants experiences a situation that results in an extended outage, Williams would need to declare a BI value for E&P production for the other operating plant. Williams would like to have underwriters consider this exposure now, and provide confirmation that Williams could elect to declare and purchase BI cover for E&P production revenue losses as a result of loss / damage to the Parachute Creek and/or Willow Creek plant at a later date in the policy term, at the Policy BI rate agreed at inception.

### WILLOW CREEK

- Grassroots plant was constructed in 2008/2009 with commercial operation beginning in late August 2009

- Designed as a straddle plant to extract up to 30,000 barrels of natural gas liquids (NGL) per day from pipeline gas (gas is already at pipeline quality so the plant can be fully bypassed if necessary)

- Processing Capacity of 450 million cubic feet per day. As gas enters the plant via a 30" pipeline from the Williams E&P treating plant located near Parachute, CO, about 40 miles to the south

- Three Solar Titan combustion turbine-driven compressors delivers the residue gas from the plant to other pipelines. The plant requires all three of these compressor units for full operation but can process 150 to 375 MMcf/day on any two of the units.

- Residue gas can go to Williams Northwest Pipeline, Colorado Interstate Gas (CIG), Colorado Interstate Pipeline (WIC) and Rocky Mountain Express

- NGL's currently supplied to either Enterprise Pipeline or ONEOK via pipeline

### PARACHUTE CREEK

- Train I was completed in 2002 and is rated at 120 MMcf/day processing capacity

- Train II was completed in 2006 and modified to increase capacity to 300 MMcf/day

- Train III was completed in 2007 and is rated at 300 MMcf/day. A further Train III Expansion was completed in 2008/09 and is also rated at 300 MMcf/day



- Plant operates 24/7/52 and is manned at all times

- Field gas comes in at about 700 psi through one 30" and one 10" gathering pipeline system, and is dehydrated and filtered

- Gas is processed and sold via pipeline, while condensate is stabilized and transported by truck (liquids sold over truck rack and 70 psi vapor pressure).

- There is a project underway to add a 6-inch NGL line from Parachute to Grand Valley which will connect to an existing 8-inch line, allowing all NGL's to be sent by pipeline instead of truck

21

2 of 2

Policy No. MSW-0388 ENDORSEMENT **#5**

## AMENDATORY ENDORSEMENT

It is hereby understood and agreed that with effect from Policy Inception, for the purposes of any premium adjustment associated with the addition or deletion of any assets to or from coverage under this Policy, the attached rating schedule is to apply.

All other Terms & Conditions remain unchanged.

| INSURER / SECURITY | AUTHORIZED SIGNATURE | POLICY / REFERENCE NO. |
|---|---|---|
| Associated Electric & Gas Insurance Services Ltd. | Date: 4/4/11 | LO559A1A10 |
| Lexington Insurance Company | Date: _____ | 61466527 |

1 of 2




Policy No. MSW-0388 ENDORSEMENT #5

INCEPTION PREMIUM:

Primary Onshore $50mm Layer Premium Worksheet

### "Risk" Only Rates (i.e. not including Named Windstorm premium)

|  | Value | Rate | Premium |
|---|---|---|---|
| All Onshore PD Values $ | 13,065,789,608 | 0.040631814% $ | 5,308,867 |
| All Onshore BI Values (2010 BI only) $ | 2,378,337,196 | 0.071105674% $ | 1,691,133 |

$  7,000,000

### NWS Only Rates (in addition to "Risk" premium)

|  | Value | Rate | Premium |
|---|---|---|---|
| "Gulf" PD Values $ | 527,010,661 | 0.24500439% $ | 1,291,199 |
| "Gulf" BI Values (2010 BI only) $ | 179,892,000 | 0.42875768% $ | 771,301 |
| "Non-Gulf" PD Values $ | 12,538,778,947 | 0.00266995% $ | 334,779 |
| "Non-Gulf" BI Values (2010 BI only) $ | 2,198,445,196 | 0.00467242% $ | 102,721 |

$  2,500,000

TOTAL $  9,500,000

The above values and rates are to be used for calculation of applicable Additional Premiums / Return Premiums during the May 1, 2010 to May 1, 2011 policy period.

Onshore rates do not include TRIPRA premium, as this option was declined by the Assured.

 

Policy No. MSW-0388 ENDORSEMENT #6

# AMENDATORY ENDORSEMENT

It is hereby understood and agreed that with effect from August 27, 2010 the Echo Springs TXP4 natural gas processing facility is added to coverage under this Policy. As a consequence of the foregoing an Additional Premium is due, calculated as $67,677 (100% annual) to be pro-rated for the remainder of the Policy Term based on 247/365 days.

All other Terms & Conditions remain unchanged.

Information:

- Construction of a fourth Turbo Expander Train (TXP4) to increase the Echo Springs Gas Plant's throughput from a nominal 395MM scf/d to 745MM scf/d. Echo Springs is a cryogenic natural gas processing facility, and the new Train includes inlet compression / separation to remove NGLs and contaminants, $CO_2$ removal (using amine treatment), a Thermal Oxidizer to burn all contaminants from the amine plant off-gases, dehydration (molecular sieve system), recompression, ancillary support systems, and a flare

- Site is located approximately 8 miles Southeast of Wamsutter, WY in Carbon County

- Replacement cost value of the new train is $166,560,874

- Placed into commercial service on August 27, 2010

- Williams has confirmed no known losses since August 27. Plant has been running without issue, though an equipment malfunction was corrected that was originally causing the facility to run at decreased capacity (issue was related to inlet guide vanes on the Mafi-Trench turbo-expander, which is part of the cryogenic system used to separate the natural gas liquids. Total downtime was roughly one week).

## Echo Springs AP Worksheet

Primary Onshore $50mm Layer Premium Worksheet

### "Risk" Only Rates (i.e. not including Named Windstorm premium)

| | Value | Rate | Premium |
|---|---|---|---|
| All Onshore PD Values $ | 166,560,874 | 0.040631814% $ | 67,677 |
| All Onshore BI Values (2010 BI only) $ | - | 0.071105674% $ | - |
| | | $ | 67,677 |

### NWS Only Rates (in addition to "Risk" premium)

| | Value | Rate | Premium |
|---|---|---|---|
| "Gulf" PD Values $ | - | 0.24500439% $ | - |
| "Gulf" BI Values (2010 BI only) $ | - | 0.42875768% $ | - |
| "Non-Gulf" PD Values $ | 166,560,874 | 0.00286995% $ | 4,447 |
| "Non-Gulf" BI Values (2010 BI only) $ | - | 0.00467242% $ | - |

|  |  |
|---|---|
| | NWS AP waived |
| TOTAL $ | 67,677 |
| Pro-rata for 247/365 days $ | 45,798 |

1 of 2



Policy No. MSW-0388 ENDORSEMENT **#6**

| INSURER / SECURITY | AUTHORIZED SIGNATURE | POLICY / REFERENCE NO. |
|---|---|---|
| Associated Electric & Gas Insurance Services Ltd. | Date: | LO559A1A10 |
| Lexington Insurance Company | Date: _____ | 61466527 |

Remainder of Page Intentionally Left Blank.

2 of 2

 

Policy No. MSW-0388 ENDORSEMENT **#7**

## AMENDATORY ENDORSEMENT

It is understood and agreed by all underwriters hereon that with effect from May 1, 2010 at 12:01am Central Standard Time the declared values in respect of "Transco Gas In Storage" are revised as per the below worksheet.

In accordance with the above an additional premium is due of $100,412 (100% annual), as calculated based on the attached Additional Premium worksheet.

All other Terms & Conditions remain unchanged.

### The Williams Companies, Inc.
### May 1, 2010 - 2011 Renewal
### Transco Gas In Storage

| Asset Name / Description | State | Value As Reported | Revised Value | Added Value |
|---|---|---|---|---|
| Gas In Storage - Hester | LA | $11,730,000 | **$11,730,000** | $0 |
| Gas In Storage - Washington | LA | $77,060,000 | **$224,330,000** | $147,270,000 |
| Gas In Storage - Eminence | MS | $21,580,000 | **$48,360,000** | $26,780,000 |
| Gas In Storage - Sta 240-Carlstadt NJ LNG | NJ | $0 | **$3,800,000** | $3,800,000 |
| Gas In Storage - Leidy, PA | PA | $51,860,000 | **$81,710,000** | $29,850,000 |
| Gas In Storage - Wharton, PA | PA | $28,920,000 | **$53,110,000** | $24,190,000 |
| Total Transco Gas In Storage | | $191,150,000 | **$423,040,000** | **$231,890,000** |

Values based on 9-30-09 volumes and spot rate price.

1 of 3



Policy No. MSW-0388 ENDORSEMENT #7

### Primary Onshore $50mm Layer Premium Worksheet

### "Risk" Only Rates (i.e. not including Named Windstorm premium)

| | Value | Rate | Premium |
|---|---|---|---|
| All Onshore PD Values  $ | 231,890,000 | 0.040631814%  $ | 94,221 |
| All Onshore BI Values (2010 BI only) | | 0.071105674%  $ | - |
| | | $ | 94,221 |

### NWS Only Rates (in addition to "Risk" premium)

| | Value | Rate | Premium |
|---|---|---|---|
| "Gulf" PD Values | | 0.24500439%  $ | - |
| "Gulf" BI Values (2010 BI only) | | 0.42875768%  $ | - |
| "Non-Gulf" PD Values  $ | 231,890,000 | 0.00266995%  $ | 6,191 |
| "Non-Gulf" BI Values (2010 BI only) | | 0.00467242%  $ | - |
| | | $ | 6,191 |

**TOTAL  $    100,412**

The above values and rates are to be used for calculation of applicable Additional Premiums / Return Premiums during the May 1, 2010 to May 1, 2011 policy period.

Onshore rates do not include TRIPRA premium, as this option was declined by the Assured.



Policy No. MSW-0388 ENDORSEMENT #7

| INSURER / SECURITY | AUTHORIZED SIGNATURE | POLICY / REFERENCE NO. |
|---|---|---|
| Associated Electric & Gas Insurance Services Ltd. | Date: July | LO559A1A10 |
| Lexington Insurance Company | Date: _____ | 61466527 |

Remainder of Page Intentionally Left Blank.

3 of 3

 

Policy No. MSW-0388 ENDORSEMENT **#8**

# AMENDATORY ENDORSEMENT –
## Engineering Fee Reimbursement

In accordance with the provision allowed by the DECLARATIONS Item 11. Premium, underwriters hereon agree to pay their proportion of the $127,000 (100%) engineering fee reimbursement due.

2010/2011 Schedule of completed engineering visits completed is attached for informational purposes.

All other Terms and Conditions remain unchanged.

| INSURER / SECURITY | AUTHORIZED SIGNATURE | POLICY / REFERENCE NO. |
|---|---|---|
| Associated Electric & Gas Insurance Services Ltd. | Date: | L0559A1A10 |
| Lexington Insurance Company | Date: | 61466527 |



Policy No. MSW-0388 ENDORSEMENT #8

# Starr Technical Risk Agency – Survey Schedule 2010/2011 Term

| Company | Asset | Location | Last Inspection | Cost | Date Completed |
|---|---|---|---|---|---|
| WGP-West | Transco Station 44 | Johnson Bayou, LA | Feb-06 | $2,500.00 | Jan-11 |
| WGP-West | Pegram Station | Pegram, ID | Mar-06 | $2,500.00 | Aug-10 |
| WGP-West | Soda Springs Station | Soda Springs, ID | Mar-06 | $2,500.00 | Aug-10 |
| WGP-West | Lava Hot Springs Station | Lava Hot Springs, ID | Mar-06 | $2,500.00 | Aug-10 |
| WGP-West | Pocatello Station | Pocatello, ID | Mar-06 | $2,500.00 | Aug-10 |
| WGP-West | Burley Station | Twin Falls, ID | Mar-06 | $2,500.00 | Aug-10 |
| WGP-West | Buhl Station | Buhl, ID | Mar-06 | $2,500.00 | Aug-10 |
| Midstream | Opal Gas Plant | Opal, WY | Aug-08 | $10,000.00 | Jun-10 |
| Midstream | Big Piney Compressor Station | Big Piney, WY | Aug-06 | $2,500.00 | Jun-10 |
| Midstream | Echo Springs Gas Plant | Wamsutter, WY | Aug-08 | $10,000.00 | Jun-10 |
| Midstream | 8-Mile Lake Compressor Station | Wamsutter, WY | Aug-08 | $2,500.00 | Jun-10 |
| Midstream | Geismar Olefins Plant | Geismar, LA | Dec-08 | $12,000.00 | Oct-10 |
| WGP-Transco | Compressor Station 130 | Comer, GA | Jan-05 | $2,500.00 | Jan-11 |
| WGP-Transco | Compressor Station 140 | Moore, SC | Jan-07 | $2,500.00 | Jan-11 |
| WGP-Transco | Compressor Station 145 | Grover, NC | Jan-07 | $2,500.00 | Jan-11 |
| WGP-Transco | Compressor Station 150 | Mount Morne, NC | Jan-05 | $2,500.00 | Jan-11 |
| WGP-Transco | Compressor Station 155 | Lexington, NC | Jan-07 | $2,500.00 | Jan-11 |
| E & P | Parachute Creek Gas Plant | Parachute Creek, CO | Aug-08 | $10,000.00 | Mar-11 |
| Midstream | Ignacio Gas Plant | Durango, CO | Jun-08 | $10,000.00 | Mar-11 |
| Midstream | Conway NGL Fractionation Plant | McPherson, KS | Jun-08 | $10,000.00 | Aug-10 |
| WGP-Transco | Meadows LNG Plant | Carlstadt, NJ | May-08 | $10,000.00 | Jul-10 |
| WGP-Transco | Compressor Station 65 | Greensburg, LA | Feb-07 | $2,500.00 | Feb-11 |
| WGP-Transco | Compressor Station 70 | Tylertown, MS | Feb-07 | $2,500.00 | Feb-11 |
| WGP-Transco | Compressor Station 77 | Seminary, MS | Mar-05 | $2,500.00 | Feb-11 |
| WGP-Transco | Compressor Station 80 | Sandersville, MS | Mar-05 | $2,500.00 | Feb-11 |
| WGP-West | Plymouth LNG | Plymouth, WA | Aug-08 | $10,000.00 | Mar-11 |
| | | | Total | $127,000.00 | |



Policy No. MSW-0388

### <u>WILLIAMS May 1, 2010 PRIMARY $50MM ONSHORE PROPERTY POLICY</u>

The subscribers hereto, severally but not jointly, do insure:

**Assured:**　　　　The Williams Companies, Inc. et al.

**Assured's Address:**　One Williams Center
P.O. Box 3483
Tulsa, OK 74101

Acting upon your instructions, we have effected with <u>Security as within</u> insurance as noted below.

**Limits:**　　　　As within

**Locations:**　　　As within

**Term:**　　　　　May 1, 2010 to May 1, 2011 both days at 12:01 a.m., Central Standard Time at Tulsa, OK, U.S.A.

**Coverage:**　　　Onshore Property / Business Interruption

**Premium:**　　　As within

THIS POLICY IS MADE AND ACCEPTED SUBJECT TO THE FOREGOING STIPULATIONS AND CONDITIONS, AND TO THE CONDITIONS PRINTED ON THE BACK HEREOF, which are specifically referred to and made a part of this policy, together with such other provisions, agreements or conditions as may be endorsed hereon or added hereto; and no officer, agent or other representative of the undersigned shall have power to waive or be deemed to have waived any provision or condition of this cover note unless such waiver, if any, shall be written upon or attached hereto, nor shall any privilege or permission affecting the insurance under this policy exist or be claimed by the Assured unless so written or attached.

This document is intended for use as evidence that insurance described herein has been effected against which a policy(ies) will be issued and that in the event of any inconsistency therewith the terms and conditions and provision of the policy(ies) prevail. Immediate advice must be given of any discrepancies or necessary changes.



EXHIBIT

_____3_____



C:\Documents and Settings\b1dad\Local Settings\Temporary Internet Files\OLK86\Primary $50mm Onshore Policy.doc

 

Policy No. MSW-0388

# SUBSCRIPTION PAGE

| Interest / Participation (%) | INSURER / SECURITY | AUTHORIZED SIGNATURE | POLICY / REFERENCE NO. |
|---|---|---|---|
| Solely As Respects the perils of Named Windstorm / ensuing Flood: **40.0%**<br><br>As Respects all other risks as covered herein: **35.0%** | Associated Electric & Gas Insurance Services Ltd. | | |
| Solely As Respects the perils of Named Windstorm / ensuing Flood: **7.5%**<br><br>As Respects all other risks as covered herein: **6.5%** | Ironshore Insurance Ltd. (Bermuda) | As per separate Binder held by RK Harrison Insurance Brokers, Ltd. as placing broker, subject wording attached to this Binder including mandatory endorsements. | |
| **25.0%** | Lexington Insurance Company | *DrDney* | 61466527 |

**TOTAL PARTICIPATION:**

Solely As Respects the perils of Named Windstorm / ensuing Flood: **72.5%**

As Respects all other risks as covered herein: **66.5%**

### Policy Provisions

It is expressly understood and agreed by the assured by accepting this instrument that McGriff, Seibels & Williams, Inc. is not one of the Underwriters or insurers hereunder and is not nor shall be in any way or to any extent liable for any loss or claim whatsoever as an Insurer, but that the assurers hereunder are those underwriters whose names are on file as herebefore set forth.

In consideration of the premium as hereinafter stated, the various companies named herein, severally but not jointly, do hereby insure that Assured named herein, for the amounts and proportions, set opposite their respective names. All subject to the terms and conditions of the forms and endorsements attached herein.

This insurance is made and accepted subject to all the provisions, conditions and warranties as set forth herein and in any forms or endorsements attached hereto, all of which are to be considered as incorporated herein, and any provisions or conditions appearing in any forms or endorsements attached hereto which alter the policy provisions shall supersede such policy provisions insofar as they are inconsistent therewith.

Any provisions required by law, to be stated in policies issued by any company subscribing hereto, shall be deemed to have been stated herein. It is further agreed that each of the companies will issue their individual policies in accord with the terms described herein, upon demand by the Assured.



The Williams Companies Inc
Policy # 61466527
Tax Wording

```
THIS CONTRACT IS REGISTERED AND DELIV-
ERED AS A SURPLUS LINE COVERAGE UNDER
THE ALABAMA SURPLUS LINE INSURANCE LAW.
     BROKER: RONALD B. GIADROSICH
            LIC. #A064443
```

This contract is delivered as surplus line coverage under
the Nonadmitted Insurance Act. The insurer issuing this
contract is not licensed in Colorado but is an approved
nonadmitted insurer. There is no protection under the
provisions of the Colorado Guaranty Association Act.
                    Ronald B Giadrosich

This contract is registered and
delivered as a surplus line
coverage under the Surplus Line
Insurance Law, O.C.G.A.
Chapter 33.5.
         Ronald B. Giadrosich

This policy is issued by an insurer not
authorized to do business in Kansas and, as
such, the form, financial condition, and rates
are not subject to review by the
Commissioner of Insurance and the insured
is not protected by any guaranty fund.

**This insurance is issued by a
nonadmitted insurer not under
the jurisdiction of the Maryland
Insurance Commissioner.**

**This insurance policy is issued pursuant to
Mississippi law covering surplus lines insurance. The
company issuing the policy is not licensed by the State of
Mississippi, but is authorized to do business in
Mississippi as a nonadmitted company. The policy is not
protected by the Mississippi Insurance Guaranty
Association in the event of the insurer's insolvency.**
Ronald B Giadrosich

MS Premium: 767780.26
Tax: 3044.21
Stamping Fee: 191.95
MWUA: 3839.01

**Surplus lines insurers' policy
rates and forms are not
approved by any Florida
Regulatory Agency**

This insurance is issued pursuant to the Florida
Surplus Lines Law. Persons insured by surplus
lines carriers do not have the protection of the
Florida Insurance Guaranty Act to the extent
of any right of recovery for the obligation of
an insolvent unlicensed insurer.

FL Premium: 15967.22   FHCF: 159.67
Tax: 798.36   Surcharge: 4.00
Stamping Fee: 15.97   Citizens: 223.54
Total: 17,168.76

This insurance policy is delivered as a surplus line coverage under
the insurance code of the State of Louisiana.

In the event of insolvency of the company issuing this contract, the
policyholder or claimant is not covered by the Louisiana Insurance
Guaranty Association which guarantees only specific policies
issued by an insurance company authorized to do business in
Louisiana. This surplus line policy has been procured by the
following licensed Louisiana surplus lines Broker:

By _____

McGriff Seibels & Williams, Inc

Louisiana Premium: 201739.71

Policy Fee: _____

Surplus Lines Tax: 10,086.99

**The insurance company with which this coverage has
been placed is not licensed by the State of North
Carolina and is not subject to its supervision. In the
event of the insolvency of the insurance company,
losses under this policy will not be paid by any State
insurance guaranty or solvency fund.**
Licensee: Camille Smith



The Williams Companies Inc
Policy # 61466527
Tax Wording

This policy is written by a surplus lines insurer and is not subject to the filing or approval requirements of the New Jersey Department of Banking and Insurance. Such a policy may contain conditions, limitations, exclusions and different terms than a policy issued by an insurer granted a Certificate of Authority by the New Jersey Department of Banking and Insurance. The insurer has been approved by the Department as an eligible surplus lines insurer, but the policy is not covered by the New Jersey Insurance Guaranty Fund, and only a policy of medical malpractice liability insurance as defined in N.J.S.A. 17:30D-3d or a policy of property insurance covering owner-occupied dwellings of less than four dwelling units are covered by the New Jersey Surplus Lines Guaranty Fund.

This policy provides surplus lines insurance by an insurer not otherwise authorized to transact business in New Mexico. This policy is not subject to supervision, review, or approval by the superintendent of insurance. The insurance so provided is not within the protection of any guaranty fund law of New Mexico designed to protect the public in the event of the insurer's insolvency.

This contract is registered and delivered as surplus line coverage under the surplus line insurance law in Oklahoma. It is not subject to the protection of the State guaranty association.

The insurer which has issued this insurance is not licensed by the Pennsylvania Insurance Department and is subject to limited regulation. This insurance in NOT covered by the Pennsylvania Property and Casualty Guaranty Association.
Surplus Lines Licensee: Ronald B. Giadrosich McGriff, Seibels and Williams, Inc. 2211 7th Ave South Birmingham, AL 35233

Idaho Premium: 56300.11
Policy or Service Fee:
State Tax:  830.40
Stamping Fee:  138.40

This Insurance is Issued Pursuant to the New Jersey Surplus Lines Law.

McGriff Seibels & Williams
2211 7th Avenue South
Birmingham, AL 35233

License # 0202947

THE INSURER(S) NAMED HEREIN IS (ARE) NOT LICENSED BY THE STATE OF NEW YORK, NOT SUBJECT TO ITS SUPERVISION, AND IN THE EVENT OF THE INSOLVENCY OF THE INSURER(S), NOT PROTECTED BY THE NEW YORK STATE SECURITY FUNDS. THE POLICY MAY NOT BE SUBJECT TO ALL OF THE REGULATIONS OF THE INSURANCE DEPARTMENT PERTAINING TO POLICY FORMS.

This is evidence of insurance procured and developed under this Oregon Surplus lines laws. It is NOT covered by the provisions of ORS 734.510 to 734.710 relating to the Oregon Insurance Guaranty Association. If the insurer issuing this insurance becomes insolvent, the Oregon Insurance Guaranty Association has no obligation to pay claims under this evidence of insurance.

Ronald B Giadrosich

Oregon Premium: 32593.30
Tax:  151.87
Fire Marshall Tax:  325.93
SLSC:  15.00

THIS SURPLUS LINE CONTRACT IS ISSUED PURSUANT TO THE IDAHO INSURANCE LAWS BY AN INSURER NOT LICENSED BY THE IDAHO DEPARTMENT OF INSURANCE. THERE IS NO COVERAGE PROVIDED FOR SURPLUS LINE INSURANCE BY EITHER THE IDAHO INSURANCE GUARAN-TY ASSOCIATION OR BY THE IDAHO LIFE AND HEALTH INSURANCE GUARANTY ASSOCIATION.

The Williams Companies Inc
Policy # 61466527
Tax Wording

This company has been approved by the director or his designee of the South Carolina Department of Insurance to write business in this State as an eligible surplus lines insurer, but it is not afforded guaranty fund protection.

This insurance contract is with an insurer not licensed to transact insurance in this state and is issued and delivered as surplus line coverage under the Texas insurance statutes. The Texas Department of Insurance does not audit the finances or review the solvency of the surplus lines insurer providing this coverage, and this insurer is not a member of the property and casualty insurance guaranty association created under Chapter 462, Insurance Code. Chapter 225, Insurance Code, requires payment of 4.85 percent tax on gross premium.

92,179.31 _Texas Premium_
4470.72 _Texas State Tax_
55.31 _Texas Stamping Fee_

The insurer issuing this policy does not hold a certificate of authority to do business in this state and this is not fully subject to regulation by the Utah Insurance Commissioner. This policy receives no protection from any of the guaranty associations created under Chapter 28, Title 31A (UC 31A-15-103[8]).

This contract is registered and delivered as a surplus line coverage under the insurance code of the state of Washington, enacted in 1947. It is not issued by a company regulated by the Washington state insurance commissioner and is not protected by any Washington state guaranty fund law.

McGriff, Seibels & Williams

Washington Premium: 146,684.25
Policy Fee: _____
Surplus Lines Tax: 2933.69
Stamping Fee: 366.71

This insurance contract is issued pursuant to the Wyoming Insurance Laws by an insurer neither licensed by nor under the jurisdiction of the Wyoming Insurance Department.

 

# COMPLAINT NOTICE

| IMPORTANT NOTICE | AVISO IMPORTANTE |
|---|---|

1.  To obtain information or make a complaint:

Para obtener informacion o para someter una queja:

2.  You may call McGriff, Seibels & Williams, Inc.'s toll-free telephone number for information or to make a complaint at:

Usted puede llamar al numero de telefono gratis de McGriff, Seibels & Williams, Inc.'s para informacion o para someter una queja al:

### 1-800-476-2211

### 1-800-476-2211

3.  You may also write to McGriff, Seibels & Williams, Inc.

Usted tambien puede escribir a McGriff, Seibels & Williams, Inc.:

### P.O. Box 10265
### Birmingham, AL 35202-0265

### P.O. Box 10265
### Birmingham, AL 35202-0265

4.  You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at:

Puede comunicarse con el Departamento de Seguros de Texas para obtener informacion acerca de companias, coberturas, derechos o quejas al:

### 1-800-252-3439

### 1-800-252-3439

5.  You may write the Texas Department of Insurance:

Puede escribir al Departamento de Seguros de Texas:

### P.O. Box 149104
### Austin, TX  78714-9104
### FAX#(512)475-1771
### Web: http//www.tdi.state.tx.us
E-mail:  ConsumerProtection@tdi.state.tx.us

### P.O. Box 149104
### Austin, TX  78714-9104
### FAX#(512)475-1771
### Web: http//www.tdi.state.tx.us
E-mail:  ConsumerProtection@tdi.state.tx.us

### 6.   PREMIUM OR CLAIM DISPUTES:
Should you have a dispute concerning your premium or about a claim you should contact the agent or the company first.  If the dispute is not resolved, you may contact the Texas Department of Insurance.

### DISPUTAS SOBRE PRIMAS O RECLAMOS:
Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con el agente o la compania primero.  Si no se resuelve la disputa, prede entonces comunicarse con el departamento (TDI).

### 7.   ATTACH THIS NOTICE TO YOUR POLICY:
This notice is for information only and does not become a part or condition of the attached document.

### UNA ESTE AVISO A SU POLIZA:
Esta aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.



# VIRGINIA FORM SLB-9

DATE 7/21/10

Applicant/Insured The Williams Companies

Name of Non-Admitted Insurer

(If available) Lexington Insurance Company

Policy No. 61466527

## NOTICE TO INSURED

THE INSURANCE POLICY THAT YOU HAVE APPLIED FOR HAS BEEN PLACED WITH OR IS BEING OBTAINED FROM AN INSURER APPROVED BY THE STATE CORPORATION COMMISSION FOR ISSUANCE OF SURPLUS LINES INSURANCE IN THE COMMONWEALTH, BUT NOT LICENSED OR REGULATED BY THE STATE CORPORATION COMMISSION OF THE COMMONWEALTH OF VIRGINIA. THEREFORE, YOU, THE POLICYHOLDER, AND PERSONS FILING A CLAIM AGAINST YOU ARE NOT PROTECTED UNDER THE VIRGINIA PROPERTY AND CASUALTY INSURANCE GUARANTY ASSOCIATION ACT (§§ 38.2-1600 ET SEQ.) OF THE CODE OF VIRGINIA AGAINST DEFAULT OF THE COMPANY DUE TO INSOLVENCY. IN THE EVENT OF INSURANCE COMPANY INSOLVENCY, YOU MAY BE UNABLE TO COLLECT ANY AMOUNT OWED TO YOU BY THE COMPANY REGARDLESS OF THE TERMS OF THIS INSURANCE POLICY, AND YOU MAY HAVE TO PAY FOR ANY CLAIMS MADE AGAINST YOU.

McGriff, Seibels, and Williams
(Name of Surplus Lines Broker)

101870
(License Number)

2211 7th Ave South
Birmingham, AL 35233
(Broker's Mailing Address)

VIRGINIA FORM SLB-9 (Eff. 9/96)

 

Policy No. MSW-0388

# THE WILLIAMS COMPANIES, INC.

## ONSHORE PROPERTY / BUSINESS INTERRUPTION POLICY

### TABLE OF CONTENTS

## DECLARATIONS

1.   NAMED ASSURED
2.   LOSS PAYEE
3.   POLICY PERIOD
4.   INTEREST
5.   SUMS INSURED AND/OR LIMITS OF LIABILITY
6.   RETENTIONS AND/OR EXCESS AMOUNTS
7.   NAMED WINDSTORM EXCESS
8.   TERRITORIAL LIMITS
9.   NOTICE TO UNDERWRITERS
10.  NOTICE TO THE ASSURED
11.  PREMIUM
12.  SCHEDULE OF SUBLIMITS


## GENERAL DEFINITIONS, CONDITIONS AND EXCLUSIONS

A.   DEFINITIONS
     A.1.   NAMED ASSURED
     A.2.   OCCURRENCE, EARTHQUAKE SHOCK, FLOOD AND NAMED WINDSTORM
     A.3.   ONSHORE
     A.4.   RIVER CROSSING(S)
     A.5.   ACTUAL CASH VALUE
     A.6.   REPLACEMENT COST
     A.7.   OBJECT
     A.8.   VALUABLE PAPERS AND RECORDS

B.   CONDITIONS
     B.1.   EXCESS AND UNDERLYING INSURANCE
     B.2.   BANKRUPTCY AND INSOLVENCY
     B.3.   ABANDONMENT OF PROPERTY
     B.4.   INSPECTION AND AUDIT
     B.5.   CANCELLATION
     B.6.   CURRENCY
     B.7.   CLAIMS NOTIFICATION AND LOSS ADJUSTMENT CLAUSE
     B.8.   UNDERWRITERS' SERVICING AGENTS OR BROKERS
     B.9.   GOVERNING LAW AND JURISDICTION
     B.10.  ALTERNATE DISPUTE RESOLUTION
     B.11.  SERVICE OF SUIT
     B.12.  TITLES OF PARAGRAPHS
     B.13.  DELAYS, ERRORS OR OMISSIONS
     B.14   OIL POLLUTION ACT DISCLAIMER
     B.15.  ACTION AGAINST UNDERWRITERS



 

Policy No. MSW-0388

B.16. ASSIGNMENT
B.17. ASSISTANCE AND COOPERATION OF THE ASSURED
B.18. RECOVERABLE CHARGES
B.19 CERTIFICATES OF INSURANCE
B.20. SUBROGATION
B.21. AUTOMATIC ACQUISITIONS
B.22. OTHER INSURANCE
B.23. CLAIMS PREPARATION COST
B.24. OFAC CLAUSE

C.  EXCLUSIONS
    C.1.  WAR AND TERRORISM EXCLUSION (NMA 2918 Amended)
    C.2.  INSTITUTE RADIOACTIVE CONTAMINATION, CHEMICAL, BIOLOGICAL,
          BIO-CHEMICAL, ELECTROMAGNETIC WEAPONS EXCLUSION CLAUSE
          (CL370)
    C.3.  ASBESTOS CLAUSE
    C.4.  MICROORGANISM EXCLUSION
    C.5.  INSTITUTE CYBER ATTACK EXCLUSION CLAUSE (CL380)
    C.6.  AUTHORITIES EXCLUSION
    C.7.  DATA DISTORTION/CORRUPTION EXCLUSION
    C.8.  MILLENNIUM CLAUSE

## SECTION A - REAL AND PERSONAL PROPERTY

A.1. INSURING AGREEMENTS
     A.1.A. PERILS INSURED
     A.1.B. PROPERTY INSURED
     A.1.C. ADDITIONAL PROPERTY INSURED

A.2. EXTENSIONS OF COVERAGE
     A.2.A. EXPEDITING EXPENSE
     A.2.B. TRANSIT
     A.2.C. POLLUTION HAZARD
     A.2.D. VALUABLE PAPERS AND ELECTRONIC DATA PROCESSING MEDIA
     A.2.E. DEMOLITION AND INCREASED COST OF CONSTRUCTION
     A.2.F. FIRE BRIGADE CHARGES AND EXTINGUISHING EXPENSES
     A.2.G. REMOVAL OF DEBRIS
     A.2.H. PROFESSIONAL FEES
     A.2.I. HAZARDOUS SUBSTANCES OR CONTAMINANTS
     A.2.J. MISCELLANEOUS UNSCHEDULED LOCATIONS
     A.2.K. PROPERTY IN COURSE OF CONSTRUCTION
     A.2.L. PIPELINE CONSTRUCTION COVERAGE
     A.2.M. SUE AND LABOR EXPENSES

 




Policy No. MSW-0388

**A.3.**   **CONDITIONS**
A.3.A. BRANDS OR TRADEMARKS
A.3.B. DUE DILIGENCE
A.3.C. MISREPRESENTATION
A.3.D. SALVAGE AND RECOVERIES
A.3.E. SPECIAL STATE REQUIREMENTS
A.3.F. SUSPENSION
A.3.G. PAIRS AND SETS
A.3.H. VALUATION

**A.4.**   **EXCLUSIONS**
A.4.A. PROPERTY EXCLUDED
A.4.B. PERILS EXCLUDED
A.4.C. SEEPAGE AND/OR POLLUTION EXCLUSION (NMA 1999B AMENDED)

# SECTION B – TIME ELEMENT

**B.1.**   **INSURING AGREEMENTS**

**B.2.**   **BASIS OF INDEMNITY**

**B.3.**   **DEFINITIONS**

**B.4.**   **CONDITIONS**
B.4.A. EXPERIENCE OF THE BUSINESS
B.4.B.. EXTENDING THE PERIOD OF INTERRUPTION
B.4.C. RESUMPTION OF OPERATIONS
B.4.D. CALCULATION OF INDEMNITY AND INDEMNITY LIMIT

**B.5.**   **EXTENSIONS OF COVERAGE**
B.5.A. EXTRA EXPENSE
B.5.B. IMPOUNDED WATER
B.5.C. SERVICE INTERRUPTION
B.5.D. DEFERRED PAYMENTS FROM CUSTOMERS
B.5.E. INGRESS/ EGRESS
B.5.F. RENTAL VALUE
    1.    INSURING AGREEMENT
    2.    BASIS OF INDEMNITY
    3.    EXCLUSIONS
    4 .    PERIOD OF INTERRUPTION
B.5.G. LEASEHOLD INTEREST
B.5.H. ACCOUNTS RECEIVABLE

**B.6. EXCLUSIONS**




C:\Documents and Settings\b1dad\Local Settings\Temporary Internet Files\OLK86\Primary $50mm Onshore Policy.doc

 

Policy No. MSW-0388 DECLARATIONS

# DECLARATIONS

### 1.  NAMED ASSURED

**THE WILLIAMS COMPANIES, INC.** Including all Subsidiary, Associated, Affiliated, Inter-related or Controlled Companies, Corporations or Firms (including any Limited Liability Company as defined herein, general and limited partnerships and joint ventures) as now exist or may hereafter be constituted for which The Williams Companies, Inc. has or acquires financial control or has the responsibility to provide Insurance. Also including Williams Partners LP and its subsidiaries and Gulfstream Natural Gas System, LLC and Gulfstream Management & Operating Services, LLC, Williams Pipeline Partners LP and its subsidiaries and Wamsutter LLC.

### 2.  LOSS PAYEE

Loss, if any, under this Policy shall be adjusted with and payable to The Williams Companies, Inc. or order, whose acceptance shall constitute a release in full of all liability of Underwriters under this Policy as regards such loss.

### 3.  POLICY PERIOD

The period of this Policy shall be from **May 1, 2010 to May, 1, 2011**, both dates at 12:01 a.m., Central Standard Time at Tulsa, Oklahoma, U.S.A.

### 4.  INTEREST

### Section A

Section A covers the Assured's **Onshore** interest against all risks of direct physical loss or damage in respect of real and personal property of every kind and description, owned, operated, controlled, leased, rented, used or intended for use by the **Assured,** and includes but is not limited to, improvements and betterments, property of others in the Care, Custody or Control of the **Assured** or in the care, custody or control of others on behalf of the **Assured,** property for which the **Assured** is responsible, personal property of the **Assured's** employees or officials while on premises owned or controlled by the Assured at the option of the **Assured,** electronic data equipment and media, valuable papers and records, property in the Course of Construction, Installation, Erection or Assembly in progress at inception or any time during the policy period or acquired subsequent thereto, and property in Transit. This Section includes but is not limited to pipelines, compression and pump stations, terminals, and gas or other product in lines and/or storage, including, but not limited to petroleum products, natural gas and its by-products, liquids derived from natural gas, liquefied natural gas, ethanol and ethanol production by-products, all as further described in Section A of this Policy provided that such property is scheduled and declared at inception.



C:\Documents and Settings\b1dad\Local Settings\Temporary Internet Files\OLK86\Primary $50mm Onshore Policy.doc

 

Policy No. MSW-0388 DECLARATIONS

## Section B

Section B covers Time Element loss from direct physical loss or damage to property arising from an **Occurrence** covered or a peril insured against under Section A, all as further described in Section B of this Policy, provided that such property is scheduled and declared at inception.

For the purpose of this Section the term Time Element shall be understood to mean Business Interruption on an Actual Loss Sustained basis, Contingent Business Interruption, Extra Expense, Contingent Extra Expense, Accounts Receivable and Rental Value as further described in Section B of this Policy.

## Section A and B

It is understood and agreed that wherever reference is made herein to property scheduled and declared at inception, same shall be deemed to be such values as scheduled and declared by the Assured, which is held on file with McGriff Seibels & Williams, Inc. and as submitted under the TWC-Insurance web site at inception, which is accessible and available to underwriters hereon for underwriting information purposes.

5. ## SUMS INSURED AND/OR LIMITS OF LIABILITY
   ## (For the Assured's Interest Unless Otherwise Stated)

A limit of **USD 50,000,000** combined single limit Sections A and B combined applies in respect of any one accident or **Occurrence**, subject to the following separate annual aggregate limits:

a)    **USD 50,000,000** for losses caused by the peril of **Flood;**

b)    **USD 50,000,000** for losses caused by the peril of **Earthquake Shock;**

c)    **USD 50,000,000** for losses caused by the peril of **Named Windstorm.**

Subject further to sublimits as attached to these Declarations.

These limits apply in excess of the Retention / Excess amounts stated in Item 6. or Item 7. of these Declarations.

Maximum **Period of Interruption** for Section B twenty-four (24) months.



C:\Documents and Settings\b1dad\Local Settings\Temporary Internet Files\OLK86\Primary $50mm Onshore Policy.doc

Policy No. MSW-0388 DECLARATIONS

## 6. RETENTIONS AND/OR EXCESS AMOUNTS
### (For the Assured's Interest Unless Otherwise Stated)

Retention/Excess Amounts shall apply separately in respect of Sections A and B. However all Retention/Excess Amounts noted in respect of Section A are also inclusive of any applicable Extra Expense and/or Contingent Extra Expense amount.

Single Largest Excess (Section A)
In the event of a loss involving more than one location, the Retention/Excess shall not exceed the single largest applicable Excess amount any one accident or **Occurrence**.

## Section A

USD 2,000,000 any one accident or **Occurrence** except:

i)   In respect of Geismar Olefins Plant (10/12ᵗʰs owned) USD 1,000,000 any one accident or **Occurrence**

ii)  In respect of Conway Storage and Fractionator USD 1,000,000 any one accident or **Occurrence**

iii) In respect of Gulfstream Natural Gas System LLC USD 500,000 any one accident or **Occurrence** (for 100%)

iv)  In respect of Laurel Mountain Midstream LLC assets and RW Gathering LLC assets USD 250,000 any one accident or **Occurrence**

v)   In respect of losses resulting from Transportation as covered herein USD 250,000 any one accident or **Occurrence**.

## Section B

60 days waiting period any one accident or **Occurrence** except as respects Gulfstream Natural Gas System LLC, RW Gathering LLC, and Laurel Mountain Midstream LLC assets to which 45 days waiting period any one accident or **Occurrence** applies.

## 7. NAMED WINDSTORM EXCESS

### Section A

USD 10,000,000 any one accident or **Occurrence** in respect of losses arising from **Named Windstorm** for interest, (except for Gulfstream Natural Gas System LLC which is for 100% interest), which is in lieu of any other excess amounts under Section A.

### Section B

75 days waiting period any one accident or **Occurrence** in respect of losses arising from **Named Windstorm** which is in lieu of any other excess amounts under Section B.



 

Policy No. MSW-0388 DECLARATIONS

## 8.   TERRITORIAL LIMITS

The fifty (50) states of the United States of America, the District of Columbia, Canada and Puerto Rico except Worldwide for Transit as further defined in Policy.

## 9.   NOTICE TO UNDERWRITERS

All notices and correspondence to Underwriters, including premiums, required under this Policy are to be sent to the following entity for onward transmission to Underwriters:

McGriff, Seibels & Williams, Inc.
P.O. Box 10265
Birmingham, Alabama 35202, U.S.A.

## 10.   NOTICE TO THE ASSURED

All notices and correspondence to the **Assured** relating to this Policy are to be addressed and sent to the **Assured** at the following address:

The Williams Companies, Inc.
Risk Management and Insurance Department

At:   One Williams Center,        Or:   P.O. Box 3483
      Tulsa, Oklahoma 74172, U.S.A.        Tulsa, Oklahoma 74101, U.S.A.

## 11.   NET PREMIUM FOR THE POLICY PERIOD (100%)

| | |
|---|---|
| Named Windstorm / ensuing Flood: | USD 2,500,000 |
| All other risks covered herein: | USD 7,000,000 |
| TOTAL: | USD 9,500,000 |

Premium includes an allowance of up to 2.5% for Engineering / Loss Control Inspection services to be performed by Starr Technical Risk Agency and/or AIG Global Energy Inspection and Insurance Company and/or Hydrocarbon Risk Consultants Limited. Allowance shall be for services performed during the Policy Period, payable at expiry, subject to receipt of invoices/receipts and inspection reports.






Policy No. MSW-0388 DECLARATIONS

## 12. SCHEDULE OF SUBLIMITS

The following sublimits are for the **Assured's** interest and apply in respect of each and every **Occurence**. They are included within, and not in addition to, the limits of liability:

| | | |
|---|---|---|
| a) | USD 2,000,000 | per month, in respect of Business Interruption arising from locations for which Business Interruption values have not been declared at inception. |
| b) | USD 25,000,000 | in respect of Extra Expense. |
| c) | USD 15,000,000 | in respect of Expediting Expense. |
| d) | USD 25,000,000 | in respect of Property in Course of Construction (excluding delay in Start Up). Maximum Estimated Insurable Contract Value at inception of work USD 25,000,000. |
| e) | USD 25,000,000 | in respect of Contingent Business Interruption. |
| f) | USD 10,000,000 | in respect of Contingent Extra Expense and Rental Value. |
| g) | 30 DAYS | in respect of Ingress / Egress. |
| h) | USD 25,000,000 | in respect of Removal of Debris. |
| i) | USD 25,000,000 | in respect of Demolition and Increased Cost of Construction. |
| j) | USD 25,000,000 | in respect of off Premises Power / Service Interruption, combined single sublimit with Contingent Business Interruption if applicable. |
| k) | USD 25,000,000 | in respect of Property in Course of Transit. |
| l) | USD 1,000,000 | in respect of Valuable Papers and Records. |
| m) | USD 2,500,000 | in respect of Accounts Receivable. |
| n) | USD 2,500,000 | in respect of Reconstitution of Electronic Data and/or Media. |
| o) | USD 2,500,000 | in respect of Professional Fees. |
| p) | 30 DAYS | in respect of Interruption by Civil or Military Authority (including OSHA). |
| q) | USD 25,000,000 | (100%) Miscelleaneous Unscheduled Locations in respect of property damage. |
| r) | USD 10,000,000 | Fire Brigade Charges and Extinguishing Expenses. |
| s) | USD 1,000,000 | Claims Preparation Costs. |

 

Policy No. MSW-0388 DECLARATIONS

| | | |
|---|---|---|
| t) | **45 DAYS** | in respect of Impounded Water. |
| u) | **USD   1,000,000** | in respect of Hazardous Substances and/or Contaminants and/or Pollutants. |
| v) | **USD 50,000,000** | in respect of Automatic Acquisitions. |
| w) | **USD 50,000,000** | in respect of gas in pipelines. |
| X) | **USD 150,000,000** | in respect of gas in storage. |



C:\Documents and Settings\b1dad\Local Settings\Temporary Internet Files\OLK86\Primary $50mm Onshore Policy.doc

 

# GENERAL DEFINITIONS, CONDITIONS, AND EXCLUSIONS
## Applicable to Section A and Section B of this Policy

**IN THE EVENT OF ANY CONFLICT BETWEEN THESE GENERAL DEFINITIONS, EXCLUSIONS AND CONDITIONS AND THE TERMS AND CONDITIONS OF AN INDIVIDUAL SECTION OF THIS POLICY, IT IS AGREED THAT THE TERMS AND CONDITIONS OF THE INDIVIDUAL SECTION SHALL ALWAYS PREVAIL.**

Words and phrases which appear in **bold** type in this Wording have the meanings set forth in these General Definitions, Exclusions and Conditions or the individual Sections of this Policy.

## A. DEFINITIONS

A.1.   **NAMED ASSURED**

The term **"Named Assured"**, wherever used in this Policy, shall mean the entities stated in Item 1. of the Declarations.

As used therein, the term "Limited Liability Company (LLC)" shall mean any Limited Liability Company (as now or hereafter formed and defined under the laws of any state of the United States of America), or a similar entity formed under the laws of any country outside of the United States of America, elsewhere in this Policy referred to as a "LLC", of which a **Named Assured** is a member.

It is agreed by the Underwriters that the coverage provided under this Policy for any LLC shall extend to any subsidiary company of such LLC and to the liability of any manager or employee of such LLC or subsidiary company while acting in his or her capacity as such.

Notwithstanding anything to the contrary contained in the foregoing, it is agreed by both the Underwriters and the **Named Assured** that:

1.   any LLC formed or acquired after the inception date or any anniversary date of this Policy shall be automatically covered under this Policy;

2.   the Underwriters' liability under this Policy shall not be increased by the bankruptcy, insolvency or inability or refusal to pay of other members of any LLC (or the insurers of such other members) of which a **Named Assured** is a member.

It is further agreed that any reference to "LLC" under this definition shall be deemed to read "LLC or LLP", and that LLP shall mean a Limited Liability Partnership.



 

Policy No. MSW-0388 GENERAL DEFINITIONS

**A.2.   OCCURRENCE, EARTHQUAKE SHOCK, FLOOD AND NAMED WINDSTORM**

i.   The term "accident" and/or "**Occurrence**" (where applied), wherever used in this Policy, shall mean one loss or series of losses arising out of one event, except:

   i)   as respects the peril of **Earthquake Shock**, the term "**Occurrence**" shall mean the sum total of all losses sustained by the **Assured** during any period of seventy two (72) hours commencing during the term of this Policy;

   ii)   as respects the peril of **Flood**, the term "**Occurrence**" shall mean the sum total of all losses sustained by the **Assured** during any period of seventy two (72) hours commencing during the term of this Policy;

   iii)   as respects the peril of **Named Windstorm**, the term "**Occurrence**" shall mean the sum total of all losses sustained by the **Assured** arising out of the same atmospheric disturbance during any period of seventy two (72) hours commencing during the term of this Policy;

   Should any **Occurrence** referred to above extend beyond the expiration date of this Policy and commence prior to the expiration, the Underwriters shall pay all losses occurring during such period as if such period fell entirely within the term of the Policy.

   The Underwriters shall not be liable, however, for any loss caused by any **Occurrence** commencing before the effective date and time or after the expiration date and time of this Policy.

ii.   The term "**Earthquake Shock**", wherever it is used in this Policy, shall mean earthquake, volcanic eruption, shock, tremor, landslide, subsidence, sinkhole collapse, tsunami, mud flow or rock fall or any other earth movement, and shall not include any ensuing loss, damage or destruction resulting from other perils insured.

iii.   The term "**Flood**", wherever it is used in this Policy, shall mean waves, tide or tidal water or the rising (including the overflowing or breaking of boundaries) of lakes, ponds, reservoirs, rivers, harbors, streams, water channels or other bodies of water, whether or not driven by wind.

iv.   The term "**Named Windstorm**", wherever it is used in this Policy, shall mean a storm, cyclone, atmospheric disturbance, depression or other weather phenomena for the period of time the National Oceanic and Atmospheric Administration (NOAA) identifies the storm, cyclone, atmospheric disturbance, depression or other weather phenomena with an Atlantic designated name allocated by the World Meteorological Organisation and only while located in the geographic jurisdiction of the United States and/or its offshore waters including but not limited to the Gulf of Mexico. The term **Named Windstorm** shall include ensuing **Flood**.

 

 

Policy No. MSW-0388 GENERAL DEFINITIONS

**A.3.  ONSHORE**

The term **"Onshore"** shall mean the **Assured's** operations, property and interests up to and including the line of ordinary low water along that portion of the coast of land within the territorial limits defined herein but shall not include that which is in direct contact with the open seas and beyond the line marking the seaward limit of inland waters.

**A.4.  RIVER CROSSING(S)**

A "**River Crossing**" is defined as the length of pipeline extending above or beneath the main active river channel or body of water and extending an additional 50 feet on either side of the main river channel or body of water and also includes the length of pipeline in the floodplain adjoining the main river channel or body of water.

**A.5.  ACTUAL CASH VALUE**

The term **"Actual Cash Value"** means the **Replacement Cost** less deduction for physical depreciation.  In determining **Actual Cash Value**, deduction for depreciation shall be no more than 2% per annum and which not to exceed fifty percent (50%) if the item was in use at the time of loss.  In no event shall the **Actual Cash Value** exceed what it would cost to repair or replace the property lost or damaged.

**A.6.  REPLACEMENT COST**

The term **"Replacement Cost"** means the lesser of either:

i.      the cost to replace new with like kind and quality, without deduction for depreciation, at the time of replacement; or

ii.     the cost to repair, re-work, re-route, rebuild, or modify, at the time of such reinstatement or repair, without deduction for depreciation, in order to return, as much as is reasonably possible, to the state of existence and/or operation prior to loss; or

iii.    the **Limit of Insurance.**

"**Replacement Cost**" shall also include any costs covered under General Conditions item B.18 and/or Section A.2 Extensions of Coverage.

If, as a result of direct physical loss or damage to Insured Property, and/or direct physical loss or damage to the property of others directly related and necessary to the operation of Insured Property, caused by a Peril Insured against by Section A, it becomes necessary to repair, replace, re-work, re-route, rebuild, modify, or demolish any Insured Property, whether damaged or not, then "**Replacement Cost**" shall include:

i.      the cost sustained in demolishing and removing any damaged or undamaged portion of the Insured Property necessitated by such loss or damage, including the cost of clearing the site thereof and removal of debris;

ii.     the cost incurred in repairing, rebuilding, replacing, re-routing, re-working or modifying the damaged, demolished, and undamaged portions of such Insured Property in order to return, as much as is reasonably possible, such Insured Property to the state of existence and/or operation prior to such loss.

Page 14 of 57



Policy No. MSW-0388 GENERAL DEFINITIONS

### A.7.   OBJECT

The term "Object" means any boiler, fired or unfired pressure vessel, refrigeration or air conditioning system, piping and accessory equipment and any mechanical or electrical machine or apparatus used for the generation, transmission or utilization of mechanical or electrical power.

### A.8.   VALUABLE PAPERS AND RECORDS

The term "Valuable Papers and Records" shall mean written, printed or otherwise inscribed documents and records including but not limited to books, mortgages, abstracts, drawings, exposed film, manuscripts, maps and records.



C:\Documents and Settings\b1dad\Local Settings\Temporary Internet Files\OLK86\Primary $50mm Onshore Policy.doc




## B. CONDITIONS

#### B.1. EXCESS AND UNDERLYING INSURANCE

Permission is granted to the **Assured** to have:

i.     excess insurance over the Limits of Liability as set forth in the Declarations;

ii.    insurance in the name of and for the benefit of the **Assured** applying to the **Assured's** Retentions/ Excess amounts as set forth in the Declarations, or any part thereof, and the existence of such insurance, if any, shall not reduce any liability under this Policy.

#### B.2. BANKRUPTCY AND INSOLVENCY

In the event of the bankruptcy or insolvency of the **Assured** or of the **Assured's** estate or of any entity comprising the **Assured**, the Underwriters hereon shall not be relieved of the payment of any losses or claims that would have been payable hereunder but for such bankruptcy or insolvency.

#### B.3. ABANDONMENT OF PROPERTY

There can be no abandonment to the Underwriters of any property without the prior consent of Underwriters.

#### B.4. INSPECTION AND AUDIT

Underwriters or their specified representatives shall be permitted but not obligated to inspect the **Assured's** property and operations at any reasonable time during normal working hours, as far as they relate to the subject matter of this Insurance, subject to prior notice being given to the Risk Management and Insurance Department of The Williams Companies, Inc. Neither the Underwriters' right to make inspections nor the making thereof nor any advice or report resulting therefrom shall constitute an undertaking on behalf of or for the benefit of the **Assured** or others, to determine or warrant that such property or operations are safe or healthful, or are in compliance with any law, rule or regulation.

Underwriters or their specified representatives may examine and audit the **Assured's** books and records at any reasonable time during normal working hours subject to prior notice being given to the Risk Management and Insurance Department of The Williams Companies, Inc., as far as they relate to the subject matter of this Insurance.




 

Policy No. MSW-0388 GENERAL CONDITIONS

**B.5.** **CANCELLATION**

This Policy cannot be cancelled by the **Assured**, nor can Underwriters reduce or cancel their participation on the Policy, for any reason except as follows:

a.    At any time an Underwriter can cancel his participation under the Policy if such cancellation is permitted by, and is in accordance with, any cancellation clause or automatic termination clause applicable to any war, strikes or similar coverage;

b.    At any time the **Assured** can cancel this Policy if the **Assured** is purchased by another company or entity, or is not the sole surviving entity following a merger with any other company or entity, or there is a significant change in the **Assured's** ownership. Notice of Cancellation in respect of such circumstance is to be given to Underwriters thirty (30) days prior to such cancellation date.

Any returns of premium payable following cancellation in accordance with this Clause will be calculated on a *pro rata* basis.

In addition, the Special Cancellation Provisions below apply:

Special Cancellation Provisions

1.    It is understood and agreed that if:

    A.    any Underwriter subscribing to this insurance:

        i.    ceases underwriting or accepting new business, whether entirely or in any class of business which partially or totally includes the coverage under this Policy, or

        ii.    enters into a runoff arrangement, or

        iii.    is subject to a scheme of arrangement, or

    B.    any action is taken in any jurisdiction for the suspension of payments by, or the dissolution, winding up, termination of existence, liquidation, insolvency administration or bankruptcy of any Underwriter, or

    C.    a provisional liquidator, liquidator, trustee, administrator, receiver, administrative receiver or similar officer is appointed in respect of any Underwriter or in respect of any part of its assets, or

    D.    any authorisation, approval or consent, licence, exemption, filing, registration or notarisation or other requirement necessary or desirable to enable any Underwriter to carry on business is modified, revoked or withheld or does not remain or proves not to have been in full force and effect, or

    E.    it becomes unlawful for any Underwriter to perform any of its obligations under the Policy or an intention is announced to take any of the actions stated in paragraphs A. to D. above, or

    F.    in the published opinion of the Underwriter's auditor or a credit rating agency, the financial ability of an Underwriter to pay claims is or may be impaired,

then the **Assured** or the **Assured's** Broker (as agent of the **Assured**) is entitled at its option to cancel that Underwriter's participation in this Policy at any time after the applicable act stated above.




Policy No. MSW-0388 GENERAL CONDITIONS

In that event, the premium earned by such Underwriter for this Insurance shall be the pro rata proportion of the premium allocated to the risks covered under the Policy which corresponds to the period for which the Underwriter has been on risk, but after the deduction of that Underwriter's proportion of outstanding claims under the Policy.

2.    Notwithstanding anything to the contrary contained in this Insurance or subsequently endorsed to it, it is understood and agreed between the Underwriters and the **Assured** that underwriters may cancel this insurance by giving the Assured written notice stating when, not less than ten [10] days thereafter for non- payment of premium, such cancellation shall be effective.

Earned premium shall be calculated on a pro-rata basis.

**B.6.    CURRENCY**

The premiums, losses and claims, if any, under this Policy are payable in United States of America Dollars (USD).

**B.7.    CLAIMS NOTIFICATION AND LOSS ADJUSTMENT CLAUSE**

a.    **Notice of Loss**

As soon as practicable after a) any **Occurrence** likely to give rise to a claim hereunder, and/or b) any loss or damage which is insured against under this Policy, is known to the Risk Management and Insurance Department of The Williams Companies, Inc., the **Assured** shall report such loss or damage with full particulars to the entity stated in Item 11. of the Declarations.

The failure to give notice in accordance with the foregoing of any **Occurrence** which at the time did not appear to involve this Policy but which at a later date appears to give rise to claim hereunder, shall not prejudice such claim.

b.    **Proof of Loss**

In the event of loss under this Policy it shall be necessary for the **Assured** to render a signed and sworn proof of loss as soon as practicable to Underwriters or their appointed representatives stating the place, time, cause of loss, damage or expense; the interest of the **Assured** and of all others in the property involved; the value of the property involved in the loss; and the amount of loss, damage or expense, including any outside claim expense, other than legal expenses incurred by the **Assured**, for any service to prove a loss resulting from an **Occurrence** insured against under this Policy.

c.    **Payment of Loss**

All adjusted claims under this Policy shall be due and payable no later than thirty (30) days after the presentation and acceptance of proof of loss by Underwriters or their appointed representative. In the event any payment, including partial loss payment, is not made within thirty days underwriters agree to reimburse the Assured for loss of interest calculated at the prevailing LIBOR rate per annum and/or pro rata for each day the payment is overdue from each respective market.



Policy No. MSW-0388 GENERAL CONDITIONS

d.  **Partial Loss**

Permission is hereby granted to the **Assured** to commence repairs in respect of any partial damage to property insured hereunder by a covered loss, provided always that Underwriters' appointed loss adjuster has reviewed and agreed to this with the **Assured**.

In the event of such covered loss whether a partial or total loss, Underwriters will make periodic loss payments to the **Assured** for both property damage and business interruption/time element subject to the Sum Insured/Limit of Liability of this Policy. Such advance partial payments will be made within (30) thirty days from submission and acceptance by Underwriters of a partial proof of loss with reasonable supporting documentation.

Underwriters agree to make an initial advance payment for property damage being the **Actual Cash Value** of the property lost or damaged. In the event of a loss involving a number of properties/assets an initial advance payment can apply to each property/asset lost or damaged. Subsequent payments on account for property damage shall be made when repair/replacement costs incurred exceed the initial payment for each property/asset. Incurred Business Interruption losses will also be eligible for inclusion within the computation for any partial payment.

Subsequent payments on account for business interruption/time element losses shall be payable in full thirty (30) days after such period of interruption.

Nothing contained in this clause shall override the basis of recovery and/or valuation clauses contained herein for any subsequent or final claims payments.

e.  **Loss Adjustment**

In the event of an **Occurrence**, the panel of agreed Loss Adjusters are as follows:

Cta (Charles Taylor adjusting).

Rex Andrews and Associates.

McLain Crow.

In the event of a loss, it is agreed the Assured can elect any one of the above loss adjusters to commence the adjustment process with prompt advice provided to Underwriters.

AEGIS and Lexington shall have the responsibility for communicating and directing the adjustment activity on all losses to include coordinating the efforts of all insurers in the claims adjustment process as respects communicating instructions, coverage positions and/or settlement offers to the adjuster and insured.

All Other Insurers shall have the absolute right, if they so choose, to attend all meetings relating to the investigation, negotiation, adjustment or settlement of the loss, and to be furnished with all the information obtained in respect of the loss, but all other insurers are expected to work through AEGIS and Lexington in

 

Policy No. MSW-0388 GENERAL CONDITIONS

communicating and/or coordinating the adjustment process. All questions from all other Insurers relating to coverage, liability and/or the adjustment will be directed to AEGIS and Lexington who will, in turn, work to address the queries and any and all issues through the assigned adjuster, the Assured and the brokers.

**B.8.** **UNDERWRITERS' SERVICING AGENTS OR BROKERS**

McGriff, Seibels & Williams, Inc., P.O. Box 10265, Birmingham, Alabama, 35202, U.S.A. is the **Assured's** servicing agent and responsible for all service requirements required by the **Assured** relating to all aspects of this insurance.

**B.9.** **GOVERNING LAW AND JURISDICTION**

Any dispute relating to this Policy or to a claim (including but not limited thereto, the interpretation of any provision of the Policy) shall be governed by and construed in accordance with the laws of the state of Oklahoma.

Each party agrees to submit to the exclusive jurisdiction of the Courts of Oklahoma.

**B.10.** **ALTERNATE DISPUTE RESOLUTION**

a.      In the event of any dispute between the parties relating to or arising out of any provision of this Policy, the representatives of the parties shall meet promptly in a good faith effort to resolve this dispute extra-judicially. The party initially raising a dispute shall arrange for this meeting at a time and place mutually acceptable to both parties. Prior to the meeting, each party shall deliver to the other party a written summary of the evidence and arguments substantiating its position.

b.      If the dispute is not resolved as a result of such meeting, the parties shall attempt to resolve the dispute by the use of a non-binding mini-trial. It is understood that the parties may mutually agree to use another method of alternate dispute resolution such as mediation or arbitration.

c.      The mini-trial shall be conducted before a panel composed of senior executive officers of each party, who have settling authority to resolve the dispute, and a neutral advisor.

d.      The parties shall exchange names of potential advisors and select from this pool a mutually acceptable candidate. If the parties cannot agree on the selection of a neutral advisor, the President of the Center for Public Resources or his or her designee shall select a neutral advisor from the Judicial Panel of the Center for Public Resources.

e.      The parties shall promptly agree on the ground rules which will govern the parties' conduct before, during and after the mini-trial. These ground rules shall include:

i.       a schedule for the exchange of documents, including briefs summarising each party's respective position on the dispute;

ii.      the duties and responsibilities of the neutral advisor;

iii.     the format and location of the mini-trial; and




    iv.    mandatory settlement discussions between the senior executives of each party immediately after the mini-trial.

f.    The parties shall also discuss whether any discovery will be necessary to prepare the mini-trial. If the parties mutually agree that such discovery is necessary, the parties shall establish an expedited discovery schedule.

g.    Either party may resort to judicial proceeding if:

    i.    such party's good faith attempt to resolve the dispute by a mini-trial has been unsuccessful, or

    ii.    interim resort to court is necessary to prevent irreparable injury to a party or to third parties.

h.    The costs of this Alternate Dispute Resolution shall be borne equally between both parties.

## B.11.  SERVICE OF SUIT

The **Assured** may serve process upon any senior partner in the firm of:

**Mendes & Mount (Attorneys), 750 Seventh Avenue, New York, N.Y. 10019-6829**
and it is agreed that in any suit instituted against any one of them upon this contract the Underwriters will abide by the final decision of the Court or of any Appellate Court in the event of an appeal.

## B.12.  TITLES OF PARAGRAPHS

The several titles of the various paragraphs of this Policy (and of any endorsements attached hereto) are inserted only for purposes of reference and shall not be deemed in any way to limit or affect the provisions to which they relate.

## B.13.  DELAYS, ERRORS OR OMISSIONS

It is agreed that this Insurance shall not be prejudiced by any unintentional delay, error or omission in reporting hereunder, provided prompt notice is given to the Underwriters as soon as said delay, error or omission becomes known to the Risk Management and Insurance Department of The Williams Companies, Inc.




C:\Documents and Settings\b1dad\Local Settings\Temporary Internet Files\OLK86\Primary $50mm Onshore Policy.doc




Policy No. MSW-0388 GENERAL CONDITIONS

### B.14. OIL POLLUTION ACT DISCLAIMER

This Insurance does not constitute evidence of financial responsibility under the Oil Pollution Act of 1990 or any similar federal or state law and it is a condition of this Insurance that it shall not be submitted to the United States Coast Guard or any federal or state agency as evidence of financial responsibility. The Underwriters do not consent to be guarantors.

### B.15. ACTION AGAINST UNDERWRITERS

No action shall be brought against Underwriters unless commenced within twenty-four (24) months from the date the claim is disputed in writing.

### B.16. ASSIGNMENT

Assignment or transfer of this Policy shall not be valid except with the prior written consent of the Underwriters.

### B.17. ASSISTANCE AND COOPERATION OF THE ASSURED

The **Assured** shall cooperate with Underwriters and, upon Underwriters' request and expense, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and conducting suits.

### B.18. RECOVERABLE CHARGES

It is agreed that the provisions contained in the **Replacement Cost** definition shall also include the Assured's direct labor cost, general and administrative overhead expenses, engineering and supervision overhead expenses, and indirect labor overhead expenses associated with the repairing or replacing of the damaged or destroyed insured property, such overhead expenses being added at the time of repair or replacement. Overhead expenses will be calculated as 10% of the total direct labor, supervision and engineering charges incurred to repair or replace damaged or destroyed insured property. Total direct labor, only for purposes of this calculation of overhead expenses, will include:

i.    the Assured's direct employee payroll charges (plus an adder to cover costs of pension, welfare, taxes, insurance, vacation and other paid absences and employment-related costs) and:

ii.   contractor labor charges, but not to include labor charges incurred by a contractor at the contractor's facility.

The Insurers' maximum total liability for overhead expenses in a single Occurrence shall not exceed USD 5,000,000.



C:\Documents and Settings\b1dad\Local Settings\Temporary Internet Files\OLK86\Primary $50mm Onshore Policy.doc




**B.19.  CERTIFICATES OF INSURANCE**

All parties to whom a certificate of insurance has been issued are automatically added to this Policy upon issuance of said certificates, either as additional **Assureds** or as loss payees, or both, in accordance with the terms and conditions of said certificates. Underwriters hereby authorize and approve McGriff, Seibels & Williams, Inc. as the **Assured's** broker of record, to issue appropriate certificates of insurance as may be required to parties who have an insurable interest in property covered by this Policy or to whom the **Named Assured** has otherwise agreed to provide such certificates.

**B.20.  SUBROGATION**

The Underwriters shall, upon payment of any loss, damage or expense under this Policy, be subrogated to all the **Assured's** rights of recovery against any other firm, person or corporation who may be legally or contractually liable for such loss, damage or expense paid by the Underwriters and the **Assured** shall at Underwriters' expense execute and deliver instruments and papers and do whatever else is necessary to secure such rights.

It is agreed that the Underwriters may make, after making prior written notice to the **Named Assured**, claim upon and institute legal proceedings against any parties believed responsible for loss, damage or expense paid under this policy in the name of the **Assured** and the **Assured** will give the Underwriters their full co-operation in pursuing such claim or legal proceeding.

Underwriters agree to waive their rights to subrogation on a blanket basis when the Assured has waived their rights in writing prior to loss.

**B.21.  AUTOMATIC ACQUISITIONS**

Subject to the Sublimit of Liability stated in the Declarations, this policy is automatically extended to cover, at nil additional premium, additional property and/or interests which may be acquired, constructed, or otherwise become at risk of the **Named Assured** during the period of this Policy, provided that the reportable value of any single newly acquired or constructed property does not exceed **USD 50,000,000**.

If the reportable values exceed **USD 50,000,000** for any single acquired or constructed property, then such acquired or constructed property is to be agreed by Underwriters prior to attachment.  Underwriters reserve the right to charge an additional premium for any single newly acquired or constructed property with values exceeding **USD 50,000,000**.

However and irrespective of reportable values, any such acquired or constructed property located within FEMA Flood Zone A, anywhere in Florida or California, or within twenty-five miles of the coastal boundaries of the following states are to be agreed by Underwriters prior to attachment::

Alabama
Georgia
Louisiana
Mississippi
North Carolina
South Carolina
Texas




 

Policy No. MSW-0388 GENERAL CONDITIONS

**B.22.  OTHER INSURANCE**

If, at the time of loss covered hereunder, there is other insurance in force which would attach to the benefit of the Assured if this Insurance had not been effected, then this Insurance shall apply only as excess of the amount paid by such insurance but in no event as contributing insurance, unless such insurance has been purchased by the Assured specifically to provide additional limits of insurance in excess of the insurance afforded by this Policy, in which case this Policy shall be primary to such excess insurance

**B.23.  CLAIMS PREPARATION COST**

Subject to the Sublimit of Liability stated in the Declarations, this Policy is extended to include the reasonable expenses incurred by the Assured for professional services such as auditors, accountants, architects and engineers, except the Assured's own employees or public adjusters, which are required in order to present a loss which is covered by this Policy.

**B.24.  OFAC CLAUSE**

Payment of loss under this policy shall only be made in full compliance with all United States of America economic or trade sanction laws or regulations, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

 



## C. EXCLUSIONS

**C.1.** **WAR AND TERRORISM EXCLUSION (NMA 2918 Amended)**

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss:

a.      war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

b.      any act of terrorism.

For the purpose of this exclusion, an "act of terrorism" means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organization(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or put the public, or any section of the public, in fear.

This Policy also excludes loss, damage, cost, or expense of whatsoever nature directly or indirectly caused by, resulting from, or in connection with any action taken in controlling, preventing, suppressing, or in any way relating to any act of terrorism.

If an act of terrorism results in a fire and the direct physical loss or damage to property insured hereunder located in any State of the United States, or the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, American Samoa, Guam, each of the United States Virgin Islands and any territory or possession of the United States, that, either pursuant to the Standard Fire Policy or otherwise, prohibits exclusions for acts of terrorism that result in fire, the Insurers will pay for the loss or damage caused by that fire. Such coverage for fire applies only to direct loss or damage to property insured hereunder and may be limited, in accordance with the Standard Fire Policy to the lesser of the actual cash value of the property at the time of the loss, or the amount which it would cost to repair or replace the property, without allowance for any increased cost of repair or replacement by reason of any ordinance or law, and without any compensation for business interruption, extra expense to continue business activities, or any other coverage for loss or damage other than direct physical loss or damage to the property insured hereunder.

With respect to fire resulting from any one or more "certified acts of terrorism" as defined under the Federal Terrorism Risk Insurance Act of 2002 ("TRIA"), Insurers will not pay any amounts for which Insurers are not responsible under the terms of that Act (including subsequent Congressional action pursuant to the Act) due to the application of TRIA Section 103 or any clause that results in a cap on our liability for payments for terrorism losses.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the **Assured**.



Policy No. MSW-0388 GENERAL EXCLUSIONS

In the event any portion of this clause is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

**C.2.  INSTITUTE RADIOACTIVE CONTAMINATION, CHEMICAL, BIOLOGICAL, BIO-CHEMICAL, ELECTROMAGNETIC WEAPONS EXCLUSION CLAUSE (CL370)**

**This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith.**

In no case shall this insurance cover loss damage liability or expense directly or indirectly caused by or contributed to by or arising from:

1.1     ionising radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel

1.2     the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof

1.3     any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter

1.4     the radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter.  The exclusion in this sub-clause does not extend to radioactive isotopes, other than nuclear fuel, when such isotopes are being prepared, carried, stored or used for commercial, agricultural, medical, scientific or other similar peaceful purposes

1.5     any chemical, biological, bio-chemical or electromagnetic weapon.

**C.3.  ASBESTOS CLAUSE**

A.     This Policy only insures asbestos physically incorporated in an insured building or structure, and then only that part of the asbestos which has been physically damaged during the Policy period by one of these Listed Perils:

Fire; Smoke; Explosion; Lightning; Windstorm; Hail; Direct Impact of vehicle, aircraft or vessel; Riot or civil commotion; Vandalism or Malicious Mischief; or Accidental Discharge of fire protective equipment.

This coverage is subject to all limitations in the Policy to which this clause is attached and, in addition, to each of the following specific limitations:

1.     The said building or structure must be insured under this Policy for damage by that Listed Peril.

2.     The Listed Peril must be the immediate, sole cause of the damage to the asbestos.

3.     The **Assured** must report to Underwriters the existence and cost of the damage as soon as practicable after the Listed Peril first damaged the asbestos. However this Policy does not insure any such damage first

 

Policy No. MSW-0388 GENERAL EXCLUSIONS

reported to Underwriters more than 12 (twelve) months after the expiration, or termination, of the Policy period.

4.      Insurance under this Policy in respect of asbestos shall not include any sum relating to:

        (i)      any faults in the design, manufacture or installation of the asbestos;

        (ii)      asbestos not physically damaged by the Listed Peril including any governmental or regulatory authority direction or request of whatsoever nature relating to undamaged asbestos.

B.      Except as set forth in the foregoing Clause A of this Condition, this Policy does not insure asbestos or any sum relating thereto.

**C.4.**    <u>**MICROORGANISM EXCLUSION**</u>

This Policy does not insure any loss, damage, claim, cost, expense or other sum directly or indirectly arising out of or relating to:

mold, mildew, fungus, spores or other microorganism of any type, nature, or description, including but not limited to any substance whose presence poses an actual or potential threat to human health.

This exclusion applies regardless whether there is (i) any physical loss or damage to insured property; (ii) any insured peril or cause, whether or not contributing concurrently or in any sequence; (iii) any loss of use, occupancy, or functionality; or (iv) any action required, including but not limited to repair, replacement, removal, cleanup, abatement, disposal, relocation, or steps taken to address medical or legal concerns.

This exclusion replaces and supersedes any provision in the Policy that provides insurance, in whole or in part, for these matters.

**C.5.**    <u>**INSTITUTE CYBER ATTACK EXCLUSION CLAUSE (CL380)**</u>

1.1      Subject only to clause 1.2 below, in no case shall this insurance cover loss damage liability or expense directly or indirectly caused by or contributed to by or arising from the use or operation, as a means of inflicting harm, of any computer, computer system, computer software program, malicious code, computer virus or process or any other electronic system.

1.2      Where this clause is endorsed on policies covering risks of war, civil war, revolution, rebellion, insurrection, or civil strife arising therefrom, or any hostile act by or against a belligerent power, or terrorism or any person acting from a political motive, Clause 1.1 shall not operate to exclude losses (which would otherwise be covered) arising from the use of any computer, computer system or computer software program or any other electronic system in the launch and/or guidance system and/or firing mechanism of any weapon or missile.






Policy No. MSW-0388 GENERAL EXCLUSIONS

**C.6.** **AUTHORITIES EXCLUSION**

Except as specifically stated in this policy or endorsement attached thereto, the Underwriters shall not be liable for loss, damage, costs, expenses, fines, or penalties incurred, sustained by or imposed on the Assured at the order of any Government Agency, Court, or other Authority arising from any cause whatsoever.

However, if any time element coverage is afforded by this policy or endorsements thereto, the coverage is extended to include any increase in the actual loss sustained by the Assured, resulting directly from an interruption of business covered hereunder, during the length of time not exceeding four (4) consecutive weeks, when as a direct result of damage to or destruction of covered property by the peril(s) insured against, access to the premises or commencement of repairs is delayed at the order of any Government Agency, Court, or other Authority.

**C.7.** **DATA DISTORTION/CORRUPTION EXCLUSION**

Underwriters will not pay for Damage or Consequential loss directly or indirectly caused by, consisting of, or arising from:

(A)    Any functioning or malfunctioning of the Internet or similar facility, or of any intranet or private network or similar facility;

(B)    Any corruption, destruction, distortion, erasure or other loss or damage to data, software or any kind of programming or instruction set;

(C)    Loss of use or functionality whether partial or entire of data, coding, program, software, any computer or computer system  or other device dependent upon any microchip or embedded logic, and any ensuing inability or failure of the Assured to conduct business.

This exclusion shall not exclude subsequent Damage or Consequential loss, not otherwise excluded, which itself results from a **Defined Peril**. **"Defined Peril"** shall mean Fire, Lightning, **Earthquake Shock**, Explosion, Falling Aircraft, **Flood**, Smoke, Vehicle Impact, **Windstorm** or Tempest, Accidental Breakdown of **an Object** including Mechanical and Electrical Breakdown.

This exclusion shall not act to increase or broaden coverage afforded by this policy.

Such Damage or Consequential Loss described in A, B, or C above, is excluded regardless of any other cause that contributed concurrently or in any other sequence.




C:\Documents and Settings\b1dad\Local Settings\Temporary Internet Files\OLK86\Primary $50mm Onshore Policy.doc

 

Policy No. MSW-0388 GENERAL EXCLUSIONS

**C.8.** <u>**MILLENNIUM CLAUSE**</u>

A.  Underwriters will not pay for Damage or Consequential Loss directly or indirectly caused by, consisting of, or arising from, the failure of any computer, data processing equipment or media microchip, operating systems, microprocessors (computer chip), integrated circuit or similar device, or any computer software, whether the property of the insured or not, and whether occurring before, during or after the year 2000 that results from the inability to:

   1.  correctly recognize any date as its true calendar date,

   2.  capture, save, or retain and/or correctly manipulate, interpret or process any data or information or command or instruction as a result of treating any date other than as its true calendar date, and/or

   3.  capture, save, retain or correctly process any data as a result of the operation of any command which has been programmed into any computer software, being a command which causes the loss of data or the inability to capture, save, retain or correctly process such data on or after any date.

B.  It is further understood that the Insurer will not pay for the repair or modification of any part of an electronic data processing system or its related equipment, to correct deficiencies or features of logic or operation.

C.  It is further understood that the Insurer will not pay for Damage or Consequential Loss arising from the failure, inadequacy, or malfunction of any advice, consultation, design, evaluation, inspection, installation, maintenance, repair or supervision done by the Assured or for the Assured or by or for others to determine, rectify or test, any potential or actual failure, malfunction or inadequacy described in A. above.

Such damage or Consequential Loss described in A, B, or C above, is excluded regardless of any other cause that contributed concurrently or in any other sequence.

This clause shall not exclude subsequent Damage or Consequential Loss which itself results from a peril not otherwise excluded under this policy.



Case 4:13-cv-00571-CVE-FHM   Document 2 Filed in USDC ND/OK on 09/03/13   Page 153 of 281



## SECTION A – REAL AND PERSONAL PROPERTY

### A.1. INSURING AGREEMENTS

#### A.1.A. PERILS INSURED

This Section insures against all risks of direct physical loss or damage in respect of property insured from perils not otherwise excluded, subject to the terms and conditions of this Section.  In the event of direct physical loss or damage to any property insured and such direct physical loss or damage, without the intervention of any other independent cause, results in a sequence of events which causes direct physical loss or damage to other property insured, then this Section will cover such resulting loss or damage.   Nothing in this clause shall be deemed to extend this insurance to property which is otherwise specifically excluded from coverages by the terms of this Section.

#### A.1.B. PROPERTY INSURED

This Section covers all **Onshore** real and personal property of every kind and description owned, operated, controlled, leased, rented, used or intended for use by the **Assured**, provided that such property is scheduled and declared at inception and includes but is not limited to  improvements and betterments, property of others in the care, custody and control of the **Assured** or in the care, custody and control of others on behalf of the **Assured**, property for which the **Assured** is responsible, personal property of the **Assured's** employees or officials while on premises owned or controlled by the **Assured** at the option of the **Assured**, electronic data equipment and media, valuable papers and records, property in the course of construction and/or alteration and/or extension and/or addition and/or repair and/or installation and/or erection and/or assembly in progress at inception or any time during the policy period or acquired subsequent thereto, and property in transit. This Section includes but is not limited to pipelines, compression and pump stations, terminals, and gas or other product in lines and/or storage, including but not limited to petroleum products, natural gas and its by-products, liquids derived from natural gas, liquefied natural gas, ethanol and ethanol production by-products.

#### A.1.C. ADDITIONAL PROPERTY INSURED

This Section covers automatic additions and deletions to property insured in accordance with the Automatic Acquisition Clause of the General Conditions, and includes the testing of any newly acquired property or **Object**, rented, purchased or in the course of construction, acquired after inception date of this Policy.





Policy No. MSW-0388 SECTION A

## A.2. EXTENSIONS OF COVERAGE

### A.2.A. EXPEDITING EXPENSE

Subject to the Sublimit of Liability stated in the Declarations, this Section shall also pay for the reasonable extra cost to make temporary repairs and to expedite the permanent repair or replacement of property insured damaged by a peril insured, including overtime and the extra cost of express or other rapid means of transportation, including air freight. Expediting Expense shall not include the costs incurred by the Assured for the temporary rental of property or the temporary replacement of damaged property nor shall it include the cost of permanent repair or replacement of the lost or damaged property.

### A.2.B. TRANSIT

Subject to the Sublimit of Liability stated in the Declarations, this Section shall pay for direct physical loss or damage not otherwise excluded, to property insured in transit, within the Territorial Limits as stated in the Declarations, during the policy period, by any means of conveyance, from the commencement of loading and continuously thereafter, including while property insured is at the location of any repair, temporary storage, consignment or exhibition; and including deviation and delay; until unloaded at the place of final destination.

i.     This Section is extended to cover physical loss or physical damage:

    a.     to all incoming and/or outgoing shipments made during the period of insurance;

    b.     to property sold and/or shipped by the **Assured**, in which the **Assured** retains an interest, under terms terminating the shipper's responsibility short of points of delivery;

    c.     to property sold and shipped by the **Assured** under terms of F.O.B. ("Free On Board") point of origin or other terms usually regarded as terminating the shipper's responsibility short of points of delivery; however, shipments on terms whereby the **Assured** is not obligated to provide transit insurance are hereby excluded; however, it is agreed that the Underwriters will grant to the **Assured** the prompt collection of losses which otherwise would have come within the terms of this Policy. Such allowance shall be repayable upon remittance of the purchase price by the consignee or to the extent of any recovery received by the **Assured** from the insurance effected by the consignee or otherwise. The **Assured** agrees not to divulge the existence of this Insurance unless required by statute or compelled by a court of law and to use all reasonable means to collect the full amount due from the party who arranged transit coverage and in the event of being unable to collect, the **Assured** agrees to subrogate to Underwriters any rights the **Assured** may have against any such party who arranged transit insurance. In the event the consignee and/or buyer, through an oversight or other reasons, does not provide primary cover, the **Assured** will be held covered for the shipment on a primary basis;

Case 4:13-cv-00571-CVE-FHM   Document 2 Filed in USDC ND/OK on 09/03/13   Page 155 of 281

d.   caused by any unauthorized person(s) representing themselves to be the proper party(ies) to receive goods for shipment or to accept goods for delivery; and

e.   resulting from the acceptance by the **Assured**, by its agents or by its customers of fraudulent bills of lading, shipping and delivery orders, or similar fraudulent documents.

ii.   The **Assured** may waive rights of recovery against private and/or contract carriers and accept bills of lading or receipts from carriers, bailees, warehousemen, or processors limiting their liability, but this transit insurance shall not inure to the benefit of any carrier, bailee, warehousemen, or processor.

iii.   the **Assured's** rights shall not be prejudiced by any agreement exempting lightermen from liability.

iv.   This Section excludes property of others and the **Assured's** legal liability therefore, being hauled on vehicles owned, leased or operated by the Assured when acting as a common or contract carrier as defined by the Interstate Commerce Commission Regulations or state regulatory agencies.

## A.2.C. POLLUTION HAZARD

Included within, and not in addition to the Sublimit of Liability stated in the Declarations for Demolition and Increased Cost of Construction, this Section covers direct physical loss or damage to pipeline **River Crossings** directly caused by governmental authorities acting for the public welfare to prevent or mitigate a pollution hazard, or the threat thereof, resulting from direct physical loss or damage to pipeline **River Crossings** for which the Underwriters are liable under this Section, provided such act of governmental authorities has not resulted from want of due diligence by the **Assured** to prevent or mitigate such hazard or threat.

## A.2.D. VALUABLE PAPERS AND ELECTRONIC DATA PROCESSING MEDIA

Subject to the Sublimits of Liability stated in the Declarations, this Section is extended to cover direct physical loss or damage to **Valuable Papers and Records** and to electronic data processing media.

i.   This coverage does not insure against loss or damage to **Valuable Papers and Records** or to electronic data processing media if such property:

a.   cannot be replaced with other(s) of like kind and quality or restored to useable condition; or

b.   is held as samples, or for sale, or for delivery after sale.

ii.   This coverage does not insure against loss or damage resulting from:

a.   errors or omissions in processing or copying, errors or omissions in machine programming or instructions to machines, or computer error or malfunction;

b.   unauthorised instruction to transfer property to any person or any place; or

Policy No. MSW-0388 SECTION A

c.    voluntary parting with any property by the **Assured** or any associate, proprietor, partner, director, trustee, officer, employee or agent of any **Assured** if induced to do so by any fraudulent scheme, trick, device or false pretence.

## A.2.E. DEMOLITION AND INCREASED COST OF CONSTRUCTION

Subject always to the Sublimit of Liability stated in the Declarations, if at the time of repair of any direct physical loss or damage insured against by this Section, there is in force any law or ordinance regulating the construction, demolition, repair, replacement, use or removal of buildings or structures, then this Section is extended to cover:

I.     the additional cost sustained in demolishing and removing any undamaged portion of the buildings or structures necessitated by such law or ordinance including the cost of clearing the site thereof and removal of debris;

II.    the cost incurred in actually repairing, rebuilding or replacing both the damaged and demolished portions of such buildings or structures in a manner to satisfy such law or ordinance.

The total liability under this coverage shall not exceed the actual expenditure incurred in demolishing and removing the undamaged portion of the building(s) or structure(s) involved plus the lesser of the following:

A.     The actual additional  expenditure incurred, not including the cost of land, in rebuilding in compliance with such law or ordinance on another site; or

B.     The additional cost of rebuilding in compliance with such law or ordinance on the same site,

In no event shall this coverage include:

i)     Demolition or increased cost of repair or reconstruction, debris removal or loss of use caused by the enforcement of any law, ordinance or administrative regulation regulating asbestos material;

ii)    Any governmental direction or request declaring that that asbestos material present in or part of or utilized on any undamaged portion of insured property can no longer be used for the purpose for which it was intended or installed and must be removed or modified; or

iii)   Cost of compliance with the enforcement of any law, ordinance or administrative regulation which the Assured would have otherwise incurred by nature of such law, ordinance or administrative regulation in the absence of any loss or damage insured against under this Policy




C:\Documents and Settings\b1dad\Local Settings\Temporary Internet Files\OLK86\Primary $50mm Onshore Policy.doc



Policy No. MSW-0388 SECTION A

**A.2.F.  FIRE BRIGADE CHARGES AND EXTINGUISHING EXPENSES**

Subject to the Sublimit of Liability stated in the Declarations, this Section is extended to cover fire brigade charges and other extinguishing expenses including loss of fire extinguishing materials.

**A.2.G.  REMOVAL OF DEBRIS**

Subject to the Sublimit of Liability stated in the Declarations, this Section shall provide reimbursement of all expenses incurred for debris removal, demolition, removal of ice and dewatering of property, and of cleaning up the site, lease or pipeline right of way, at an insured location, occasioned by direct physical loss or damage to insured property covered by this Policy, and for the temporary removal from its location any insured property endangered by a peril for which indemnity is provided. This extension shall not apply to any cost to remove or neutralize Contaminants and/or Pollutants.

**A.2.H.  PROFESSIONAL FEES**

Subject to the Sublimit of Liability stated in the Declarations, this Section is extended to include Architects', Surveyors', Accountants', Consulting Engineers' or other professional fees of similar nature necessarily incurred in the reinstatement of property consequent upon its loss or damage (but not for preparing any claim), but not including attorneys' fees.

**A.2.I.  HAZARDOUS SUBSTANCES OR CONTAMINANTS**

Subject to the Sublimit of Liability stated in the Declarations, if, as a result of an **Occurrence** insured hereunder, covered property is damaged, contaminated or polluted by Hazardous Substances or Contaminants, Underwriters shall be liable under this policy and any of its endorsements, for the additional expenses incurred for cleanup, repair or replacement, or disposal of that damaged, contaminated or polluted property. As used hereon additional expenses shall mean expenses incurred beyond those for which Underwriters would have been liable if no Hazardous Substances or Contaminants had been involved in the **Occurrence**.



C:\Documents and Settings\b1dad\Local Settings\Temporary Internet Files\OLK86\Primary $50mm Onshore Policy.doc

### A.2.J. MISCELLANEOUS UNSCHEDULED LOCATIONS

Subject to the Sublimit of Liability stated in the Declarations, this Section, subject to all terms, conditions and limitations herein, is extended to cover insured property while at fixed locations not included in the property scheduled and declared at inception.

Coverage under this extension shall not apply to signs, tracks, trestles, bridges, tunnels, electrical transmission and distribution lines, line transformers, towers and poles, cables, equipment or apparatus connected to any of the preceding.

Coverage under this extension shall also not apply to property located anywhere in Florida or California, or within twenty-five miles of the coastal boundaries of the following states:

Alabama
Georgia
Louisiana
Mississippi
North Carolina
South Carolina
Texas

### A.2.K. PROPERTY IN COURSE OF CONSTRUCTION

Subject to the Sublimit of Liability stated in the Declarations, and subject to all terms, conditions and limitations herein, this policy is extended to cover property in the course of construction, fabrication, installation, erection, assembly or testing, including while in transit and storage, (hereinafter referred to as construction work) which commences within the Policy period or is in progress as of inception, provided that the estimated insurable contract value at the inception of such construction work does not exceed the Sublimit. Such coverage shall apply automatically without advice to Underwriters and cover shall continue hereunder through to individual project completion, meaning the earlier of either the completion of testing or the placing of the project into commercial operation, if taking place in the Policy period. Any projects extending beyond the Policy period and intended for coverage hereunder are to be declared and endorsed for coverage under this Policy at terms to be agreed by the Insurer.

With respect to any construction work where the contract value exceeds the sublimit amount stated in the Declarations of this Policy, provision of coverage may be considered by Underwriters subject to the provision of acceptable Underwriting information, and terms and conditions to be specifically agreed by Underwriters prior to attachment of coverage for such construction work hereon.

Notwithstanding anything contained within the foregoing to the contrary, it is understood and agreed that irrespective of the contract value, coverage hereon shall also apply automatically, without advice to underwriters, to any property destined to be used in the course of construction or fabrication or installation or erection or assembly or testing, including while in transit and storage, provided that coverage for any such property to be used is not afforded by any other insurance policy and coverage for all such property shall be automatically transferred to a Construction All Risks policy, if applicable, at the inception date of the Construction All Risks policy. Coverage for such property to be used shall always be limited to the Sublimit as stated in the Declarations of this Policy applying to this Property in Course of Construction Clause.

In no event shall this extension include coverage for any Delay in Start-Up.





Policy No. MSW-0388 SECTION A

**A.2.L. PIPELINE CONSTRUCTION COVERAGE**

Notwithstanding anything contained within this Policy to the contrary, it is understood and agreed that when the scope of any construction project covered hereunder in accordance with the preceding clause **A.2.K.** of this Section involves the laying or installation of pipelines, then Exclusion **A.4.A.xi.** of this Section is deleted in its entirety, and the following wording is added to this Section:

i.  The following is added to clause **A.2.K.** of this Section, **PROPERTY IN COURSE OF CONSTRUCTION**:

In the event of insured physical loss of or damage to pipelines being a part of the insured project, Insurers will pay the following necessary and reasonable costs:

a.  Costs of searching for leaks following a hydrostatic test using special apparatus such as robotic cameras, including the cost of lease, operation and transport of such apparatus. Insurers' liability for this extension of coverage shall not exceed USD **250,000** in any one **Occurrence.**

b.  Costs to excavate and backfill a trench, not damaged in itself, when necessary to search for damage to or to effect the repair or replacement of the pipeline, or any portions thereof. However, Insurers shall not be liable for costs beyond that required to search for damage in, or to effect the repair or replacement of, the pipeline, or any portions thereof.

ii. The following is added to Item **A.4.B.** of this Section, **PERILS EXCLUDED**:

Insurers shall not be liable for:

Loss, damage or expense caused by, resulting from, contributed to or made worse by accumulation of water, silt, mud, sand or other debris within or upon pipelines when the length of an open trench exceeds **1 mile** per section per **Occurrence**, within open trenches and within or upon pipelines installed therein.

iii. The following is added to Item **A.3.** of this Section, **CONDITIONS**:

The **Named Assured** warrants that:

a.  100% of all welded seams six inches in diameter and greater have been x-rayed and all others inspected and tested according to Department of Transportation regulations. Any deficiencies discovered thereby have been properly repaired;

b.  Prior to completion of pressure tests, open trenches have been sufficiently backfilled to prevent displacement of pipelines and cables in the event of water accumulation and further that installed pipelines have been plugged so as to prevent the accumulation of water, silt, mud or other debris within the pipeline.



C:\Documents and Settings\b1dad\Local Settings\Temporary Internet Files\OLK86\Primary $50mm Onshore Policy.doc

 

Policy No. MSW-0388 SECTION A

**A.2.M. SUE AND LABOR EXPENSES**

It is agreed that should the Property Insured under this Policy suffer loss or damage covered under the terms of this Insurance, or should loss or damage covered under the terms of this Insurance be imminent, it shall be lawful and necessary for the **Assured**, their factors, servants and assigns, to sue, labor and travel for, in and about the defense, safeguard and recovery of the said Property, or any part thereof, without prejudice to this Insurance, and subject always to the terms, conditions, limitations and exclusions applicable to this Policy, the charges thereof shall be borne by the Underwriters. It is especially declared and agreed that no acts of the Underwriters or the **Assured** in recovering, saving or preserving the Property shall be considered as a waiver or acceptance of abandonment.

Notwithstanding the foregoing, the Underwriters' liability for Sue and Labor Expenses shall always be contained within the overall Limit of Underwriters' Liability as set forth in Item 5. of the Declarations.

## A.3. CONDITIONS

### A.3.A. BRANDS OR TRADEMARKS

In the event of damage to property, caused by the perils insured against under this Section, bearing a brand or trademark, or sale of which in any way carries or implies the guarantee or the responsibility of the manufacturer or the **Assured**, the salvage value of such damaged property shall be determined after removal in the customary manner of all such brands or trademarks or other identifying characteristics. This Clause shall in no way obligate the **Assured** to remove brands or trademarks. The **Assured** will be given the option to control the salvage disposition of the damaged property. Any expense in connection with this disposition will be included as part of the loss.

### A.3.B. DUE DILIGENCE

The **Assured** shall take all reasonable precautions and consider all reasonable recommendations of the Underwriters to prevent loss or damage to the property insured.

### A.3.C. MISREPRESENTATION

This Section shall be void if the **Assured** has willfully concealed or misrepresented any material fact or circumstance concerning this Section or the subject thereof or in case of any fraud, attempted fraud or false swearing by the **Assured** touching any matter relating to this Section or the subject thereof, whether before or after a loss, except that the acts of one **Assured** shall not void, alter, abrogate or otherwise affect this Section as to all other **Assureds** hereunder.

### A.3.D. SALVAGE AND RECOVERIES

When, in connection with any loss hereunder, any salvage or recovery is received subsequent to the payment of such loss, the loss shall be refigured on the basis on which it would have been settled had the amount of salvage or recovery been known at the time the loss was originally determined. Any amounts thus found to be due either party from the other shall be paid promptly.



**A.3.E. SPECIAL STATE REQUIREMENTS**

Any and all provisions of this Section which are in conflict with the statutes of the state wherein this Policy is applicable are understood, declared, and acknowledged by Underwriters to be amended to conform to such statutes.

**A.3.F. SUSPENSION**

Upon the discovery of a dangerous condition with respect to any **Object**, any representative of Underwriters may, notify the Director, Risk Management and Insurance, of such condition and allow a 30 day period for the condition to be addressed. In the event that the condition is not addressed, Underwriters may suspend the insurance with respect to an Accident to said Object by written notice mailed or delivered to The Williams Companies, Inc. The insurance so suspended may be reinstated by Underwriters, but only by an endorsement issued to form part of this Policy. The **Assured** shall be allowed the unearned portion of the premium paid for such suspended insurance, pro rata for the period of suspension.

**A.3.G. PAIRS AND SETS**

In the event of loss or damage by the perils insured against under this Section to any article or articles which are part of a pair or set, Underwriters agree to pay the full amount of the value of such pair or a set. The **Assured** agrees to surrender the remaining article or articles of the pair or set to Underwriters. The **Assured** shall have the option of retaining the damaged article or articles and salvage credit to Underwriters shall be negotiated.

**A.3.H. VALUATION**

Notwithstanding anything to the contrary contained herein, in the event of loss, the basis of adjustment and valuation shall be as follows:

a.   **Improvements and betterments, and personal property of the Assured:**
Replacement Cost if actually replaced or, if not so replaced, at **Actual Cash Value** at time of loss.

b.   **Buildings, structures, machinery and equipment:**
Replacement Cost if actually replaced; otherwise, **Actual Cash Value** at time of loss.

c.   **Finished Stock:**
the Assured's selling price less all discounts and non-incurred expense.

d.   **Raw Stock and Stock in Process:**
Replacement Cost.

e.   **Valuable Papers and Records, and Media:**
cost to reproduce , if reproduced; if not reproduced, seventy five percent (75%) of reproduction cost or **Actual Cash Value**, whichever is greater.






Policy No. MSW-0388 SECTION A

f.   **River Crossings:**
Replacement Cost if actually replaced; otherwise, **Actual Cash Value** at time of loss.

g.   **Special Provision for Gas Stored Underground:**
Gas loss insured against under this Section from any storage facility will be adjusted for the account of the **Assured** in the same proportion as the **Assured's** own product and the product the **Assured** is responsible for insuring or replacing bears to the total gas volumes in the facility just prior to any loss. Loss will first be adjusted against working gas reserves. Should total working gas be depleted by loss (including working gas not insured under this Section), then loss will be adjusted against cushion gas, provided the **Assured** has insurable interest in cushion gas.

h.   **All Other Property:**
Replacement Cost if actually replaced; otherwise, **Actual Cash Value** at time of loss.

If the the repair, rebuid or replacement of any lost or damaged property is not commenced within two years of the date of loss, the basis of valuation will be the **Actual Cash Value.**

The Insurer shall not pay the **Named Assured** more than the **Named Assured's** or owner's financial interest in the property insured. Financial interests shall include but not be limited to the **Named Assured's** contractual obligation to cover the financial interests of its partners in joint ventures but only to the extent such interests were reported to the Insurer in the application or submission made to the Insurer prior to the Insurer's agreement to provide coverage hereunder or thereafter if accepted in writing by the Insurer.






Policy No. MSW-0388 SECTION A

## A.4. EXCLUSIONS

### A.4.A. PROPERTY EXCLUDED

i.      Bills, currency, deeds, evidence of debt, money, notes, securities;

ii.     Land, growing crops, standing timber, animals, watercraft, aircraft (including any airplane, helicopter or other craft designed to fly in the air or space), automotive vehicles licensed for use on public highways except while on premises of the **Assured**;

iii.    Mines, except for equipment and property contained therein, caverns, salt domes and any property contained therein (except insured products), or wells, but this exclusion shall not apply to any ensuing business interruption or extra expense loss that may result because of loss of or damage to the insured product(s);

iv.     Dams, water shafts, power tunnels, dikes, gates and flumes, but this exclusion shall not apply to any resultant damage to covered property caused by a covered peril;

v.      Retaining walls not constituting part of a building, and property located thereon, all when such loss is caused by ice, water pressure, or collision;

vi.     Docks, piers or wharves when such loss is caused by ice or collision;

vii.    Nuclear reactor power plants including all auxiliary property on the site or any other nuclear reactor installation;

viii.   Any nuclear fuel or raw materials used in the nuclear fuel process at any point in the fuel cycle;

ix.     All electrical transmission and distribution lines, line transformers, cables, and equipment or apparatus connected therewith except those on covered property or in the open on land within 1,000 feet of declared property;

x.      Property sold by the Assured under conditional sale, trust agreement, installment plan or other deferred payment plan after delivery to customers, except when the **Assured** is required by contract to provide insurance such as is available under this Section or has the risk of loss;

xi.     Underground transmission and/or lateral pipelines, underground gathering system pipelines, fittings, drains and/or flues, except where located within the fenced area of any plant, compressor station or pumping, metering station or other property, or at **River Crossings**. This exclusion shall not apply to gas or other product within a pipeline or gathering system, or to any ensuing business interruption or extra expense loss that may result because of loss of or damage to such pipeline and/or pipeline equipment, gas or other product, nor shall this exclusion apply to fiberoptic cables, fiberoptic equipment or other related materials, or to leased pipelines;

xii.    Property not located **Onshore**;

xiii.   Property in the course of Ocean Marine Transit;



Policy No. MSW-0388 SECTION A

xiv.    Animals, livestock, standing timber or growing crops;

xv.    Land (including land on which the property is located) except for improvements or betterments,

xvi.    Aircraft, speedcraft, satellites, watercraft, any vehicle or equipment licensed for highway use or rolling stock, except for rolling stock at insured locations or on railroad sidings, and vehicles or equipment licensed for highway use while at insured locations;

xvii.    Bridges, unless specifically identified in property scheduled and declared at inception;

xviii.    Railroad beds, ties and tracks, unless they are located on the Assured's premises and are owned by, leased to, or the responsibility of the Assured;

xix.    Reservoirs, containment basins, ponds, or lakes; however, this exclusion shall not apply to equipment or machinery appurtenant to any of the forgoing;

xx.    Dikes or levees, unless specifically identified in property scheduled and declared at inception;

xxi.    Fine art, furs, jewelry, jewels, pearls, precious or semi-precious stones, gold, silver, bullion, platinum or other precious metals and precious alloys;

xxii.    Property of others hauled on vehicles owned, leased or operated by the Assured when acting as a common or contract carrier as defined by the Interstate Commerce Commission or state regulatory agencies.

## A.4.B. PERILS EXCLUDED

i.    This Section does not insure loss or damage caused by or resulting from:

    a.    Nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, or due to any act or condition incidental to any of the foregoing, whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by any physical damage insured against by this Section. However, subject to the foregoing and all provisions of this Policy, direct loss by fire resulting from nuclear reaction or nuclear radiation or radioactive contamination is insured against by this Section;

    b.    Infidelity or dishonesty of the **Assured;**

    c.    Any shortage of property discovered upon the taking of inventory or any mysterious disappearance of property or gas in storage;

    d.    California **Earthquake Shock** unless declared and agreed by underwriters;



 

Policy No. MSW-0388 SECTION A

e.   Release, discharge, or dispersal of toxic or hazardous substances, contaminants or pollutants, all whether direct or indirect, proximate or remote, except as specifically provided for in the Seepage, Pollution and Contamination Exclusion attaching to this Section;

f.   Any defect or fault in material, workmanship, or design or latent defect. However, if loss or damage directly results as a consequence of the defective or faulty material, workmanship, design or latent defect excluded above, Underwriters shall be liable for said consequences, but always excluding loss or damage to faulty parts;

g.   Ordinary wear and tear, deterioration, rust, normal corrosion or erosion; gradual cracking, normal settling, shrinkage, bulging, expansion or other gradually developing defects; all unless loss by a peril otherwise insured against hereunder ensues and then Underwriters shall be liable only for such ensuing loss;

h.   Contamination (other than computer viruses, which are already excluded by the provisions of General Condition 26.); shrinkage, evaporation, loss of weight or loss of contents of containers by leakage, unless such damage results directly from other physical damage not otherwise excluded by this Section or results directly from service interruption;

i.   Extremes or changes of temperature or changes in relative humidity, all whether atmospheric or not; exposure to light; change in color or flavor or texture or finish; insects or vermin, seepage, condensation, dampness, depletion, disease, deterioration, dry rot, rot, infestation, inherent vice, mildew, mold, spoilage and decay to raw materials, stock in process or finished goods, unless such damage results directly from other physical damage not otherwise excluded by this Section or results directly from service interruption;

j.   Errors in design, poor workmanship, or use of faulty materials in the development, processing, testing or manufacture of the **Assured's** products or materials; loss attributable to manufacturing or processing operations which result in damage to stock or materials while such stock or materials are being processed, manufactured, tested, or otherwise being worked upon; all unless physical damage not otherwise excluded by this Section results, in which event, this Section shall cover only such resulting damage;

k.   Electrical breakdown of any electrical machine or electrical apparatus while said equipment is undergoing an insulation breakdown test or is being dried out; all unless physical damage not otherwise excluded by this Section results, in which event, this Section shall cover only such resulting damage;

l.   An accident or **Occurrence** to any **Object** operating with sulphur dioxide or hydrogen sulphur gas for:

(i)   loss or damage resulting from corrosion anywhere following the said accident, and





Policy No. MSW-0388 SECTION A

      (ii)    loss or damage to any catalyst caused solely by steam or water contracting or permeating the said catalyst following the said accident or **Occurrence**.

m.    Confiscation, expropriation, nationalization, commandeering, requisition or destruction of or damage to property by order of the Government de jure or de facto or any public, municipal or local authority of the country or area in which the property is situated, seizure or destruction under quarantine or customs regulation.

n.    Functional and economic obsolescence;

o.    Damage from insects, birds, rodents or other animals;

p.    Settling, cracking, heaving, bulging, expansion or contraction of any foundation, wall, floor, ceiling, roof, structure, patio, walkway, driveway or pavement;

q.    Loss or damage covered by any warranty or guaranty provided by any contractor, vendor, supplier or manufacturer. If the interest of any such contractor, vendor, supplier or manufacturer in the property to which the warranty or guaranty applies is covered under this Policy, this exclusion shall also apply to such interest in such property;

r.    Water below the surface of the ground which presses on or flows or seeps through foundations, walls, floors, paved surfaces, basements, doors, windows or other openings.;

s.    Asbestos;

t.    Fraudulent or dishonest acts;

u.    Voluntary parting;

v.    Loss of market;

w.    Fungi, Wet or Dry Rot, or Bacteria





C:\Documents and Settings\lb1dad\Local Settings\Temporary Internet Files\OLK86\Primary $50mm Onshore Policy.doc



Policy No. MSW-0388 SECTION A

**A.4.C. <u>SEEPAGE AND/OR POLLUTION AND/OR CONTAMINATION EXCLUSION (NMA 1999B AMENDED)</u>**

Except as may be provided under item(s) A.2.C., A.2.E., and/or A.2.I. of this Section, Extensions of Coverage, this Section does not insure against loss, damage, costs or expenses in connection with any kind or description of seepage and/or pollution and/or contamination, direct or indirect, arising from any cause whatsoever.

NEVERTHELESS if fire is not excluded from this Section and a fire arises directly or indirectly from seepage and/or pollution and/or contamination then direct physical loss or damage insured under this Section arising directly from that fire shall (subject otherwise to the terms, conditions and limitations of the Policy) be covered.

However, if the insured property is the subject of direct physical loss or damage for which Underwriters have paid or agreed to pay then this Section (subject otherwise to its terms, conditions and limitations) insures against direct physical loss or damage to the property insured hereunder caused by resulting seepage and/or pollution and/or contamination.

The **Assured** shall give notice to the Underwriters of intent to claim under the immediately preceding paragraph NO LATER THAN 12 MONTHS AFTER THE DATE OF THE ORIGINAL DIRECT PHYSICAL LOSS OR DAMAGE.

<u>COST OF CLEAN UP EXTENSION</u>
Notwithstanding the provisions of the preceding exclusion in this clause, or any other provision in this Policy respecting seepage and/or pollution and/or contamination, and/or cost of clean, in the event of direct physical loss or damage to the property insured hereunder, this Policy (subject otherwise to its terms, conditions and limitations, including but not limited to any applicable deductible) also insures, within the sum insured, cost of clean up, at the premises of the **Assured**, made necessary as a result of such direct physical loss or damage.

PROVIDED that this Section does not insure against the costs of decontamination or removal of water, soil or any other substance on or under such premises other than insured property.

It is a condition precedent to recovery under this extension that Underwriters shall have paid or agreed to pay for direct physical loss or damage to the property insured hereunder unless such payment is precluded solely by the operation of any deductible or excess amount and that the **Assured** shall give notice to the Underwriters of intent to claim for cost of clean up NO LATER THAN 12 MONTHS AFTER THE DATE OF SUCH DIRECT PHYSICAL LOSS OR DAMAGE.






Policy No. MSW-0388 SECTION B

# SECTION B – TIME ELEMENT

## B.1. INSURING AGREEMENTS

### B.1.A. Losses to Assured's Property

This Section insures against loss directly resulting from the necessary interruption of the **Assured's** business caused by direct physical loss or damage insured under Section A during the term of this Policy, to real and personal property of the **Assured**, subject to the terms and conditions of this Section. This Policy is extended to cover Business Interruption incurred, as insured by this Policy, resulting from Interruption of the **Assured's** operations at scheduled insured locations following direct physical loss or damage at any other scheduled or unscheduled location(s) of the Assured as covered under the property damage section of this Policy, or which would be covered except for the application of any retention/excess.

### B.1.B. Losses to Contingent Property

Subject to the Sublimit of Liability stated in the Declarations, this Section extends to also insure against loss directly resulting from the necessary interruption of the **Assured's** business caused by direct physical loss or damage to or destruction of real or personal property of third parties by the peril(s) insured against under Section A of this Policy, but only in respect of the **Assured's** direct customers and suppliers and/or as per the Contingent Business Interruption information on file with underwriters.

## B.2. BASIS OF INDEMNITY

The basis of indemnity under this coverage shall be:

**Actual Loss Sustained:**

the amount of Actual Loss Sustained which occurs during the **Period of Interruption,** calculated in accordance with Clause B.7. of this Section, but not exceeding the reduction in **Gross Earnings** less cash charges and expenses which do not necessarily continue during such interruption of business.




C:\Documents and Settings\b1dad\Local Settings\Temporary Internet Files\OLK86\Primary $50mm Onshore Policy.doc

Case 4:13-cv-00571-CVE-FHM   Document 2   Filed in USDC ND/OK on 09/03/13   Page 169 of 281




## B.3. DEFINITIONS

**B.3.A.** "**Gross Earnings**" shall mean the sum of:

  i.    total net sales value of production (manufacturing operations);

  ii.   total net sales of **Merchandise**; and

  iii.  other earnings derived from operation of the business;

Less the cost of:

  a.    **Raw Stock** from which such production is derived;

  b.    supplies consisting of materials consumed directly in the conversion of such **Raw Stock** into **Finished Stock** or in supplying the service(s) sold by the **Assured**;

  c.    **Merchandise** sold, including packaging materials therefore; and

  d.    services purchased from outsiders (not employees of the **Assured**) for resale which do not continue under contract.

No other costs shall be deducted in determining Gross Earnings.

**B.3.B.** Period of Interruption

The **Period of Interruption** shall mean:

  i.    such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such described property as has been lost or damaged or destroyed and to make such property ready for operations under the same or equivalent physical and operating conditions that existed prior to the **Occurrence**. This length of time shall include delays caused by Federal and/or State law, decree, order, regulation or injunction or any similar acts. The length of time does not include any additional time required for making changes to the buildings, equipment or contents regardless of the reason(s) for the changes, except as provided for in the Increased Cost of Construction, Demolition and Debris Removal Clauses contained in this Section; nor any additional time required for restaffing or retraining employees nor for delay of any kind caused by labor disputes, including strikes;

  ii.   such additional time as may be required with the exercise of due diligence and dispatch to repair or replace damaged or destroyed **Valuable Papers and Records**, but not to exceed the time that would be required for transcription from originals or duplicates whether or not the originals or duplicates are available; and/or

  iii.  such additional time as may be required with the exercise of due diligence and dispatch to repair or replace damaged or destroyed data and programming for electronic and electromechanical data processing and production equipment, but not to exceed the time that would be required for reproduction from duplicates or from the previous generation of the data whether or not the duplicates or previous generation are available.



The **Period of Interruption** shall commence on the date immediately following the date of exhaustion of the Retention/Excess Amount (waiting period) stated in Item 7. of the Declarations and shall not be limited by the expiration of this Policy, but the liability of Underwriters shall in no event exceed the maximum **Period of Interruption** stated in Item 5 of the Declarations.

**B.3.C. Finished Stock** is defined as stock manufactured by the **Assured** which in the ordinary course of the **Assured's** business is ready for packing, shipment or sale.

**B.3.D. Raw Stock** is defined as material and supplies in the state in which the **Assured** receives them for conversion into **Finished Stock.**

**B.3.E. Merchandise** is defined as goods kept for sale by the **Assured** which are not the product of manufacturing operations conducted by the **Assured.**

**B.3.F. Normal** shall mean the condition that would have existed had no loss occurred.

## B.4. CONDITIONS

### B.4.A. EXPERIENCE OF THE BUSINESS

In determining the amount payable under this coverage, due consideration shall be given to the experience of the business before the **Period of Interruption** and the probable experience thereafter had no interruption of the business occurred.

In the event the **Assured** would have experienced an operating deficit had no **Period of Interruption** occurred, the Actual Loss Sustained shall be determined by subtracting the operating deficit from the fixed charges and expenses including but not limited to payroll that necessarily continue.

### B.4.B. EXTENDING THE PERIOD OF INTERRUPTION

This Section also insures against the Actual Loss Sustained by the **Assured** resulting directly from the interruption of business, as covered by this Section, for such additional length of time as would be required with the exercise of due diligence and dispatch to restore the business to the condition which would have existed had no loss occurred, commencing with the later of the following dates:

i.      The date on which the liability of Underwriters for loss resulting from interruption of business would terminate if this extension of coverage was not provided; or

ii.     The date on which repair, replacement or rebuilding of such part of the building(s), structure(s), machinery, equipment or furniture and fixtures of the property insured under Section A as had been damaged or destroyed is actually completed,

but in no event for more than one hundred and eighty (180) consecutive calendar days from said later commencement date.

 

Policy No. MSW-0388 SECTION B

### B.4.C. RESUMPTION OF OPERATIONS

As soon as possible after an **Occurrence**, the **Assured** with due diligence and dispatch shall resume business, in whole or in part, and make up lost business within a reasonable period of time (not to be limited to the period during which business is interrupted) through use of every available means, including surplus machinery, duplicate parts, equipment, supplies, surplus or reserve stock, owned or controlled or obtainable from other sources and through working extra time or overtime, all to the extent that the amount for which Underwriters would otherwise be liable under this Section is reduced. Underwriters may take such means as will in the opinion of Underwriters reduce or avert interruption of business or supply the functions in some other way. All extra expense so incurred by the **Assured** as permitted in this Clause or by the **Assured** at the written direction of Underwriters or by Underwriters, shall be covered hereunder and shall be part of and not in addition to the Sum Insured/ Limit of Liability stated in the Declarations.

### B.4.D. CALCULATION OF INDEMNITY AND INDEMNITY LIMIT

Business interruption indemnity under this Section is to be calculated on the basis of the monthly business interruption values, which are to be calculated either by applying one twelfth per month of the annual business interruption values declared by the **Assured** at inception, or by taking the actual monthly values declared by the **Assured** at inception.

Indemnification will be calculated on an Actual Loss Sustained basis, to be capped at one hundred and fifteen percent (115%) of the monthly values. In respect of locations for which Business interruption values have not been declared, Business Interruption indemnity shall be subject to a sublimit of USD 2,000,000 per month per accident or **Occurrence**.

Business Interruption values scheduled and declared after inception by the Assured are to be agreed hereon prior to date of loss, and will be subject to an Additional Premium to be agreed at the time of such declaration by the Assured.



C:\Documents and Settings\lb1dad\Local Settings\Temporary Internet Files\OLK86\Primary $50mm Onshore Policy.doc

 

Policy No. MSW-0388 SECTION B

## B.5. EXTENSIONS OF COVERAGE

### B.5.A. EXTRA EXPENSE

Subject to the Sublimit of Liability stated in the Declarations;

I.    This Section insures against **Extra Expense** incurred by the **Assured** directly resulting from necessary interruption of the **Assured's** business caused by direct physical loss or damage insured against, during the term of this Policy, to property insured, subject to the terms and conditions of Section A of this Policy.

II.    This Section further insures against **Extra Expense** incurred by the **Assured** directly resulting from necessary interruption of the Assured's business caused by direct physical loss or damage by a peril(s) insured against, to property of third parties and/or unscheduled property of the Assured. Coverage under this paragraph ii. shall not be subject to any retention/excess amount.

"Extra Expense" shall mean:

A.    The reasonable and necessary **Extra Expenses** incurred to temporarily continue the Assured's business to as nearly **Normal** levels as practicable; and the amount of expense which is reasonably incurred by the **Assured** or Underwriters to reduce or avert the interruption of business, but only to the extent that the total amount which otherwise would have been paid is thereby reduced.

B.    The reasonable and necessary extra costs of temporarily using property or facilities of the **Assured** or others.

In no event shall this **Extra Expense** include:

i)    loss of Throughput Income;

ii)    costs which normally would have been incurred in maintaining Throughput Income levels during the same period had no physical loss or physical damage insured against occurred; or

iii)    cost of permanent repair or replacement of property that has been lost or damaged.

This coverage does not cover:

a)    **Extra Expense** incurred as a result of damage to finished products manufactured by the **Assured** nor the time required for their reproduction;

b)    any **Extra Expense** incurred due to the suspension, cancellation or lapse of any lease, contract, license or order nor any loss due to fines or damage for breach of contract or for late or non-completion of orders or penalties of whatsoever nature, nor shall Underwriters be liable for **Extra Expense** incurred due to any other consequential or remote loss.

The **Assured** agrees to use any suitable property or service owned or controlled by the **Assured** or obtainable from other sources in reducing the **Extra Expense** incurred under this coverage.




Policy No. MSW-0388 SECTION B

**B.5.B.** <u>IMPOUNDED WATER</u>

In the event that water used as a raw material or for power or for other manufacturing purposes, stored behind dams or in reservoirs, is released from storage as the result of damage as insured against hereunder, to such dam or reservoir, or equipment connected therewith, this Section covers loss, if any, caused by lack of adequate water supply from such sources, such loss not to exceed forty five (45) consecutive days after exhaustion of the Retention/Excess Amount (waiting period) stated in Item 7. of the Declarations.

**B.5.C.** <u>SERVICE INTERRUPTION</u>

Subject to the Sublimit of Liability stated in the Declarations, this Section is extended to cover against loss resulting directly from necessary interruption of the **Assured's** business caused by lack of incoming electricity, fuel, water, gas, steam, refrigeration or telephone service, caused by a type of **Occurrence** that would otherwise be insured, to property of a type not otherwise excluded herein, owned, operated or controlled by the public utility company or any other company contracted by the **Assured** to supply said services directly to the **Assured**.

This Section also insures against a consequential business interruption loss caused by change in temperature or humidity, or interruption of power, gas, water, steam, electricity, heat, air conditioning or refrigeration resulting from physical loss or physical damage by the perils insured, to any generating plant, power house, sub-station, transformer, air conditioning or refrigeration supplier, including electrical transmission and distribution lines, connections or supply pipes away from the **Assured's** locations, which furnishes electricity, steam, gas, water or refrigeration to the **Assured's** locations.

This coverage shall not apply to the following:

a.     Any loss if the interruption of the incoming services is caused directly or indirectly by the failure of the Assured to comply with the terms and conditions of any contracts or agreements the Assured has for the receipt of such services;

b.     Any loss if the interruption of incoming services is caused directly or indirectly by or results from any deliberate act or acts by the supplying utility to shed load to maintain system integrity; or

c.     any purchase of Utility Services by the Assured with the intent of reselling or trading such Utility Services, including hedging and speculation sales of Utility Services.

**B.5.D.** <u>DEFERRED PAYMENTS FROM CUSTOMERS</u>

This Section is extended to cover business interruption loss resulting from the perils insured against, to the property excluded under property exclusion x. of Section A




Policy No. MSW-0388 SECTION B

**B.5.E. INGRESS/ EGRESS**

Subject to the Sublimit of Liability stated in the Declarations, this Section is extended to cover loss and/or Extra Expense directly resulting from the necessary interruption of the Assured's business due to prevention of ingress to or egress from an insured location (whether or not the premises or property of the Assured is damaged), provided that such prevention is a direct result of physical damage of the type insured by this Policy to the kind of property covered and not excluded by this Policy and occurring within five statute miles of the location so affected.

Such coverage shall start from the day of physical damage or loss and will apply for thirty consecutive days from the start date. Payments under this Coverage Extension shall not be subject to the waiting period for Section B and any time period for which the Assured receives payments under this Coverage Extension shall not count towards the waiting period for Section B.

**B.5.F. RENTAL VALUE**

**1.    INSURING AGREEMENT**

Subject to the Sublimit of Liability stated in the Declarations, this Section is extended to cover the Actual Loss Sustained by the **Assured** during the **Period of Interruption** caused by loss or damage insured, during the term of this Policy to property not otherwise excluded which is utilized by the **Assured**, subject to the terms and conditions of this Section.

**2.    BASIS OF INDEMNITY**

The basis of indemnity under this coverage shall be:

**A.    Actual Loss Sustained**

In the event the property is necessarily rendered wholly or partially untenantable, Underwriters shall be liable, subject to all other conditions of this coverage, for the Actual Loss Sustained on the following basis during the **Period of Interruption**:

i.      the fair rental value of any portion of the property occupied by the **Assured;**

ii.     income reasonably expected from rentals of unoccupied or unrented portions of such property; and

iii.    the rental income from the rented portions of such property according to bona fide leases, contracts or agreements in force at the time of loss,

but not including non-continuing charges and expenses.

The **Assured** agrees to use any suitable property or service owned or controlled by the **Assured** or obtainable from other sources in reducing loss under this coverage.

 

Policy No. MSW-0388 SECTION B

In determining the indemnity payable under this coverage, due considerations shall be given to rental conditions before the loss and what reasonably could have been expected had no loss occurred.

B.   **Expenses**

Expenses necessarily incurred in reducing loss under this coverage are covered for an amount not exceeding that by which the loss is reduced.

3.   **EXCLUSIONS**

This coverage does not cover:

A.   loss of rental income with respect to any period during which the insured property would not have been tenantable for any reason other than physical damage of the type insured against by Section A;

B.   any increase of loss due to strike(s) or due to the suspension, cancellation or lapse of any lease, contract, license or order nor any loss due to fines or damage for breach of contract or penalties of whatever nature.

4.   **PERIOD OF INTERRUPTION**

The **Period of Interruption** shall mean such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such described property as has been lost or damaged or destroyed and to make such property ready for operations under the same or equivalent physical and operating conditions that existed prior to the **Occurrence**. This length of time shall include delays caused by Federal and/or State law, decree, order, regulation or injunction or any similar acts. The length of time does not include any additional time required for making changes to the buildings, equipment or contents regardless of the reason(s) for the changes, except as provided for in the Increased Cost of Construction, Demolition and Debris Removal Clauses contained in this Section; nor any additional time required for restaffing or retraining employees nor for delay of any kind caused by labor disputes, including strikes;

The **Period of Interruption** shall commence on the date immediately following the date of exhaustion of the Excess amount (waiting period) detailed at Item 7. of the Declarations and shall not be limited by the expiration of this Policy but the liability of Underwriters shall in no event exceed the maximum **Period of Interruption** stated at Item 5 of the Declarations.



 

Policy No. MSW-0388 SECTION B

**B.5.G. LEASEHOLD INTEREST**

This Section is extended to cover **Leasehold Interest** of the **Assured** as lessee of premises.

i.    The term **"Leasehold Interest"** is hereby defined as the excess rental amount between the existing lease at time of loss and/or damage and the actual rental payable, including any maintenance or operating charges to be paid by the **Assured** at newly leased premises during the unexpired term of the **Assured's** lease, whether the premises be occupied in whole or in part, or whether they be sublet to others.

ii.    Underwriters shall not be liable for any loss to the interest of the **Assured** as lessee by reason of the **Assured** exercising an option to cancel the lease (except as may be reasonably necessary as a result of destruction of and/or damage to the leased premises), or by suspension, lapse or cancellation of any license.

**B.5.H. ACCOUNTS RECEIVABLE**

Subject to the Sublimit of Liability stated in the Declarations, this Section is extended to cover any shortage in collection of accounts receivable, resulting from direct physical loss or damage insured to accounts receivable records, subject to the following conditions:

i.    In the event of loss hereunder the **Assured** shall use all reasonable diligence and dispatch, including legal action if necessary, to effect collection of outstanding accounts receivable, the records for which have been destroyed, and the extra cost, if any, incurred thereby shall constitute a claim to the extent that it reduces the loss hereunder. Underwriters shall also be liable for interest charges on any loan to offset impaired collections pending repayment of such sum uncollectible as the result of such loss or damage.

ii.    Unearned interest and service charges on deferred payment accounts and normal credit losses on bad debts shall be deducted in determining the recovery hereunder.

iii.    The settlement of any loss hereunder shall be made within ninety (90) days from the date of such loss or damage, and all amounts recovered by the **Assured** on accounts receivable outstanding at the time of such loss or damage shall belong and be paid to Underwriters by the **Assured** up to a total not exceeding the amount of loss paid hereunder, but all recoveries in excess of that amount shall belong to the **Assured.**

iv.    In the event it is possible to reconstruct the **Assured's** accounts receivable records after they have been lost or damaged, so that no shortage in collection of accounts receivable is sustained, Underwriters shall be liable only for the cost of material and time required, with the exercise of due diligence and dispatch, to re-establish and/or reconstruct such accounts receivable records, but only so far as these are not covered by any other form of insurance.

v.    This coverage does not apply to loss due to book keeping, accounting or billing errors or omissions, or errors or omissions in machine programming or instruction to machines, or computer error or malfunction.




Policy No. MSW-0388 SECTION B

vi.  This coverage does not apply to loss due to alteration, falsification, manipulation, concealment, destruction or disposal of accounts receivable records committed to conceal the wrongful giving, taking, obtaining or withholding of money, securities or other property, but only to the extent of such wrongful giving, taking, obtaining or withholding.

vii.  The **Assured** agrees to use any suitable property or service owned or controlled by the **Assured** or obtainable from other sources in reducing the loss under this coverage.

## B.6. EXCLUSIONS

Underwriters shall not be liable for any Actual Loss Sustained:

A.  for any time during which business would not or could not have been conducted had direct physical loss or damage to the property as insured against under Section A not occurred;

B.  resulting from damage to finished products manufactured by the **Assured** nor for the time required for their reproduction;

C.  resulting from loss or damage for breach of contract or for late or non-completion of orders;

D.  resulting from breach of contract, penalties, late or non-completion of orders, or suspension, lapse, or cancellation of any contract, permit, lease, or license

E.  for Professional Fees resulting from direct physical loss or damage to property in the course of construction;

F.  resulting from direct physical loss or damage to property not located **Onshore**.

G.  resulting from the loss of incoming Utility Services; or

H.  resulting from loss of Business Interruption or Extra Expense of a trader, reseller or wholesaler of electricity, gas, telephone services or any other commodity or service.

I.  resulting from non-availability of funds for the repair or replacement of lost or damaged property;

J.  resulting from import, export or customs restrictions or regulations

K.  resulting from failure of any Assured to obtain, maintain or extend any contract, permit, lease, license

L.  resulting from failure of any Assured to use reasonable diligence in restoring the damaged property to the condition existing immediately prior to loss or damage;



Policy No. MSW-0388 SECTION B

M.    resulting from interference at an insured location caused by boycott, strikers or other persons involved with building, repairing, replacing, manufacturing or supplying the property insured or services thereof;

N.    resulting from loss occasioned by the failure or inability to collect amounts due from customers for work performed or services provided



C:\Documents and Settings\b1dad\Local Settings\Temporary Internet Files\OLK86\Primary $50mm Onshore Policy.doc

 

Policy No. MSW-0388 ENDORSEMENT **#1**

# SERVICE OF SUIT ENDORSEMENT

As respects Associated Electric & Gas Insurance Services Ltd. participation only, it is understood and agreed that General Conditions Item B.11. of this Policy is hereby amended as follows:

## B.11.   SERVICE OF SUIT

Service of process in any suit instituted against the Insurer(s) under this Policy may be made upon Dewey & LeBoeuf L.L.P., 1301 Avenue of the Americas, New York, New York 10019. The Insurer(s) will abide by the final decision of the court in such suit or of any appellate court in the event of any appeal. Dewey & LeBouef L.L.P. are authorized and directed to accept service of process on behalf of the Insurer(s) in any such suit and, upon the **Assured's** request, to give a written undertaking to the **Assured** that they will enter a general appearance upon the Insurer's behalf in the event such suit is instituted. Nothing in this clause constitutes or should be understood to constitute a waiver of the Insurer's right to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek to transfer a case to another court as permitted by the laws of the United States or of any state in the United States.

Further, pursuant to any statute of any state, territory or district of the United States of America or province of Canada, which makes provision therefore, we hereby designate the Superintendent, Commissioner or Director of Insurance or other office specified for that purpose in the statute, or his successor or successors in office, as our true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by you or on your behalf or any beneficiary hereunder arising out of this contract of insurance, and we hereby designate the above named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

All other terms and conditions of this Policy remain unchanged.



1 of 1

 

Policy No. MSW-0388 ENDORSEMENT **#2**

## MEMBERSHIP AND VOTING RIGHTS ENDORSEMENT

As respects Associated Electric & Gas Insurance Services Ltd. participation only, it is understood and agreed this Policy is amended as follows:

This Policy does not entitle the Assured to be a member in the Insurer.

This Policy does not entitle the Assured to a vote on any matter submitted to the members of the Insurer.



1 of 1



Policy No. MSW-0388 ENDORSEMENT #3

# AMENDATORY ENDORSEMENT

Effective at Policy Inception, it is understood and agreed that the GENERAL EXCLUSIONS of this Policy, Clause C. 6. AUTHORITIES EXCLUSION is amended to read as follows:

**C.6.**   **AUTHORITIES EXCLUSION**

Except as specifically stated in this policy or endorsement attached thereto, the Underwriters shall not be liable for loss, damage, costs, expenses, fines, or penalties incurred, sustained by or imposed on the Assured at the order of any Government Agency, Court, or other Authority arising from any cause whatsoever.

However, if any time element coverage is afforded by this policy or endorsements thereto, the coverage is extended to include any increase in the actual loss sustained by the Assured, resulting directly from an interruption of business covered hereunder, during the length of time not exceeding four (4) consecutive weeks thirty (30) consecutive days, when as a direct result of damage to or destruction of covered property by the peril(s) insured against, access to the premises or commencement of repairs is delayed at the order of any Government Agency, Court, or other Authority.

All other Terms & Conditions remain unchanged.

| INSURER / SECURITY | AUTHORIZED SIGNATURE | POLICY / REFERENCE NO. |
|---|---|---|
| Associated Electric & Gas Insurance Services Ltd. | Date: _____ | LO559A1A10 |
| Lexington Insurance Company | Date: 10/14/2010 | 61466527 |

1 of 1

Policy No. MSW-0388 ENDORSEMENT #4

## AMENDATORY ENDORSEMENT

It is hereby understood and agreed that the Assured shall have the option to declare Business Interruption value(s) and purchase Time Element coverage for E&P revenue at the Parachute Creek and/or Willow Creek facility(ies) at a later date in the policy term, with additional premium to be calculated pro-rata of the Policy rate for "Business Interruption" (with a minimum of 50% of the applicable annual premium).

Underwriting information supporting this provision was provided to Insurers as part of the renewal underwriting submission (a copy is attached to this Endorsement as Information).

All other Terms & Conditions remain unchanged.

| INSURER / SECURITY | AUTHORIZED SIGNATURE | POLICY / REFERENCE NO. |
|---|---|---|
| Associated Electric & Gas Insurance Services Ltd. | Date: 4/7/11 | LO559A1A10 |
| Lexington Insurance Company | Date: SEPT/1/2011 | 61466527 |



1 of 2

 

Policy No. MSW-0388 ENDORSEMENT #4

INFORMATION ONLY (excerpt from renewal underwriting submission):



WILLOW CREEK / PARACHUTE CREEK Business Interruption Exposure Summary

Please note that the declared Business Interruption value for the Willow Creek plant is only representative of gas processing revenue (not E&P production revenue). No BI value has been declared for the Parachute Creek facility. The reason for not declaring a BI value for E&P production at either plant is because lost throughput at one plant can be "picked-up" by the other in the event of a loss. That said, if one of the plants experiences a situation that results in an extended outage, Williams would need to declare a BI value for E&P production for the other operating plant. Williams would like to have underwriters consider this exposure now, and provide confirmation that Williams could elect to declare and purchase BI cover for E&P production revenue losses as a result of loss / damage to the Parachute Creek and/or Willow Creek plant at a later date in the policy term, at the Policy BI rate agreed at inception.

WILLOW CREEK

- Grassroots plant was constructed in 2008/2009 with commercial operation beginning in late August 2009

- Designed as a straddle plant to extract up to 30,000 barrels of natural gas liquids (NGL) per day from pipeline gas (gas is already at pipeline quality so the plant can be fully bypassed if necessary)

- Processing Capacity of 450 million cubic feet per day  All gas enters the plant via a 30" pipeline from the Williams E&P treating plant located near Parachute, CO, about 40 miles to the south

- Three Solar Titan combustion turbine-driven compressors deliver the residue gas from the plant to other pipelines. The plant requires all three of these compressor units for full operation but can process 350 to 375 MMcf/day on any two of the units.

- Residue gas can go to Williams Northwest Pipeline, Colorado Interstate Gas (CIG), Colorado Interstate Pipeline (WIC) and Rocky Mountain Express

- NGL's currently supplied to either Enterprise Pipeline or ONEOK via pipeline



PARACHUTE CREEK

- Train I was completed in 2002 and is rated at 120 MMcf/day processing capacity

- Train II was completed in 2006 and modified to increase capacity to 300 MMcf/day

- Train III was completed in 2007 and is rated at 300 MMcf/day. A further Train III Expansion was completed in 2008/09 and is also rated at 300 MMcf/day

- Plant operates 24/7/52 and is manned at all times

- Field gas comes in at about 700 psi through one 30" and one 16" gathering pipeline system, and is dehydrated and filtered

- Gas is processed and sold via pipeline, while condensate is stabilized and transported by truck (liquids sold over truck rack are 70 psi vapor pressure)

- There is a project underway to add a 6-inch NGL line from Parachute to Grand Valley which will connect to an existing 8-inch line, allowing all NGL's to be sent by pipeline instead of truck

21



K:\EMO\Williams\2010-2011 Corporate Renewal\Policy & Endorsements\I - Primary AEGIS and LEX\Drafts\Policy MSW-0388 End't 4.doc




Policy No. MSW-0388 ENDORSEMENT **#5**

# AMENDATORY ENDORSEMENT

It is hereby understood and agreed that with effect from Policy Inception, for the purposes of any premium adjustment associated with the addition or deletion of any assets to or from coverage under this Policy, the attached rating schedule is to apply.

All other Terms & Conditions remain unchanged.

| INSURER / SECURITY | AUTHORIZED SIGNATURE | POLICY / REFERENCE NO. |
|---|---|---|
| Associated Electric & Gas Insurance Services Ltd. | Date: _____ | LO559A1A10 |
| Lexington Insurance Company | Date: 10/14/2010 | 61466527 |

1 of 2



Policy No. MSW-0388 ENDORSEMENT #5

**INCEPTION PREMIUM:**

Primary Onshore $50mm Layer Premium Worksheet

**"Risk" Only Rates (i.e. not including Named Windstorm premium)**

|  | Value | Rate | Premium |
|---|---|---|---|
| All Onshore PD Values $ | 13,065,789,608 | 0.040631814% $ | 5,308,867 |
| All Onshore BI Values (2010 BI only) $ | 2,378,337,196 | 0.071105674% $ | 1,691,133 |
|  |  |  | $ 7,000,000 |

**NWS Only Rates (in addition to "Risk" premium)**

|  | Value | Rate | Premium |
|---|---|---|---|
| "Gulf" PD Values $ | 527,010,661 | 0.24500439% $ | 1,291,199 |
| "Gulf" BI Values (2010 BI only) $ | 179,892,000 | 0.42875768% $ | 771,301 |
| "Non-Gulf" PD Values $ | 12,538,778,947 | 0.00266995% $ | 334,779 |
| "Non-Gulf" BI Values (2010 BI only) $ | 2,198,445,196 | 0.00467242% $ | 102,721 |
|  |  |  | $ 2,500,000 |

**TOTAL $ 9,500,000**

The above values and rates are to be used for calculation of applicable Additional Premiums / Return Premiums during the May 1, 2010 to May 1, 2011 policy period.

Onshore rates do not include TRIPRA premium, as this option was declined by the Assured.



2 of 2



Policy No. MSW-0388 ENDORSEMENT #6

# AMENDATORY ENDORSEMENT

It is hereby understood and agreed that with effect from August 27, 2010 the Echo Springs TXP4 natural gas processing facility is added to coverage under this Policy. As a consequence of the foregoing an Additional Premium is due, calculated as $67,677 (100% annual) to be pro-rated for the remainder of the Policy Term based on 247/365 days.

All other Terms & Conditions remain unchanged.

### Information:

- Construction of a fourth Turbo Expander Train (TXP4) to increase the Echo Springs Gas Plant's throughput from a nominal 395MM scf/d to 745MM scf/d. Echo Springs is a cryogenic natural gas processing facility, and the new Train includes inlet compression / separation to remove NGLs and contaminants, $CO_2$ removal (using amine treatment), a Thermal Oxidizer to burn all contaminants from the amine plant off-gases, dehydration (molecular sieve system), recompression, ancillary support systems, and a flare

- Site is located approximately 8 miles Southeast of Wamsutter, WY in Carbon County

- Replacement cost value of the new train is $166,560,874

- Placed into commercial service on August 27, 2010

- Williams has confirmed no known losses since August 27. Plant has been running without issue, though an equipment malfunction was corrected that was originally causing the facility to run at decreased capacity (issue was related to inlet guide vanes on the Mafi-Trench turbo-expander, which is part of the cryogenic system used to separate the natural gas liquids. Total downtime was roughly one week).

### Echo Springs AP Worksheet
Primary Onshore $50mm Layer Premium Worksheet

#### "Risk" Only Rates (i.e. not including Named Windstorm premium)

|  | Value | Rate | Premium |
|---|---|---|---|
| All Onshore PD Values $ | 166,560,874 | 0.040631814% $ | 67,677 |
| All Onshore BI Values (2010 BI only) $ | - | 0.071105674% $ | - |
|  |  | $ | 67,677 |

#### NWS Only Rates (in addition to "Risk" premium)

|  | Value | Rate | Premium |
|---|---|---|---|
| "Gulf" PD Values $ | - | 0.24500439% $ | - |
| "Gulf" BI Values (2010 BI only) $ | - | 0.42875768% $ | - |
| "Non-Gulf" PD Values $ | 166,560,874 | 0.00268995% $ | 4,447 |
| "Non-Gulf" BI Values (2010 BI only) $ | - | 0.00467242% $ | - |

NWS AP waived

| | |
|---|---|
| TOTAL $ | 67,677 |
| Pro-rata for 247/365 days $ | 45,798 |



 

Policy No. MSW-0388 ENDORSEMENT #6

| INSURER / SECURITY | AUTHORIZED SIGNATURE | POLICY / REFERENCE NO. |
|---|---|---|
| Associated Electric & Gas Insurance Services Ltd. | Date: _____ | LO559A1A10 |
| Lexington Insurance Company | Date: 10/14/2010 | 61466527 |

Remainder of Page Intentionally Left Blank.

2 of 2

Policy No. MSW-0388 ENDORSEMENT #7

## AMENDATORY ENDORSEMENT

It is understood and agreed by all underwriters hereon that with effect from May 1, 2010 at 12:01am Central Standard Time the declared values in respect of "Transco Gas In Storage" are revised as per the below worksheet.

In accordance with the above an additional premium is due of $100,412 (100% annual), as calculated based on the attached Additional Premium worksheet.

All other Terms & Conditions remain unchanged.

### The Williams Companies, Inc.
### May 1, 2010 - 2011 Renewal
### Transco Gas In Storage

| Asset Name / Description | State | Value As Reported | Revised Value | Added Value |
|---|---|---|---|---|
| Gas In Storage - Hester | LA | $11,730,000 | $11,730,000 | $0 |
| Gas In Storage - Washington | LA | $77,060,000 | $224,330,000 | $147,270,000 |
| Gas In Storage - Eminence | MS | $21,580,000 | $48,360,000 | $26,780,000 |
| Gas In Storage - Sta 240-Carlstadt NJ LNG | NJ | $0 | $3,800,000 | $3,800,000 |
| Gas In Storage - Leidy, PA | PA | $51,860,000 | $81,710,000 | $29,850,000 |
| Gas In Storage - Wharton, PA | PA | $28,920,000 | $53,110,000 | $24,190,000 |
| Total Transco Gas In Storage | | $191,150,000 | $423,040,000 | $231,890,000 |

Values based on 9-30-09 volumes and spot rate price.

1 of 3

Policy No. MSW-0388 ENDORSEMENT #7

## Primary Onshore $50mm Layer Premium Worksheet

### "Risk" Only Rates (i.e. not including Named Windstorm premium)

| | Value | Rate | Premium |
|---|---|---|---|
| All Onshore PD Values $ | 231,890,000 | 0.040631814% $ | 94,221 |
| All Onshore BI Values (2010 BI only) | | 0.071105674% $ | - |
| | | $ | 94,221 |

### NWS Only Rates (in addition to "Risk" premium)

| | Value | Rate | Premium |
|---|---|---|---|
| "Gulf" PD Values | | 0.24500439% $ | - |
| "Gulf" BI Values (2010 BI only) | | 0.42875768% $ | - |
| "Non-Gulf" PD Values $ | 231,890,000 | 0.00266995% $ | 6,191 |
| "Non-Gulf" BI Values (2010 BI only) | | 0.00467242% $ | - |
| | | $ | 6,191 |

| | | | |
|---|---|---|---|
| | | TOTAL $ | 100,412 |

The above values and rates are to be used for calculation of applicable Additional Premiums / Return Premiums during the May 1, 2010 to May 1, 2011 policy period.

Onshore rates do not include TRIPRA premium, as this option was declined by the Assured.

2 of 3

Policy No. MSW-0388 ENDORSEMENT #7

| INSURER / SECURITY | AUTHORIZED SIGNATURE | POLICY / REFERENCE NO. |
|---|---|---|
| Associated Electric & Gas Insurance Services Ltd. | Date: | LO559A1A10 |
| Lexington Insurance Company | Date: 6/24 | 61466527 |

Remainder of Page Intentionally Left Blank.

3 of 3



Policy No. MSW-0388 ENDORSEMENT #8

## AMENDATORY ENDORSEMENT –
### Engineering Fee Reimbursement

In accordance with the provision allowed by the DECLARATIONS Item 11. Premium, underwriters hereon agree to pay their proportion of the $127,000 (100%) engineering fee reimbursement due.

2010/2011 Schedule of completed engineering visits completed is attached for informational purposes.

All other Terms and Conditions remain unchanged.

| INSURER / SECURITY | AUTHORIZED SIGNATURE | POLICY / REFERENCE NO. |
|---|---|---|
| Associated Electric & Gas Insurance Services Ltd. | Date: _____ | L0559A1A10 |
| Lexington Insurance Company | Date: 7·21·2o4 | 61466527 |

1 of 2



Policy No. MSW-0388 ENDORSEMENT #8

# Starr Technical Risk Agency – Survey Schedule 2010/2011 Term

| Company | Asset | Location | Last Inspection | Cost | Date Completed |
|---|---|---|---|---|---|
| WGP-West | Transco Station 44 | Johnson Bayou, LA | Feb-06 | $2,500.00 | Jan-11 |
| WGP-West | Pegram Station | Pegram, ID | Mar-06 | $2,500.00 | Aug-10 |
| WGP-West | Soda Springs Station | Soda Springs, ID | Mar-06 | $2,500.00 | Aug-10 |
| WGP-West | Lava Hot Springs Station | Lava Hot Springs, ID | Mar-06 | $2,500.00 | Aug-10 |
| WGP-West | Pocatello Station | Pocatello, ID | Mar-06 | $2,500.00 | Aug-10 |
| WGP-West | Burley Station | Twin Falls, ID | Mar-06 | $2,500.00 | Aug-10 |
| WGP-West | Buhl Station | Buhl, ID | Mar-06 | $2,500.00 | Aug-10 |
| Midstream | Opal Gas Plant | Opal, WY | Aug-08 | $10,000.00 | Jun-10 |
| Midstream | Big Piney Compressor Station | Big Piney, WY | Aug-06 | $2,500.00 | Jun-10 |
| Midstream | Echo Springs Gas Plant | Wamsutter, WY | Aug-08 | $10,000.00 | Jun-10 |
| Midstream | 8-Mile Lake Compressor Station | Wansutter, WY | Aug-08 | $2,500.00 | Jun-10 |
| Midstream | Geismar Olefins Plant | Geismar, LA | Dec-08 | $12,000.00 | Oct-10 |
| WGP-Transco | Compressor Station 130 | Comer, GA | Jan-05 | $2,500.00 | Jan-11 |
| WGP-Transco | Compressor Station 140 | Moore, SC | Jan-07 | $2,500.00 | Jan-11 |
| WGP-Transco | Compressor Station 145 | Grover, NC | Jan-07 | $2,500.00 | Jan-11 |
| WGP-Transco | Compressor Station 150 | Mount Morne, NC | Jan-05 | $2,500.00 | Jan-11 |
| WGP-Transco | Compressor Station 155 | Lexington, NC | Jan-07 | $2,500.00 | Jan-11 |
| E & P | Parachute Creek Gas Plant | Parachute Creek, CO | Aug-08 | $10,000.00 | Mar-11 |
| Midstream | Ignacio Gas Plant | Durango, CO | Jun-08 | $10,000.00 | Mar-11 |
| Midstream | Conway NGL Fractionation Plant | McPherson, KS | Jun-06 | $10,000.00 | Aug-10 |
| WGP-Transco | Meadows LNG Plant | Carlstadt, NJ | May-08 | $10,000.00 | Jul-10 |
| WGP-Transco | Compressor Station 65 | Greensburg, LA | Feb-07 | $2,500.00 | Feb-11 |
| WGP-Transco | Compressor Station 70 | Tylertown, MS | Feb-07 | $2,500.00 | Feb-11 |
| WGP-Transco | Compressor Station 77 | Seminary, MS | Mar-05 | $2,500.00 | Feb-11 |
| WGP-Transco | Compressor Station 80 | Sandersville, MS | Mar-05 | $2,500.00 | Feb-11 |
| WGP-West | Plymouth LNG | Plymouth, WA | Aug-08 | $10,000.00 | Mar-11 |
| | | | Total | $127,000.00 | |



## OFAC Disclosure Notice

**Office of Foreign Assets Control (OFAC) Disclosure Notice**
**This proposal or resulting Binder, the continuation of any bound insurance, and any**
**payments to you, to a claimant or to another third party, may be affected by the**
**administration and enforcement of U.S. economic embargoes and trade sanctions by the**
**office of Foreign Assets Control (OFAC), if we determine that any such party is on the**
**"Specially Designated Nationals or Blocked Persons" list is maintained by OFAC.**



## IN THE DISTRICT COURT IN AND FOR TULSA COUNTY
## STATE OF OKLAHOMA

DISTRICT COURT
**F I L E D**

THE WILLIAMS COMPANIES, INC., a )
Delaware corporation; and )
TRANSCONTINENTAL GAS PIPE LINE )
COMPANY, LLC, a Delaware limited )
liability company, )
)
        Plaintiffs, )
)
v. )
)
IRONSHORE INSURANCE, LTD., a )
foreign corporation. )
)
        Defendant. )

AUG - 5 2013

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA, TULSA COUNTY

Case No. *CJ-2013-3629*

Judge *E. MARK BARCUS*

### EX PARTE MOTION FOR THE APPOINTMENT OF A SPECIAL PROCESS SERVER

       Plaintiffs, The Williams Companies, Inc. ("Williams") and Transcontinental Gas Pipe

Line Company, LLC ("Transco"), by and through their attorney, James E. Green, Jr., hereby

request this Court to appoint a special process server pursuant to OKLA. STAT. tit. 12, §

2004(C)(1)(a), and in support thereof state:

1. The instant action was filed and Summons issued on Monday, August 5, 2013.

2. The Defendant, Ironshore Insurance, Ltd., is located in Hamilton, Bermuda making

    service of the Summons by the sheriff or deputy virtually impossible given the time and

    expense related to same.

3. Plaintiffs respectfully request that APS International, Ltd., 7800 Glenroy Road,

    Minneapolis, MN 55439-3122, including its designated agents in Bermuda, be appointed

    and authorized to effect service of process on the Defendants Ironshore Insurance, Ltd. in

    Bermuda.

4. This special process server is a person over 18 years of age and not a party to this action.



**EXHIBIT**

2



**WHEREFORE**, Plaintiffs pray that this Court appoint a special process server.

Respectfully Submitted,

**CONNER & WINTERS, LLP**

James E. Green, Jr., OBA #3582
M. Freeman-Burney, OBA #12337
4000 One Williams Center
Tulsa, OK 74172-0148
918 / 586-8516; 918 / 586-8616 Fax

and

**CROWE & DUNLEVY**
Michael J. Gibbens, OBA #3339
Susan E. Huntsman, OBA #18401
500 Kennedy Building
321 S. Boston Avenue
Tulsa, OK  74103-3313
918 / 592-9800

*Attorneys for Plaintiffs*
*The Williams Companies, Inc. and*
*Transcontinental Gas Pipe Line Company, LLC*





**IN THE DISTRICT COURT IN AND FOR TULSA COUNTY DISTRICT COURT**

**STATE OF OKLAHOMA** **F I L E D**

AUG – 6 2013

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA, TULSA COUNTY

| | |
|---|---|
| THE WILLIAMS COMPANIES, INC., a Delaware corporation; and TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC, a Delaware limited liability company, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| IRONSHORE INSURANCE, LTD., a foreign corporation. | ) ) ) |
| Defendant. | ) ) |

Case No. CJ-2013-3629

Judge _____ E. MARK BARCUS

## ORDER APPOINTING SPECIAL PROCESS SERVER

NOW on this 6 day of Augus, 2013, there comes before this Court the

Plaintiffs' Motion for the Appointment of a Special Process Server pursuant to Okla. Stat. tit. 12

§ 2004. Having reviewed Plaintiffs' Motion, and upon good cause shown, this Court FINDS

Plaintiffs' Motion to be meritorious so that it should be **GRANTED**.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** that APS

International, Ltd., including its designated agents, is appointed and authorized to effect service

of process on the Defendant, Ironshore Insurance, Ltd, in Bermuda. Service shall be effected

according to any internationally agreed means, the laws of the foreign country, or as directed by

the foreign authority or the originating court if not otherwise prohibited by international

agreement or the laws of the foreign country, and in a manner reasonably calculated to give

notice.

IT IS SO ORDERED this _6_ day of _Hpt_, 2013.

_____
JUDGE OF THE DISTRICT COURT

**PREPARED AND SUBMITTED BY:**

**CONNER & WINTERS, LLP**

_____

James E. Green, Jr., OBA #3582
M. Freeman-Burney, OBA #12337
4000 One Williams Center
Tulsa, OK 74172-0148
918 / 586-8516; 918 / 586-8616 Fax

        and

**CROWE & DUNLEVY**
Michael J. Gibbens, OBA #3339
Susan E. Huntsman, OBA #18401
500 Kennedy Building
321 S. Boston Avenue
Tulsa, OK  74103-3313
918 / 592-9800

*Attorneys for Plaintiffs,*
*The Williams Companies, Inc. and*
*Transcontinental Gas Pipe Line Company, LLC*





## IN THE DISTRICT COURT OF TULSA COUNTY
## STATE OF OKLAHOMA

| | | |
|---|---|---|
| THE WILLIAMS COMPANIES, INC.; and TRANSCONTINENTAL GAS PIPE LINE COMPANY, LLC, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No.  CJ-2013-03629 |
| v. | ) | Judge Barcus |
| | ) | |
| IRONSHORE INSURANCE LTD., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**DISTRICT COURT**
# F I L E D

AUG – 6 2013

SALLY HOWE SMITH, COURT CLERK
STATE OF OKLA. TULSA COUNTY

### ENTRY OF APPEARANCE

Michael J. Gibbens and Susan E. Huntsman of Crowe & Dunlevy, P.C., hereby enter their appearance as additional counsel for Plaintiffs, The Williams Companies, Inc., and Transcontinental Gas Pipe Line Company, LLC.

Dated this 6th day of August, 2013.

Respectfully submitted,

Michael J. Gibbens, OBA #3339
Susan E. Huntsman, OBA #18401

-Of the Firm-

CROWE & DUNLEVY
A Professional Corporation
500 Kennedy Building
321 South Boston Avenue
Tulsa, OK 74103-3313
(918) 592-9800
(918) 592-9801 (Facsimile)

ATTORNEYS FOR PLAINTIFFS

2013 AUG -6  PM 4: 08
SALLY HOWE SMITH
COURT CLERK

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing was mailed, postage prepaid, this 6th day of August, 2013 to:

James E. Green, Jr.
M. Freeman-Burney
4000 One Williams Center
Tulsa, OK 74172-0148

Michael J. Gibbens

2474435.02



**THE OKLAHOMA STATE COURTS NETWORK**
*www.oscn.net*

**Home   Courts   Court Dockets   Legal Research   Calendar   Help**

The information on this page is NOT an official record. Do not rely on the correctness or completeness of this information. Verify all information with the official record keeper. The information contained in this report is provided in compliance with the Oklahoma Open Records Act, 51 O.S. 24A.1. Use of this information is governed by this act, as well as other applicable state and federal laws.

## IN THE DISTRICT COURT IN AND FOR TULSA COUNTY, OKLAHOMA

| | |
|---|---|
| WILLIAMS COMPANIES INC,<br>        Plaintiff, and<br>TRANSCONTINENTAL GAS PIPE LINE COMPANY LLC,<br>        Plaintiff,<br>v.<br>IRONSHORE INSURANCE LTD,<br>        Defendant. | No. CJ-2013-3629<br>(Civil relief more than $10,000:<br>BREACH OF AGREEMENT - CONTRACT)<br><br>Filed: 08/05/2013<br><br><br>Judge: Barcus, Mark |

## Parties

IRONSHORE INSURANCE LTD , Defendant
TRANSCONTINENTAL GAS PIPE LINE COMPANY LLC , Plaintiff
WILLIAMS COMPANIES INC , Plaintiff

## Attorneys

| Attorney | Represented Parties |
|---|---|
| GIBBENS, MICHAEL J(Bar # 3339)<br>321 S BOSTON, STE 500<br>TULSA, OK 74103 | WILLIAMS COMPANIES INC,<br>TRANSCONTINENTAL GAS PIPE LINE COMPANY LLC, |
| Green, James(Bar # 3582)<br>CONNER & WINTERS LLP<br>4000 ONE WILLIAMS CENTER<br>TULSA, OK 74172 | TRANSCONTINENTAL GAS PIPE LINE COMPANY LLC,<br>WILLIAMS COMPANIES INC, |
| HUNTSMAN, SUSAN E(Bar # 18401)<br>CROWE & DUNLEVY<br>500 KENNEDY BUILDING<br>321 S. BOSTON AVE<br>TULSA, OK 74103 | WILLIAMS COMPANIES INC,<br>TRANSCONTINENTAL GAS PIPE LINE COMPANY LLC, |

## Events

| Event | Party | Docket | Reporter |
|---|---|---|---|

## Issues

For cases filed before 1/1/2000, ancillary issues may not appear except in the docket.

**Issue # 1.**                                   Issue: BREACH OF AGREEMENT - CONTRACT
                                                (CONTRACT)
                                                Filed by: WILLIAMS COMPANIES INC
                                                Filed Date: 08/05/2013

**Party Name:**                                 **Disposition Information:**

**Defendant:** IRONSHORE INSURANCE  Pending.

**EXHIBIT**

3

LTD

**Issue # 1.**

Issue: BREACH OF AGREEMENT - CONTRACT
(CONTRACT)
Filed by: TRANSCONTINENTAL GAS PIPE LINE
COMPANY LLC
Filed Date: 08/05/2013

<u>**Party Name:**</u>      <u>**Disposition Information:**</u>

<u>**Defendant:**</u> IRONSHORE INSURANCE   Pending.
LTD

## Docket

| Date | Code | Count | Party | Serial # | Entry Date | | |
|------|------|-------|-------|----------|------------|---|---|
| 08-05-2013 | TEXT | 1 | | 86300409 | Aug 5 2013 4:28:11:510PM | - | $ 0.00 |
| | CIVIL RELIEF MORE THAN $10,000 INITIAL FILING. | | | | | | |
| 08-05-2013 | CONTRACT | - | | 86300411 | Aug 5 2013 4:29:06:360PM | Realized | $ 0.00 |
| | BREACH OF AGREEMENT CONTRACT | | | | | | |
| 08-05-2013 | DMFE | - | | 86300412 | Aug 5 2013 4:28:11:610PM | Realized | $ 2.00 |
| | DISPUTE MEDIATION FEE($ 2.00) | | | | | | |
| 08-05-2013 | PFE1 | - | | 86300413 | Aug 5 2013 4:43:24:580PM | Realized | $ 163.00 |
| | PETITION($ 163.00) 🗎 *Document Available (#1022331510)* | | | | | | |
| 08-05-2013 | PFE7 | - | | 86300414 | Aug 5 2013 4:28:11:610PM | Realized | $ 6.00 |
| | LAW LIBRARY FEE($ 6.00) | | | | | | |
| 08-05-2013 | OCISR | - | | 86300415 | Aug 5 2013 4:28:11:610PM | Realized | $ 25.00 |
| | OKLAHOMA COURT INFORMATION SYSTEM REVOLVING FUND($ 25.00) | | | | | | |
| 08-05-2013 | CCADMIN02 | - | | 86300416 | Aug 5 2013 4:28:11:610PM | Realized | $ 0.20 |
| | COURT CLERK ADMINISTRATIVE FEE ON $2 COLLECTIONS($ 0.20) | | | | | | |
| 08-05-2013 | OCJC | - | | 86300417 | Aug 5 2013 4:28:11:610PM | Realized | $ 2.00 |
| | OKLAHOMA COUNCIL ON JUDICIAL COMPLAINTS REVOLVING FUND($ 2.00) | | | | | | |
| 08-05-2013 | OCASA | - | | 86300418 | Aug 5 2013 4:28:11:610PM | Realized | $ 5.00 |
| | OKLAHOMA COURT APPOINTED SPECIAL ADVOCATES($ 5.00) | | | | | | |
| 08-05-2013 | CCADMIN04 | - | | 86300419 | Aug 5 2013 4:28:11:610PM | Realized | $ 0.50 |
| | COURT CLERK ADMINISTRATIVE FEE ON COLLECTIONS($ 0.50) | | | | | | |
| 08-05-2013 | LTF | - | | 86300420 | Aug 5 2013 4:28:11:720PM | Realized | $ 10.00 |
| | LENGTHY TRIAL FUND($ 10.00) | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 08-05-2013 | SMF | - | | 86300421 | Aug 5 2013 4:28:11:760PM | Realized | $ 5.00 |

SUMMONS FEE (CLERKS FEE)($ 5.00)

---

| 08-08-2013 | SMIP | - | | 86300422 | Aug 5 2013 4:28:11:790PM | Realized | $ 0.00 |

SUMMONS ISSUED - PRIVATE PROCESS SERVER

---

| 08-05-2013 | MO | | WILLIAMS COMPANIES INC | 86302687 | Aug 6 2013 9:11:03:457AM | - | $ 0.00 |

EX PARTE MOTION FOR THE APPONTMENT OF A SPECIAL PROCESS SERVER (A/J)
📄 *Document Available (#1022333750)*

---

| 08-05-2013 | TEXT | - | | 86300410 | Aug 5 2013 4:28:11:540PM | - | $ 0.00 |

OCIS HAS AUTOMATICALLY ASSIGNED JUDGE BARCUS, MARK TO THIS CASE.

---

| 08-05-2013 | ACCOUNT | - | | 86300462 | Aug 5 2013 4:29:46:540PM | - | $ 0.00 |

RECEIPT # 2013-2656879 ON 08/05/2013.
PAYOR:CONNER & WINTERS TOTAL AMOUNT PAID: $218.70.
LINE ITEMS:
CJ-2013-3629: $168.00 ON AC01 CLERK FEES.
CJ-2013-3629: $6.00 ON AC23 LAW LIBRARY FEE.
CJ-2013-3629: $0.70 ON AC31 COURT CLERK REVOLVING FUND.
CJ-2013-3629: $5.00 ON AC58 OKLAHOMA COURT APPOINTED SPECIAL ADVOCATES.
CJ-2013-3629: $2.00 ON AC59 OKLAHOMA COUNCIL ON JUDICIAL COMPLAINTS REVOLVING
FUND.
CJ-2013-3629: $2.00 ON AC64 DISPUTE MEDIATION FEES.
CJ-2013-3629: $25.00 ON AC79 OCIS REVOLVING FUND.
CJ-2013-3629: $10.00 ON AC81 LENGTHY TRIAL FUND.

---

| 08-06-2013 | O | - | | 86314117 | Aug 6 2013 3:10:42:280PM | - | $ 0.00 |

ORDER APPOINTING SPECIAL PROCESS SERVER / PLAINTIFFS' MOTION GRANTED
📄 *Document Available (#1022559269)*

---

| 08-06-2013 | EAA | - | WILLIAMS COMPANIES INC | 86320251 | Aug 7 2013 9:32:55:157AM | - | $ 0.00 |

ENTRY OF APPEARANCE / MICHAEL J GIBBENS AND SUSAN E HUNTSMAN ENTERING AS
COUNSEL / CERTIFICATE OF SERVICE
📄 *Document Available (#1022439999)*

---

| 08-08-2013 | SMF | - | | 86334026 | Aug 8 2013 9:34:37:477AM | Realized | $ 5.00 |

ALIAS SUMMONS FEE (CLERKS FEE)-1($ 5.00)

---

| 08-08-2013 | SMIMA | - | | 86334030 | Aug 8 2013 9:34:50:477AM | - | $ 0.00 |

ALIAS SUMMONS ISSUED - MAILED BY ATTORNEY-1

---

| 08-08-2013 | ACCOUNT | - | | 86334033 | Aug 8 2013 9:35:16:457AM | - | $ 0.00 |

RECEIPT # 2013-2659151 ON 08/08/2013.
PAYOR:CONNER & WINTERS LLP TOTAL AMOUNT PAID: $5.00.
LINE ITEMS:
CJ-2013-3629: $5.00 ON AC01 CLERK FEES.

Report Generated by The Oklahoma Court Information System at September 3, 2013 9:36 AM

End of Transmission.



Insurance
Brokers

| UMR | B0180E101443 | | 180 RKH |
|---|---|---|---|

### MARKET REFORM CONTRACT

| Insured |
|---|
| The Williams Companies, Inc. |

| Layer |
|---|
| Primary USD 50,000,000 |

| Period |
|---|
| From : 1st May 2010          To:  1st May 2011 |

| Order | No of Slips |
|---|---|
| | Hereto WTN |
| | Total WTN |
| | Sign % |

| For LPSO use |
|---|

| For ILU use |
|---|

| For LIRMA use |
|---|

R K Harrison Insurance Brokers Limited
Appointed Representative of R K Harrison Group Limited




Insurance Brokers

UMR: B0180E101443

## Risk Details:

**UNIQUE MARKET
REFERENCE:**  B0180E101443

**TYPE:**  Primary Onshore Energy Package

**INSURED:**  THE WILLIAMS COMPANIES INC Including all Subsidiary, Associated, Affiliated, inter-related or Controlled Companies, Corporations, or Firms (including any Limited Liability Company as defined herein, general and limited partnerships and joint ventures) as now exist or may hereafter be constituted for which The Williams Companies, Inc has or acquires financial control or has responsibility to provide insurance. Also including Williams Partners LP and its subsidiaries and Gulfstream Natural Gas System, LLC and Gulfstream Management & Operating Services, LLC , Williams Pipeline Partners LP and its subsidiaries and Wemsutter LLC

**ADDRESS OF INSURED:**  One Williams Center
P.O. Box 3483
Tulsa
Oklahoma 74101
U.S.A.

**PERIOD:**  From:  **1st May 2010**
To:  **1st May 2011**
Both days at 12:01am Central Standard Time at Tulsa Oklahoma, USA.

**INTEREST:**  Section A:

Section A covers the Assured's interest against all risks of physical loss or physical damage, and extra expense / contingent extra expense, in respect of all real and personal property of every kind and description, owned, operated, controlled, leased, rented, used or intended for use by the Assured, and includes, but is not limited to, improvements and betterments, property of others in the Care, Custody or Control of the Assured or in the Care, Custody or Control of others on behalf of the Assured, property for which the Assured is responsible, personal property of the Assured's employees or officials while on premises owned or controlled by the Assured, at the option of the Assured, electronic data equipment and media, valuable papers and records, property in the Course of Construction, Installation, Erection or Assembly in progress at inception or any time during the policy period or acquired subsequent thereto, and Property in Transit. This subsection includes but is not limited to pipelines, compression and pump stations, terminals, and gas or other product in lines and / or storage, including, but not limited to, petroleum products, natural gas and its by-products, liquids derived from natural gas, liquefied natural gas, ethanol and ethanol production by-products all as further described in Section A of the Policy Wording provided that such Property is scheduled and declared at inception.

Section B:

Section B covers Time Element loss from direct physical loss or damage to property arising from an Occurrence covered or a peril insured against, under Section A of this section, all as further described in Section B of the Policy wording provided that such property is scheduled and declared at inception.

For the purpose of this Subsection the term Time Element shall be understood to mean Business Interruption on an Actual Loss Sustained basis, Contingent Business Interruption, Accounts Receivable or Rental Value, and as further described in Section B of the Policy Wording.

Case 4:13-cv-00571-CVE-FHM   Document 2 Filed in USDC ND/OK on 09/03/13   Page 206 of 281

 Insurance Brokers

UMR: B0180E101443

It is understood and agreed that wherever reference is made herein to Property scheduled and declared at inception, same shall be deemed to be such Property values and Business Interruption values as scheduled and declared by the Assured, which held on file with McGriff Seibel and Williams Inc, and RK Harrison Insurance Brokers Limited and have been submitted under the TWC Insurance website as at date to be agreed slip leader only, which is accessible and available to underwriters hereon for underwriting information purposes.

**SUM INSURED/LIMIT OF LIABILITY (For Assured's Interest unless otherwise stated)**

A limit of USD 50,000,000 Combined Single Limit, Sections A and B combined, applies in respect of each and every accident or occurrence, subject to the following separate annual aggregate limits:

USD 50,000,000 for losses caused by the peril of Flood;

USD 50,000,000 for losses caused by the peril of Earthquake shock;

USD 50,000,000 for losses caused by the peril of Named Windstorm (including ensuing Flood);

Subject to further sublimits as attached.

Maximum Period of Indemnity for Section B, twenty four (24) months.

EXCESS OF:

Underlying Retentions / Excess as per schedule attached.

**SITUATION/TERRITORIAL SCOPE:**

The (50) States of the United States of America, the District of Columbia, Canada and Puerto Rico except Worldwide for transit.

**CONDITIONS:**

To co-insure the same risk at the same terms and conditions as the Co-Insurer's Policy Number to be advised. Co-Insurer's Policy Wording as ~~attached.~~ Submitted to Ironshore 29 April 2010

The Co-Insurer are Aegis NJ with 40% and Lexington Insurance with 25%.

Notice of Loss to: McGriff, Seibels and Williams Inc, Birmingham, Alabama.

LMA 5092 – US Terrorism Risk Insurance Act of 2002 as amended Not Purchased Clause

**LOSS PAYEE:**

Insured or Order.

**NOTICES:**

None.

**EXPRESS WARRANTIES:**

None.

**SUBJECTIVITIES:**

None.

**CHOICE OF LAW AND JURISDICTION:**

Ironshore Arbitration and Choice of Law Clause IRNS-002 11/2007 as attached

**PREMIUM:**

USD 9,500,000 (100%) Annual.

**PREMIUM PAYMENT TERMS:**

45 days Premium Payment Condition PPC5 (TOR) 4/86 as attached.

**TAXES PAYABLE BY INSURED AND ADMINISTERED BY INSURERS:**

None applicable.



 Insurance Brokers

UMR: B0180E101443

| | |
|---|---|
| **RECORDING, TRANSMITTING & STORING INFORMATION:** | Where R K Harrison Insurance Brokers Limited maintains risk and claim data/information/documents R K Harrison Insurance Brokers Limited may hold data/information/documents electronically. |
| **INSURER CONTRACT DOCUMENTATION:** | Policy to be issued; utilising Lloyd's Policy LMA 3044A, IS3 or Companies Equivalent. |
| | XIS to sign Lloyd's policy |
| | XIS to sign Company policy |
| | The policies are to be signed by XIS on Policy Form |
| | This contract is subject to US state surplus lines requirements. It is the responsibility of the surplus lines broker to affix a surplus lines notice to the contract document before it is provided to the Insured. In the event that the surplus lines notice is not affixed to the contract document the Insured should contact the surplus lines broker. |



 **Insurance Brokers**

UMR: B0180E101443

## THE WILLIAMS COMPANIES, INC.

### SCHEDULE OF PROGRAM SUB-LIMITS (FOR INTEREST)

(To apply any one occurrence / accident unless otherwise stated and excess of Program Deductibles)

The following sublimits are for the Assured's interest and apply in respect of each and every Occurrence. They are included within, and not in addition to, the limits of liability:

| | | | |
|---|---|---|---|
| a) | USD | 2,000,000 | per month, in respect of Business Interruption arising from locations for which Business Interruption values have not been declared at inception. |
| b) | USD | 25,000,000 | in respect of Extra Expense. |
| c) | USD | 15,000,000 | in respect of Expediting Expense. |
| d) | USD | 25,000,000 | in respect of Property in Course of Construction (excluding delay in Start Up). Maximum estimated insurable contract value at inception of work USD 25,000,000 |
| e) | USD | 25,000,000 | in respect of Contingent Business Interruption. |
| f) | USD | 10,000,000 | in respect of Contingent Extra Expense and Rental Value. |
| g) | | 30 DAYS | in respect of Ingress / Egress. |
| h) | USD | 25,000,000 | in respect of Removal of Debris. |
| i) | USD | 25,000,000 | in respect of Demolition and Increased Cost of Construction. |
| j) | USD | 25,000,000 | in respect of off Premises Power / Service Interruption, combined single sublimit with Contingent Business Interruption if applicable. |
| k) | USD | 25,000,000 | in respect of Property in Course of Transit. |
| l) | USD | 1,000,000 | in respect of Valuable Papers and Records. |
| m) | USD | 2,500,000 | in respect of Accounts Receivable. |
| n) | USD | 2,500,000 | in respect of Reconstitution of Electronic Data and/or Media. |
| o) | USD | 2,500,000 | in respect of Professional Fees. |
| p) | | 30 DAYS | in respect of Interruption by Civil or Military Authority (including OSHA). |
| q) | USD | 25,000,000 | Miscellaneous Unscheduled Locations in respect of property damage |
| r) | USD | 10,000,000 | Fire Brigade Charges and Extinguishing Expenses. |
| s) | USD | 1,000,000 | Claims Preparation Costs. |
| t) | | 45 DAYS | in respect of Impounded Water. |
| u) | USD | 1,000,000 | in respect of Hazardous Substances and/or Contamination |
| v) | USD | 50,000,000 | in respect of Automatic Acquisitions. |
| w) | USD | 50,000,000 | in respect of gas in pipelines |
| x) | USD | 150,000,000 | in respect of gas in storage |



 **Insurance Brokers**

UMR: B0180E101443

**THE WILLIAMS COMPANIES, INC.**

**SCHEDULE OF RETENTIONS**
(For the Assured's Interest Unless Otherwise Stated)

The Excess Amounts under Section A and Section B are:

1. Underline **Section A-Property Damage:**

   USD 2,000,000 any one accident or occurrence except

   i) Geismar Olefins Plant (10/12ths owned) USD 1,000,000 any one accident or occurrence.

   ii) In respect of Conway Storage and Fractionator USD 1,000,000 any one accident or occurrence

   iii) In respect of Gulfstream Natural Gas System LLC USD 500,000 (100%) any one accident or occurrence.

   iv) In respect of Laurel Mountain Midstream LLC assets and RW Gathering LLC assets USD 250,000 any one accident or occurrence.

   v) In respect of losses resulting from Transportation USD 250,000 any one accident or occurrence Physical Damage / Time Element combined

   However, USD 10,000,000 any one accident or occurrence in respect of Named Windstorm (except for Gulfstream Natural Gas System LLC which is USD 5,000,000 for 100%), which is in lieu of any other Excess amounts under Section A.

2. **Section B-Time Element:**

   60 days waiting period any one accident or occurrence except as respects Gulfstream Natural Gas System, LLC, RW Gathering LLC and Laurel Mountain Midstream LLC assets to which 45 days waiting period any one accident or occurrence applies.

   However in respect of losses arising from Named Windstorm 75 days waiting period any one accident or occurrence.

Notwithstanding anything contained within the above Retentions / Excess Amounts to the contrary, it is understood and agreed that if loss arising out of an Occurrence involves loss at one or more locations and/or is subject to any combination of the aforementioned Property Damage Retentions / Excess Amounts, then the amount to be applied as the Property Damage Retention / Excess Amounts shall be the largest single Property Damage Retention / Excess amount applicable.

If following a loss covered by a peril insured the property being repaired or replaced is subject to an additional loss caused by a peril insured, then no additional Retention / Excess Amounts will be incurred by the Assured.



 Insurance Brokers

UMR: B0180E101443

## THE WILLIAMS COMPANIES, INC.

### U.S. TERRORISM RISK INSURANCE ACT OF 2002 AS AMENDED
### NOT PURCHASED CLAUSE

This Clause is issued in accordance with the terms and conditions of the "U.S. Terrorism Risk Insurance Act of 2002" as amended as summarized in the disclosure notice.

It is hereby noted that the Underwriters have made available coverage for "insured losses" directly resulting from an "act of terrorism" as defined in the "U.S. Terrorism Risk Insurance Act of 2002", as amended ("TRIA") and the insured has declined or not confirmed to purchase this coverage.

This Insurance therefore affords no coverage for losses directly resulting from any "act of terrorism" as defined in TRIA except to the extent, if any, otherwise provided by this policy.

All other terms, conditions, insured coverage and exclusions of this Insurance including applicable limits and deductibles remain unchanged and apply in full force and effect to the coverage provided by this Insurance.

LMA5092
21/12/2007
Form approved by Lloyd's Market Association



 Insurance Brokers

UMR: B0180E101443

THE WILLIAMS COMPANIES, INC.

PREMIUM PAYMENT CONDITION (TOR) 4/86 DIRECT

It is a condition of this contract of insurance that the premium due at inception must be paid to and received by Insurers on or before midnight on 15 June 2010.

If this condition is not complied with, then this contract of insurance will terminate on the above date with the Insured hereby agreeing to pay premium calculated at not less than pro rata temporis.

PPC5 (TOR) 4/86





**R∖H** Insurance Brokers

UMR: B0180E101443

## THE WILLIAMS COMPANIES, INC.

### ARBITRATION AND CHOICE OF LAW CLAUSE

1. Any dispute, controversy or claim arising out of or relating to this Policy or the breach, termination or invalidity thereof shall be finally and fully determined in London, England under the provisions of the Arbitration Act 1996 ("Act") and/or any statutory modifications or amendments thereto, for the time being in force, by a Board composed of three arbitrators. Each arbitrator shall be an active Queens Counsel or retired English judge familiar with insurance and with the Act. All matters relating to the existence of the agreement to arbitrate and the selection of arbitrators shall be determined under the laws of England and Wales. The arbitrator shall be selected for each controversy as follows:

   Any party may, in the event of such a dispute, controversy or claim, notify the other party or parties to such dispute, controversy or claim of its desire to arbitrate the matter, and at the time of such notification the party desiring arbitration shall notify any other party or parties of the name of the arbitrator selected by it. The other party who has been so notified shall within thirty (30) calendar days thereafter select an arbitrator and notify the party desiring arbitration of the name of such second arbitrator. If the party notified of a desire for arbitration shall fail or refuse to nominate the second arbitrator within thirty (30) calendar days following the receipt of such notification, the party who first served notice of a desire to arbitrate will, within an additional period of thirty (30) calendar days, apply to a judge of the High Court of Justice of England and Wales for the appointment of a second arbitrator and in such a case the arbitrator appointed by such a judge shall be deemed to have been nominated by the party or parties who failed to select the second arbitrator. The two arbitrators, chosen as above provided, shall within thirty (30) calendar days after the appointment of the second arbitrator choose a third arbitrator, who shall be the chairman. In the event of the failure of the first two arbitrators to agree on a third arbitrator within said thirty (30) calendar day period, either of the parties may within a period of thirty (30) calendar days, thereafter, after notice to the other party or parties, apply to a judge of the High Court of Justice of England and Wales for the appointment of a third arbitrator, and in such case the person so appointed shall be deemed and shall act as the third arbitrator and chairman. Upon acceptance of the appointment by said third arbitrator, the Board of Arbitration for the controversy in question shall be deemed fixed.

2. The board of Arbitration shall fix, by a notice in writing to the parties involved, a reasonable time and place for the hearing and may prescribe reasonable rules and regulations governing the course and conduct of the arbitration proceeding, including without limitation discovery by the parties.

3. The board shall, within ninety (90) calendar days following the conclusion of the hearing, render its award as respects the matter or matters in controversy in writing and shall cause a copy thereof to be served on all the parties thereto, but the Board shall not set forth any reasons for its award. In case the Board fails to reach a unanimous decision, the decision of the majority of the members of the Board shall be deemed to be the decision of the Board, and the same shall be final and binding on the parties thereto. Such decision shall be a complete defense to any attempted appeal or litigation of such decision in the absence of serious irregularity under Section 68 of the Act. Without limiting the foregoing, the parties waive any right to appeal to, and/or seek collateral review of the decision of the Board of Arbitration by, any court or other body to the fullest extent permitted by applicable law, including, without limitation, any right to make application to the court under Section 45 or to appeal under Section 69 of the Act.

   Any order as to the costs of the arbitration shall be in the sole discretion of the Board, who may direct to whom and by whom and in what manner they shall be paid.

4. Ironshore Insurance Ltd and the Insured agree that in the event that claims for indemnity or contribution are asserted in any action or proceeding against Ironshore Insurance Ltd by any of the Insured's other insurers in any jurisdiction or forum other than that set forth in this paragraph 4, the Insured will in good faith take all reasonable steps requested by Ironshore Insurance Ltd to assist Ironshore Insurance Ltd in obtaining a dismissal of these claims (other than on the merits) and will, without limitation, undertake to the court or other tribunal to reduce any judgment or award against such other insurers to the extent that the court or tribunal determines that Ironshore Insurance Ltd would have been liable to such insurers for indemnity or contribution pursuant to this Policy. The Insured shall be entitled to assert claims against Ironshore Insurance Ltd for coverage under this Policy, including, without limitation, for amounts by which the Insured reduced its judgment against such other insurers in respect of such claims for indemnity or

 Insurance Brokers

UMR: B0180E101443

contribution, in an arbitration between Ironshore Insurance Ltd and the Insured pursuant to this paragraph 4, which arbitration may take place before, concurrently with and/or after the action or proceeding involving such other insurers; provided, however, that Ironshore Insurance Ltd in such arbitration in respect of such reduction of any judgment shall be entitled to raise any defenses under this Policy and any other defenses (other than jurisdictional defenses) as it would have been entitled to raise in the action or proceeding with such insurers (and no determination in any such action or proceeding involving such other insurers shall have collateral estoppel, res judicata or other issue preclusion or estoppel effect against Ironshore Insurance Ltd in such arbitration, irrespective of whether or not Ironshore Insurance Ltd remained a party to such action or proceeding).

## GOVERNING LAW AND INTERPRETATION

This policy shall be construed in accordance with the laws of the State of New York, United States except insofar as such laws:

A.    pertain to regulation under the New York Insurance Law, or regulations issued by the Insurance Department of the State of New York pursuant thereto, applying to insurers doing insurance business, or issuance, delivery or procurement of policies of insurance, within the State of New York or as respects risks or insureds situated in the State of New York;

B.    pertain to choice of law and result in the selection of any substantive law other than New York; or

C.    are inconsistent with any of the Ironshore Insurance Ltd Terms and Conditions.

provided, however, that the provisions, stipulations, exclusions and conditions of this Policy are to be construed in an evenhanded fashion as between the Insured and Ironshore Insurance Ltd. Without limitation, where the language of this Policy is deemed to be ambiguous or otherwise unclear, the issues shall be resolved in the manner most consistent with the relevant provisions, stipulations, exclusions and conditions (without regard to authorship of the language, without reference to the reasonable expectations of one party only and without any presumption or arbitrary interpretation or construction in favour of either the Insured or Ironshore Insurance Ltd and without reference to parol or other extrinsic evidence).

IRNS-002 11/2007





**R*H** Insurance Brokers

UMR: B0180E101443

## Information Section:

The following information was provided to insurer(s) to support the assessment of the risk at the time of underwriting.

As per Williams website at www.twc-insurance.com.

Username: To be advised
Password: To be advised

Draft Co-insurers' Policy Wording as attached.



 Insurance Brokers

UMR: B0180E101443

## Security Details

**INSURER'S
LIABILITY:**

<u>LMA 3333</u>
Dated 21 June 2007

**Insurer's liability several not joint**
The liability of an insurer under this contract is several and not joint with other insurers party to this contract. An insurer is liable only for the proportion of liability it has underwritten. An insurer is not jointly liable for the proportion of liability underwritten by any other insurer. Nor is an insurer otherwise responsible for any liability of any other insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by an insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp. This is subject always to the provision concerning "signing" below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is an insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. A member is not jointly liable for any other member's proportion. Nor is any member otherwise responsible for any liability of any other insurer that may underwrite this contract. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

**Proportion of liability**
Unless there is "signing" (see below), the proportion of liability under this contract underwritten by each insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp and is referred to as its "written line".

Where this contract permits, written lines, or certain written lines, may be adjusted ("signed"). In that case a schedule is to be appended to this contract to show the definitive proportion of liability under this contract underwritten by each insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together). A definitive proportion (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of a Lloyd's syndicate taken together) is referred to as a "signed line". The signed lines shown in the schedule will prevail over the written lines unless a proven error in calculation has occurred.

Although reference is made at various points in this clause to "this contract" in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.

**ORDER HEREON:**     *7.5* % of 100%

**BASIS OF WRITTEN
LINES:**

Percentage of whole.
Lines Clause NMA 2419

**SIGNING
PROVISIONS:**

In the event that the written lines hereon exceed 100% of the order, any lines written "to stand" will be allocated in full and all other lines will be signed down in equal proportions so that the aggregate signed lines are equal to 100% of the order without further agreement of any of the insurers.

However;



 Insurance Brokers

UMR: B0180E101443

a)  in the event that the placement of the order is not completed by the commencement date of the period of insurance then all lines written by that date will be signed in full;

b)  the insured may elect for the disproportionate signing of insurers lines, without further specific agreement of insurers, providing that any such variation is made prior to the commencement date of the period of insurance, and that lines written "to stand" may not be varied without the documented agreement of those insurers.

c)  the signed lines resulting from the application of the above provisions can be varied, before or after the commencement date of the period of insurance, by the documented agreement of the (re)insured and all (re)insurers whose lines are to be varied. The variation to the contracts will take effect only when all such (re)insurers have agreed, with the resulting variation in signed lines commencing from the date set out in that agreement.

**SIGNED LINES**

**WRITTEN LINES**
In a co-insurance placement, following (re)insurers may, but are not obliged to, follow the premium charged by the lead (re)insurer.

(Re) insurers may not seek to guarantee for themselves terms as favourable as those which others subsequently achieve during the placement.



7.5%  IRONSHORE
Insurance Ltd. (Bermuda)
4 4 3 1 2 2 6 1 0 4

30
4
10

Line To Stand - 45 days PPC5 TOR 4/86
All Amendments To Be Agreed By Ironshore



**R K H** Insurance Brokers

UMR: B0180E101443

Page 1 of 4

## Contract Administration and Advisory Sections:

## Subscription Agreement Section

**SLIP LEADER:**  Ironshore Insurance Ltd. (Bermuda)

**BASIS OF AGREEMENT TO CONTRACT CHANGES:**  GUA (October 2001) with Non Marine Schedule (October 2001).

**OTHER AGREEMENT PARTIES FOR CONTRACT CHANGES, FOR PART 2 GUA CHANGES ONLY:**

Part 2 changes may be agreed by Slip Leader only.

The period referred to in paragraph 1.14 (Extensions to premium payment condition/warranty) of the Non-Marine Schedule October 2001 is extended from 5 to 14 days.

When required to do so by the Slip Leader only, R K Harrison Insurance Brokers Limited will provide details of agreed endorsements to following insurers. If required, electronic transmission may be used by R K Harrison Insurance Brokers Limited for providing details of agreed endorsements, contractual changes or information to following insurers as necessary.

Signing slip and/or signing slip endorsements to be agreed by slip leader only.

Amendments to final going-in values, premium and basis of coverage to be agreed by the Slip Leader only.

Net equivalent downwards to be agreed slip leader only.

**AGREEMENT PARTIES FOR CONTRACT CHANGES, FOR THEIR PROPORTION ONLY:**  None.

**BASIS OF CLAIMS AGREEMENT:**  Claims to be managed in accordance with the Lloyd's 2006 Claims Scheme or as amended and IUA claims agreement practices.

All Non Bureau insurers to agree claims, each for their own proportion only.

**CLAIMS AGREEMENT PARTIES:**

In respect of the Lloyd's 2006 Claims Scheme:
The Slip Leader.
The Leading Lloyd's Underwriter and Xchanging Claims Services (XCS) for the following Lloyd's syndicates.
The Leading IUA Insurer.

In respect of the 2010 Pilot Scheme:
The Slip Leader.
The Leading Lloyd's Underwriter only for Category 3 claims. The Leading Lloyd's Underwriter and the Second Lloyd's Underwriter for Category 1 and 2 claims.





Insurance Brokers

UMR: B0180E101443

Page 2 of 4

The Leading IUA Insurer.

**CLAIMS
ADMINISTRATION:**

R K Harrison Insurance Brokers Limited to enter claim advices into the relevant market CLASS system.  All Underwriters to use their respective market CLASS system for claims agreement.  Electronic transmission to be used by R K Harrison Insurance Brokers Limited for distribution of claim file information to Underwriters in support of the CLASS entry.

Underwriters will respond to claims matters to R K Harrison Insurance Brokers Limited via CLASS (unless otherwise specified here).

Claims settlement to be remitted to R K Harrison Insurance Brokers Limited (unless otherwise specified here) within 7 working days after agreement of claim by Slip Leader and submission of collection to market(s).

Payment of claims to client to be via R K Harrison Insurance Brokers Limited (unless otherwise specified here).

**RULES AND
EXTENT OF ANY
OTHER DELEGATED
CLAIMS
AUTHORITY:**

None.

**EXPERT(S) FEES
COLLECTION:**

R K Harrison Insurance Brokers Limited to collect fees.

**SETTLEMENT DUE
DATE:**

15 June 2010

**BUREAU
ARRANGEMENTS:**

Xchanging Ins-sure Services are authorised to sign premium from individual cedants / territories separately as and when received by R K Harrison Insurance Brokers Limited

Premium payment requirements deemed met by presentation of premium / accounts to Ins-sure or Underwriters hereon as applicable on or before the Settlement Due Date(s) which deemed to be in compliance with Settlement Due Date(s) and will therefore not be recorded as a late signing or payment.

Where Settlement Due Date (SDD) or any Premium Payment Warranty (PPW) or Premium Payment Condition (PPC) due date falls on a weekend or public holiday, presentation to Xchanging Ins-sure Services or Underwriters hereon as applicable on the next working day will be deemed in compliance with SDD, PPW or PPC

Where a Premium Payment Condition or Premium Payment Warranty requires payment by a date which is later than the Settlement Due Date, the Settlement Due Date is deemed to have been amended and shall be the same as the Premium Payment Condition or Premium Payment Warranty due date.

**NON-BUREAU
ARRANGEMENTS:**

None.



 Insurance Brokers          UMR: B0180E101443          Page 3 of 4

## Fiscal and Regulatory Section

**TAX PAYABLE BY**
**INSURER(S):**           None applicable.

**COUNTRY OF**
**ORIGIN:**               United States of America.

**OVERSEAS**
**BROKER:**               McGriff, Seibels & Williams, Inc.
                          2211 7th Avenue South
                          35233
                          Birmingham
                          Alabama

**SURPLUS LINES**
**BROKER:**               Ronald B Gladrosich – Oklahoma
                          Non Resident License No.: 599578

**STATE OF FILING:**      Oklahoma

**US**
**CLASSIFICATION:**       US Surplus Lines

**ALLOCATION OF**
**PREMIUM TO**
**CODING:**               EF – 100%

**FSA CLIENT**
**CLASSIFICATION:**       Large Risk.



 

 **Insurance Brokers**

UMR: B0180E101443

Page 4 of 4

## Broker Remuneration & Deductions Section

**FEE PAYABLE BY CLIENT:** Yes, fee payable to R K Harrison Insurance Brokers Limited.

**TOTAL BROKERAGE:** Nil

**OTHER DEDUCTIONS FROM PREMIUM:** 2.50% Engineering fee allowance in respect of AIG Global Energy inspection and Insurance Company and / or Starr Technical Risk Agency and / or Hydrocarbon Risk Consultants Limited. Inspections subject to invoices to be agreed slip leader only.





Policy No. MSW-0388

### <u>WILLIAMS May 1, 2010 PRIMARY $50MM ONSHORE PROPERTY POLICY</u>

The subscribers hereto, severally but not jointly, do insure:

**Assured:**          The Williams Companies, Inc. et al.

**Assured's Address:**  One Williams Center
P.O. Box 3483
Tulsa, OK 74101

Acting upon your instructions, we have effected with **<u>Security as within</u>** insurance as noted below.

| | |
|---|---|
| **Limits:** | As within |
| **Locations:** | As within |
| **Term:** | May 1, 2010 to May 1, 2011 both days at 12:01 a.m., Central Standard Time at Tulsa, OK, U.S.A. |
| **Coverage:** | Onshore Property / Business Interruption |
| **Premium:** | As within |

THIS POLICY IS MADE AND ACCEPTED SUBJECT TO THE FOREGOING STIPULATIONS AND CONDITIONS, AND TO THE CONDITIONS PRINTED ON THE BACK HEREOF, which are specifically referred to and made a part of this policy, together with such other provisions, agreements or conditions as may be endorsed hereon or added hereto; and no officer, agent or other representative of the undersigned shall have power to waive or be deemed to have waived any provision or condition of this cover note unless such waiver, if any, shall be written upon or attached hereto, nor shall any privilege or permission affecting the insurance under this policy exist or be claimed by the Assured unless so written or attached.

This document is intended for use as evidence that insurance described herein has been effected against which a policy(ies) will be issued and that in the event of any inconsistency therewith the terms and conditions and provision of the policy(ies) prevail.  Immediate advice must be given of any discrepancies or necessary changes.



C:\Documents and Settings\besta\Local Settings\Temporary Internet Files\OLK40\Primary $50mm Onshore Policy (2).doc

Policy No. MSW-0388

# SUBSCRIPTION PAGE

| Interest / Participation (%) | INSURER / SECURITY | AUTHORIZED SIGNATURE | POLICY / REFERENCE NO. |
|---|---|---|---|
| Solely As Respects the perils of Named Windstorm / ensuing Flood: **40.0%** <br><br> As Respects all other risks as covered herein: **31.5%** | Associated Electric & Gas Insurance Services Ltd. |  | L0559A1A10 |
| Solely As Respects the perils of Named Windstorm / ensuing Flood: **7.5%** <br><br> As Respects all other risks as covered herein: **6.5%** | Ironshore Insurance Ltd. (Bermuda) | As per separate Binder held by RK Harrison Insurance Brokers, Ltd. as placing broker, subject wording attached to this Binder including mandatory endorsements. | |
| **25.0%** | Lexington Insurance Company | _____ | 61466527 |

**TOTAL PARTICIPATION:**

Solely As Respects the perils of Named Windstorm / ensuing Flood: **72.5%**

As Respects all other risks as covered herein: **63.0%**

### Policy Provisions

It is expressly understood and agreed by the assured by accepting this Instrument that McGriff, Seibels & Williams, Inc. is not one of the Underwriters of Insurers hereunder and is not nor shall be in any way or to any extent liable for any loss or claim whatsoever as an Insurer, but that the assurers hereunder are those underwriters whose names are on file as hereinbefore set forth.

In consideration of the premium as hereinafter stated, the various companies named herein, severally but not jointly, do hereby insure that Assured named herein, for the amounts and proportions, set opposite their respective names. All subject to the terms and conditions of the forms and endorsements attached herein.

This Insurance is made and accepted subject to all the provisions, conditions and warranties as set forth herein and in any forms or endorsements attached hereto, all of which are to be considered as incorporated herein, and any provisions or conditions appearing in any forms or endorsements attached hereto which alter the policy provisions shall supersede such policy provisions insofar as they are inconsistent therewith.

Any provisions required by law, to be stated in policies issued by any company subscribing hereto, shall be deemed to have been stated herein. It is further agreed that each of the companies will issue their individual policies in accord with the terms described herein, upon demand by the Assured.



I:\home\und  dpt\COMMON\PROPERTY ACCOUNTS\williams companies\L0559A1A10\Primary $50mm Onshore Policy (2).doc

The Williams Companies
Policy # L0559A1A10
Tax Wording

THIS SURPLUS LINE CONTRACT IS ISSUED PURSUANT TO
THE IDAHO INSURANCE LAWS BY AN INSURER NOT
LICENSED BY THE IDAHO DEPARTMENT OF INSURANCE.
THERE IS NO COVERAGE PROVIDED FOR SURPLUS LINE
INSURANCE BY EITHER THE IDAHO INSURANCE GUARAN-
TY ASSOCIATION OR BY THE IDAHO LIFE AND HEALTH
INSURANCE GUARANTY ASSOCIATION.

This policy is issued by an insurer not
authorized to do business in Kansas and, as
such, the form, financial condition, and rates
are not subject to review by the
Commissioner of Insurance and the insured
is not protected by any guaranty fund.

THIS CONTRACT IS REGISTERED AND DELIV-
ERED AS A SURPLUS LINE COVERAGE UNDER
THE ALABAMA SURPLUS LINE INSURANCE LAW.

BROKER: RONALD B. GIADROSICH
LIC. #A064443

This contract is delivered as surplus line coverage under
the Nonadmitted Insurance Act. The insurer issuing this
contract is not licensed in Colorado but is an approved
nonadmitted insurer. There is no protection under the
provisions of the Colorado Guaranty Association Act.
Ronald B Giadrosich

This insurance policy is delivered as a surplus line coverage under
the insurance code of the State of Louisiana.

In the event of insolvency of the company issuing this contract, the
policyholder or claimant is not covered by the Louisiana Insurance
Guaranty Association which guarantees only specific policies
issued by an insurance company authorized to do business in
Louisiana. This surplus line policy has been procured by the
following licensed Louisiana surplus lines Broker:

By: _____
McGriff Seibels & Williams, Inc

FL Premium: 2154735  FHCF: 215.47
Tax: 1077.37  Surcharge: 400
Stamping Fee: 43.10  Citizens: 301.66
Total: 2318895

Louisiana Premium: 272242.43
Policy Fee: _____
Surplus Lines Tax: 13,612.12

**Surplus lines insurers' policy
rates and forms are not
approved by any Florida
Regulatory Agency**

This insurance is issued pursuant to the Florida
Surplus Lines Law. Persons insured by surplus
lines carriers do not have the protection of the
Florida Insurance Guaranty Act to the extent
of any right of recovery for the obligation of
an insolvent unlicensed insurer.

This contract is registered and
delivered as a surplus line
coverage under the Surplus Line
Insurance Law, O.C.G.A.
Chapter 33.5.
Ronald B. Giadrosich

This insurance policy is issued pursuant to
Mississippi law covering surplus lines insurance. The
company issuing the policy is not licensed by the State of
Mississippi, but is authorized to do business in
Mississippi as a nonadmitted company. The policy is not
protected by the Mississippi Insurance Guaranty Association
in the event of the insurer's insolvency.
Ronald B Giadrosich

**This insurance is issued by a
nonadmitted insurer not under
the jurisdiction of the Maryland
Insurance Commissioner.**

The insurance company with which this coverage
has been placed is not licensed by the State of
North Carolina and is not subject to its supervision.
In the event of the insolvency of the insurance
company, losses under this policy will not be paid
by any State insurance guaranty or solvency fund.
Licensee: Camille Smith

MS Premium: 103,612.94
Tax: 4144.52
Stamping Fee: 259.03
MWUA: 5180.65

## The Williams Companies
### Policy # L0559A1A10
### Tax Wording

This policy is written by a surplus lines insurer and is not subject to the filing or approval requirements of the New Jersey Department of Banking and Insurance. Such a policy may contain conditions, limitations, exclusions and different terms than a policy issued by an insurer granted a Certificate of Authority by the New Jersey Department of Banking and Insurance. The insurer has been approved by the Department as an eligible surplus lines insurer, but the policy is not covered by the New Jersey Insurance Guaranty Fund, and only a policy of medical malpractice liability insurance as defined in N.J.S.A. 17:30D-3d or a policy of property insurance covering owner-occupied dwellings of less than four dwelling units are covered by the New Jersey Surplus Lines Guaranty Fund.

THE INSURER(S) NAMED HEREIN IS (ARE) NOT LICENSED BY THE STATE OF NEW YORK, NOT SUBJECT TO ITS SUPERVISION, AND IN THE EVENT OF THE INSOLVENCY OF THE INSURER(S), NOT PROTECTED BY THE NEW YORK STATE SECURITY FUNDS. THE POLICY MAY NOT BE SUBJECT TO ALL OF THE REGULATIONS OF THE INSURANCE DEPARTMENT PERTAINING TO POLICY FORMS.

This contract is registered and delivered as surplus line coverage under the surplus line insurance law in Oklahoma. It is not subject to the protection of the State guaranty association.

This Insurance is Issued Pursuant to the New Jersey Surplus Lines Law.

McGriff Seibels & Williams
2211 7th Avenue South
Birmingham, AL 35233

License # 0202947

This policy provides surplus lines insurance by an insurer not otherwise authorized to transact business in New Mexico. This policy is not subject to supervision, review, or approval by the superintendent of insurance. The insurance so provided is not within the protection of any guaranty fund law of New Mexico designed to protect the public in the event of the insurer's insolvency.

This is evidence of insurance procured and developed under this Oregon Surplus lines laws. It is NOT covered by the provisions of ORS 734.510 to 734.710 relating to the Oregon Insurance Guaranty Association. If the insurer issuing this insurance becomes insolvent, the Oregon Insurance Guaranty Association has no obligation to pay claims under this evidence of insurance.

Ronald B Giadrosich

Oregon Premium: 4398380
Tax: 879.68
Fire Marshall Tax: 439.84
SLSC: 15.00

This company has been approved by the director or his designee of the South Carolina Department of Insurance to write business in this State as an eligible surplus lines insurer, but it is not afforded guaranty fund protection.

The insurer which has issued this insurance is not licensed by the Pennsylvania Insurance Department and is subject to limited regulation. This insurance in NOT covered by the Pennsylvania Property and Casualty Guaranty Association.
Surplus Lines Licensee: Ronald B. Giadrosich McGriff, Seibels and Williams, Inc. 2211 7th Ave South Birmingham, AL 35233

The insurer issuing this policy does not hold a certificate of authority to do business in this state and this is not fully subject to regulation by the Utah Insurance Commissioner. This policy receives no protection from any of the guaranty associations created under Chapter 28, Title 31A (UC 31A-15-103[8]).

**The Williams Companies**
**Policy # L0559A1A10**
**Tax Wording**

This insurance contract is with an insurer not licensed to transact insurance in this state and is issued and delivered as surplus line coverage under the Texas insurance statutes. The Texas Department of Insurance does not audit the finances or review the solvency of the surplus lines insurer providing this coverage, and this insurer is not a member of the property and casualty insurance guaranty association created under Chapter 462, Insurance Code. Chapter 225, Insurance Code, requires payment of 4.85 percent tax on gross premium.

This contract is registered and delivered as a surplus line coverage under the insurance code of the state of Washington, enacted in 1947. It is not issued by a company regulated by the Washington state insurance commissioner and is not protected by any Washington state guaranty fund law.

McGriff, Seibels & Williams

Washington Premium: 197,946.54
Policy Fee: _____
Surplus Lines Tax: 3958.93
Stamping Fee: 494.87



This insurance contract is issued pursuant to the Wyoming Insurance Laws by an insurer neither licensed by nor under the jurisdiction of the Wyoming Insurance Department.

# COMPLAINT NOTICE

## IMPORTANT NOTICE

1.   To obtain information or make a complaint:

2.   You may call McGriff, Seibels & Williams, Inc.'s toll-free telephone number for information or to make a complaint at:

**1-800-476-2211**

3.   You may also write to McGriff, Seibels & Williams, Inc.

**P.O. Box 10265**
**Birmingham, AL 35202-0265**

4.   You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at:

**1-800-252-3439**

5.   You may write the Texas Department of Insurance:

**P.O. Box 149104**
**Austin, TX  78714-9104**
**FAX#(512)475-1771**
Web: http://www.tdi.state.tx.us
E-mail: ConsumerProtection@tdi.state.tx.us

6.   **PREMIUM OR CLAIM DISPUTES:**
Should you have a dispute concerning your premium or about a claim you should contact the agent or the company first.  If the dispute is not resolved, you may contact the Texas Department of Insurance.

7.   **ATTACH THIS NOTICE TO YOUR POLICY:**
This notice is for information only and does not become a part or condition of the attached document.

## AVISO IMPORTANTE

Para obtener informacion o para someter una queja:

Usted puede llamar al numero de telefono gratis de McGriff, Seibels & Williams, Inc.'s para informacion o para someter una queja al:

**1-800-476-2211**

Usted tambien puede escribir a McGriff, Seibels & Williams, Inc.:

**P.O. Box 10265**
**Birmingham, AL 35202-0265**

Puede comunicarse con el **Departamento de Seguros de Texas** para obtener informacion acerca de companias, coberturas, derechos o quejas al:

**1-800-252-3439**

Puede escribir al **Departamento de Seguros de Texas:**

**P.O. Box 149104**
**Austin, TX  78714-9104**
**FAX#(512)475-1771**
Web: http://www.tdi.state.tx.us
E-mail: ConsumerProtection@tdi.state.tx.us

**DISPUTAS SOBRE PRIMAS O RECLAMOS:**
Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con el agente o la compania primero.  Si no se resuelve la disputa, prede entonces comunicarse con el departamento (TDI).

**UNA ESTE AVISO A SU POLIZA:**
Esta aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.

Policy No. MSW-0388

# THE WILLIAMS COMPANIES, INC.

## ONSHORE PROPERTY / BUSINESS INTERRUPTION POLICY

## TABLE OF CONTENTS

### DECLARATIONS

1. NAMED ASSURED
2. LOSS PAYEE
3. POLICY PERIOD
4. INTEREST
5. SUMS INSURED AND/OR LIMITS OF LIABILITY
6. RETENTIONS AND/OR EXCESS AMOUNTS
7. NAMED WINDSTORM EXCESS
8. TERRITORIAL LIMITS
9. NOTICE TO UNDERWRITERS
10. NOTICE TO THE ASSURED
11. PREMIUM
12. SCHEDULE OF SUBLIMITS


### GENERAL DEFINITIONS, CONDITIONS AND EXCLUSIONS

A. **DEFINITIONS**
   A.1.   NAMED ASSURED
   A.2.   OCCURRENCE, EARTHQUAKE SHOCK, FLOOD AND NAMED WINDSTORM
   A.3.   ONSHORE
   A.4.   RIVER CROSSING(S)
   A.5.   ACTUAL CASH VALUE
   A.6.   REPLACEMENT COST
   A.7.   OBJECT
   A.8.   VALUABLE PAPERS AND RECORDS

B. **CONDITIONS**
   B.1.   EXCESS AND UNDERLYING INSURANCE
   B.2.   BANKRUPTCY AND INSOLVENCY
   B.3.   ABANDONMENT OF PROPERTY
   B.4.   INSPECTION AND AUDIT
   B.5.   CANCELLATION
   B.6.   CURRENCY
   B.7.   CLAIMS NOTIFICATION AND LOSS ADJUSTMENT CLAUSE
   B.8.   UNDERWRITERS' SERVICING AGENTS OR BROKERS
   B.9.   GOVERNING LAW AND JURISDICTION
   B.10.  ALTERNATE DISPUTE RESOLUTION
   B.11.  SERVICE OF SUIT
   B.12.  TITLES OF PARAGRAPHS
   B.13.  DELAYS, ERRORS OR OMISSIONS
   B.14   OIL POLLUTION ACT DISCLAIMER
   B.15.  ACTION AGAINST UNDERWRITERS



Policy No. MSW-0388

  B.16. ASSIGNMENT
  B.17. ASSISTANCE AND COOPERATION OF THE ASSURED
  B.18. RECOVERABLE CHARGES
  B.19 CERTIFICATES OF INSURANCE
  B.20. SUBROGATION
  B.21. AUTOMATIC ACQUISITIONS
  B.22. OTHER INSURANCE
  B.23. CLAIMS PREPARATION COST
  B.24. OFAC CLAUSE

C.  EXCLUSIONS
  C.1. WAR AND TERRORISM EXCLUSION (NMA 2918 Amended)
  C.2. INSTITUTE RADIOACTIVE CONTAMINATION, CHEMICAL, BIOLOGICAL,
    BIO-CHEMICAL, ELECTROMAGNETIC WEAPONS EXCLUSION CLAUSE
    (CL370)
  C.3. ASBESTOS CLAUSE
  C.4. MICROORGANISM EXCLUSION
  C.5. INSTITUTE CYBER ATTACK EXCLUSION CLAUSE (CL380)
  C.6. AUTHORITIES EXCLUSION
  C.7. DATA DISTORTION/CORRUPTION EXCLUSION
  C.8. MILLENNIUM CLAUSE

# SECTION A - REAL AND PERSONAL PROPERTY

A.1. INSURING AGREEMENTS
  A.1.A. PERILS INSURED
  A.1.B. PROPERTY INSURED
  A.1.C. ADDITIONAL PROPERTY INSURED

A.2. EXTENSIONS OF COVERAGE
  A.2.A. EXPEDITING EXPENSE
  A.2.B. TRANSIT
  A.2.C. POLLUTION HAZARD
  A.2.D. VALUABLE PAPERS AND ELECTRONIC DATA PROCESSING MEDIA
  A.2.E. DEMOLITION AND INCREASED COST OF CONSTRUCTION
  A.2.F. FIRE BRIGADE CHARGES AND EXTINGUISHING EXPENSES
  A.2.G. REMOVAL OF DEBRIS
  A.2.H. PROFESSIONAL FEES
  A.2.I. HAZARDOUS SUBSTANCES OR CONTAMINANTS
  A.2.J. MISCELLANEOUS UNSCHEDULED LOCATIONS
  A.2.K. PROPERTY IN COURSE OF CONSTRUCTION
  A.2.L. PIPELINE CONSTRUCTION COVERAGE
  A.2.M. SUE AND LABOR EXPENSES



Policy No. MSW-0388

A.3.   **CONDITIONS**
      A.3.A.  BRANDS OR TRADEMARKS
      A.3.B.  DUE DILIGENCE
      A.3.C.  MISREPRESENTATION
      A.3.D.  SALVAGE AND RECOVERIES
      A.3.E.  SPECIAL STATE REQUIREMENTS
      A.3.F.  SUSPENSION
      A.3.G.  PAIRS AND SETS
      A.3.H.  VALUATION

A.4.   **EXCLUSIONS**
      A.4.A.  PROPERTY EXCLUDED
      A.4.B.  PERILS EXCLUDED
      A.4.C.  SEEPAGE AND/OR POLLUTION EXCLUSION (NMA 1999B AMENDED)

## SECTION B – TIME ELEMENT

B.1.   **INSURING AGREEMENTS**

B.2.   **BASIS OF INDEMNITY**

B.3.   **DEFINITIONS**

B.4.   **CONDITIONS**
      B.4.A.  EXPERIENCE OF THE BUSINESS
      B.4.B..  EXTENDING THE PERIOD OF INTERRUPTION
      B.4.C.  RESUMPTION OF OPERATIONS
      B.4.D.  CALCULATION OF INDEMNITY AND INDEMNITY LIMIT

B.5.   **EXTENSIONS OF COVERAGE**
      B.5.A.  EXTRA EXPENSE
      B.5.B.  IMPOUNDED WATER
      B.5.C.  SERVICE INTERRUPTION
      B.5.D.  DEFERRED PAYMENTS FROM CUSTOMERS
      B.5.E.  INGRESS/ EGRESS
      B.5.F.  RENTAL VALUE
            1.     INSURING AGREEMENT
            2.     BASIS OF INDEMNITY
            3.     EXCLUSIONS
            4 .    PERIOD OF INTERRUPTION
      B.5.G.  LEASEHOLD INTEREST
      B.5.H.  ACCOUNTS RECEIVABLE

B.6.  **EXCLUSIONS**



Policy No. MSW-0388 DECLARATIONS

# DECLARATIONS

## 1.   NAMED ASSURED

**THE WILLIAMS COMPANIES, INC.** including all Subsidiary, Associated, Affiliated, Inter-related or Controlled Companies, Corporations or Firms (including any Limited Liability Company as defined herein, general and limited partnerships and joint ventures) as now exist or may hereafter be constituted for which The Williams Companies, Inc. has or acquires financial control or has the responsibility to provide insurance. Also including Williams Partners LP and its subsidiaries and Gulfstream Natural Gas System, LLC and Gulfstream Management & Operating Services, LLC, Williams Pipeline Partners LP and its subsidiaries and Wamsutter LLC.

## 2.   LOSS PAYEE

Loss, if any, under this Policy shall be adjusted with and payable to The Williams Companies, Inc. or order, whose acceptance shall constitute a release in full of all liability of Underwriters under this Policy as regards such loss.

## 3.   POLICY PERIOD

The period of this Policy shall be from **May 1, 2010** to **May, 1, 2011**, both dates at 12:01 a.m., Central Standard Time at Tulsa, Oklahoma, U.S.A.

## 4.   INTEREST

## Section A

Section A covers the Assured's **Onshore** interest against all risks of direct physical loss or damage in respect of real and personal property of every kind and description, owned, operated, controlled, leased, rented, used or intended for use by the **Assured,** and includes but is not limited to, improvements and betterments, property of others in the Care, Custody or Control of the **Assured** or in the care, custody or control of others on behalf of the **Assured,** property for which the **Assured** is responsible, personal property of the **Assured's** employees or officials while on premises owned or controlled by the Assured at the option of the **Assured,** electronic data equipment and media, valuable papers and records, property in the Course of Construction, Installation, Erection or Assembly in progress at inception or any time during the policy period or acquired subsequent thereto, and property in Transit. This Section includes but is not limited to pipelines, compression and pump stations, terminals, and gas or other product in lines and/or storage, including, but not limited to petroleum products, natural gas and its by-products, liquids derived from natural gas, liquefied natural gas, ethanol and ethanol production by-products, all as further described in Section A of this Policy provided that such property is scheduled and declared at inception.





Policy No. MSW-0388 DECLARATIONS

### Section B

Section B covers Time Element loss from direct physical loss or damage to property arising from an **Occurrence** covered or a peril insured against under Section A, all as further described in Section B of this Policy, provided that such property is scheduled and declared at inception.

For the purpose of this Section the term Time Element shall be understood to mean Business Interruption on an Actual Loss Sustained basis, Contingent Business Interruption, Extra Expense, Contingent Extra Expense, Accounts Receivable and Rental Value as further described in Section B of this Policy.

### Section A and B

It is understood and agreed that wherever reference is made herein to property scheduled and declared at inception, same shall be deemed to be such values as scheduled and declared by the Assured, which is held on file with McGriff Seibels & Williams, Inc. and as submitted under the TWC-Insurance web site at inception, which is accessible and available to underwriters hereon for underwriting information purposes.

### 5. SUMS INSURED AND/OR LIMITS OF LIABILITY (For the Assured's Interest Unless Otherwise Stated)

A limit of **USD 50,000,000** combined single limit Sections A and B combined applies in respect of any one accident or **Occurence**, subject to the following separate annual aggregate limits:

a)  **USD 50,000,000** for losses caused by the peril of **Flood**;

b)  **USD 50,000,000** for losses caused by the peril of **Earthquake Shock;**

c)  **USD 50,000,000** for losses caused by the peril of **Named Windstorm.**

Subject further to sublimits as attached to these Declarations.

These limits apply in excess of the Retention / Excess amounts stated in Item 6. or Item 7. of these Declarations.

Maximum **Period of Interruption** for Section B twenty-four (24) months.





Policy No. MSW-0388 DECLARATIONS

## 6.  RETENTIONS AND/OR EXCESS AMOUNTS
### (For the Assured's Interest Unless Otherwise Stated)

Retention/Excess Amounts shall apply separately in respect of Sections A and B. However all Retention/Excess Amounts noted in respect of Section A are also inclusive of any applicable Extra Expense and/or Contingent Extra Expense amount.

Single Largest Excess (Section A)
In the event of a loss involving more than one location, the Retention/Excess shall not exceed the single largest applicable Excess amount any one accident or **Occurrence**.

### Section A

**USD 2,000,000** any one accident or **Occurrence** except:

    i)        In respect of Geismar Olefins Plant (10/12ths owned) USD 1,000,000 any one accident or **Occurrence**

    ii)       In respect of Conway Storage and Fractionator USD 1,000,000 any one accident or **Occurrence**

    iii)      In respect of Gulfstream Natural Gas System LLC USD 500,000 any one accident or **Occurrence** (for 100%)

    iv)      In respect of Laurel Mountain Midstream LLC assets and RW Gathering LLC assets USD 250,000 any one accident or **Occurrence**

    v)       In respect of losses resulting from Transportation as covered herein USD 250,000 any one accident or **Occurrence**.

### Section B

60 days waiting period any one accident or **Occurrence** except as respects Gulfstream Natural Gas System LLC, RW Gathering LLC, and Laurel Mountain Midstream LLC assets to which 45 days waiting period any one accident or **Occurrence** applies.

## 7.  NAMED WINDSTORM EXCESS

### Section A

**USD 10,000,000** any one accident or **Occurrence** in respect of losses arising from **Named Windstorm** for interest, (except for Gulfstream Natural Gas System LLC which is for 100% Interest), which is in lieu of any other excess amounts under Section A.

### Section B

75 days waiting period any one accident or **Occurrence** in respect of losses arising from **Named Windstorm** which is in lieu of any other excess amounts under Section B.



Policy No. MSW-0388 DECLARATIONS

## 8. TERRITORIAL LIMITS

The fifty (50) states of the United States of America, the District of Columbia, Canada and Puerto Rico except Worldwide for Transit as further defined in Policy.

## 9. NOTICE TO UNDERWRITERS

All notices and correspondence to Underwriters, including premiums, required under this Policy are to be sent to the following entity for onward transmission to Underwriters:

McGriff, Seibels & Williams, Inc.
P.O. Box 10265
Birmingham, Alabama 35202, U.S.A.

## 10. NOTICE TO THE ASSURED

All notices and correspondence to the **Assured** relating to this Policy are to be addressed and sent to the **Assured** at the following address:

The Williams Companies, Inc.
Risk Management and Insurance Department

At:  One Williams Center,           Or:  P.O. Box 3483
     Tulsa, Oklahoma 74172, U.S.A.         Tulsa, Oklahoma 74101, U.S.A.

## 11. NET PREMIUM FOR THE POLICY PERIOD (100%)

| | |
|---|---|
| **Named Windstorm / ensuing Flood:** | **USD 2,500,000** |
| **All other risks covered herein:** | **USD 7,000,000** |
| **TOTAL:** | **USD 9,500,000** |

Premium includes an allowance of up to 2.5% for Engineering / Loss Control Inspection services to be performed by Starr Technical Risk Agency and/or AIG Global Energy Inspection and Insurance Company and/or Hydrocarbon Risk Consultants Limited. Allowance shall be for services performed during the Policy Period, payable at expiry, subject to receipt of invoices/receipts and inspection reports.



Policy No. MSW-0388 DECLARATIONS

## 12.  SCHEDULE OF SUBLIMITS

The following sublimits are for the **Assured**'s interest and apply in respect of each and every **Occurence**. They are included within, and not in addition to, the limits of liability:

| | | |
|---|---|---|
| a) | USD 2,000,000 | per month, in respect of Business Interruption arising from locations for which Business Interruption values have not been declared at inception. |
| b) | USD 25,000,000 | in respect of Extra Expense. |
| c) | USD 15,000,000 | in respect of Expediting Expense. |
| d) | USD 25,000,000 | in respect of Property in Course of Construction (excluding delay in Start Up). Maximum Estimated Insurable Contract Value at inception of work USD 25,000,000. |
| e) | USD 25,000,000 | in respect of Contingent Business Interruption. |
| f) | USD 10,000,000 | in respect of Contingent Extra Expense and Rental Value. |
| g) | 30 DAYS | in respect of Ingress / Egress. |
| h) | USD 25,000,000 | in respect of Removal of Debris. |
| i) | USD 25,000,000 | in respect of Demolition and Increased Cost of Construction. |
| j) | USD 25,000,000 | in respect of off Premises Power / Service Interruption, combined single sublimit with Contingent Business Interruption if applicable. |
| k) | USD 25,000,000 | in respect of Property in Course of Transit. |
| l) | USD  1,000,000 | in respect of Valuable Papers and Records. |
| m) | USD  2,500,000 | in respect of Accounts Receivable. |
| n) | USD  2,500,000 | in respect of Reconstitution of Electronic Data and/or Media. |
| o) | USD  2,500,000 | in respect of Professional Fees. |
| p) | 30 DAYS | in respect of Interruption by Civil or Military Authority (including OSHA). |
| q) | USD 25,000,000 | (100%) Miscelleaneous Unscheduled Locations in respect of property damage. |
| r) | USD 10,000,000 | Fire Brigade Charges and Extinguishing Expenses. |
| s) | USD  1,000,000 | Claims Preparation Costs. |



Policy No. MSW-0388 DECLARATIONS

t) **45 DAYS** in respect of Impounded Water.

u) **USD   1,000,000** in respect of Hazardous Substances and/or Contaminants and/or Pollutants.

v) **USD 50,000,000** in respect of Automatic Acquisitions.

w) **USD 50,000,000** in respect of gas in pipelines.

x) **USD 150,000,000** in respect of gas in storage.



C:\Documents and Settings\besta\Local Settings\Temporary Internet Files\OLK40\Primary $50mm Onshore Policy (2).doc



# GENERAL DEFINITIONS, CONDITIONS, AND EXCLUSIONS
## Applicable to Section A and Section B of this Policy

IN THE EVENT OF ANY CONFLICT BETWEEN THESE GENERAL DEFINITIONS, EXCLUSIONS AND CONDITIONS AND THE TERMS AND CONDITIONS OF AN INDIVIDUAL SECTION OF THIS POLICY, IT IS AGREED THAT THE TERMS AND CONDITIONS OF THE INDIVIDUAL SECTION SHALL ALWAYS PREVAIL.

Words and phrases which appear in **bold** type in this Wording have the meanings set forth in these General Definitions, Exclusions and Conditions or the Individual Sections of this Policy.

## A. DEFINITIONS

### A.1.   NAMED ASSURED

The term **"Named Assured"**, wherever used in this Policy, shall mean the entities stated in Item 1. of the Declarations.

As used therein, the term "Limited Liability Company (LLC)" shall mean any Limited Liability Company (as now or hereafter formed and defined under the laws of any state of the United States of America), or a similar entity formed under the laws of any country outside of the United States of America, elsewhere in this Policy referred to as a "LLC", of which a **Named Assured** is a member.

It is agreed by the Underwriters that the coverage provided under this Policy for any LLC shall extend to any subsidiary company of such LLC and to the liability of any manager or employee of such LLC or subsidiary company while acting in his or her capacity as such.

Notwithstanding anything to the contrary contained in the foregoing, it is agreed by both the Underwriters and the **Named Assured** that:

1.   any LLC formed or acquired after the inception date or any anniversary date of this Policy shall be automatically covered under this Policy;

2.   the Underwriters' liability under this Policy shall not be increased by the bankruptcy, insolvency or inability or refusal to pay of other members of any LLC (or the insurers of such other members) of which a **Named Assured** is a member.

It is further agreed that any reference to "LLC" under this definition shall be deemed to read "LLC or LLP", and that **LLP** shall mean a Limited Liability Partnership.



Policy No. MSW-0388 GENERAL DEFINITIONS

**A.2.** **OCCURRENCE, EARTHQUAKE SHOCK, FLOOD AND NAMED WINDSTORM**

    i.    The term "accident" and/or "**Occurrence**" (where applied), wherever used in this Policy, shall mean one loss or series of losses arising out of one event, except:

        i)    as respects the peril of **Earthquake Shock**, the term "**Occurrence**" shall mean the sum total of all losses sustained by the **Assured** during any period of seventy two (72) hours commencing during the term of this Policy;

        ii)    as respects the peril of **Flood,** the term "**Occurrence**" shall mean the sum total of all losses sustained by the **Assured** during any period of seventy two (72) hours commencing during the term of this Policy;

        iii)    as respects the peril of **Named Windstorm**, the term "**Occurrence**" shall mean the sum total of all losses sustained by the **Assured** arising out of the same atmospheric disturbance during any period of seventy two (72) hours commencing during the term of this Policy;

    Should any **Occurrence** referred to above extend beyond the expiration date of this Policy and commence prior to the expiration, the Underwriters shall pay all losses occurring during such period as if such period fell entirely within the term of the Policy.

    The Underwriters shall not be liable, however, for any loss caused by any **Occurrence** commencing before the effective date and time or after the expiration date and time of this Policy.

    ii.    The term "**Earthquake Shock**", wherever it is used in this Policy, shall mean earthquake, volcanic eruption, shock, tremor, landslide, subsidence, sinkhole collapse, tsunami, mud flow or rock fall or any other earth movement, and shall not include any ensuing loss, damage or destruction resulting from other perils insured.

    iii.    The term "**Flood**", wherever it is used in this Policy, shall mean waves, tide or tidal water or the rising (including the overflowing or breaking of boundaries) of lakes, ponds, reservoirs, rivers, harbors, streams, water channels or other bodies of water, whether or not driven by wind.

    iv.    The term "**Named Windstorm**", wherever it is used in this Policy, shall mean a storm, cyclone, atmospheric disturbance, depression or other weather phenomena for the period of time the National Oceanic and Atmospheric Administration (NOAA) identifies the storm, cyclone, atmospheric disturbance, depression or other weather phenomena with an Atlantic designated name allocated by the World Meteorological Organisation and only while located in the geographic jurisdiction of the United States and/or its offshore waters including but not limited to the Gulf of Mexico. The term **Named Windstorm** shall include ensuing **Flood**.



**A.3.** <u>**ONSHORE**</u>

The term **"Onshore"** shall mean the **Assured's** operations, property and interests up to and including the line of ordinary low water along that portion of the coast of land within the territorial limits defined herein but shall not include that which is in direct contact with the open seas and beyond the line marking the seaward limit of inland waters.

**A.4.** <u>**RIVER CROSSING(S)**</u>

A "**River Crossing**" is defined as the length of pipeline extending above or beneath the main active river channel or body of water and extending an additional 50 feet on either side of the main river channel or body of water and also includes the length of pipeline in the floodplain adjoining the main river channel or body of water.

**A.5.** <u>**ACTUAL CASH VALUE**</u>

The term "**Actual Cash Value**" means the **Replacement Cost** less deduction for physical depreciation. In determining **Actual Cash Value**, deduction for depreciation shall be no more than 2% per annum and which not to exceed fifty percent (50%) if the item was in use at the time of loss. In no event shall the **Actual Cash Value** exceed what it would cost to repair or replace the property lost or damaged.

**A.6.** <u>**REPLACEMENT COST**</u>

The term "**Replacement Cost**" means the lesser of either:

i.   the cost to replace new with like kind and quality, without deduction for depreciation, at the time of replacement; or

ii.   the cost to repair, re-work, re-route, rebuild, or modify, at the time of such reinstatement or repair, without deduction for depreciation, in order to return, as much as is reasonably possible, to the state of existence and/or operation prior to loss; or

iii.   the **Limit of Insurance**.

"**Replacement Cost**" shall also include any costs covered under General Conditions item B.18 and/or Section A.2 Extensions of Coverage.

If, as a result of direct physical loss or damage to Insured Property, and/or direct physical loss or damage to the property of others directly related and necessary to the operation of Insured Property, caused by a Peril Insured against by Section A, it becomes necessary to repair, replace, re-work, re-route, rebuild, modify, or demolish any Insured Property, whether damaged or not, then "**Replacement Cost**" shall include:

i.   the cost sustained in demolishing and removing any damaged or undamaged portion of the Insured Property necessitated by such loss or damage, including the cost of clearing the site thereof and removal of debris;

ii.   the cost incurred in repairing, rebuilding, replacing, re-routing, re-working or modifying the damaged, demolished, and undamaged portions of such Insured Property in order to return, as much as is reasonably possible, such Insured Property to the state of existence and/or operation prior to such loss.



Policy No. MSW-0388 GENERAL DEFINITIONS

**A.7.**   <u>OBJECT</u>

The term "**Object**" means any boiler, fired or unfired pressure vessel, refrigeration or air conditioning system, piping and accessory equipment and any mechanical or electrical machine or apparatus used for the generation, transmission or utilization of mechanical or electrical power.

**A.8.**   <u>VALUABLE PAPERS AND RECORDS</u>

The term "**Valuable Papers and Records**" shall mean written, printed or otherwise inscribed documents and records including but not limited to books, mortgages, abstracts, drawings, exposed film, manuscripts, maps and records.



C:\Documents and Settings\besta\Local Settings\Temporary Internet Files\OLK40\Primary $50mm Onshore Policy (2).doc

Policy No. MSW-0388 GENERAL CONDITIONS

## B. CONDITIONS

**B.1.   EXCESS AND UNDERLYING INSURANCE**

Permission is granted to the **Assured** to have:

i.    excess insurance over the Limits of Liability as set forth in the Declarations;

ii.   insurance in the name of and for the benefit of the **Assured** applying to the **Assured's** Retentions/ Excess amounts as set forth in the Declarations, or any part thereof, and the existence of such insurance, if any, shall not reduce any liability under this Policy.

**B.2.   BANKRUPTCY AND INSOLVENCY**

In the event of the bankruptcy or insolvency of the **Assured** or of the **Assured's** estate or of any entity comprising the **Assured**, the Underwriters hereon shall not be relieved of the payment of any losses or claims that would have been payable hereunder but for such bankruptcy or insolvency.

**B.3.   ABANDONMENT OF PROPERTY**

There can be no abandonment to the Underwriters of any property without the prior consent of Underwriters.

**B.4.   INSPECTION AND AUDIT**

Underwriters or their specified representatives shall be permitted but not obligated to inspect the **Assured's** property and operations at any reasonable time during normal working hours, as far as they relate to the subject matter of this Insurance, subject to prior notice being given to the Risk Management and Insurance Department of The Williams Companies, Inc.  Neither the Underwriters' right to make inspections nor the making thereof nor any advice or report resulting therefrom shall constitute an undertaking on behalf of or for the benefit of the **Assured** or others, to determine or warrant that such property or operations are safe or healthful, or are in compliance with any law, rule or regulation.

Underwriters or their specified representatives may examine and audit the **Assured's** books and records at any reasonable time during normal working hours subject to prior notice being given to the Risk Management and Insurance Department of The Williams Companies, Inc., as far as they relate to the subject matter of this Insurance.



Policy No. MSW-0388 GENERAL CONDITIONS

**B.5.**   **CANCELLATION**

This Policy cannot be cancelled by the **Assured**, nor can Underwriters reduce or cancel their participation on the Policy, for any reason except as follows:

a.   At any time an Underwriter can cancel his participation under the Policy if such cancellation is permitted by, and is in accordance with, any cancellation clause or automatic termination clause applicable to any war, strikes or similar coverage;

b.   At any time the **Assured** can cancel this Policy if the **Assured** is purchased by another company or entity, or is not the sole surviving entity following a merger with any other company or entity, or there is a significant change in the **Assured's** ownership. Notice of Cancellation in respect of such circumstance is to be given to Underwriters thirty (30) days prior to such cancellation date.

Any returns of premium payable following cancellation in accordance with this Clause will be calculated on a *pro rata* basis.

In addition, the Special Cancellation Provisions below apply:

Special Cancellation Provisions

1.   It is understood and agreed that if:

A.   any Underwriter subscribing to this insurance:

i.   ceases underwriting or accepting new business, whether entirely or in any class of business which partially or totally includes the coverage under this Policy, or

ii.   enters into a runoff arrangement, or

iii.   is subject to a scheme of arrangement, or

B.   any action is taken in any jurisdiction for the suspension of payments by, or the dissolution, winding up, termination of existence, liquidation, insolvency administration or bankruptcy of any Underwriter, or

C.   a provisional liquidator, liquidator, trustee, administrator, receiver, administrative receiver or similar officer is appointed in respect of any Underwriter or in respect of any part of its assets, or

D.   any authorisation, approval or consent, licence, exemption, filing, registration or notarisation or other requirement necessary or desirable to enable any Underwriter to carry on business is modified, revoked or withheld or does not remain or proves not to have been in full force and effect, or

E.   it becomes unlawful for any Underwriter to perform any of its obligations under the Policy or an intention is announced to take any of the actions stated in paragraphs A. to D. above, or

F.   in the published opinion of the Underwriter's auditor or a credit rating agency, the financial ability of an Underwriter to pay claims is or may be impaired,

then the **Assured** or the **Assured's** Broker (as agent of the **Assured**) is entitled at its option to cancel that Underwriter's participation in this Policy at any time after the applicable act stated above.



Policy No. MSW-0388 GENERAL CONDITIONS

In that event, the premium earned by such Underwriter for this Insurance shall be the pro rata proportion of the premium allocated to the risks covered under the Policy which corresponds to the period for which the Underwriter has been on risk, but after the deduction of that Underwriter's proportion of outstanding claims under the Policy.

2.   Notwithstanding anything to the contrary contained in this Insurance or subsequently endorsed to it, it is understood and agreed between the Underwriters and the **Assured** that underwriters may cancel this insurance by giving the Assured written notice stating when, not less than ten [10] days thereafter for non- payment of premium, such cancellation shall be effective.

Earned premium shall be calculated on a pro-rata basis.

**B.6.   CURRENCY**

The premiums, losses and claims, if any, under this Policy are payable in United States of America Dollars (USD).

**B.7.   CLAIMS NOTIFICATION AND LOSS ADJUSTMENT CLAUSE**

a.   **Notice of Loss**

As soon as practicable after a) any **Occurrence** likely to give rise to a claim hereunder, and/or b) any loss or damage which is insured against under this Policy, is known to the Risk Management and Insurance Department of The Williams Companies, Inc., the **Assured** shall report such loss or damage with full particulars to the entity stated in Item 11. of the Declarations.

The failure to give notice in accordance with the foregoing of any **Occurrence** which at the time did not appear to involve this Policy but which at a later date appears to give rise to claim hereunder, shall not prejudice such claim.

b.   **Proof of Loss**

In the event of loss under this Policy it shall be necessary for the **Assured** to render a signed and sworn proof of loss as soon as practicable to Underwriters or their appointed representatives stating the place, time, cause of loss, damage or expense; the interest of the **Assured** and of all others in the property involved; the value of the property involved in the loss; and the amount of loss, damage or expense, including any outside claim expense, other than legal expenses incurred by the **Assured,** for any service to prove a loss resulting from an **Occurrence** insured against under this Policy.

c.   **Payment of Loss**

All adjusted claims under this Policy shall be due and payable no later than thirty (30) days after the presentation and acceptance of proof of loss by Underwriters or their appointed representative. In the event any payment, including partial loss payment, is not made within thirty days underwriters agree to reimburse the Assured for loss of interest calculated at the prevailing LIBOR rate per annum and/or pro rata for each day the payment is overdue from each respective market.



Policy No. MSW-0388 GENERAL CONDITIONS

d.   **Partial Loss**

Permission is hereby granted to the **Assured** to commence   repairs in respect of any partial damage to property insured hereunder by a covered loss, provided always that Underwriters' appointed loss adjuster has reviewed and agreed to this with the **Assured**.

In the event of such covered loss whether a partial or total loss, Underwriters will make periodic loss payments to the **Assured** for both property damage and business interruption/time element subject to the Sum Insured/Limit of Liability of this Policy.  Such advance partial payments will be made within (30) thirty days from submission and acceptance by Underwriters of a partial proof of loss with reasonable supporting documentation.

Underwriters agree to make an initial advance payment for property damage being the **Actual Cash Value** of the property lost or damaged.  In the event of a loss involving a number of properties/assets an initial advance payment can apply to each property/asset lost or damaged.  Subsequent payments on account for property damage shall be made when repair/replacement costs incurred exceed the initial payment for each property/asset.    Incurred Business Interruption losses will also be eligible for inclusion within the computation for any partial payment.

Subsequent payments on account for business interruption/time element losses shall be payable in full thirty (30) days after such period of interruption.

Nothing contained in this clause shall override the basis of recovery and/or valuation clauses contained herein for any subsequent or final claims payments.

e.   **Loss Adjustment**

In the event of an **Occurrence**, the panel of agreed Loss Adjusters are as follows:

Cta (Charles Taylor adjusting).

Rex Andrews and Associates.

McLain Crow.

In the event of a loss, it is agreed the Assured can elect any one of the above loss adjusters to commence the adjustment process with prompt advice provided to Underwriters.

AEGIS and Lexington shall have the responsibility for communicating and directing the adjustment activity on all losses to include coordinating the efforts of all insurers in the claims adjustment process as respects communicating instructions, coverage positions and/or settlement offers to the adjuster and insured.

All Other Insurers shall have the absolute right, if they so choose, to attend all meetings relating to the investigation, negotiation, adjustment or settlement of the loss, and to be furnished with all the information obtained in respect of the loss, but all other Insurers are expected to work through AEGIS and Lexington in



Policy No. MSW-0388 GENERAL CONDITIONS

communicating and/or coordinating the adjustment process. All questions from all other Insurers relating to coverage, liability and/or the adjustment will be directed to AEGIS and Lexington who will, in turn, work to address the queries and any and all issues through the assigned adjuster, the Assured and the brokers.

**B.8.   UNDERWRITERS' SERVICING AGENTS OR BROKERS**

McGriff, Seibels & Williams, Inc., P.O. Box 10265, Birmingham, Alabama, 35202, U.S.A. is the **Assured's** servicing agent and responsible for all service requirements required by the **Assured** relating to all aspects of this insurance.

**B.9.   GOVERNING LAW AND JURISDICTION**

Any dispute relating to this Policy or to a claim (including but not limited thereto, the interpretation of any provision of the Policy) shall be governed by and construed in accordance with the laws of the state of Oklahoma.

Each party agrees to submit to the exclusive jurisdiction of the Courts of Oklahoma.

**B.10.  ALTERNATE DISPUTE RESOLUTION**

a.   In the event of any dispute between the parties relating to or arising out of any provision of this Policy, the representatives of the parties shall meet promptly in a good faith effort to resolve this dispute extra-judicially. The party initially raising a dispute shall arrange for this meeting at a time and place mutually acceptable to both parties. Prior to the meeting, each party shall deliver to the other party a written summary of the evidence and arguments substantiating its position.

b.   If the dispute is not resolved as a result of such meeting, the parties shall attempt to resolve the dispute by the use of a non-binding mini-trial. It is understood that the parties may mutually agree to use another method of alternate dispute resolution such as mediation or arbitration.

c.   The mini-trial shall be conducted before a panel composed of senior executive officers of each party, who have settling authority to resolve the dispute, and a neutral advisor.

d.   The parties shall exchange names of potential advisors and select from this pool a mutually acceptable candidate. If the parties cannot agree on the selection of a neutral advisor, the President of the Center for Public Resources or his or her designee shall select a neutral advisor from the Judicial Panel of the Center for Public Resources.

e.   The parties shall promptly agree on the ground rules which will govern the parties' conduct before, during and after the mini-trial. These ground rules shall include:

i.    a schedule for the exchange of documents, including briefs summarising each party's respective position on the dispute;

ii.   the duties and responsibilities of the neutral advisor;

iii.  the format and location of the mini-trial; and



Policy No. MSW-0388 GENERAL CONDITIONS

      iv.     mandatory settlement discussions between the senior executives of each party immediately after the mini-trial.

    f.    The parties shall also discuss whether any discovery will be necessary to prepare the mini-trial. If the parties mutually agree that such discovery is necessary, the parties shall establish an expedited discovery schedule.

    g.    Either party may resort to judicial proceeding if:

      i.     such party's good faith attempt to resolve the dispute by a mini-trial has been unsuccessful, or

      ii.    interim resort to court is necessary to prevent irreparable injury to a party or to third parties.

    h.    The costs of this Alternate Dispute Resolution shall be borne equally between both parties.

## B.11. SERVICE OF SUIT

The **Assured** may serve process upon any senior partner in the firm of:

**Mendes & Mount (Attorneys), 750 Seventh Avenue, New York, N.Y. 10019-6829**
and it is agreed that in any suit instituted against any one of them upon this contract the Underwriters will abide by the final decision of the Court or of any Appellate Court in the event of an appeal.

## B.12. TITLES OF PARAGRAPHS

The several titles of the various paragraphs of this Policy (and of any endorsements attached hereto) are inserted only for purposes of reference and shall not be deemed in any way to limit or affect the provisions to which they relate.

## B.13. DELAYS, ERRORS OR OMISSIONS

It is agreed that this Insurance shall not be prejudiced by any unintentional delay, error or omission in reporting hereunder, provided prompt notice is given to the Underwriters as soon as said delay, error or omission becomes known to the Risk Management and Insurance Department of The Williams Companies, Inc.



C:\Documents and Settings\besta\Local Settings\Temporary Internet Files\OLK40\Primary $50mm Onshore Policy (2).doc

Case 4:13-cv-00571-CVE-FHM   Document 2 Filed in USDC ND/OK on 09/03/13   Page 246 of 281

### B.14. OIL POLLUTION ACT DISCLAIMER

This Insurance does not constitute evidence of financial responsibility under the Oil Pollution Act of 1990 or any similar federal or state law and it is a condition of this Insurance that it shall not be submitted to the United States Coast Guard or any federal or state agency as evidence of financial responsibility. The Underwriters do not consent to be guarantors.

### B.15. ACTION AGAINST UNDERWRITERS

No action shall be brought against Underwriters unless commenced within twenty-four (24) months from the date the claim is disputed in writing.

### B.16. ASSIGNMENT

Assignment or transfer of this Policy shall not be valid except with the prior written consent of the Underwriters.

### B.17. ASSISTANCE AND COOPERATION OF THE ASSURED

The **Assured** shall cooperate with Underwriters and, upon Underwriters' request and expense, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and conducting suits.

### B.18. RECOVERABLE CHARGES

It is agreed that the provisions contained in the **Replacement Cost** definition shall also include the Assured's direct labor cost, general and administrative overhead expenses, engineering and supervision overhead expenses, and indirect labor overhead expenses associated with the repairing or replacing of the damaged or destroyed insured property, such overhead expenses being added at the time of repair or replacement. Overhead expenses will be calculated as 10% of the total direct labor, supervision and engineering charges incurred to repair or replace damaged or destroyed insured property. Total direct labor, only for purposes of this calculation of overhead expenses, will include:

i.      the Assured's direct employee payroll charges (plus an adder to cover costs of pension, welfare, taxes, insurance, vacation and other paid absences and employment-related costs) and:

ii.     contractor labor charges, but not to include labor charges incurred by a contractor at the contractor's facility.

The Insurers' maximum total liability for overhead expenses in a single Occurrence shall not exceed USD 5,000,000.



C:\Documents and Settings\besta\Local Settings\Temporary Internet Files\OLK40\Primary $50mm Onshore Policy (2).doc

### B.19. CERTIFICATES OF INSURANCE

All parties to whom a certificate of insurance has been issued are automatically added to this Policy upon issuance of said certificates, either as additional **Assureds** or as loss payees, or both, in accordance with the terms and conditions of said certificates. Underwriters hereby authorize and approve McGriff, Seibels & Williams, Inc. as the **Assured's** broker of record, to issue appropriate certificates of insurance as may be required to parties who have an insurable interest in property covered by this Policy or to whom the **Named Assured** has otherwise agreed to provide such certificates.

### B.20. SUBROGATION

The Underwriters shall, upon payment of any loss, damage or expense under this Policy, be subrogated to all the **Assured's** rights of recovery against any other firm, person or corporation who may be legally or contractually liable for such loss, damage or expense paid by the Underwriters and the **Assured** shall at Underwriters' expense execute and deliver instruments and papers and do whatever else is necessary to secure such rights.

It is agreed that the Underwriters may make, after making prior written notice to the **Named Assured**, claim upon and institute legal proceedings against any parties believed responsible for loss, damage or expense paid under this policy in the name of the **Assured** and the **Assured** will give the Underwriters their full co-operation in pursuing such claim or legal proceeding.

Underwriters agree to waive their rights to subrogation on a blanket basis when the Assured has waived their rights in writing prior to loss.

### B.21. AUTOMATIC ACQUISITIONS

Subject to the Sublimit of Liability stated in the Declarations, this policy is automatically extended to cover, at nil additional premium, additional property and/or interests which may be acquired, constructed, or otherwise become at risk of the **Named Assured** during the period of this Policy, provided that the reportable value of any single newly acquired or constructed property does not exceed **USD 50,000,000**.

If the reportable values exceed **USD 50,000,000** for any single acquired or constructed property, then such acquired or constructed property is to be agreed by Underwriters prior to attachment. Underwriters reserve the right to charge an additional premium for any single newly acquired or constructed property with values exceeding **USD 50,000,000**.

However and irrespective of reportable values, any such acquired or constructed property located within FEMA Flood Zone A, anywhere in Florida or California, or within twenty-five miles of the coastal boundaries of the following states are to be agreed by Underwriters prior to attachment::

Alabama
Georgia
Louisiana
Mississippi
North Carolina
South Carolina
Texas



Policy No. MSW-0388 GENERAL CONDITIONS

### B.22. OTHER INSURANCE

If, at the time of loss covered hereunder, there is other insurance in force which would attach to the benefit of the Assured if this Insurance had not been effected, then this Insurance shall apply only as excess of the amount paid by such insurance but in no event as contributing insurance, unless such Insurance has been purchased by the Assured specifically to provide additional limits of insurance in excess of the insurance afforded by this Policy, in which case this Policy shall be primary to such excess insurance

### B.23. CLAIMS PREPARATION COST

Subject to the Sublimit of Liability stated in the Declarations,  this Policy is extended to include the reasonable expenses incurred by the Assured for professional services such as auditors, accountants, architects and engineers, except the Assured's own employees or public adjusters, which are required in order to present a loss which is covered by this Policy.

### B.24. OFAC CLAUSE

Payment of loss under this policy shall only be made in full compliance with all United States of America economic or trade sanction laws or regulations, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").



Case 4:13-cv-00571-CVE-FHM   Document 2 Filed in USDC ND/OK on 09/03/13   Page 249 of 281

## C. EXCLUSIONS

### C.1.   WAR AND TERRORISM EXCLUSION (NMA 2918 Amended)

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss:

a.   war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

b.   any act of terrorism.

For the purpose of this exclusion, an "act of terrorism" means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organization(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or put the public, or any section of the public, in fear.

This Policy also excludes loss, damage, cost, or expense of whatsoever nature directly or indirectly caused by, resulting from, or in connection with any action taken in controlling, preventing, suppressing, or in any way relating to any act of terrorism.

If an act of terrorism results in a fire and the direct physical loss or damage to property insured hereunder located in any State of the United States, or the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, American Samoa, Guam, each of the United States Virgin Islands and any territory or possession of the United States, that, either pursuant to the Standard Fire Policy or otherwise, prohibits exclusions for acts of terrorism that result in fire, the Insurers will pay for the loss or damage caused by that fire.  Such coverage for fire applies only to direct loss or damage to property insured hereunder and may be limited, in accordance with the Standard Fire Policy to the lesser of the actual cash value of the property at the time of the loss, or the amount which it would cost to repair or replace the property, without allowance for any increased cost of repair or replacement by reason of any ordinance or law, and without any compensation for business interruption, extra expense to continue business activities, or any other coverage for loss or damage other than direct physical loss or damage to the property insured hereunder.

With respect to fire resulting from any one or more "certified acts of terrorism" as defined under the Federal Terrorism Risk Insurance Act of 2002 ("TRIA"), Insurers will not pay any amounts for which insurers are not responsible under the terms of that Act (including subsequent Congressional action pursuant to the Act) due to the application of TRIA Section 103 or any clause that results in a cap on our liability for payments for terrorism losses.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the **Assured**.



Policy No. MSW-0388 GENERAL EXCLUSIONS

In the event any portion of this clause is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

**C.2.**  **INSTITUTE RADIOACTIVE CONTAMINATION, CHEMICAL, BIOLOGICAL, BIO-CHEMICAL, ELECTROMAGNETIC WEAPONS EXCLUSION CLAUSE (CL370)**

**This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith.**

In no case shall this insurance cover loss damage liability or expense directly or indirectly caused by or contributed to by or arising from:

1.1 ionising radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear waste or from the combustion of nuclear fuel

1.2 the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear installation, reactor or other nuclear assembly or nuclear component thereof

1.3 any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter

1.4 the radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter. The exclusion in this sub-clause does not extend to radioactive isotopes, other than nuclear fuel, when such isotopes are being prepared, carried, stored or used for commercial, agricultural, medical, scientific or other similar peaceful purposes

1.5 any chemical, biological, bio-chemical or electromagnetic weapon.

**C.3.**  **ASBESTOS CLAUSE**

A. This Policy only insures asbestos physically incorporated in an insured building or structure, and then only that part of the asbestos which has been physically damaged during the Policy period by one of these Listed Perils:

Fire; Smoke; Explosion; Lightning; Windstorm; Hail; Direct Impact of vehicle, aircraft or vessel; Riot or civil commotion; Vandalism or Malicious Mischief; or Accidental Discharge of fire protective equipment.

This coverage is subject to all limitations in the Policy to which this clause is attached and, in addition, to each of the following specific limitations:

1. The said building or structure must be insured under this Policy for damage by that Listed Peril.

2. The Listed Peril must be the immediate, sole cause of the damage to the asbestos.

3. The **Assured** must report to Underwriters the existence and cost of the damage as soon as practicable after the Listed Peril first damaged the asbestos. However this Policy does not insure any such damage first



Policy No. MSW-0388 GENERAL EXCLUSIONS

reported to Underwriters more than 12 (twelve) months after the expiration, or termination, of the Policy period.

4.   Insurance under this Policy in respect of asbestos shall not include any sum relating to:

(i)   any faults in the design, manufacture or installation of the asbestos;

(ii)   asbestos not physically damaged by the Listed Peril including any governmental or regulatory authority direction or request of whatsoever nature relating to undamaged asbestos.

B.   Except as set forth in the foregoing Clause A of this Condition, this Policy does not insure asbestos or any sum relating thereto.

**C.4.   MICROORGANISM EXCLUSION**

This Policy does not insure any loss, damage, claim, cost, expense or other sum directly or indirectly arising out of or relating to:

mold, mildew, fungus, spores or other microorganism of any type, nature, or description, including but not limited to any substance whose presence poses an actual or potential threat to human health.

This exclusion applies regardless whether there is (i) any physical loss or damage to insured property; (ii) any insured peril or cause, whether or not contributing concurrently or in any sequence; (iii) any loss of use, occupancy, or functionality; or (iv) any action required, including but not limited to repair, replacement, removal, cleanup, abatement, disposal, relocation, or steps taken to address medical or legal concerns.

This exclusion replaces and supersedes any provision in the Policy that provides insurance, in whole or in part, for these matters.

**C.5.   INSTITUTE CYBER ATTACK EXCLUSION CLAUSE (CL380)**

1.1   Subject only to clause 1.2 below, in no case shall this insurance cover loss damage liability or expense directly or indirectly caused by or contributed to by or arising from the use or operation, as a means of inflicting harm, of any computer, computer system, computer software program, malicious code, computer virus or process or any other electronic system.

1.2   Where this clause is endorsed on policies covering risks of war, civil war, revolution, rebellion, insurrection, or civil strife arising therefrom, or any hostile act by or against a belligerent power, or terrorism or any person acting from a political motive, Clause 1.1 shall not operate to exclude losses (which would otherwise be covered) arising from the use of any computer, computer system or computer software program or any other electronic system in the launch and/or guidance system and/or firing mechanism of any weapon or missile.



Policy No. MSW-0388 GENERAL EXCLUSIONS

**C.6.** **AUTHORITIES EXCLUSION**

Except as specifically stated in this policy or endorsement attached thereto, the Underwriters shall not be liable for loss, damage, costs, expenses, fines, or penalties incurred, sustained by or imposed on the Assured at the order of any Government Agency, Court, or other Authority arising from any cause whatsoever.

However, if any time element coverage is afforded by this policy or endorsements thereto, the coverage is extended to include any increase in the actual loss sustained by the Assured, resulting directly from an interruption of business covered hereunder, during the length of time not exceeding four (4) consecutive weeks, when as a direct result of damage to or destruction of covered property by the peril(s) insured against, access to the premises or commencement of repairs is delayed at the order of any Government Agency, Court, or other Authority.

**C.7.** **DATA DISTORTION/CORRUPTION EXCLUSION**

Underwriters will not pay for Damage or Consequential loss directly or indirectly caused by, consisting of, or arising from:

(A)    Any functioning or malfunctioning of the Internet or similar facility, or of any intranet or private network or similar facility;

(B)    Any corruption, destruction, distortion, erasure or other loss or damage to data, software or any kind of programming or instruction set;

(C)    Loss of use or functionality whether partial or entire of data, coding, program, software, any computer or computer system  or other device dependent upon any microchip or embedded logic, and any ensuing inability or failure of the Assured to conduct business.

This exclusion shall not exclude subsequent Damage or Consequential loss, not otherwise excluded, which itself results from a **Defined Peril**. **"Defined Peril"** shall mean Fire, Lightning, **Earthquake Shock**, Explosion, Falling Aircraft, **Flood**, Smoke, Vehicle Impact, **Windstorm** or Tempest, Accidental Breakdown of an **Object** including Mechanical and Electrical Breakdown.

This exclusion shall not act to increase or broaden coverage afforded by this policy.

Such Damage or Consequential Loss described in A, B, or C above, is excluded regardless of any other cause that contributed concurrently or in any other sequence.



Policy No. MSW-0388 GENERAL EXCLUSIONS

**C.8.**  <u>**MILLENNIUM CLAUSE**</u>

A.  Underwriters will not pay for Damage or Consequential Loss directly or indirectly caused by, consisting of, or arising from, the failure of any computer, data processing equipment or media microchip, operating systems, microprocessors (computer chip), integrated circuit or similar device, or any computer software, whether the property of the insured or not, and whether occurring before, during or after the year 2000 that results from the inability to:

1.  correctly recognize any date as its true calendar date,

2.  capture, save, or retain and/or correctly manipulate, interpret or process any data or information or command or instruction as a result of treating any date other than as its true calendar date, and/or

3.  capture, save, retain or correctly process any data as a result of the operation of any command which has been programmed into any computer software, being a command which causes the loss of data or the inability to capture, save, retain or correctly process such data on or after any date.

B.  It is further understood that the insurer will not pay for the repair or modification of any part of an electronic data processing system or its related equipment, to correct deficiencies or features of logic or operation.

C.  It is further understood that the insurer will not pay for Damage or Consequential Loss arising from the failure, inadequacy, or malfunction of any advice, consultation, design, evaluation, inspection, installation, maintenance, repair or supervision done by the Assured or for the Assured or by or for others to determine, rectify or test, any potential or actual failure, malfunction or inadequacy described in A. above.

Such damage or Consequential Loss described in A, B, or C above, is excluded regardless of any other cause that contributed concurrently or in any other sequence.

This clause shall not exclude subsequent Damage or Consequential Loss which itself results from a peril not otherwise excluded under this policy.



Policy No. MSW-0388 SECTION A

# SECTION A – REAL AND PERSONAL PROPERTY

## A.1. INSURING AGREEMENTS

### A.1.A. PERILS INSURED

This Section insures against all risks of direct physical loss or damage in respect of property insured from perils not otherwise excluded, subject to the terms and conditions of this Section.  In the event of direct physical loss or damage to any property insured and such direct physical loss or damage, without the intervention of any other independent cause, results in a sequence of events which causes direct physical loss or damage to other property insured, then this Section will cover such resulting loss or damage.  Nothing in this clause shall be deemed to extend this insurance to property which is otherwise specifically excluded from coverages by the terms of this Section.

### A.1.B. PROPERTY INSURED

This Section covers all **Onshore** real and personal property of every kind and description owned, operated, controlled, leased, rented, used or intended for use by the **Assured,** provided that such property is scheduled and declared at inception and includes but is not limited to  improvements and betterments, property of others in the care, custody and control of the **Assured** or in the care, custody and control of others on behalf of the **Assured,** property for which the **Assured** is responsible, personal property of the **Assured's** employees or officials while on premises owned or controlled by the **Assured** at the option of the **Assured,** electronic data equipment and media, valuable papers and records, property in the course of construction and/or alteration and/or extension and/or addition and/or repair and/or installation and/or erection and/or assembly in progress at inception or any time during the policy period or acquired subsequent thereto, and property in transit. This Section includes but is not limited to pipelines, compression and pump stations, terminals, and gas or other product in lines and/or storage, including but not limited to petroleum products, natural gas and its by-products, liquids derived from natural gas, liquefied natural gas, ethanol and ethanol production by-products.

### A.1.C. ADDITIONAL PROPERTY INSURED

This Section covers automatic additions and deletions to property insured in accordance with the Automatic Acquisition Clause of the General Conditions, and includes the testing of any newly acquired property or **Object,** rented, purchased or in the course of construction, acquired after inception date of this Policy.



C:\Documents and Settings\besta\Local Settings\Temporary Internet Files\OLK40\Primary $50mm Onshore Policy (2).doc

Policy No. MSW-0388 SECTION A

## A.2. EXTENSIONS OF COVERAGE

### A.2.A. EXPEDITING EXPENSE

Subject to the Sublimit of Liability stated in the Declarations, this Section shall also pay for the reasonable extra cost to make temporary repairs and to expedite the permanent repair or replacement of property insured damaged by a peril insured, including overtime and the extra cost of express or other rapid means of transportation, including air freight. Expediting Expense shall not include the costs incurred by the Assured for the temporary rental of property or the temporary replacement of damaged property nor shall it include the cost of permanent repair or replacement of the lost or damaged property.

### A.2.B. TRANSIT

Subject to the Sublimit of Liability stated in the Declarations, this Section shall pay for direct physical loss or damage not otherwise excluded, to property insured in transit, within the Territorial Limits as stated in the Declarations, during the policy period, by any means of conveyance, from the commencement of loading and continuously thereafter, including while property insured is at the location of any repair, temporary storage, consignment or exhibition; and including deviation and delay; until unloaded at the place of final destination.

    i.    This Section is extended to cover physical loss or physical damage:

        a.    to all incoming and/or outgoing shipments made during the period of insurance;

        b.    to property sold and/or shipped by the **Assured**, in which the **Assured** retains an interest, under terms terminating the shipper's responsibility short of points of delivery;

        c.    to property sold and shipped by the **Assured** under terms of F.O.B. ("Free On Board") point of origin or other terms usually regarded as terminating the shipper's responsibility short of points of delivery; however, shipments on terms whereby the **Assured** is not obligated to provide transit insurance are hereby excluded; however, it is agreed that the Underwriters will grant to the **Assured** the prompt collection of losses which otherwise would have come within the terms of this Policy. Such allowance shall be repayable upon remittance of the purchase price by the consignee or to the extent of any recovery received by the **Assured** from the insurance effected by the consignee or otherwise. The **Assured** agrees not to divulge the existence of this Insurance unless required by statute or compelled by a court of law and to use all reasonable means to collect the full amount due from the party who arranged transit coverage and in the event of being unable to collect, the **Assured** agrees to subrogate to Underwriters any rights the **Assured** may have against any such party who arranged transit insurance. In the event the consignee and/or buyer, through an oversight or other reasons, does not provide primary cover, the **Assured** will be held covered for the shipment on a primary basis;



Policy No. MSW-0388 SECTION A

    d.    caused by any unauthorized person(s) representing themselves to be the proper party(ies) to receive goods for shipment or to accept goods for delivery; and

    e.    resulting from the acceptance by the **Assured,** by its agents or by its customers of fraudulent bills of lading, shipping and delivery orders, or similar fraudulent documents.

  ii.    The **Assured** may waive rights of recovery against private and/or contract carriers and accept bills of lading or receipts from carriers, bailees, warehousemen, or processors limiting their liability, but this transit insurance shall not inure to the benefit of any carrier, bailee, warehousemen, or processor.

  iii.    the **Assured's** rights shall not be prejudiced by any agreement exempting lightermen from liability.

  iv.    This Section excludes property of others and the **Assured's** legal liability therefore, being hauled on vehicles owned, leased or operated by the Assured when acting as a common or contract carrier as defined by the Interstate Commerce Commission Regulations or state regulatory agencies.

## A.2.C. POLLUTION HAZARD

Included within, and not in addition to the Sublimit of Liability stated in the Declarations for Demolition and Increased Cost of Construction, this Section covers direct physical loss or damage to pipeline **River Crossings** directly caused by governmental authorities acting for the public welfare to prevent or mitigate a pollution hazard, or the threat thereof, resulting from direct physical loss or damage to pipeline **River Crossings** for which the Underwriters are liable under this Section, provided such act of governmental authorities has not resulted from want of due diligence by the **Assured** to prevent or mitigate such hazard or threat.

## A.2.D. VALUABLE PAPERS AND ELECTRONIC DATA PROCESSING MEDIA

Subject to the Sublimits of Liability stated in the Declarations, this Section is extended to cover direct physical loss or damage to **Valuable Papers and Records** and to electronic data processing media.

  i.    This coverage does not insure against loss or damage to **Valuable Papers and Records** or to electronic data processing media if such property:

    a.    cannot be replaced with other(s) of like kind and quality or restored to useable condition; or

    b.    is held as samples, or for sale, or for delivery after sale.

  ii.    This coverage does not insure against loss or damage resulting from:

    a.    errors or omissions in processing or copying, errors or omissions in machine programming or instructions to machines, or computer error or malfunction;

    b.    unauthorised instruction to transfer property to any person or to any place; or



Case 4:13-cv-00571-CVE-FHM   Document 2 Filed in USDC ND/OK on 09/03/13   Page 257 of 281

    c.    voluntary parting with any property by the **Assured** or any associate, proprietor, partner, director, trustee, officer, employee or agent of any **Assured** if induced to do so by any fraudulent scheme, trick, device or false pretence.

## A.2.E. <u>DEMOLITION AND INCREASED COST OF CONSTRUCTION</u>

Subject always to the Sublimit of Liability stated in the Declarations, if at the time of repair of any direct physical loss or damage insured against by this Section, there is in force any law or ordinance regulating the construction, demolition, repair, replacement, use or removal of buildings or structures, then this Section is extended to cover:

    I.    the additional cost sustained in demolishing and removing any undamaged portion of the buildings or structures necessitated by such law or ordinance including the cost of clearing the site thereof and removal of debris;

    II.    the cost incurred in actually repairing, rebuilding or replacing both the damaged and demolished portions of such buildings or structures in a manner to satisfy such law or ordinance.

The total liability under this coverage shall not exceed the actual expenditure incurred in demolishing and removing the undamaged portion of the building(s) or structure(s) involved plus the lesser of the following:

    A.    The actual additional  expenditure incurred, not including the cost of land, in rebuilding in compliance with such law or ordinance on another site; or

    B.    The additional cost of rebuilding in compliance with such law or ordinance on the same site,

In no event shall this coverage include:

    i)    Demolition or increased cost of repair or reconstruction, debris removal or loss of use caused by the enforcement of any law, ordinance or administrative regulation regulating asbestos material;

    ii)    Any governmental direction or request declaring that that asbestos material present in or part of or utilized on any undamaged portion of insured property can no longer be used for the purpose for which it was intended or installed and must be removed or modified; or

    iii)    Cost of compliance with the enforcement of any law, ordinance or administrative regulation which the Assured would have otherwise incurred by nature of such law, ordinance or administrative regulation in the absence of any loss or damage insured against under this Policy



Policy No. MSW-0388 SECTION A

#### A.2.F. FIRE BRIGADE CHARGES AND EXTINGUISHING EXPENSES

Subject to the Sublimit of Liability stated in the Declarations, this Section is extended to cover fire brigade charges and other extinguishing expenses including loss of fire extinguishing materials.

#### A.2.G. REMOVAL OF DEBRIS

Subject to the Sublimit of Liability stated in the Declarations, this Section shall provide reimbursement of all expenses incurred for debris removal, demolition, removal of ice and dewatering of property, and of cleaning up the site, lease or pipeline right of way, at an insured location, occasioned by direct physical loss or damage to insured property covered by this Policy, and for the temporary removal from its location any insured property endangered by a peril for which indemnity is provided. This extension shall not apply to any cost to remove or neutralize Contaminants and/or Pollutants.

#### A.2.H. PROFESSIONAL FEES

Subject to the Sublimit of Liability stated in the Declarations, this Section is extended to include Architects', Surveyors', Accountants', Consulting Engineers' or other professional fees of similar nature necessarily incurred in the reinstatement of property consequent upon its loss or damage (but not for preparing any claim), but not including attorneys' fees.

#### A.2.I. HAZARDOUS SUBSTANCES OR CONTAMINANTS

Subject to the Sublimit of Liability stated in the Declarations, if, as a result of an **Occurrence** insured hereunder, covered property is damaged, contaminated or polluted by Hazardous Substances or Contaminants, Underwriters shall be liable under this policy and any of its endorsements, for the additional expenses incurred for cleanup, repair or replacement, or disposal of that damaged, contaminated or polluted property. As used hereon additional expenses shall mean expenses incurred beyond those for which Underwriters would have been liable if no Hazardous Substances or Contaminants had been involved in the **Occurrence**.



Case 4:13-cv-00571-CVE-FHM   Document 2 Filed in USDC ND/OK on 09/03/13   Page 259 of 281

### A.2.J. <u>MISCELLANEOUS UNSCHEDULED LOCATIONS</u>

Subject to the Sublimit of Liability stated in the Declarations, this Section, subject to all terms, conditions and limitations herein, is extended to cover insured property while at fixed locations not included in the property scheduled and declared at inception.

Coverage under this extension shall not apply to signs, tracks, trestles, bridges, tunnels, electrical transmission and distribution lines, line transformers, towers and poles, cables, equipment or apparatus connected to any of the preceding.

Coverage under this extension shall also not apply to property located anywhere in Florida or California, or within twenty-five miles of the coastal boundaries of the following states:

Alabama
Georgia
Louisiana
Mississippi
North Carolina
South Carolina
Texas

### A.2.K. <u>PROPERTY IN COURSE OF CONSTRUCTION</u>

Subject to the Sublimit of Liability stated in the Declarations, and subject to all terms, conditions and limitations herein, this policy is extended to cover property in the course of construction, fabrication, installation, erection, assembly or testing, including while in transit and storage, (hereinafter referred to as construction work) which commences within the Policy period or is in progress as of inception, provided that the estimated insurable contract value at the inception of such construction work does not exceed the Sublimit. Such coverage shall apply automatically without advice to Underwriters and cover shall continue hereunder through to individual project completion, meaning the earlier of either the completion of testing or the placing of the project into commercial operation, if taking place in the Policy period. Any projects extending beyond the Policy period and intended for coverage hereunder are to be declared and endorsed for coverage under this Policy at terms to be agreed by the Insurer.

With respect to any construction work where the contract value exceeds the sublimit amount stated in the Declarations of this Policy, provision of coverage may be considered by Underwriters subject to the provision of acceptable Underwriting information, and terms and conditions to be specifically agreed by Underwriters prior to attachment of coverage for such construction work hereon.

Notwithstanding anything contained within the foregoing to the contrary, it is understood and agreed that irrespective of the contract value, coverage hereon shall also apply automatically, without advice to underwriters, to any property destined to be used in the course of construction or fabrication or installation or erection or assembly or testing, including while in transit and storage, provided that coverage for any such property to be used is not afforded by any other insurance policy and coverage for all such property shall be automatically transferred to a Construction All Risks policy, if applicable, at the inception date of the Construction All Risks policy. Coverage for such property to be used shall always be limited to the Sublimit as stated in the Declarations of this Policy applying to this Property in Course of Construction Clause.

In no event shall this extension include coverage for any Delay in Start-Up.



C:\Documents and Settings\besta\Local Settings\Temporary Internet Files\OLK40\Primary $50mm Onshore Policy (2).doc



Policy No. MSW-0388 SECTION A

## A.2.L. PIPELINE CONSTRUCTION COVERAGE

Notwithstanding anything contained within this Policy to the contrary, it is understood and agreed that when the scope of any construction project covered hereunder in accordance with the preceding clause **A.2.K.** of this Section involves the laying or installation of pipelines, then Exclusion **A.4.A.xi.** of this Section is deleted in its entirety, and the following wording is added to this Section:

i.  The following is added to clause **A.2.K.** of this Section, **PROPERTY IN COURSE OF CONSTRUCTION**:

In the event of Insured physical loss of or damage to pipelines being a part of the insured project, Insurers will pay the following necessary and reasonable costs:

    a.  Costs of searching for leaks following a hydrostatic test using special apparatus such as robotic cameras, including the cost of lease, operation and transport of such apparatus. Insurers' liability for this extension of coverage shall not exceed **USD 250,000** in any one **Occurrence.**

    b.  Costs to excavate and backfill a trench, not damaged in itself, when necessary to search for damage to or to effect the repair or replacement of the pipeline, or any portions thereof. However, Insurers shall not be liable for costs beyond that required to search for damage in, or to effect the repair or replacement of, the pipeline, or any portions thereof.

ii.  The following is added to Item **A.4.B.** of this Section, **PERILS EXCLUDED**:

Insurers shall not be liable for:

Loss, damage or expense caused by, resulting from, contributed to or made worse by accumulation of water, silt, mud, sand or other debris within or upon pipelines when the length of an open trench exceeds **1 mile** per section per **Occurrence**, within open trenches and within or upon pipelines installed therein.

iii.  The following is added to Item **A.3.** of this Section, **CONDITIONS**:

The **Named Assured** warrants that:

    a.  100% of all welded seams six inches in diameter and greater have been x-rayed and all others inspected and tested according to Department of Transportation regulations. Any deficiencies discovered thereby have been properly repaired;

    b.  Prior to completion of pressure tests, open trenches have been sufficiently backfilled to prevent displacement of pipelines and cables in the event of water accumulation and further that installed pipelines have been plugged so as to prevent the accumulation of water, silt, mud or other debris within the pipeline.



Policy No. MSW-0388 SECTION A

### A.2.M. SUE AND LABOR EXPENSES

It is agreed that should the Property Insured under this Policy suffer loss or damage covered under the terms of this Insurance, or should loss or damage covered under the terms of this Insurance be imminent, it shall be lawful and necessary for the **Assured**, their factors, servants and assigns, to sue, labor and travel for, in and about the defense, safeguard and recovery of the said Property, or any part thereof, without prejudice to this Insurance, and subject always to the terms, conditions, limitations and exclusions applicable to this Policy, the charges thereof shall be borne by the Underwriters. It is especially declared and agreed that no acts of the Underwriters or the **Assured** in recovering, saving or preserving the Property shall be considered as a waiver or acceptance of abandonment.

Notwithstanding the foregoing, the Underwriters' liability for Sue and Labor Expenses shall always be contained within the overall Limit of Underwriters' Liability as set forth in Item 5. of the Declarations.

## A.3. CONDITIONS

### A.3.A. BRANDS OR TRADEMARKS

In the event of damage to property, caused by the perils insured against under this Section, bearing a brand or trademark, or sale of which in any way carries or implies the guarantee or the responsibility of the manufacturer or the **Assured**, the salvage value of such damaged property shall be determined after removal in the customary manner of all such brands or trademarks or other identifying characteristics. This Clause shall in no way obligate the **Assured** to remove brands or trademarks. The **Assured** will be given the option to control the salvage disposition of the damaged property. Any expense in connection with this disposition will be included as part of the loss.

### A.3.B. DUE DILIGENCE

The **Assured** shall take all reasonable precautions and consider all reasonable recommendations of the Underwriters to prevent loss or damage to the property insured.

### A.3.C. MISREPRESENTATION

This Section shall be void if the **Assured** has willfully concealed or misrepresented any material fact or circumstance concerning this Section or the subject thereof or in case of any fraud, attempted fraud or false swearing by the **Assured** touching any matter relating to this Section or the subject thereof, whether before or after a loss, except that the acts of one **Assured** shall not void, alter, abrogate or otherwise affect this Section as to all other **Assureds** hereunder.

### A.3.D. SALVAGE AND RECOVERIES

When, in connection with any loss hereunder, any salvage or recovery is received subsequent to the payment of such loss, the loss shall be refigured on the basis on which it would have been settled had the amount of salvage or recovery been known at the time the loss was originally determined. Any amounts thus found to be due either party from the other shall be paid promptly.



Policy No. MSW-0388 SECTION A

### A.3.E. SPECIAL STATE REQUIREMENTS

Any and all provisions of this Section which are in conflict with the statutes of the state wherein this Policy is applicable are understood, declared, and acknowledged by Underwriters to be amended to conform to such statutes.

### A.3.F. SUSPENSION

Upon the discovery of a dangerous condition with respect to any **Object**, any representative of Underwriters may, notify the Director, Risk Management and Insurance, of such condition and allow a 30 day period for the condition to be addressed. In the event that the condition is not addressed, Underwriters may suspend the insurance with respect to an Accident to said Object by written notice mailed or delivered to The Williams Companies, Inc. The insurance so suspended may be reinstated by Underwriters, but only by an endorsement issued to form part of this Policy. The **Assured** shall be allowed the unearned portion of the premium paid for such suspended insurance, pro rata for the period of suspension.

### A.3.G. PAIRS AND SETS

In the event of loss or damage by the perils insured against under this Section to any article or articles which are part of a pair or set, Underwriters agree to pay the full amount of the value of such pair or a set. The **Assured** agrees to surrender the remaining article or articles of the pair or set to Underwriters. The **Assured** shall have the option of retaining the damaged article or articles and salvage credit to Underwriters shall be negotiated.

### A.3.H. VALUATION

Notwithstanding anything to the contrary contained herein, in the event of loss, the basis of adjustment and valuation shall be as follows:

a.     <u>Improvements and betterments, and personal property of the Assured</u>:
**Replacement Cost** if actually replaced or, if not so replaced, at **Actual Cash Value** at time of loss.

b.     <u>Buildings, structures, machinery and equipment</u>:
**Replacement Cost** if actually replaced; otherwise, **Actual Cash Value** at time of loss.

c.     <u>Finished Stock</u>:
the **Assured's** selling price less all discounts and non-incurred expense.

d.     <u>Raw Stock and Stock in Process</u>:
**Replacement Cost.**

e.     <u>Valuable Papers and Records, and Media</u>:
cost to reproduce , if reproduced; if not reproduced, seventy five percent (75%) of reproduction cost or **Actual Cash Value**, whichever is greater.



    f.    **River Crossings:**
Replacement Cost if actually replaced; otherwise, **Actual Cash Value** at time of loss.

    g.    **Special Provision for Gas Stored Underground:**
Gas loss insured against under this Section from any storage facility will be adjusted for the account of the **Assured** in the same proportion as the **Assured's** own product and the product the **Assured** is responsible for insuring or replacing bears to the total gas volumes in the facility just prior to any loss. Loss will first be adjusted against working gas reserves. Should total working gas be depleted by loss (including working gas not insured under this Section), then loss will be adjusted against cushion gas, provided the **Assured** has insurable interest in cushion gas.

    h.    **All Other Property:**
Replacement Cost if actually replaced; otherwise, **Actual Cash Value** at time of loss.

If the the repair, rebuild or replacement of any lost or damaged property is not commenced within two years of the date of loss, the basis of valuation will be the **Actual Cash Value.**

The insurer shall not pay the **Named Assured** more than the **Named Assured's** or owner's financial interest in the property insured. Financial interests shall include but not be limited to the **Named Assured's** contractual obligation to cover the financial interests of its partners in joint ventures but only to the extent such interests were reported to the Insurer in the application or submission made to the Insurer prior to the Insurer's agreement to provide coverage hereunder or thereafter if accepted in writing by the Insurer.



Policy No. MSW-0388 SECTION A

## A.4. <u>EXCLUSIONS</u>

### A.4.A. <u>PROPERTY EXCLUDED</u>

i.  Bills, currency, deeds, evidence of debt, money, notes, securities;

ii.  Land, growing crops, standing timber, animals, watercraft, aircraft (including any airplane, helicopter or other craft designed to fly in the air or space), automotive vehicles licensed for use on public highways except while on premises of the **Assured**;

iii.  Mines, except for equipment and property contained therein, caverns, salt domes and any property contained therein (except insured products), or wells, but this exclusion shall not apply to any ensuing business interruption or extra expense loss that may result because of loss of or damage to the insured product(s);

iv.  Dams, water shafts, power tunnels, dikes, gates and flumes, but this exclusion shall not apply to any resultant damage to covered property caused by a covered peril;

v.  Retaining walls not constituting part of a building, and property located thereon, all when such loss is caused by ice, water pressure, or collision;

vi.  Docks, piers or wharves when such loss is caused by ice or collision;

vii.  Nuclear reactor power plants including all auxiliary property on the site or any other nuclear reactor installation;

viii.  Any nuclear fuel or raw materials used in the nuclear fuel process at any point in the fuel cycle;

ix.  All electrical transmission and distribution lines, line transformers, cables, and equipment or apparatus connected therewith except those on covered property or in the open on land within 1,000 feet of declared property;

x.  Property sold by the Assured under conditional sale, trust agreement, installment plan or other deferred payment plan after delivery to customers, except when the **Assured** is required by contract to provide insurance such as is available under this Section or has the risk of loss;

xi.  Underground transmission and/or lateral pipelines, underground gathering system pipelines, fittings, drains and/or flues, except where located within the fenced area of any plant, compressor station or pumping, metering station or other property, or at **River Crossings**. This exclusion shall not apply to gas or other product within a pipeline or gathering system, or to any ensuing business interruption or extra expense loss that may result because of loss of or damage to such pipeline and/or pipeline equipment, gas or other product, nor shall this exclusion apply to fiberoptic cables, fiberoptic equipment or other related materials, or to leased pipelines;

xii.  Property not located **Onshore**;

xiii.  Property in the course of Ocean Marine Transit;



Policy No. MSW-0388 SECTION A

xiv.    Animals, livestock, standing timber or growing crops;

xv.    Land (including land on which the property is located) except for improvements or betterments,

xvi.    Aircraft, speedcraft, satellites, watercraft, any vehicle or equipment licensed for highway use or rolling stock, except for rolling stock at insured locations or on railroad sidings, and vehicles or equipment licensed for highway use while at insured locations;

xvii.    Bridges, unless specifically identified in property scheduled and declared at inception;

xviii.    Railroad beds, ties and tracks, unless they are located on the Assured's premises and are owned by, leased to, or the responsibility of the Assured;

xix.    Reservoirs, containment basins, ponds, or lakes; however, this exclusion shall not apply to equipment or machinery appurtenant to any of the forgoing;

xx.     Dikes or levees, unless specifically identified in property scheduled and declared at inception;

xxi.    Fine art, furs, jewelry, jewels, pearls, precious or semi-precious stones, gold, silver, bullion, platinum or other precious metals and precious alloys;

xxii.    Property of others hauled on vehicles owned, leased or operated by the Assured when acting as a common or contract carrier as defined by the Interstate Commerce Commission or state regulatory agencies.


**A.4.B. PERILS EXCLUDED**

i.    This Section does not insure loss or damage caused by or resulting from:

   a.    Nuclear reaction or nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, or due to any act or condition incidental to any of the foregoing, whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by any physical damage insured against by this Section. However, subject to the foregoing and all provisions of this Policy, direct loss by fire resulting from nuclear reaction or nuclear radiation or radioactive contamination is insured against by this Section;

   b.    Infidelity or dishonesty of the **Assured;**

   c.    Any shortage of property discovered upon the taking of inventory or any mysterious disappearance of property or gas in storage;

   d.    California **Earthquake Shock** unless declared and agreed by underwriters;



Policy No. MSW-0388 SECTION A

e.    Release, discharge, or dispersal of toxic or hazardous substances, contaminants or pollutants, all whether direct or indirect, proximate or remote, except as specifically provided for in the Seepage, Pollution and Contamination Exclusion attaching to this Section;

f.    Any defect or fault in material, workmanship, or design or latent defect. However, if loss or damage directly results as a consequence of the defective or faulty material, workmanship, design or latent defect excluded above, Underwriters shall be liable for said consequences, but always excluding loss or damage to faulty parts;

g.    Ordinary wear and tear, deterioration, rust, normal corrosion or erosion; gradual cracking, normal settling, shrinkage, bulging, expansion or other gradually developing defects; all unless loss by a peril otherwise insured against hereunder ensues and then Underwriters shall be liable only for such ensuing loss;

h.    Contamination (other than computer viruses, which are already excluded by the provisions of General Condition 26.); shrinkage, evaporation, loss of weight or loss of contents of containers by leakage, unless such damage results directly from other physical damage not otherwise excluded by this Section or results directly from service interruption;

i.    Extremes or changes of temperature or changes in relative humidity, all whether atmospheric or not; exposure to light; change in color or flavor or texture or finish; insects or vermin, seepage, condensation, dampness, depletion, disease, deterioration, dry rot, rot, infestation, inherent vice, mildew, mold, spoilage and decay to raw materials, stock in process or finished goods, unless such damage results directly from other physical damage not otherwise excluded by this Section or results directly from service interruption;

j.    Errors in design, poor workmanship, or use of faulty materials in the development, processing, testing or manufacture of the **Assured's** products or materials; loss attributable to manufacturing or processing operations which result in damage to stock or materials while such stock or materials are being processed, manufactured, tested, or otherwise being worked upon; all unless physical damage not otherwise excluded by this Section results, in which event, this Section shall cover only such resulting damage;

k.    Electrical breakdown of any electrical machine or electrical apparatus while said equipment is undergoing an insulation breakdown test or is being dried out; all unless physical damage not otherwise excluded by this Section results, in which event, this Section shall cover only such resulting damage;

l.    An accident or **Occurrence** to any **Object** operating with sulphur dioxide or hydrogen sulphur gas for:

       (i)    loss or damage resulting from corrosion anywhere following the said accident, and



Policy No. MSW-0388 SECTION A

      (ii)    loss or damage to any catalyst caused solely by steam or water contracting or permeating the said catalyst following the said accident or **Occurrence.**

m.    Confiscation, expropriation, nationalization, commandeering, requisition or destruction of or damage to property by order of the Government de jure or de facto or any public, municipal or local authority of the country or area in which the property is situated, seizure or destruction under quarantine or customs regulation.

n.    Functional and economic obsolescence;

o.    Damage from insects, birds, rodents or other animals;

p.    Settling, cracking, heaving, bulging, expansion or contraction of any foundation, wall, floor, ceiling, roof, structure, patio, walkway, driveway or pavement;

q.    Loss or damage covered by any warranty or guaranty provided by any contractor, vendor, supplier or manufacturer. If the interest of any such contractor, vendor, supplier or manufacturer in the property to which the warranty or guaranty applies is covered under this Policy, this exclusion shall also apply to such interest in such property;

r.    Water below the surface of the ground which presses on or flows or seeps through foundations, walls, floors, paved surfaces, basements, doors, windows or other openings.;

s.    Asbestos;

t.    Fraudulent or dishonest acts;

u.    Voluntary parting;

v.    Loss of market;

w.    Fungi, Wet or Dry Rot, or Bacteria



Policy No. MSW-0388 SECTION A

**A.4.C.** <u>SEEPAGE AND/OR POLLUTION AND/OR CONTAMINATION EXCLUSION (NMA 1999B AMENDED)</u>

Except as may be provided under item(s) A.2.C., A.2.E., and/or A.2.I. of this Section, Extensions of Coverage, this Section does not insure against loss, damage, costs or expenses in connection with any kind or description of seepage and/or pollution and/or contamination, direct or indirect, arising from any cause whatsoever.

NEVERTHELESS if fire is not excluded from this Section and a fire arises directly or indirectly from seepage and/or pollution and/or contamination then direct physical loss or damage insured under this Section arising directly from that fire shall (subject otherwise to the terms, conditions and limitations of the Policy) be covered.

However, if the insured property is the subject of direct physical loss or damage for which Underwriters have paid or agreed to pay then this Section (subject otherwise to its terms, conditions and limitations) insures against direct physical loss or damage to the property insured hereunder caused by resulting seepage and/or pollution and/or contamination.

The **Assured** shall give notice to the Underwriters of intent to claim under the immediately preceding paragraph NO LATER THAN 12 MONTHS AFTER THE DATE OF THE ORIGINAL DIRECT PHYSICAL LOSS OR DAMAGE.

<u>COST OF CLEAN UP EXTENSION</u>
Notwithstanding the provisions of the preceding exclusion in this clause, or any other provision in this Policy respecting seepage and/or pollution and/or contamination, and/or cost of clean, in the event of direct physical loss or damage to the property insured hereunder, this Policy (subject otherwise to its terms, conditions and limitations, including but not limited to any applicable deductible) also insures, within the sum insured, cost of clean up, at the premises of the **Assured,** made necessary as a result of such direct physical loss or damage.

PROVIDED that this Section does not insure against the costs of decontamination or removal of water, soil or any other substance on or under such premises other than insured property.

It is a condition precedent to recovery under this extension that Underwriters shall have paid or agreed to pay for direct physical loss or damage to the property insured hereunder unless such payment is precluded solely by the operation of any deductible or excess amount and that the **Assured** shall give notice to the Underwriters of intent to claim for cost of clean up NO LATER THAN 12 MONTHS AFTER THE DATE OF SUCH DIRECT PHYSICAL LOSS OR DAMAGE.



Policy No. MSW-0388 SECTION B

# SECTION B – TIME ELEMENT

## B.1. INSURING AGREEMENTS

### B.1.A. Losses to Assured's Property

This Section insures against loss directly resulting from the necessary interruption of the **Assured's** business caused by direct physical loss or damage insured under Section A during the term of this Policy, to real and personal property of the **Assured**, subject to the terms and conditions of this Section. This Policy is extended to cover Business Interruption incurred, as insured by this Policy, resulting from interruption of the **Assured's** operations at scheduled insured locations following direct physical loss or damage at any other scheduled or unscheduled location(s) of the Assured as covered under the property damage section of this Policy, or which would be covered except for the application of any retention/excess.

### B.1.B. Losses to Contingent Property

Subject to the Sublimit of Liability stated in the Declarations, this Section extends to also insure against loss directly resulting from the necessary interruption of the **Assured's** business caused by direct physical loss or damage to or destruction of real or personal property of third parties by the peril(s) insured against under Section A of this Policy, but only in respect of the **Assured's** direct customers and suppliers and/or as per the Contingent Business Interruption information on file with underwriters.

## B.2. BASIS OF INDEMNITY

The basis of indemnity under this coverage shall be:

### Actual Loss Sustained:

the amount of Actual Loss Sustained which occurs during the **Period of Interruption,** calculated in accordance with Clause B.7. of this Section, but not exceeding the reduction in **Gross Earnings** less cash charges and expenses which do not necessarily continue during such interruption of business.



Policy No. MSW-0388 SECTION B

## B.3. DEFINITIONS

**B.3.A. "Gross Earnings"** shall mean the sum of:

    i.     total net sales value of production (manufacturing operations);

    ii.    total net sales of **Merchandise**; and

    iii.   other earnings derived from operation of the business;

Less the cost of:

    a.     **Raw Stock** from which such production is derived;

    b.    supplies consisting of materials consumed directly in the conversion of such **Raw Stock** into **Finished Stock** or in supplying the service(s) sold by the **Assured**;

    c.    **Merchandise** sold, including packaging materials therefore; and

    d.    services purchased from outsiders (not employees of the **Assured**) for resale which do not continue under contract.

No other costs shall be deducted in determining Gross Earnings.

**B.3.B. Period of Interruption**

The **Period of Interruption** shall mean:

    i.     such length of time as  would be required with the exercise of due diligence and dispatch  to rebuild, repair or replace such described property as has been  lost or damaged or destroyed and to make such property ready  for operations under the same or equivalent physical and  operating conditions that existed prior to the **Occurrence**.  This length of time shall include delays caused by Federal and/or State law, decree, order, regulation or injunction or any similar acts.  The length of time does not include any additional time required for making changes to the buildings, equipment or contents regardless of the reason(s) for the changes, except as  provided for in the Increased Cost of Construction, Demolition and Debris Removal Clauses contained in this Section; nor any additional time required for restaffing or retraining employees nor for delay of any kind caused by labor disputes, including strikes;

    ii.    such additional time as may be required with the exercise of due diligence and dispatch to repair or replace damaged or destroyed **Valuable Papers and Records**, but not to exceed the time that would be required for transcription from originals or duplicates whether or not the originals or duplicates are available; and/or

    iii.   such additional time as may be required with the exercise of due diligence and dispatch to repair or replace damaged or destroyed media, data and programming for electronic and electromechanical data processing and production equipment, but not to exceed the time that would be required for reproduction from duplicates or from the previous generation of the data, whether or not the duplicates or previous generation are available.



Policy No. MSW-0388 SECTION B

The **Period of Interruption** shall commence on the date immediately following the date of exhaustion of the Retention/Excess Amount (waiting period) stated in Item 7. of the Declarations and shall not be limited by the expiration of this Policy, but the liability of Underwriters shall in no event exceed the maximum **Period of Interruption** stated in Item 5 of the Declarations.

**B.3.C.** **Finished Stock** is defined as stock manufactured by the **Assured** which in the ordinary course of the **Assured's** business is ready for packing, shipment or sale.

**B.3.D.** **Raw Stock** is defined as material and supplies in the state in which the **Assured** receives them for conversion into **Finished Stock.**

**B.3.E.** **Merchandise** is defined as goods kept for sale by the **Assured** which are not the product of manufacturing operations conducted by the **Assured.**

**B.3.F.** **Normal** shall mean the condition that would have existed had no loss occurred.

## B.4. CONDITIONS

### B.4.A. EXPERIENCE OF THE BUSINESS

In determining the amount payable under this coverage, due consideration shall be given to the experience of the business before the **Period of Interruption** and the probable experience thereafter had no interruption of the business occurred.

In the event the **Assured** would have experienced an operating deficit had no **Period of Interruption** occurred, the Actual Loss Sustained shall be determined by subtracting the operating deficit from the fixed charges and expenses including but not limited to payroll that necessarily continue.

### B.4.B. EXTENDING THE PERIOD OF INTERRUPTION

This Section also insures against the Actual Loss Sustained by the **Assured** resulting directly from the interruption of business, as covered by this Section, for such additional length of time as would be required with the exercise of due diligence and dispatch to restore the business to the condition which would have existed had no loss occurred, commencing with the later of the following dates:

i.      The date on which the liability of Underwriters for loss resulting from interruption of business would terminate if this extension of coverage was not provided; or

ii.     The date on which repair, replacement or rebuilding of such part of the building(s), structure(s), machinery, equipment or furniture and fixtures of the property insured under Section A as had been damaged or destroyed is actually completed,

but in no event for more than one hundred and eighty (180) consecutive calendar days from said later commencement date.



Policy No. MSW-0388 SECTION B

**B.4.C. <u>RESUMPTION OF OPERATIONS</u>**

As soon as possible after an **Occurrence,** the **Assured** with due diligence and dispatch shall resume business, in whole or in part, and make up lost business within a reasonable period of time (not to be limited to the period during which business is interrupted) through use of every available means, including surplus machinery, duplicate parts, equipment, supplies, surplus or reserve stock, owned or controlled or obtainable from other sources and through working extra time or overtime, all to the extent that the amount for which Underwriters would otherwise be liable under this Section is reduced. Underwriters may take such means as will in the opinion of Underwriters reduce or avert interruption of business or supply the functions in some other way. All extra expense so incurred by the **Assured** as permitted in this Clause or by the **Assured** at the written direction of Underwriters or by Underwriters, shall be covered hereunder and shall be part of and not in addition to the Sum Insured/ Limit of Liability stated in the Declarations.

**B.4.D. <u>CALCULATION OF INDEMNITY AND INDEMNITY LIMIT</u>**

Business interruption indemnity under this Section is to be calculated on the basis of the monthly business interruption values, which are to be calculated either by applying one twelfth per month of the annual business interruption values declared by the **Assured** at inception, or by taking the actual monthly values declared by the **Assured** at inception.

Indemnification will be calculated on an Actual Loss Sustained basis, to be capped at one hundred and fifteen percent (115%) of the monthly values. In respect of locations for which Business interruption values have not been declared, Business Interruption indemnity shall be subject to a sublimit of USD 2,000,000 per month per accident or **Occurrence.**

Business Interruption values scheduled and declared after inception by the Assured are to be agreed hereon prior to date of loss, and will be subject to an Additional Premium to be agreed at the time of such declaration by the Assured.



## B.5. EXTENSIONS OF COVERAGE

### B.5.A. EXTRA EXPENSE

Subject to the Sublimit of Liability stated in the Declarations;

I.     This Section insures against **Extra Expense** incurred by the **Assured** directly resulting from necessary interruption of the **Assured's** business caused by direct physical loss or damage insured against, during the term of this Policy, to property insured, subject to the terms and conditions of Section A of this Policy.

II.    This Section further insures against **Extra Expense** incurred by the **Assured** directly resulting from necessary interruption of the Assured's business caused by direct physical loss or damage by a peril(s) insured against, to property of third parties and/or unscheduled property of the Assured. Coverage under this paragraph II. shall not be subject to any retention/excess amount.

**"Extra Expense"** shall mean:

A.    The reasonable and necessary **Extra Expenses** incurred to temporarily continue the Assured's business to as nearly **Normal** levels as practicable; and the amount of expense which is reasonably incurred by the **Assured** or Underwriters to reduce or avert the interruption of business, but only to the extent that the total amount which otherwise would have been paid is thereby reduced.

B.    The reasonable and necessary extra costs of temporarily using property or facilities of the **Assured** or others.

In no event shall this **Extra Expense** include:

i)    loss of Throughput Income;

ii)    costs which normally would have been incurred in maintaining Throughput Income levels during the same period had no physical loss or physical damage insured against occurred; or

iii)    cost of permanent repair or replacement of property that has been lost or damaged.

This coverage does not cover:

a)    **Extra Expense** incurred as a result of damage to finished products manufactured by the **Assured** nor the time required for their reproduction;

b)    any **Extra Expense** incurred due to the suspension, cancellation or lapse of any lease, contract, license or order nor any loss due to fines or damage for breach of contract or for late or non-completion of orders or penalties of whatsoever nature, nor shall Underwriters be liable for **Extra Expense** incurred due to any other consequential or remote loss.

The **Assured** agrees to use any suitable property or service owned or controlled by the **Assured** or obtainable from other sources in reducing the **Extra Expense** incurred under this coverage.



Policy No. MSW-0388 SECTION B

**B.5.B.** <u>IMPOUNDED WATER</u>

In the event that water used as a raw material or for power or for other manufacturing purposes, stored behind dams or in reservoirs, is released from storage as the result of damage as insured against hereunder, to such dam or reservoir, or equipment connected therewith, this Section covers loss, if any, caused by lack of adequate water supply from such sources, such loss not to exceed forty five (45) consecutive days after exhaustion of the Retention/Excess Amount (waiting period) stated in Item 7. of the Declarations.

**B.5.C.** <u>SERVICE INTERRUPTION</u>

Subject to the Sublimit of Liability stated in the Declarations, this Section is extended to cover against loss resulting directly from necessary interruption of the **Assured's** business caused by lack of incoming electricity, fuel, water, gas, steam, refrigeration or telephone service, caused by a type of **Occurrence** that would otherwise be insured, to property of a type not otherwise excluded herein, owned, operated or controlled by the public utility company or any other company contracted by the **Assured** to supply said services directly to the **Assured**.

This Section also insures against a consequential business interruption loss caused by change in temperature or humidity, or interruption of power, gas, water, steam, electricity, heat, air conditioning or refrigeration resulting from physical loss or physical damage by the perils insured, to any generating plant, power house, sub-station, transformer, air conditioning or refrigeration supplier, including electrical transmission and distribution lines, connections or supply pipes away from the **Assured's** locations, which furnishes electricity, steam, gas, water or refrigeration to the **Assured's** locations.

This coverage shall not apply to the following:

a.  Any loss if the interruption of the incoming services is caused directly or indirectly by the failure of the Assured to comply with the terms and conditions of any contracts or agreements the Assured has for the receipt of such services;

b.  Any loss if the interruption of incoming services is caused directly or indirectly by or results from any deliberate act or acts by the supplying utility to shed load to maintain system integrity; or

c.  any purchase of Utility Services by the Assured with the intent of reselling or trading such Utility Services, including hedging and speculation sales of Utility Services.

**B.5.D.** <u>DEFERRED PAYMENTS FROM CUSTOMERS</u>

This Section is extended to cover business interruption loss resulting from the perils insured against, to the property excluded under property exclusion x. of Section A.



Case 4:13-cv-00571-CVE-FHM  Document 2 Filed in USDC ND/OK on 09/03/13  Page 275 of 281

**B.5.E.** **INGRESS/ EGRESS**

Subject to the Sublimit of Liability stated in the Declarations, this Section is extended to cover loss and/or Extra Expense directly resulting from the necessary interruption of the Assured's business due to prevention of ingress to or egress from an insured location (whether or not the premises or property of the Assured is damaged), provided that such prevention is a direct result of physical damage of the type insured by this Policy to the kind of property covered and not excluded by this Policy and occurring within five statute miles of the location so affected.

Such coverage shall start from the day of physical damage or loss and will apply for thirty consecutive days from the start date.  Payments under this Coverage Extension shall not be subject to the waiting period for Section B and any time period for which the Assured receives payments under this Coverage Extension shall not count towards the waiting period for Section B.

**B.5.F.** **RENTAL VALUE**

    **1.**    **INSURING AGREEMENT**

Subject to the Sublimit of Liability stated in the Declarations, this Section is extended to cover the Actual Loss Sustained by the **Assured** during the **Period of Interruption** caused by loss or damage insured, during the term of this Policy to property not otherwise excluded which is utilized by the **Assured,** subject to the terms and conditions of this Section.

    **2.**    **BASIS OF INDEMNITY**

The basis of indemnity under this coverage shall be:

    A.    **Actual Loss Sustained**

In the event the property is necessarily rendered wholly or partially untenantable, Underwriters shall be liable, subject to all other conditions of this coverage, for the Actual Loss Sustained on the following basis during the **Period of Interruption:**

    i.    the fair rental value of any portion of the property occupied by the **Assured;**

    ii.    income reasonably expected from rentals of unoccupied or unrented portions of such property; and

    iii.    the rental income from the rented portions of such property according to bona fide leases, contracts or agreements in force at the time of loss,

but not including non-continuing charges and expenses.

The **Assured** agrees to use any suitable property or service owned or controlled by the **Assured** or obtainable from other sources in reducing loss under this coverage.



C:\Documents and Settings\besta\Local Settings\Temporary Internet Files\OLK40\Primary $50mm Onshore Policy (2).doc

In determining the indemnity payable under this coverage, due considerations shall be given to rental conditions before the loss and what reasonably could have been expected had no loss occurred.

B. **Expenses**

Expenses necessarily incurred in reducing loss under this coverage are covered for an amount not exceeding that by which the loss is reduced.

3. **EXCLUSIONS**

This coverage does not cover:

A. loss of rental income with respect to any period during which the insured property would not have been tenantable for any reason other than physical damage of the type insured against by Section A;

B. any increase of loss due to strike(s) or due to the suspension, cancellation or lapse of any lease, contract, license or order nor any loss due to fines or damage for breach of contract or penalties of whatever nature.

4. **PERIOD OF INTERRUPTION**

The **Period of Interruption** shall mean such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such described property as has been lost or damaged or destroyed and to make such property ready for operations under the same or equivalent physical and operating conditions that existed prior to the **Occurrence**. This length of time shall include delays caused by Federal and/or State law, decree, order, regulation or injunction or any similar acts. The length of time does not include any additional time required for making changes to the buildings, equipment or contents regardless of the reason(s) for the changes, except as provided for in the Increased Cost of Construction, Demolition and Debris Removal Clauses contained in this Section; nor any additional time required for restaffing or retraining employees nor for delay of any kind caused by labor disputes, including strikes;

The **Period of Interruption** shall commence on the date immediately following the date of exhaustion of the Excess amount (waiting period) detailed at Item 7. of the Declarations and shall not be limited by the expiration of this Policy but the liability of Underwriters shall in no event exceed the maximum **Period of Interruption** stated at Item 5 of the Declarations.



Policy No. MSW-0388 SECTION B

**B.5.G.** <u>LEASEHOLD INTEREST</u>

This Section is extended to cover **Leasehold Interest** of the **Assured** as lessee of premises.

i.    The term **"Leasehold Interest"** is hereby defined as the excess rental amount between the existing lease at time of loss and/or damage and the actual rental payable, including any maintenance or operating charges to be paid by the **Assured** at newly leased premises during the unexpired term of the **Assured's** lease, whether the premises be occupied in whole or in part, or whether they be sublet to others.

ii.    Underwriters shall not be liable for any loss to the interest of the **Assured** as lessee by reason of the **Assured** exercising an option to cancel the lease (except as may be reasonably necessary as a result of destruction of and/or damage to the leased premises), or by suspension, lapse or cancellation of any license.

**B.5.H.** <u>ACCOUNTS RECEIVABLE</u>

Subject to the Sublimit of Liability stated in the Declarations, this Section is extended to cover any shortage in collection of accounts receivable, resulting from direct physical loss or damage insured to accounts receivable records, subject to the following conditions:

i.    In the event of loss hereunder the **Assured** shall use all reasonable diligence and dispatch, including legal action if necessary, to effect collection of outstanding accounts receivable, the records for which have been destroyed, and the extra cost, if any, incurred thereby shall constitute a claim to the extent that it reduces the loss hereunder. Underwriters shall also be liable for interest charges on any loan to offset impaired collections pending repayment of such sum uncollectible as the result of such loss or damage.

ii.    Unearned interest and service charges on deferred payment accounts and normal credit losses on bad debts shall be deducted in determining the recovery hereunder.

iii.    The settlement of any loss hereunder shall be made within ninety (90) days from the date of such loss or damage, and all amounts recovered by the **Assured** on accounts receivable outstanding at the time of such loss or damage shall belong and be paid to Underwriters by the **Assured** up to a total not exceeding the amount of loss paid hereunder, but all recoveries in excess of that amount shall belong to the **Assured.**

iv.    In the event it is possible to reconstruct the **Assured's** accounts receivable records after they have been lost or damaged, so that no shortage in collection of accounts receivable is sustained, Underwriters shall be liable only for the cost of material and time required, with the exercise of due diligence and dispatch, to re-establish and/or reconstruct such accounts receivable records, but only so far as these are not covered by any other form of insurance.

v.    This coverage does not apply to loss due to book keeping, accounting or billing errors or omissions, or errors or omissions in machine programming or instruction to machines, or computer error or malfunction.



Policy No. MSW-0388 SECTION B

vi.    This coverage does not apply to loss due to alteration, falsification, manipulation, concealment, destruction or disposal of accounts receivable records committed to conceal the wrongful giving, taking, obtaining or withholding of money, securities or other property, but only to the extent of such wrongful giving, taking, obtaining or withholding.

vii.    The **Assured** agrees to use any suitable property or service owned or controlled by the **Assured** or obtainable from other sources in reducing the loss under this coverage.

## B.6. EXCLUSIONS

Underwriters shall not be liable for any Actual Loss Sustained:

A.    for any time during which business would not or could not have been conducted had direct physical loss or damage to the property as insured against under Section A not occurred;

B.    resulting from damage to finished products manufactured by the **Assured** nor for the time required for their reproduction;

C.    resulting from loss or damage for breach of contract or for late or non-completion of orders;

D.    resulting from breach of contract, penalties, late or non-completion of orders, or suspension, lapse, or cancellation of any contract, permit, lease, or license

E.    for Professional Fees resulting from direct physical loss or damage to property in the course of construction;

F.    resulting from direct physical loss or damage to property not located **Onshore**.

G.    resulting from the loss of incoming Utility Services; or

H.    resulting from loss of Business Interruption or Extra Expense of a trader, reseller or wholesaler of electricity, gas, telephone services or any other commodity or service.

I.    resulting from non-availability of funds for the repair or replacement of lost or damaged property;

J.    resulting from import, export or customs restrictions or regulations

K.    resulting from failure of any Assured to obtain, maintain or extend any contract, permit, lease, license

L.    resulting from failure of any Assured to use reasonable diligence in restoring the damaged property to the condition existing immediately prior to loss or damage;



Policy No. MSW-0388 SECTION B

M.   resulting from interference at an insured location caused by boycott, strikers or other persons involved with building, repairing, replacing, manufacturing or supplying the property insured or services thereof;

N.   resulting from loss occasioned by the failure or inability to collect amounts due from customers for work performed or services provided

Policy No. MSW-0388 ENDORSEMENT #1

## SERVICE OF SUIT ENDORSEMENT

As respects Associated Electric & Gas Insurance Services Ltd. participation only, it is understood and agreed that General Conditions Item B.11. of this Policy is hereby amended as follows:

### B.11. SERVICE OF SUIT

Service of process in any suit instituted against the Insurer(s) under this Policy may be made upon Dewey & LeBoeuf L.L.P., 1301 Avenue of the Americas, New York, New York 10019. The Insurer(s) will abide by the final decision of the court in such suit or of any appellate court in the event of any appeal. Dewey & LeBouef L.L.P. are authorized and directed to accept service of process on behalf of the Insurer(s) in any such suit and, upon the **Assured's** request, to give a written undertaking to the **Assured** that they will enter a general appearance upon the Insurer's behalf in the event such suit is instituted. Nothing in this clause constitutes or should be understood to constitute a waiver of the Insurer's right to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek to transfer a case to another court as permitted by the laws of the United States or of any state in the United States.

Further, pursuant to any statute of any state, territory or district of the United States of America or province of Canada, which makes provision therefore, we hereby designate the Superintendent, Commissioner or Director of Insurance or other office specified for that purpose in the statute, or his successor or successors in office, as our true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by you or on your behalf or any beneficiary hereunder arising out of this contract of insurance, and we hereby designate the above named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

All other terms and conditions of this Policy remain unchanged.

1 of 1

Policy No. MSW-0388 ENDORSEMENT #2

## MEMBERSHIP AND VOTING RIGHTS ENDORSEMENT

As respects Associated Electric & Gas Insurance Services Ltd. participation only, it is understood and agreed this Policy is amended as follows:

This Policy does not entitle the Assured to be a member in the Insurer.

This Policy does not entitle the Assured to a vote on any matter submitted to the members of the Insurer.

1 of 1